## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KING DOWNING, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MASSACHUSETTS PORT AUTHORITY, THE ) | Civil Action No. 04-12513-RBC |
| MASSACHUSETTS DEPARTMENT OF STATE ) | |
| POLICE, STATE POLICE TROOPER ) | |
| THOMPSON, STATE POLICE SERGEANT ) | |
| CROXTON, THOMAS G. ROBBINS, and ) | |
| PETER J. DIDOMENICA, ) | |
| ) | |
| Defendants. ) | |
| ) | |

### DEFENDANT MASSACHUSETTS PORT AUTHORITY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff King Downing alleges that on October 16, 2003, he was the victim of an unlawful search and seizure at Logan Airport pursuant to a behavioral assessment program implemented by the Massachusetts State Police and the Massachusetts Port Authority. According to Downing, the behavioral assessment screening system (the "B.A.S.S. program") "directs or authorizes State Police troopers to stop, question and/or arrest certain individuals at Logan despite the absence of reasonable suspicion[,] . . . authorizes State Police officers to deny access to Logan to any person who refuses to cooperate with police requests for identification or other information[,] and . . . effectively condones and encourages racial and ethnic profiling." Compl. ¶ 13. Contrary to Downing's claims, neither racial profiling nor any Fourth Amendment violation occurred in this case. Despite extensive discovery through document requests and multiple depositions, Downing is unable to present any evidence that the B.A.S.S. program was ever employed by the officers in this case or that the program in any way promotes racial

profiling – omissions fatal to his claims. Absent proof that his encounters with State Police were the result of training supervised and provided by Massport to the officers, there is no basis for any liability against Massport, and summary judgment must be entered in its favor on all counts.[1]

Even assuming Downing can somehow overcome the threshold inquiries of whether the B.A.S.S. program played a role in this case or utilizes racial profiling – which he cannot – no Fourth Amendment violation occurred as the two "stops" he challenges were permissible as a matter of law. Neither Downing's first nor second encounter with police constituted a seizure, and, accordingly, the Fourth Amendment was not triggered. Even assuming his encounters rose to the level of a seizure – which they did not – they were nonetheless permissible under the Fourth Amendment given the government's interest in airport security and the heightened awareness following the events of September 11, 2001.

This is a case in search of facts to support its claims. As Massport demonstrates below, it does not matter which set of "facts" are considered, from the uncontroverted credible sworn testimony of the depositions[2] to the unsupported bare allegations of the Complaint (and various alternative iterations in between) there is, as a matter of law, no sustainable legal claim for racial profiling or any constitutional violation. Defendants, therefore, are entitled to summary judgment as a matter of law.

## FACTS

On October 16, 2003, Downing – who is African-American and serves as the National Coordinator of the American Civil Liberties Union's Campaign Against Racial Profiling –

---

[1] The B.A.S.S. program is sometimes referred to as the P.A.S.S. program – Passenger Assessment and Screening System – throughout the depositions in this case.

[2] These are the "undisputed facts" relied upon as a basis for this Motion. It is all the more compelling, however, that when these "facts" are manipulated, or assumptions varied, the relevant law supports no colorable claim of a constitutional or statutory violation of law or any basis for a declaratory judgment.

arrived at Logan Airport on a red-eye flight from the West Coast.  Compl. ¶¶ 14-15.  He alleges

that after deplaning, he was stopped twice by Massachusetts State Trooper William Thompson.

The First Encounter

Allegations by Downing:  Downing alleges that his first encounter with Trooper

Thompson occurred after he left the secure gate area and stopped to make a call from a payphone

in the upper level of the terminal, near the exit.  *Id*. at ¶ 16.  According to Downing, when he

completed his call, Trooper Thompson demanded that he produce identification, which he

refused to do.  *Id*. at ¶ 17.  According to Downing, Trooper Thompson told him that if he was not

going to produce identification, "he would have to leave the airport."  *Id*.  Plaintiff Downing then

agreed to leave.  *Id*.  As described in the Complaint, he "left the airport terminal on the upper

level and attempted to locate a taxi."  *Id*. at ¶ 19.  According to Downing, his encounter with

police was prompted by the B.A.S.S. program, which allegedly promotes racial profiling.  *See id*.

at ¶¶ 24-25.

Undisputed Facts:  Contrary to Downing's allegations, the undisputed facts gleaned

through discovery demonstrate that the initial interaction between Downing and Trooper

Thompson had nothing to do with race and everything to do with Downing's own behavior.  The

following facts are undisputed.  Downing is a lawyer.  Downing Dep. 6:4-5, Sept. 18, 2006,

hereinafter Ex. A. [3]  In his work at the ACLU, he is charged with, among other things, raising

"awareness about the existence of racial profiling through public education, media outreach,

know-your-rights training, [and] public service announcements."  *Id*. at 10:13-11:7.  He had

flown to Boston to attend a meeting related to a racial-profiling working group that was

---

[3] All Exhibits cited in this Memorandum reference the Exhibits attached to the Tenn Affidavit In
Support Of Defendant Massachusetts Port Authority's Motion For Summary Judgment.  *See* L.R.
56.1.

scheduled to begin at 10:00 a.m. that day in Roxbury.  *Id*. at 13:4-7, 14:9-21, 44:6-9.  After

deplaning, he used the payphone located outside of the secure area of Terminal B.  Compl. ¶ 16;

Ex. A at 18:3-22.  Trooper Thompson is African-American – a fact absent from Downing's

Complaint.  Ex. A at 28:20-22; *cf*. Compl. ¶¶ 10-26.  Prior to his interaction with Downing,

Trooper Thompson was standing a few feet from where Downing was using the payphone,

observing the security checkpoint.  *See* Thompson Dep. 50:7-8, 51:13-16, June 22, 2006,

hereinafter Ex. B; Ex. A at 19:16-20:14.

 Before any words were exchanged between the two men, Downing started looking at

Trooper Thompson.  *See* Ex. A at 112:10-21.  Downing testified that Trooper Thompson asked

Downing, "Is there a problem?"  *Id*.  Downing replied by telling Trooper Thompson:  "I just

want to know why you're standing here so close to me while I'm talking on the phone."  *Id*. at

22:19-21; *see* Ex. B at 50:5-6, 10-11, 51:20-22.[4]  Downing refused to provide any information to

Trooper Thompson concerning who he was or why he was at the airport, saying:  "Why do I

have to show you ID?," and "I'm not showing you my ID," Ex. A at 23:14-16; *see* Ex. B at

52:15-19, 53:4-8, 55:2-19.  As a result, Trooper Thompson considered Downing to be

condescending, confrontational, and even irate.  *See* Ex. B at 52:9-53:8, 66:16-23, 93:13-21.  At

some point during their exchange, Trooper Thompson told Downing that if he would not provide

information, he would have to leave the airport, Compl. ¶ 17; Ex. A at 25:3-13, 117:8-13; Ex. B

at 54:23-55:23, which Downing did, Compl. ¶ 19; Ex. A at 23:20-24, 25:8-18, 117:14-16; Ex. B

at 56:11-14.  He freely walked out of the doors on the upper level of the terminal and attempted

---

[4] Whether Downing spoke first to Trooper Thompson or vice versa is a disputed fact, but an
immaterial one, since the encounter promptly became argumentative and Downing refused to
produce his identification.

to hail a cab, walking up and down the sidewalk.  Compl. ¶¶ 17, 19; Ex. A at 25:19-26:3, 117:14-

16.  Cabs, however, do not take fares from the upper level of the terminal.  Ex. A at 117:17-19.

<u>The Second Encounter</u>

<u>Allegations by Downing</u>:  Downing further alleges in his Complaint that his second

interaction with police occurred when Trooper Thompson followed Downing out of the terminal

where Plaintiff was attempting to hail a cab and again demanded his identification, informing

Downing that if he did not produce it, he would be "going downtown."  Compl. ¶ 19.  When

Downing asked if he was under arrest, Trooper Thompson allegedly told him he was under arrest

and not free to leave.  *Id*.  After Downing again refused to provide any identification, Trooper

Thompson radioed for back-up and additional officers, including Trooper Croxton, arrived.  *Id*.

at ¶¶ 19, 21.  Downing subsequently produced his driver's license, which was checked and

returned to him.  *Id*. at ¶ 22.  According to Downing, Trooper Croxton then asked him to provide

his airline ticket for inspection.  *Id*.  It is further alleged that Trooper Croxton told him that if he

did not produce it, he would be placed on Logan's trespass list.  *Id*.[5]  Downing subsequently

produced his itinerary, which was checked and returned to him.  *Id*.  He then left the airport.  *Id*.

<u>Undisputed Facts</u>:  Although Downing alleges that his second encounter with police was

prompted by the B.A.S.S. program, which allegedly utilizes race-based factors to justify stops,

*see id*. at ¶¶ 24-25, Downing admitted during his deposition that he does not know whether the

B.A.S.S. program played any role in his interaction with police, let alone whether the program

utilizes race-based factors or condones racial profiling, Ex. A at 100:7-102:13.  When asked

---

[5] During his deposition, Downing clarified allegations made in his Complaint, testifying that it
was Sergeant Kiley, not Trooper Croxton, who asked for and ultimately received his license.  *See*
Ex. A at 29:24-30:4.  Downing further testified that he was also asked to produce travel
documentation, which he did, although he could not recall which officer made the request.  *See*
*id*. at 35:7-23, 37:14-38:5.

during his deposition whether it was fair to say that he did not know whether the B.A.S.S. program was employed during his stop at Logan, Downing replied, "No, I don't know. . . . No, I do not know that it was or I do not know that it wasn't." *Id*. at 100:21-101:4.  When asked whether he believed the B.A.S.S. program condones racial profiling, he further testified, "I don't have any belief either way." *Id*. at 101:5-8.  Separate from the B.A.S.S. program, Downing does not even know whether race played any role in his encounter with police.  *See id*. at 139:22-140:10.  When asked whether Trooper Thompson asked him for his identification based solely upon his race and ethnicity, Downing testified, "No.  I don't know what the basis was." *Id*. at 139:22-140:4.  Moreover, three of the four officers who responded to Trooper Thompson's call, including Trooper Croxton, are African-American; only Sergeant Kiley is white.  *See id*. at 28:16-29:2.

Furthermore, during the second encounter, Downing was asked for his license by Sergeant Kiley.  *Id*. at 29:24-30:4; Kiley Dep. 21:5-10, July 18, 2006, hereinafter Ex. C.  Once Downing produced his license, Trooper Thompson had it checked against the trespass list and then returned it to Downing.  Ex. A at 31:11-23; Ex. B at 72:2-18, 82:19-83:18.  One of the officers also asked Downing for his plane ticket.  Ex. A at 35:14-17.  Downing initially refused to comply, stating, "You asked me to show identification.  I've shown identification.  Now you're asking for my tickets.  I'm not going to show you my tickets." *Id*. at. 35:7-23.  Downing, however, eventually produced his ticket, which was reviewed and then returned to him.  *Id*. at 37:15-38:2, 16-18, 41:11-21.  He then left the area, went to the lower level of the terminal, and took a taxi to his meeting.  *See id*. at 42:1-16.  Downing produced his license and eventually produced his travel documents because he was concerned about missing his morning meeting.  *Id*. at 29:24-30:4, 30:8-31:1, 34:8-10, 37:15-38:2, 16-18, 43:7-10.

At no time prior to his departure from the airport was Downing arrested.  He was never physically restrained, never handcuffed, or ever placed in a police cruiser.  *Id*. at 93:20-94:1, 5-7, 126:4-6.  His entire interaction with police occurred in and around the public spaces at Logan Airport.  Compl. ¶¶ 16-19, 21-22.  He was never instructed to relocate to a private area of the terminal.  Ex. A at 94:8-14.

## PROCEDURAL HISTORY

On November 10, 2004, Plaintiff Downing filed his Complaint in the Massachusetts Superior Court against the Massachusetts Port Authority ("Massport"), the Massachusetts Department of State Police ("State Police"), Trooper Thompson, Trooper Croxton, Thomas G. Robbins, and Peter J. DiDomenica.  The Complaint asserts claims under Mass. Gen. Law. C. 12 § 11I and 42 U.S.C. § 1983 for alleged violations of Articles 1 and 14 of the Massachusetts Declaration of Rights, as well as the Fourth and Fourteenth Amendments of the United States Constitution.  Downing seeks, among other things, an award of monetary damages against Massport and the individual Defendants.  Compl. ¶ a.  He also seeks declaratory relief, including a finding that the B.A.S.S. program is unconstitutional under the Massachusetts Declaration of Rights and the United States Constitution.  *Id*. at b.  On November 30, 2004, Massport filed a Notice Of Removal to the United States District Court for the District of Massachusetts, where the case was originally assigned to Judge George A. O'Toole, Jr.  On or about July 1, 2005, the parties consented to the assignment of the matter to Judge Robert B. Collins.

## STANDARD

Pursuant to Fed. R. Civ. P. 56(c) ("Rule 56(c)"), summary judgment should be granted when "no genuine issue as to any material fact" exists for resolution at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those that "have the potential to affect the

outcome of the suit." *MacGlashing v. Dunlap Equip. Co., Inc.*, 89 F.3d 932, 936 (1st Cir. 1996).

Disputes as to the existence of material facts are genuine if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Id.* (quotations omitted).  In the

instant case, summary judgment should be granted for Massport because no genuine issues of

material fact exist, and it is entitled to judgment as a matter of law on alternative grounds.

## ARGUMENT

### I.    THERE IS NO EVIDENCE THAT THE OFFICERS' INTERACTIONS WITH DOWNING WERE CONDUCTED PURSUANT TO THE B.A.S.S. PROGRAM

At the heart of Downing's Complaint is the claim that his civil rights were violated when

he was subjected to an impermissible search and seizure pursuant to a policy and practice of

Massport and the State Police directing law enforcement officials at Logan Airport to question

and remove individuals who meet particular "'behavioral' profiles" – a policy Downing alleges

"condones and encourages racial and ethnic profiling."  Compl. ¶¶ 1, 13.  Here, however, there is

no evidence that the B.A.S.S. program served as the basis for Downing's interaction with police.

Nor is there any evidence that the B.A.S.S. program in any way utilizes or condones racial

profiling.  As the United States Supreme Court has long-held when resolving summary judgment

motions, "the burden on the moving party may be discharged by 'showing' - that is, pointing out

to the district court - that there is an absence of evidence to support the nonmoving party's case."

*See Celotex Corp.*, 477 U.S. at 325.  Having failed to make a showing sufficient to establish the

existence of an element essential to his case, Rule 56(c) mandates the entry of summary

judgment against Downing.  *See id.* at 322.

Trooper Thompson – the officer primarily involved in the encounters with Downing –

testified during his deposition that neither the B.A.S.S. program nor Downing's race played any

role in their interaction.  *See* Ex. B at 94:2-4.  He further testified that he has never applied the

B.A.S.S. program in his work at Logan Airport.  *See id.* at 40:1-24, 41:19-42:10.  Deposition testimony provided by some of the other officers who responded to Trooper Thompson's call for back-up only reinforces the fact that the B.A.S.S. program played no role in the interaction between Downing and the police.  *See* Croxton Dep. 48:3-5; 53:7-15, June 23, 2006, hereinafter Ex. D (testifying that his interaction with Downing had nothing to do with either the B.A.S.S. program or Downing's race; he was merely responding to Trooper Thompson's call); Moore Dep. 66:3-6, July 19, 2006, hereinafter Ex. E (testifying that he did not employ the B.A.S.S. program during the interaction with Downing); *see also* DiDomenica Dep. 49:2-12, Jan. 4, 2007, hereinafter Ex. F (testifying that while officers were "encouraged" to use the B.A.S.S. program as one law enforcement tool, it was not mandatory).  Furthermore, Peter DiDomenica, the officer who provided the training for the B.A.S.S. program, testified that race cannot be the basis for a stop when applying the B.A.S.S. program.  *See* Ex. F at 39:16-23.

Moreover, it is undisputed that Downing does not know whether, and cannot show that, his interaction with police was in anyway prompted by or resulted from the application of the B.A.S.S. program.  Nor does Downing know whether the B.A.S.S. program in anyway promotes racial profiling.  The following exchange from his deposition reveals this evidentiary void.

> Q.     And is it fair to say that you do not know if such a [B.A.S.S.] program was employed at your stop at Logan Airport on October 16?
>
> A.     No, I don't know.
>
> Q.     You do not know that, okay.  I'm asking you do you know that it was employed?
>
> A.     No, I do not know that it was or I do not know that it wasn't.
>
> Q.     Do you have any belief or any basis for believing that this program would condone in any way racial or ethnic profiling?

A.     I don't have any belief either way.

Q.     You do know that you stated that in your Complaint, though, that it effectively, and I'm quoting from page 4, "Effectively condones and encourages racial and ethnic profiling."  And it is referring to, "[the B.A.S.S. program] training provided by Massachusetts State Police, Robbins, and Didomenica."

A.     Well, if this incident is an example of that, then it would.

***

Q.     . . . .You don't know if you were stopped based on the [B.A.S.S. program]; is that correct?

A.     Right.

Q.     An you don't know for a fact whether or not this [B.A.S.S. program] effectively condones racial and ethnic profiling?

A.     No.

Ex. A at 100:21-101:18, 102:6-13.  It is further undisputed that Downing does not know whether race generally played any role in his encounter with police.  His deposition testimony again reflects the absence of this relevant evidence.

Q.     And that's your claim here is that Officer Thompson requested that you produce identification based solely upon racial or ethnic profiling?

A.     No.

Q.     No?

A.     No.  I don't know what the basis was.  I'm not able to get into his mind as to what was going through his mind at the time that he did it. . . .

*Id*. at 139:22-140:7.

Any unsubstantiated allegation that the officers were motivated to use the B.A.S.S. program is insufficient to deny summary judgment.  "Summary judgment is not automatically preclude[d] even in cases where elusive concepts such as motive or intent are at issue.  [I]f the

non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation, summary judgment may be appropriate even where intent is an issue." *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997) (quotations and citations omitted).

In fact, contrary to Downing's bald assertions, the B.A.S.S. program was constructed to conform to constitutional safeguards. The program was developed by a security consulting firm and evolved from techniques employed at Ben Gurion Airport in Israel. Ex. F at 21:18-22:20. Prior to adopting it, Sergeant DiDominica – an attorney – reviewed the program and identified tactics that could not be legally employed in the United States. *See id.* at 22:13-24, 25:9-27:11. According to DiDomenica, race cannot be the basis for a stop under the program. *Id.* at 39:16-23. The B.A.S.S. program was not a law enforcement technique, but rather a threat-mitigation strategy designed to improve airport safety. *See id.* at 35:19-37:12.

Absent evidence that the B.A.S.S. program was utilized in this case, Downing can maintain no claim for liability against Massport. Because Downing has not produced, and cannot produce, any evidence linking the conduct of the officers to the B.A.S.S. program or evidence further linking the B.A.S.S. program to racial profiling, Massport is entitled to summary judgment on all counts. At best, Plaintiff's Complaint seeks an advisory opinion concerning whether the hypothetical application of the B.A.S.S. program would be constitutionally permissible – relief not appropriate here where there exists no evidence that the B.A.S.S. training was ever used in the encounters. *See, e.g.*, *United States v. Green*, 407 F.3d 434, 444 (1st Cir. 2005) (noting that courts are forbidden from issuing advisory opinions or answering hypothetical questions). In fact, Downing cannot maintain a claim for liability against *any* Defendant – not just Massport – because, as demonstrated below, the actions of the officers in this case were constitutionally permissible.

## II.    THE OFFICERS' INTERACTION WITH DOWNING WAS PERMISSIBLE AS A MATTER OF LAW

Downing alleges that his interaction with the officers constituted an unconstitutional seizure and that the officers' subsequent requests for his identification and plane ticket constituted an unconstitutional search, both in violation of the Fourth Amendment. *See* Compl. ¶ 23. As a matter of law, however, Plaintiff is incorrect; the interaction between him and the police was constitutionally permissible.

The Fourth Amendment affords citizens "[t]he right . . . to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As the Amendment expressly states, it proscribes only *unreasonable* searches and seizures. Fourth-Amendment analysis therefore requires that two separate questions be answered: 1) Did a seizure occur and 2) If so, was it reasonable? *See United States v. Viegas*, 639 F.2d 42, 44 (1st Cir. 1981) (holding that the court need not determine whether defendant was seized by police in airport, because even assuming so, seizure was reasonable given, among other things, defendant's evasive actions). Here, the answers to these questions demonstrate that the "stops" Downing challenges were constitutional.

### A.    DOWNING WAS NEVER UNLAWFULLY DETAINED

#### 1.    In the first interaction between Downing and Trooper Thompson, there was no seizure

Downing's initial encounter with Trooper Thompson, which began when Downing was using a public payphone, constituted a consensual interaction between a police officer and a member of the public. The Supreme Court has long-held that "not all personal intercourse between policemen and citizens involves 'seizures' of person. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we

conclude that a 'seizure' has occurred" – a principle so fundamental that it was first articulated in a footnote. *See Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968). The relevant inquiry is whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion) (stating that no seizure occurred when DEA agents approached respondent in public concourse of airport, requested identification and airline ticket, and put a few questions to her). Assuming the initial interaction between Downing and Trooper Thompson began as Downing alleges with an unprovoked request for identification, an officer's requests for identification does not amount to a seizure. As the Supreme Court has explicitly stated, "[a]sking questions is an essential part of police investigations. In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment. Interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humbolt County*, 542 U.S. 177, 185 (2004) (holding that officer who arrested suspect for violation of Nevada's stop-and-identify statute did not contravene Fourth Amendment as officer's request for identification was related to the stop) (brackets and quotations omitted); *see Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984) (per curiam) (holding that when police officers approached a man in the airport and asked him to talk, "[t]he initial contact . . . was clearly the sort of consensual encounter that implicates no Fourth Amendment interest" and any subsequent seizure was reasonable); *United States v. Smith*, 423 F.3d 25, 30 (1st Cir. 2005) (holding that defendant was not seized when police, among other things, approached him in public and asked him for identification using an aggressive and sarcastic tone of voice). Downing himself, a lawyer, acknowledges that airport

personnel "can always ask" for a traveler's identification, even outside of the secure area of the airport. *See* Ex. A at 53:23-54:3.

More importantly, Downing remained free to leave and to terminate his encounter with Trooper Thompson at all times while he was inside the concourse. There is no better rebuttal to Downing's claim that he was seized than his own experience in the airport on October 16. It is undisputed that Trooper Thompson explicitly told Downing that if he did not produce his identification, "he would have to leave the airport," which Downing in fact did – undoubtedly the antithesis of not being free to leave. Compl. ¶ 17; *see* Ex. A at 25:8-18. Even more telling, Downing testified during his deposition that after refusing to provide identification, he "hung up the phone, and . . . started walking away," Ex. A at 23:23-24, in an effort to "terminate the conversation with the trooper," *id.* at 24:22-23. "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon the person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Mendenhall*, 446 U.S. at 554; *see Gilmore v. Gonzalez*, 435 F.3d 1125, 1138 (9th Cir. 2006), *cert. denied*, 127 S. Ct. 929 (2007) (holding that airline personnel's request for passenger identification is not a seizure and noting that passenger's own experience in leaving airports rather than providing identification provides the best rebuttal to his claim that he was seized). Thus, as a matter of law, because Downing remained free to leave throughout his interaction with Trooper Thompson, he was not seized.

> ## 2. The second interaction between Downing and the troopers was likewise constitutionally permissible and did not involve an unlawful seizure

Like the first encounter inside the airport, Downing's subsequent interaction with Trooper Thompson and the other officers outside the terminal did not constitute a "seizure." During the

second encounter, Downing's identification was again requested.[6]  As previously discussed, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen. . . ."  *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion) (holding that it was "no doubt permissible" for officers to approach traveler in an airport and ask for and examine his license and ticket and further holding that the consensual aspects of the inquiry only evaporated when officers, among other things, withheld traveler's identification and ticket, retrieved his luggage from the airline, and led him to an interrogation room to confirm suspicions and search his luggage); *United States v. Rodriguez*, 69 F.3d 136, 141-42 (7th Cir. 1995) ("Our cases have made it clear that police do not violate the Fourth Amendment merely by approaching a person in an airport and asking routine questions, including those relating to identification, airline ticket information, and the nature and length of recent air travel."); *see Gilmore*, 435 F.3d at1138 (holding that airline personnel's request for passenger identification is not a seizure); *see also* Part II.A.1, *supra*.  Nor does the fact that Downing eventually responded to the officers convert this encounter into a seizure.  *See INS v. Delgado*, 466 U.S. 210, 216 (1984) ("[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation.  While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.").  As a matter of law, then, no seizure occurred during Downing's second encounter with police.

---

[6] As demonstrated above, Trooper Thompson's initial interaction with Downing did not rise to the level of a seizure – a mandatory conclusion as a matter of law.  *See* Part II.A.1, *supra*. During the course of their subsequent interaction on the sidewalk, the consensual nature of that encounter did not, as a matter of law, morph into a seizure.

The only suggestion of a seizure that Downing has alleged in this case is Trooper Thompson's alleged affirmative response when Downing asked whether he was under arrest and the trooper's alleged threat that Downing would be "going downtown" absent compliance.  These statements, while disputed facts, are not material.  First and foremost, if the testimony is to be believed, the statement of Trooper Thompson was no more than a conditional threat of arrest, not arrest.  Moreover, Trooper Thompson denies that he made the statements.[7]  *See* Ex. B at 95:7-9. Even more importantly, none of the traditional indicia of arrest were present in this case, and Downing remained free to leave at all times.  He was not physically restrained by the officers in any way; neither Trooper Thompson nor any of the other officers ever touched Downing or ever pointed a weapon at him.  Ex. A at 93:20-94:4; *see, e.g.*, *United States v. Regan*, 687 F.2d 531, 535 (1st Cir. 1982) (holding that defendant was not "seized" when DEA agents approached him in airport because, among other things, agents never displayed weapons, never blocked his path, never touched him, and never physically restrained him).  Moreover, Downing was never handcuffed, never placed in a cruiser, nor ever asked to relocate to a different area of the airport. *See* Ex. A at 125:19-126:6, 94:5-14.  There was no basis for Downing to believe that he was under arrest or that he reasonably believed that he would be arrested.

Even more revealing, Downing's deposition testimony demonstrates that he did not believe he was *not* free to leave.  Specifically, he eventually handed over his license because he did not want to miss the meeting he had flown to Boston to attend – hardly the actions of someone who believed he was not free to leave.  *See* Ex. A at 29:24-30:9, 30:20-31:1, 43:7-10 ("I ended my portion of the issue by showing the ID at a time when I felt that I might have had

---

[7] It is not a credible assertion that Trooper Thompson stated that Downing would be "going downtown" because, for airport-related detentions, the facilities of Troop F in East Boston are customarily used.

approximately an hour left to get to my meeting.").  In fact, after producing his license, Downing

was "gathering up [his] things to go."  *Id.* at 35:11-12.  He also produced his travel documents,

concerned about the timing of his meeting.  *See id.* at 37:15-21.  It is further undisputed that after

producing his license and ticket, Downing left the area, went to the lower level of the airport, and

took a cab away from Logan Airport to attend his meeting.  *See id.* at 41:24-42:16, 126:7-16,

44:6-7.  Contrary to the alleged statement of Trooper Thompson, Downing was not under arrest,

nor do his actions suggest that he believed he was not free to leave.[8]

Because Downing's interaction with police never constituted a "seizure" and, thus, never

triggered Fourth Amendment concerns, Massport is entitled to summary judgment on all counts.[9]

**B.    ASSUMING DOWNING WAS "SEIZED," THE SEIZURE WAS
        REASONABLE GIVEN THE GOVERNMENT'S COMPELLING
        INTEREST IN AIRPORT SECURITY IN THE WAKE OF SEPTEMBER
        11, 2001**

If the encounters in this case constituted a seizure, they were nonetheless constitutionally

permissible given the government's interest in airport safety and security following September

11th.  As noted above, the touchstone of constitutionality under the Fourth Amendment is

"reasonableness."  *Vernonia School District v. Acton*, 515 U.S. 646, 652 (1995) (upholding

suspicionless search of student-athletes by urinalysis testing given government's interest in

---

[8] As a lawyer and executive member of the ACLU, Downing was better positioned than the
average person to know he had the right to refuse to interact with the police and was free to
leave.  Although the question of whether Downing was free to leave is objective, his repeated
refusals to provide information – the exercise of his right not to comply – are strong
circumstantial evidence of his state of mind, contributing to the conclusion that no seizure
occurred.  *See Regan*, 687 F.2d at 535-36 ("Regan's own testimony, and his conduct during the
encounter, such as his refusal to permit his larger bag to be searched after being told he could
refuse, tend to support the district court's conclusion that he was not intimidated nor placed under
restraint.  We accordingly sustain the . . . finding that a seizure did not occur.").

[9] Massport does not argue here that any seizure of Downing was a constitutional *Terry*-stop
because it is not necessary to reach that issue based upon the above analysis.  *See* Part II.A,
*supra*; *Terry v. Ohio*, 392 U.S. 1 (1968).  Massport, however, preserves the right to assert that
argument at trial should this matter survive summary judgment.

deterring drug use in schoolchildren). Typically, searches and seizures must be supported by probable cause. *See id*. at 652-53. However, exceptions to the probable cause requirement exist, and "[a] search unsupported by probable cause can be constitutional . . . 'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Id.* at 653.[10] Whether a search and seizure "meets the reasonableness standard is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 652-53 (quotations omitted).

Here, the balance of the government's interest in airport security, when measured against the slight intrusion upon Downing, weighs in favor of the government. In discussing how the Fourth Amendment applies to an airport, courts have noted that an airport is a "critical zone" in which "special Fourth Amendment considerations apply . . . due to the danger posed by air piracy." *United States v. Moreno*, 475 F.2d 44, 51 (5th Cir. 1973) (upholding search of passenger in airport as constitutional). The serious nature of the government's interest in safeguarding the nation's airports and deterring future terrorist activity – needs well beyond general crime prevention – cannot be disputed. *See Cassidy v. Chertoff*, 471 F.3d 67, 82 (2d Cir. 2006) (holding that the suspicionless searches of ferry passengers' carry-on bags and automobile trunks do not violate the Fourth Amendment and noting that "[i]t is clear to the Court that the prevention of terrorist attacks on large vessels engaged in mass transportation . . . constitutes a 'special need.' Preventing or deterring large-scale terrorist attacks present problems that are distinct from standard law enforcement needs and indeed go well beyond them"); *MacWade v. Kelly*, 2005 WL 3338573, at *17 (S.D.N.Y. Dec. 7, 2005), *aff'd* 460 F.3d 260 (upholding random

---

[10] *Terry*-stops based upon reasonable articulable suspicion also constitute exceptions to the probable cause requirement. The Fourth Amendment, however, imposes no irreducable requirement of such suspicion. *United States v. Martinez-Fuerte*, 428 U.S. 543, 561-62 (1976) (upholding suspicionless searches conducted at vehicle checkpoints to detect illegal aliens).

container inspection searches of subway passengers and stating that "[t]he need to prevent a terrorist bombing of the New York City subway system is a government interest of the very highest order"). Following the attacks on the World Trade Center on September 11th, air travel across the United States and throughout the world changed, demonstrating the obvious nexus between airport safety and the prevention of terrorism. The institution of a national threat-level indicator, the increased scrutiny and identification of items that constitute contraband on aircrafts, and the implementation of additional precautions at passenger-screening checkpoints surely signal the government's compelling interest in airport security designed to reduce the threat of terror. *See Cassidy*, 471 F.3d at 82 ("Indeed, as in the case of airline hijacking, a large ferry commandeered by a terrorist becomes a weapon . . . . [T]he government has a 'special need' to prevent such potentially disastrous situations from developing, and courts have readily acknowledged the special government need in protecting citizens in the mass transportation context."); *see United States v. Doe*, 61 F.3d 107, 109-10 (1st Cir. 1995) (noting that "[r]outine security searches at airport checkpoints pass constitutional muster because the compelling public interest in curbing air piracy generally outweighs their limited intrusiveness" but finding that the subsequent piercing of a package to search for illicit drugs exceeded these concerns).

By contrast, any intrusion suffered by Downing was negligible at best. His interaction with police was brief, and he was asked to produce only his identification and his travel documents to determine his legitimate presence at the airport – the very same information he would have had to produce before boarding his flight to Boston. No other "search" of his person or his belongings occurred. Moreover, any privacy expectation held by Downing was undoubtedly minimal. Both "stops" occurred in and around a public airport – places where, for years, courts have recognized a reduced expectation of privacy. *See Rodriguez*, 469 U.S. at 6

("Respondent 'was approached in a major international airport where, due in part to extensive antihijacking surveillance and equipment, reasonable privacy expectations are of significantly lesser magnitude.'"); *see also Mendenhall*, 446 U.S. at 556 (noting that the fact that interaction between respondent and DEA agents occurred in the public concourse of airport contributed to the conclusion that no seizure occurred).[11]

Accordingly, because all contact between Plaintiff and the police was constitutionally reasonable and permissible, Massport is entitled to summary judgment on all counts of the Complaint.

### CONCLUSION

For the reasons set forth above, Massport requests that summary judgment be entered for Defendants on all counts.

Date:   March 1, 2007                                Respectfully submitted,

                                                     MASSACHUSETTS PORT AUTHORITY
                                                     By its attorneys,


                                                     /s/ Annmarie A. Tenn
                                                     Roscoe Trimmier, Jr.  (BBO #502506)
                                                     Annmarie A. Tenn (BBO #658789)
                                                     Ropes & Gray LLP
                                                     One International Place
                                                     Boston, Massachusetts 02110
                                                     (617) 951-7000
                                                     roscoe.trimmier@ropesgray.com
                                                     annmarie.tenn@ropesgray.com

---

[11] What Massport has argued here is further reinforced by the post-September 11th cases that have applied the above analysis to uphold various searches in the context of mass transit.  *See, e.g.*, *Cassidy*, 471 F.3d 67; *MacWade*, 2005 WL 3338573; *American-Arab Anti-Discrimination Comm. v. Massachusetts Bay Transp. Auth.*, 2004 WL 1682859 (D. Mass July 28, 2004) (upholding as constitutional searches of passengers on buses and Orange Line trains that pass near the Fleet Center during the Democratic National Convention).

**CERTIFICATE OF SERVICE**

In accordance with L.R. 5.2(b) and Section E.2 of the Electronic Case Filing Administrative Procedures of the United States District Court for the District of Massachusetts, I, Annmarie A. Tenn, hereby certify that on March 1, 2007, the within Memorandum Of Law filed through the ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing.


/s/ Annmarie A. Tenn
Annmarie A. Tenn