**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KING DOWNING, <br><br> Plaintiff, <br><br> v. <br><br> MASSACHUSETTS PORT AUTHORITY, THE MASSACHUSETTS DEPARTMENT OF STATE POLICE, STATE POLICE TROOPER THOMPSON, STATE POLICE SERGEANT CROXTON, THOMAS G. ROBBINS, and PETER J. DIDOMENICA, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 04-12513-RBC <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**AFFIDAVIT OF ANNMARIE A. TENN IN SUPPORT OF DEFENDANT**
**MASSACHUSETTS PORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT**

I, Annmarie A. Tenn, state and depose as follows:

1.     I am an associate at Ropes & Gray LLP, One International Place, Boston, MA 02110.

2.     I represent Defendant Massachusetts Port Authority in the above-captioned matter.  I make this Affidavit in support of Defendant Massachusetts Port Authority's Motion For Summary Judgment, its Memorandum Of Law In Support Of Its Motion For Summary Judgment, and its related Statement Of Undisputed Facts.  *See* L.R. 56.1.

3.     A true and correct copy of portions of the transcript from Plaintiff King Downing's deposition held on September 18, 2006 is attached hereto as Exhibit A.

4.     A true and correct copy of portions of the transcript from Defendant William Thompson's deposition held on June 22, 2006 is attached hereto as Exhibit B.

5.      A true and correct copy of portions of the transcript from Sergeant Mark Kiley's deposition held on July 18, 2006 is attached hereto as Exhibit C.

6.      A true and correct copy of portions of the transcript from Trooper Howard Croxton's deposition held on June 23, 2006 is attached hereto as Exhibit D.

7.      A true and correct copy of portions of the transcript from Trooper Robert Moore's deposition held on July 19, 2006 is attached hereto as Exhibit E.

8.      A true and correct copy of portions of the transcript from Sergeant Peter DiDomenica's deposition held on January 4, 2007 is attached hereto as Exhibit F.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 1, 2007                                    /s/ Annmarie A. Tenn
                                                        Annmarie A. Tenn


Sworn before me this day: March 1, 2007                /s/ Thomas T. Tuttle
                                                        Notary Public

**CERTIFICATE OF SERVICE**

In accordance with L.R. 5.2(b) and Section E.2 of the Electronic Case Filing Administrative Procedures of the United States District Court for the District of Massachusetts, I, Annmarie A. Tenn, hereby certify that on March 1, 2007, the within Affidavit filed through the ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing.

/s/ Annmarie A. Tenn
Annmarie A. Tenn

**EXHIBIT A**



**Page 1**

```
                        VOLUME:   1
                        PAGES:  1 through 146

                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS

**************************************
KING DOWNING,                        )
              Plaintiff,             )
                                     )
    VS.                              )
                                     )
MASSACHUSETTS PORT AUTHORITY, THE    )
MASSACHUSETTS DEPARTMENT OF STATE    )
POLICE, STATE POLICE TROOPER         )
THOMPSON, STATE POLICE SERGEANT      )
CROXTON, THOMAS G. ROBBINS, and      )
PETER J. DIDOMENICA,                 )
              Defendant.             )
**************************************

     DEPOSITION OF KING DOWNING, a witness called
on behalf of the Defendants, taken pursuant to
the provisions of the Federal Rules of Civil
Procedure, before Lisa W. Starr, a Registered
Professional Reporter/Certified Realtime Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Ropes & Gray,
LLP, One International Place, Boston,
Massachusetts, on September 18, 2006, commencing
at 9:30 a.m.

              COPLEY COURT REPORTING, INC.
              101 Tremont Street, Suite 500
                 Boston, Massachusetts 02108
                      (617) 423-5841
```

**Page 2**

```
 1  APPEARANCES:
 2  FOR THE PLAINTIFF:
      AMERICAN CIVIL LIBERTIES UNION OF MASS.
 3    BY:  John Reinstein, Esq.
      99 Chauncy Street
 4    Boston, Massachusetts  02111
      Tel:  (617) 482-3170
 5
    FOR THE DEFENDANT MASSACHUSETTS PORT AUTHORITY:
 6    ROPES & GRAY, LLP
      BY:  Roscoe Trimmier, Jr., Esq.
 7    One International Place
      Boston, Massachusetts 02110
 8    Tel:  (617) 951-7000
 9  FOR DEFENDANTS COMMONWEALTH OF MASSACHUSETTS,
      MASSACHUSETTS STATE POLICE, THOMAS G. ROBBINS
10    AND PETER J. DIDOMENICA:
      BY:  Mary O'Neil, Asst. Attorney General
11    Government Bureau/Trial Division
      One Ashburton Place, Room 1813
12    Boston, Massachusetts  02108-1598
      Tel:  (617) 727-2200 ext. 2331
13
    FOR DEFENDANTS SERGEANT CROXTON AND TROOPER
14    THOMPSON:
      BY:  Joseph P. Kittredge, Esq.
15    160 Gould Street, Suite 111
      Needham, Massachusetts  02494
16    Tel:  (781) 455-0707
17  FOR THE DEFENDANT MASSPORT:
      BY:  Joseph M. Kaigler, Esq.
18    Legal Department
      One Harborside Drive, Suite 200S
19    East Boston, Massachusetts  02128-2909
      Tel:  (617) 568-3142
20
21
22
23
24
```

**Page 3**

```
 1              I N D E X
 2  Witness        Direct  Cross  Redirect  Recross
    KING DOWNING
 3  (By Mr. Trimmier)   4              138
    (By Ms. O'Neil)              55
 4  (By Mr. Kittredge)           108
 5
 6              E X H I B I T S
 7  No.   Page    Description
    1      12     Job Posting
 8  2      16     Travel Itinerary
    3      39     Copies of Boarding Passes
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1            P R O C E E D I N G S
 2       MR. TRIMMIER:  The first thing, the
 3  first order of business is the stipulations.  I
 4  propose that we stipulate that all objections,
 5  except as to form, are reserved until the time of
 6  trial and that the deposition transcript be
 7  signed in the presence of any notary.  Is that
 8  acceptable?
 9       MR. REINSTEIN:  In the presence of a
10  notary?
11       MR. TRIMMIER:  Yes.
12       MR. REINSTEIN:  That's fine.  I'm
13  not sure that we need that, but if you prefer
14  that, that's agreeable.
15       MR. TRIMMIER:  Are there any other
16  stipulations?
17       MR. KITTREDGE:  That's fine.
18            KING DOWNING
19  of lawful age, being first properly identified
20  and duly sworn to tell the truth, the whole
21  truth, and nothing but the truth, deposes and
22  says as follows in answer to direct
23  interrogatories by Attorney Trimmier:
24     Q.  Mr. Downing, I represent Massachusetts
```

**Page 5**

```
 1  Port Authority, a defendant in this action.  I
 2  understand you are an attorney; is that correct?
 3     A.  Yes.
 4     Q.  Then you understand that at any point in
 5  the course of my questions if you don't
 6  understand the question you should let me know,
 7  and I will try to rephrase it in a way that makes
 8  it more understandable.
 9       If at any time you want to take a break
10  or consult with your counsel, you may request to
11  do so.
12     A.  Fine.
13     Q.  Could you state your name for the record,
14  please?.
15     A.  King Downing.
16     Q.  What is your full name?
17     A.  My full name is Lylburn King Attorney
18  Downing.
19     Q.  L-Y-L-B-U-R-N?
20     A.  Yes.
21     Q.  Where do you reside?
22     A.  In New York City.
23     Q.  And your residence address?
24     A.  My address is 125 Broad Street, New York,
```

**Page 6**

```
 1  New York 10004.  I'm sorry, residence, 2035
 2  Second Avenue, New York 10029.
 3     Q.  What is your educational background?
 4     A.  I have a law degree from Rutgers
 5  University.
 6     Q.  What year?
 7     A.  1992.
 8     Q.  Undergraduate?
 9     A.  Harvard University, 1975.
10     Q.  And you received an A.B. from Harvard?
11     A.  Yes.
12     Q.  What was your concentration?
13     A.  Government.
14     Q.  What did you do between your graduation
15  from Harvard in 1975 and the year you began
16  studying law at Rutgers?
17     A.  In 1975, I spent a year in Boston right
18  after I got out of school.  Then I moved to New
19  York City.  In both of those instances, I was
20  working in the music industry and also working in
21  a retail store.
22       Then in 1976, I moved to the midwest,
23  where I held several jobs.  I worked as a
24  representative and a member of the International
```

Page 7

1 Alliance of Theatrical Stage Employees. I also
2 worked at KETC television as a cameraman.
3   Q. I'm sorry, K --
4   A. KETC.
5   Q. And where is that?
6   A. That's in St. Louis.
7   Q. Was that your last employment before
8 going to Rutgers Law School?
9   A. No. After that, I moved to New Haven,
10 Connecticut where I was an instructor in arts,
11 music, and photography for the Arts Council in
12 New Haven.
13       I also worked in the newsroom at the CBS
14 affiliate there.
15   Q. Doing what?
16   A. I was a news assistant in the newsroom.
17   Q. And after that?
18   A. At that point, I started working for a
19 youth program in Brownsville, Brooklyn.
20   Q. What year was that?
21   A. Approximately 1980. I worked there until
22 around 1982.
23   Q. And the prior position in New Haven, what
24 years? Through 1980, but starting in what year?

Page 8

1   A. From about 1978.
2   Q. And from 1976 to 1978, you were in
3 St. Louis?
4   A. Yes.
5   Q. I'm sorry, I interrupted. After the
6 youth program in Brownsville, that was 1980 to
7 '82?
8   A. Then I had some success in the music
9 industry.
10   Q. What type of success?
11   A. I was in a band that went on tour, and I
12 did that for about a year. And when I came back,
13 I went to Medgar Evers College as a teacher.
14   Q. Where was that?
15   A. That was in New York City.
16   Q. And what did you teach?
17   A. I taught English composition,
18 developmental writing, public speaking, critical
19 thinking.
20   Q. How long did you do that?
21   A. Approximately, I did that full time until
22 about the fall of -- I'm sorry, until the spring
23 of '84. And then I started working full time for
24 a youth employment project as the manager of a

Page 9

1 GED center.
2   Q. And where was that?
3   A. That was in New York City.
4   Q. A GED educational center?
5   A. Yes.
6   Q. And what was your position? Director?
7   A. I was learning center manager.
8   Q. And that was for how long?
9   A. From '84 until 1988.
10   Q. After that?
11   A. Then I went to law school that September.
12   Q. September of '88?
13   A. Right.
14   Q. And I believe you indicated you received
15 a J.D. degree from Rutgers in 1992?
16   A. Right.
17   Q. What was your employment after law
18 school?
19   A. I went right out of law school and opened
20 up my own practice.
21   Q. Where?
22   A. Newark, New Jersey.
23   Q. And what sort of practice was it?
24   A. A general practice.

Page 10

1   Q. Civil and criminal?
2   A. Yes.
3   Q. Was it a partnership or sole
4 proprietorship?
5   A. No, sole proprietor.
6   Q. You were the only lawyer?
7   A. Yes.
8   Q. What sort of cases did you take on?
9   A. I took minor criminal cases, traffic
10 cases. I did a good bit of transactional work,
11 small business formation, taxation, some related
12 to the entertainment industry.
13   Q. How long were you in private practice?
14   A. Until I started at the ACLU in 2001.
15   Q. And in 2001, what position did you assume
16 with the ACLU?
17   A. National Coordinator, Campaign Against
18 Racial Profiling.
19   Q. What month in 2001?
20   A. June.
21   Q. Could you describe your responsibilities
22 as National Coordinator of the, I think it's
23 called CARP, the acronym, Campaign Against Racial
24 Profiling?

Page 11

1   A. That's right. Positions in the
2 communications department, and the basic idea was
3 to raise awareness about the existence of racial
4 profiling through public education, media
5 outreach, know-your-rights training, public
6 service announcements; and to assist our
7 affiliates around the country.
8   Q. And when you say affiliates, what does
9 that mean?
10   A. The ACLU has 53 affiliates and chapters
11 around the country organized by state for the
12 most part.
13   Q. And Massachusetts is an affiliate?
14   A. Yes.
15   Q. I'm going to place before you a document
16 that was provided to us I think as a part of the
17 automatic disclosures and ask if you could review
18 that.
19   A. Yes.
20   Q. What is it?
21   A. It's the job posting for the position
22 that I ultimately accepted.
23   Q. And you currently hold that position?
24   A. Yes.

Page 12

1   Q. Does that fairly and accurately describe
2 the duties, qualifications, responsibility of
3 your position?
4   A. Yes.
5       MR. TRIMMIER: I ask that that be
6 marked as Defendants' Exhibit 1.
7       (Job posting dated
8 3/8/2001 was marked as Exhibit D-1 for
9 identification).
10   Q. Mr. Downing, since you assumed this
11 position as National Coordinator in June of 2001,
12 have you received any specialized training
13 regarding issues of racial profiling?
14   A. No.
15   Q. Have you taken part in any training since
16 you assumed this position with the ACLU at all?
17   A. No.
18   Q. In connection with your duties, do you
19 travel to Boston frequently?
20   A. Yes.
21   Q. How frequently?
22   A. Approximately once a month until
23 recently, until over the last, I'd say, three
24 months. But prior to that, almost once a month

**Page 13**

1 since about the beginning of 2003.
2    Q. And generally, what are the purposes of
3 those visits?
4    A. The purpose of almost all the visits were
5 to take part in the racial profiling working
6 group that was convened by Ed Flynn, who at the
7 time was the Director of DPS.
8    Q. What is DPS?
9    A. Department of Public Safety.
10    Q. So, this was -- well, explain to me what
11 this working group was.
12    A. The state legislature enacted a statute
13 that banned racial profiling in the State of
14 Massachusetts and required a study of citations
15 that have been issued over approximately a year
16 and a half period.
17      As part of that effort, Director Flynn,
18 on the advice of Northeastern University,
19 convened a group of community members, law
20 enforcement, and civil rights and civil liberties
21 organizations to discuss the issue of racial
22 profiling, advise on the design of the data
23 collection process, and set up a program for the
24 dissemination of the results of the study.

**Page 14**

1    Q. And your participation in that was as a
2 representative of the Campaign Against Racial
3 Profiling?
4    A. Yes.
5    Q. And the ACLU?
6    A. The national ACLU.
7    Q. On October 16, 2003, were you coming to
8 Boston for a meeting of that working group?
9    A. I was coming for a meeting that was
10 related to the working group but not an actual
11 working group meeting.
12    Q. And what was the meeting that you were
13 coming to Boston to attend?
14    A. A group of community organizations,
15 advocacy groups, were having a caucus.
16    Q. And what was your role in that meeting?
17    A. It was similar to the larger working
18 group meeting, to participate as a representative
19 of the national ACLU.
20    Q. What time was that meeting scheduled for?
21    A. It was scheduled for 10:00 a.m.
22    Q. On October 16?
23    A. Yes.
24    Q. Now, without testing anybody's memory,

**Page 15**

1 let me show you another document. Do you
2 recognize that document?
3    A. Yes.
4    Q. What is it?
5    A. It's my itinerary for my travel between
6 the 14th and October 16th.
7    Q. 2003?
8    A. 2003.
9    Q. And that itinerary shows you leaving
10 Newark, New Jersey on Tuesday, October 14 and
11 going to Seattle, Washington; is that right?
12    A. Yes.
13    Q. At the time, did you reside in Newark?
14    A. No.
15    Q. You just departed from Newark airport
16 because that was convenient?
17    A. Yes.
18    Q. What was the purpose of the trip to
19 Seattle?
20    A. An organization of tribal members called
21 United Native Nations had a conference in
22 Seattle. And I was there to speak on the racial
23 profiling of Native Americans.
24    Q. When were you scheduled to speak?

**Page 16**

1    A. I don't recall what time I was scheduled
2 to speak, but not only was I scheduled to speak,
3 but there's an informal aspect to those meetings
4 as well. So, I was to be available to talk to
5 individuals who might have had questions
6 throughout the conference.
7    Q. How long was the conference scheduled
8 for?
9    A. It went from October 14th through the end
10 of the 16th. I believe there may have been even
11 a part of it that went into the 17th as well.
12    Q. This itinerary shows that --
13    A. I'm sorry, in fact it did go until the
14 17th.
15    Q. And how do you know that?
16    A. Because I arrived on the evening of the
17 16th at 9:00 p.m., and there was not very much
18 conference going on after 10:00 that night.
19    Q. And you were referring to the document
20 which I will now ask be marked as Exhibit 2 for
21 identification.
22      (Itinerary was marked as
23 Exhibit D-2 for identification).
24    Q. According to this itinerary, as you

**Page 17**

1 pointed out, after your visit to Boston you
2 returned to Seattle on a flight that departed
3 Boston at approximately 6:00 on Thursday, October
4 16, arriving there at 9:12 p.m., at least it was
5 scheduled to do that; is that right?
6    A. Yes.
7    Q. And the purpose of your return was to be
8 available during what remained of that
9 conference?
10    A. Yes.
11    Q. For the purposes that you previously
12 outlined; is that right?
13    A. Yes.
14    Q. Now, this document also shows that you
15 left Seattle, you were scheduled to leave Seattle
16 on Wednesday, October 15, at 10:51 p.m. on a
17 flight that was scheduled to arrive in Boston on
18 October 16 at 7:05 a.m.; is that right?
19    A. Yes.
20    Q. Did that flight in fact leave
21 approximately on time and arrive at approximately
22 7:00 a.m. on October 16 in Boston?
23    A. I don't remember if it arrived exactly on
24 time. I don't remember any --

**Page 18**

1    Q. Significant departure?
2    A. Any significant delay, no.
3    Q. When you arrived at Logan International
4 Airport, I think it's correct that you arrived at
5 a gate at Terminal B; is that right?
6    A. Yes.
7    Q. When you got off the airplane, where did
8 you go?
9    A. I got off the plane, and I went straight
10 out of the terminal into the general area.
11    Q. When you say out of the terminal --
12    A. Out of the secure area of the terminal.
13    Q. And that's on the second level or the top
14 level of the terminal; is that right?
15    A. Yes.
16    Q. And what did you do after you left the
17 secure area?
18    A. I went to a pay phone.
19    Q. Did you make a call?
20    A. Yes.
21    Q. To whom?
22    A. I was checking my messages.
23    Q. From your office in New York?
24    A. From my office.

Page 19

1  Q. Messages left at your office in New York?
2  A. Right.
3  Q. Voicemail?
4  A. Yes.
5  Q. That was done electronically without you
6  speaking; is that right?
7  A. Could you explain that?
8  Q. Did you have to speak in order to
9  retrieve your messages presumably from voicemail?
10  A. No.
11  Q. While you were -- by the way, do you
12  have a cell phone?
13  A. No.
14  Q. You didn't then, either?
15  A. No.
16  Q. While you were retrieving your messages,
17  what happened?
18  A. I was on the telephone, and for some
19  reason I turned to my right while I was on the
20  phone, and I observed the trooper standing to my
21  right at a very close proximate distance to me,
22  up against the wall in a very tighten closure.
23  Q. And the trooper you referred to is
24  Trooper Thompson, who is present here today?

Page 20

1  A. Yes.
2  Q. How close was he?
3  A. About five feet.
4  Q. And you described the area as very close.
5  Why is that? It's a confined space?
6  A. The telephone was very close to the wall
7  that faced the street. There were a row of
8  phones, and there wasn't a lot of clearance
9  between the phones and the wall.
10  Q. And he was standing between the phones
11  and the wall?
12  A. He was standing that certain number of
13  feet to my right, but he wasn't between the
14  phones; he was against the wall.
15  Q. He was between you and the so-called
16  secure area?
17  A. No, no. The secure area was where you
18  are now sitting, and the wall to the outside and
19  the street was behind me. And he was to my
20  right. He would have also been facing you.
21  Q. Let me see if I can describe this in
22  a way without the diagram. You were facing the
23  secure area with your back to the window of the
24  terminal. Trooper Thompson --

Page 21

1  MS. O'NEIL: Can you just state that
2  for the record?
3  Q. Is that right?
4  A. The question again.
5  Q. You were facing the secure area with your
6  back to the windows of the terminal while you
7  were on the phone; is that right?
8  A. Well, let me correct that. I was facing,
9  the secure area was off and to our left. I was
10  not facing directly into the secure area. The
11  passageway that people would leave was probably
12  about a 45-degree angle from where I was. People
13  would not have walked right out of the secure
14  area and run into the telephones. The phones
15  were out of the way of the secure area.
16  Q. And that was at a 45-degree angle to your
17  left; is that right?
18  A. Yes.
19  Q. And Trooper Thompson was also to your
20  left?
21  A. No. He was to my right.
22  Q. He was to your right. What to your
23  recollection do you recall Trooper Thompson was
24  doing, or what did you observe him doing?

Page 22

1  A. Standing against the wall with his arms
2  folded in front of him.
3  Q. At some point, did you speak to Trooper
4  Thompson?
5  A. At some point I spoke to Trooper
6  Thompson, but not until he had spoken to me.
7  Q. When did -- did he speak to you while
8  you were still on the phone?
9  A. Yes.
10  Q. What did he say?
11  A. Well, when I turned and looked over my
12  right shoulder and I saw him there, he asked me
13  if there was a problem. His words were, "Is
14  there a problem?"
15  Q. Those were his exact words, as you
16  recall?
17  A. Yes.
18  Q. And what did you say?
19  A. I said, "I just want to know why you're
20  standing here so close to me while I'm talking on
21  the telephone."
22  Q. Were you in fact talking on the telephone
23  or were you just on the telephone?
24  A. Well, I was retrieving messages, but at

Page 23

1  that time I may have also been leaving messages.
2  So, for me, talking on the telephone meant while
3  I have a phone in use.
4  Q. And in response to your statement, what
5  did Trooper Thompson say, if anything?
6  A. He said, "All right. I want to see some
7  ID."
8  Q. Were you still on the phone at that
9  point?
10  A. I was holding the phone in my hand. I
11  don't know if I was in the middle of leaving a
12  message at that point or retrieving a message.
13  Q. What did you do at that point?
14  A. I said, "Why do I have to show you ID?"
15  And he requested to see my ID again. I said,
16  "I'm not showing you my ID."
17  Q. Why did you refuse?
18  A. Because I believe under the Constitution
19  I have a right not to show my identification.
20  Q. What happened next?
21  A. Well, he had requested my ID again, and I
22  said I wasn't going to show it. And at that
23  point, I hung up the phone, and I started walking
24  away towards the passageway that I said was at a

Page 24

1  45-degree angle. It was an open walkway there,
2  and I started walking away.
3  He came around from the other side and
4  stood probably maybe, well, I don't know how the
5  distance, but he took a position that was facing
6  me and requested my identification again.
7  Q. And this was still inside the terminal?
8  A. Yes.
9  Q. Were you attempting to leave the terminal
10  at that point?
11  A. No.
12  Q. Why not?
13  A. I didn't have any reason to.
14  Q. Well, what do you mean? You were going
15  to just stay in the terminal area in the upper
16  level of terminal B until you had a reason to
17  leave? I don't understand your statement.
18  A. I didn't understand the question.
19  Q. Okay. When you said you hung up the
20  phone, after you hung up the phone where were you
21  headed?
22  A. At that point, I just wanted to terminate
23  the conversation with the trooper.
24  Q. And so, you moved to another area of the

**Page 25**

1 terminal?
2   A. Yes.
3   Q. What did you do in response to this
4 second request for identification?
5   A. I told him I wasn't going to show ID and
6 I didn't have to show ID.
7   Q. What did he say?
8   A. We may have had another round back and
9 forth about that, and then he said, "If you don't
10 show ID, you're going to have to leave the
11 terminal."
12   Q. And what did you do then?
13   A. I said, "Okay, I'll leave."
14   Q. And did you?
15   A. Yes, I left.
16   Q. You departed from the upper level of
17 Terminal B?
18   A. Yes.
19   Q. And what happened after you got outside?
20   A. I walked outside, and I saw a cab coming.
21 I tried to hail a cab, but it drove past. I
22 later realized that I was on the wrong level to
23 get a cab. So, I tried to walk a little further
24 out. I still didn't realize that the cabs

**Page 26**

1 weren't stopping because it was not an authorized
2 place. So I would walk a little further up, and
3 then the trooper accosted me again.
4   Q. When you say you weren't in the right
5 place to get a cab, by that you mean the cab
6 stand is on the lower level of the terminals?
7   A. Right.
8   Q. And that is where the taxi pool
9 dispatches taxis for pick-ups; is that right?
10   A. Yes.
11   Q. You walked a little further, and you said
12 you and Trooper Thompson had another encounter.
13 What happened in that encounter?
14   A. He came up to me while I was waiting to
15 hail a cab, and he demanded my identification.
16   Q. And what did you say?
17   A. He told me if I didn't want to show ID
18 that I would have to leave the terminal. Well, I
19 left the terminal.
20   Q. And you were attempting to leave the
21 airport at that point in time; is that right?
22   A. Yes.
23   Q. What happened next?
24   A. We went back and forth some more.

**Page 27**

1   Q. Do you recall what the back and forth was
2 at that point?
3   A. Him requesting my ID and me saying that I
4 wasn't going to show it and that I had left the
5 terminal. And then at one point, I tried to walk
6 away further down, and he told me I couldn't go.
7 And I asked him if I was under arrest.
8   Q. And what did he say?
9   A. He said yes.
10   Q. "Yes" unequivocably?
11   A. He was very clear.
12   Q. And what happened next?
13   A. I asked him what the charges were.
14   Q. And what did he say?
15   A. He said he didn't have to tell me.
16   Q. What happened next?
17   A. At that point, he got on the radio, and
18 that's --
19   Q. Trooper Thompson?
20   A. Trooper Thompson got on the radio.
21   Q. Trooper Thompson made a call on his
22 portable hand-held radio?
23   A. Yes.
24   Q. Did you hear what he said?

**Page 28**

1   A. I don't remember at this time.
2   Q. What happened next?
3   A. Then another officer showed up.
4   Q. How many?
5   A. A sergeant and three other officers. I
6 think one of them also may have been a sergeant
7 as well.
8   Q. Did you engage in any conversation with
9 any of the four officers that arrived?
10   A. They stood around me for awhile, and then
11 a white sergeant went and spoke to the trooper
12 and then came over to me.
13   Q. Thompson?
14   A. Yes, spoke to Thompson and then came to
15 me.
16   Q. When you say a white officer, am I
17 correct that the other three of the four officers
18 who arrived were African-American?
19   A. Yes.
20   Q. And Trooper Thompson is also
21 African-American?
22   A. Yes.
23   Q. And the white officer that came to you,
24 have you subsequently learned his name to be

**Page 29**

1 Sergeant Mark Kiley?
2   A. Yes.
3   Q. And what was the conversation, if any,
4 between the two of you?
5   A. He said words to the effect of, "The
6 reason why the trooper asked for your ID is
7 because you were acting suspiciously."
8   Q. And did you respond to that?
9   A. I asked him what did he say that I was
10 doing suspiciously.
11   Q. What did he then say?
12   A. He said, "I didn't ask him that." And I
13 said, "You're a supervisor, and you didn't ask
14 him what it was that I was doing?"
15   Q. And he said?
16   A. He said, "He's been on the force,"
17 referring to Trooper Thompson, I don't remember
18 the years, seven years comes to mind, "And if he
19 says you're acting suspiciously, you're acting
20 suspiciously."
21   Q. What happened next?
22   A. There may have been some other words, but
23 nothing of substance that I remember.
24   Q. Did Sergeant Kiley request that you

**Page 30**

1 produce identification?
2   A. Yes.
3   Q. Did you?
4   A. Yes, I eventually did.
5   Q. Was there any other conversation that we
6 haven't discussed between before he made his
7 request for identification and you produced it?
8   A. No. At that point in time I had a ten
9 o'clock meeting, and it was becoming clear --
10 oh, I need to add something else here. The words
11 that the trooper used that if I didn't show ID,
12 this is one of the other exchanges, he said, "If
13 you don't show ID, you're going downtown."
14   Q. And this is Trooper Thompson that said
15 that?
16   A. Right.
17   Q. Before the other four officers arrived?
18   A. Yes.
19   Q. And --
20   A. And what that told me was that I very
21 likely flew the red eye into Seattle to Boston to
22 attend a meeting which I now probably would miss,
23 but it was very likely that I wouldn't make it
24 back to Seattle for the rest of the Indian

**Page 31**

1 conference. Being told that I was being put
2 under arrest and taken downtown, I had a clear
3 impression in my mind that I might not see the
4 light of day until Monday.
5      So, at that point, I turned over my ID.
6 Q. And what did Sergeant -- what kind of ID
7 did you provide?
8 A. A driver's license.
9 Q. What did Sergeant Kiley do with the
10 driver's license?
11 A. I don't recall exactly, but I know at
12 some point Trooper Thompson took it over to the
13 vehicle. I assume that he ran the license.
14 Q. And by ran the license, you mean he
15 radioed the information on the license to some
16 authority for it to be checked?
17 A. Yes.
18 Q. Do you know what the check was for?
19 A. Do I know what the check was for? I was
20 not told what the check was for.
21 Q. Nor do you know to whom the radio call
22 was made?
23 A. No.
24 Q. What happened after he ran the license?

**Page 32**

1 A. Well, before I get into that, I also --
2 you had asked about other conversation, and I did
3 have a brief conversation with the other three
4 troopers while we were standing there.
5 Q. Do you at this point know their names?
6 A. I know that one's name is Croxton, and --
7 Q. And he was the sergeant, the other
8 sergeant?
9 A. I learned that he was a sergeant. The
10 other two, I don't recall their names right now,
11 but I have since learned their names.
12 Q. The other is Robert Moore, one of the
13 others, and Trooper Adell?
14 A. Yes.
15 Q. I'm sorry, I interrupted. You were going
16 to say you had a conversation with those three as
17 a group, or individually?
18 A. No, as a group, yes.
19 Q. And what was that conversation?
20 A. I believe one of them was trying to
21 explain. I know the conversation was about
22 identification. I remember I didn't want to get
23 into much of a conversation about identification,
24 but I did use the time to mention the fact that

**Page 33**

1 Trooper Thompson had his name badge clipped on
2 backwards. And, to me, that meant that I wasn't
3 able to identify him.
4      So, up until that point, I didn't know
5 who he was.
6 Q. What do you mean clipped on backwards?
7 How was it affixed?
8 A. There is a clip that hangs from some part
9 of the uniform that had the name on it. And it
10 was clipped in a way that the badge faced
11 backwards, and so --
12 Q. The badge or the name tag?
13 A. The name tag, I'm sorry. And so, I did
14 get into a conversation with them about that. I
15 told them that when they brought up the issue of
16 the ID, I brought up the issue that his name
17 badge was turned around. And they said to me,
18 well, the wind probably blew it. I said that,
19 well, we were in the terminal, and it wasn't
20 twisted.
21      I mean, I've worn badges or name tags
22 that can be turned around, but I told them that
23 it was clearly clipped backwards so that the name
24 tag faced him.

**Page 34**

1      At some point in time, when he came back,
2 I don't know if they had an opportunity to speak
3 to him at some point, but when he came back, the
4 badge was clipped, the clip had been turned
5 around so that the name tag was visible. And
6 that's how I was able to identify him. Prior to
7 that, I would not have been able to.
8      So, at that point, I had to leave, and I
9 knew who I had been dealing with. So, that's
10 when I turned over the ID.
11 Q. At that point, were you able to identify
12 not only Trooper Thompson but the other four
13 officers who were involved?
14 A. I didn't have clear recollection of them.
15 I was really trying to concentrate on who it was
16 that all of this had started with.
17 Q. The initial contact?
18 A. Yes.
19 Q. Did you notice whether or not any of the
20 other four troopers had their name tags on
21 backwards?
22 A. I don't recall that any of the others
23 did.
24 Q. So, you were able to see their name tags?

**Page 35**

1 A. No. I said I don't recall.
2 Q. You just don't recall at all?
3 A. Right. Actually, I did have a
4 recollection of the name Croxton.
5 Q. From that encounter on October 16?
6 A. Yes.
7 Q. Were you asked to produce airline
8 tickets?
9 A. Yes.
10 Q. By whom?
11 A. After I had given the ID, I was gathering
12 up my things to go.
13 Q. What happened?
14 A. I was asked to produce my airline
15 tickets.
16 Q. By whom?
17 A. I'm not sure who it was that asked me.
18 Q. And did you produce those tickets, a
19 ticket?
20 A. After some conversation, I said, "You
21 asked me to show identification. I've shown
22 identification. Now you're asking for my
23 tickets. I'm not going to show you my tickets."
24 Q. Why did you refuse?

**Page 36**

1 A. I had reluctantly relinquished my rights
2 not to show ID, and I saw no reason now why I had
3 to relinquish additional rights.
4 Q. Well, after providing identification,
5 what additional rights were you relinquishing by
6 showing travel documents?
7 A. My understanding is that once we
8 relinquish any right, it doesn't apply to every
9 right that may arise from that point on.
10 Q. I understand that. But what specific
11 right were you foregoing by showing travel
12 documents? You had already identified yourself;
13 is that right?
14 A. Right.
15 Q. What was the additional --
16 A. I'm under no obligation to provide any
17 information, whether I've given my name or not,
18 my travel plans, or where I plan to eat or
19 anything else that's in my pockets, or anything.
20 Q. Have you described the conversation that
21 took place subsequent to the request that you
22 produce airline tickets?
23 A. Have I described it?
24 Q. Yes.

Page 37

1  A. Part of it.
2  Q. What's the rest of it?
3  A. I was told that if I didn't show my
4  identification that I was going to be put on a
5  watch list, some words to that effect, and I
6  asked what the watch list was. They said that if
7  I got placed on the watch list and I ever came
8  back to the airport and I wasn't able to account
9  for why I was there, I would be arrested.
10  Q. Did they say watch list, or did they say
11  trespass list?
12  A. They might have used the word trespass
13  list.
14  Q. Was there any other conversation?
15  A. Might have had another round of saying
16  that I wasn't going to show the ticket, but I
17  think at that point the same issues that came up
18  before about time, needing to get away from
19  there, not being sure whether I might be subject
20  to arrest again, that I showed them the travel
21  tickets.
22  Q. And what happened after you -- who did
23  you produce the travel tickets to?
24  A. I gave them -- I just handed them to the

Page 38

1  group. The sergeant was there, Trooper Thompson
2  was there. I turned them over to the group.
3  Q. You don't recall specifically who you
4  handed them to?
5  A. No.
6  Q. What did the group then do with the
7  tickets?
8  A. Well, they got into a discussion among
9  themselves about whether my ticket qualified me
10  to not be a trespasser because of the fact that
11  the ticket said October 15, and it was October
12  16. So, they got into a discussion for awhile.
13  And then --
14  Q. Go ahead.
15  A. No, please, go ahead.
16  Q. What ticket did you produce?
17  A. It was the boarding pass from Seattle to
18  Boston.
19  Q. I'm placing before you another document.
20  There appears to be xeroxed copies of two
21  boarding passes. Do you recognize that?
22  A. Yes.
23  Q. Are there in fact images of two boarding
24  passes on this sheet?

Page 39

1  A. Yes.
2  Q. Why is that?
3  A. I changed seats. I don't recall why.
4  Q. And you changed from which, 23B to 14B or
5  the other way around?
6  A. The other way around.
7  Q. From 14B to 23B?
8  A. Yes.
9  Q. You moved further back on the plane?
10  A. Yes.
11  MR. TRIMMIER: Can we have that
12  marked as Defendants' Exhibit 3 for
13  identification).
14  (Copies of boarding
15  passes were marked as Exhibit D-3 for
16  identification).
17  Q. So, which of the boarding passes on
18  Exhibit 3 did you produce?
19  A. The top one that's circled that has the
20  stamp on it.
21  Q. And it's for seat 23B?
22  A. Right.
23  Q. Did you produce anything other than this
24  boarding pass that's on Exhibit D-3?

Page 40

1  A. No.
2  Q. Okay. You had a receipt from the airline
3  ticket that you used to travel from Newark to
4  Seattle; is that right?
5  A. Repeat that for me, please.
6  Q. Did you have in your possession the
7  receipt for the airline ticket you used to travel
8  from Newark to Seattle?
9  A. Not at that time.
10  Q. Did you have the receipt for the airline
11  ticket --
12  A. Oh, are you talking about -- go ahead
13  and ask the question again, please.
14  Q. Did you have the receipt for the ticket
15  used to fly from Newark to Seattle?
16  A. I probably did.
17  Q. Did you have the receipt for the ticket
18  you used to fly from Seattle to Boston?
19  A. This is the ticket.
20  Q. That's the boarding pass. Did you have a
21  receipt for that ticket?
22  A. No.
23  Q. Did you have the ticket that you planned
24  to use to fly from Boston to Seattle the next

Page 41

1  day?
2  A. No.
3  Q. These were electronic tickets?
4  A. Yes.
5  Q. Did you have a copy of the itinerary that
6  we had marked as Exhibit D-1?
7  A. I most likely did.
8  Q. Had you been issued a boarding pass yet
9  for the flight from Boston to Seattle?
10  A. No.
11  Q. You said there ensued a discussion among
12  the troopers about whether the boarding pass you
13  presented them was adequate to justify your
14  presence in the airport because the boarding pass
15  is dated October 15, and it was the morning of
16  October 16; is that right?
17  A. Right.
18  Q. What was the result of that conversation?
19  A. Well, the result of the conversation was
20  that they realized that I caught a flight that
21  left on the 15th and arrived on the 16th.
22  Q. And what did they do upon that
23  realization?
24  A. They told me I was free to go.

Page 42

1  Q. And what did you do then?
2  A. I left.
3  Q. How?
4  A. Quickly.
5  Q. By what means?
6  A. By cab.
7  Q. Where did you catch the cab?
8  A. Downstairs, where I should have caught it
9  in the first place.
10  Q. How did you get there? Did you go back
11  through the terminal?
12  A. I don't remember. I don't even know if
13  there's a way -- I don't know if there's a way
14  to go --
15  Q. Other than through the terminal?
16  A. Other than through the terminal.
17  Q. From the first encounter you had with
18  Trooper Thompson at the telephone to the time of
19  your departure, how much time do you estimate
20  elapsed?
21  A. I would say thirty to forty minutes.
22  Q. So, assuming the flight landed at or
23  about the time it was scheduled to land, we're
24  now somewhere around 7:40 or 7:45 in the morning

Page 43

1  when you departed the airport?
2  A. My feeling was that --
3  Q. Please, answer my question first. Was it
4  about 7:45 when you left the airport?
5  A. Then I'll say no.
6  Q. What time was it?
7  A. My feeling was that I ended my portion of
8  the issue by showing the ID at a time when I felt
9  that I might have had approximately an hour left
10 to get to my meeting. And so, it may not have
11 been accurate to say it was 7:40. It may have
12 been even getting closer to 9:00.
13 Q. If it were getting close to 9:00 and your
14 flight landed at seven, are you saying that these
15 encounters with the State of Massachusetts state
16 troopers in the airport lasted two hours?
17 A. No, because the flight lands, that's the
18 time the plane touches down. Then it takes time
19 to get to the terminal. Takes time to de-board,
20 got out, might have stopped to go to the
21 bathroom, then walked out.
22 Q. So, the total time that had elapsed
23 between the time of the plane arriving and your
24 departure from the airport could have been as

Page 44

1  long as two hours?
2  A. Could have been as long as an hour and
3  fifty minutes. I thought it was getting close to
4  the time that I had an hour left to get to my
5  meeting.
6  Q. Did you get to your meeting?
7  A. Yes.
8  Q. Where was the meeting held?
9  A. At the Roxbury Defender's Office.
10 Q. How long did that meeting last?
11 A. I don't recall. It wouldn't have been
12 more than two hours, but I don't recall how long
13 it lasted.
14 Q. Sometime around midday it ended?
15 A. Yes.
16 Q. How many people attended that meeting
17 roughly?
18 A. Less than a dozen.
19 Q. Did you discuss the incidents that we've
20 been discussing this morning at Logan Airport
21 with anyone who attended that meeting?
22 A. I may have discussed it with the
23 executive director of our organization but not
24 with people who were at the meeting.

Page 45

1  Q. And who is the executive director?
2  A. Carol Rose.
3  Q. Do you recall a specific conversation
4  with Ms. Rose?
5  A. No.
6  Q. On that day or any other?
7  A. No. I may have spoken to her at that
8  meeting or I may have come back to the office and
9  spoken to her about it.
10 Q. Did you speak to anyone else that day
11 about the events at Logan Airport on that
12 morning?
13 A. I don't remember talking to anybody else.
14 Q. That day?
15 A. That day.
16 Q. With whom have you had a discussion about
17 the events of October 16, 2003, since that day?
18 A. Well, I've talked to my lawyers.
19 Q. By that you mean Mr. Reinstein and Mr.
20 Krupp?
21 A. And Mr. Krupp.
22 Q. Anyone else?
23 A. If I did, it may have been in passing.
24 Not anybody that I would remember. Maybe I told

Page 46

1  a friend.
2  Q. Have you given interviews to any
3  reporters?
4  A. No, but I know that a press release was
5  put together by our organization that contained a
6  quote from me.
7  Q. And so, any quote from you that appears
8  in the press would have been obtained from that
9  press release?
10 A. Right.
11 Q. When did you first consult with either
12 Mr. Krupp or Mr. Reinstein about these events?
13 A. It may have been -- well, I know that I
14 probably talked to the executive director that
15 day. But as far as when I had conversations with
16 Mr. Reinstein, I don't recall when we had that
17 first conversation. I was coming up here every
18 month, so...
19 Q. Do you recall whether or not that
20 conversation took place before the end of 2003?
21 A. When you say "that conversation", which
22 conversation?
23 Q. The first conversation you had with Mr.
24 Reinstein?

Page 47

1  A. I can't say for sure. It might have
2  happened before the end of 2003.
3  Q. Did you prepare any documents
4  memorializing the events of October 16, 2003 at
5  Logan Airport?
6  A. No.
7  Q. Any e-mails?
8  A. No.
9  Q. Do you have any notes relating to what
10 happened?
11 A. No.
12 Q. Mr. Downing, could you describe for me
13 how you were dressed when you arrived at Logan on
14 the morning of October 16?
15 A. I was wearing some casual slacks, like
16 Dockers, and some black or brown casual shoes,
17 and a striped shirt with what some people call a
18 parson's collar, and a Members Only jacket.
19 Q. So you were dressed casually, not the way
20 you are here today with suit and tie; is that
21 correct?
22 A. Right.
23 Q. At any point during the interactions you
24 had with the state troopers, did you assert to

Page 48

1  them that you were a lawyer?
2  A. No.
3  Q. Why not?
4  A. If I wasn't going to give them my ID, I
5  sure wasn't going to tell them my occupation.
6  Q. Why is that?
7  A. I felt I had a right not to.
8  Q. Is it fair to say that your training as a
9  lawyer contributed at least in part to your
10 refusal to provide identification that morning?
11 A. I had held that point of view long before
12 I went to law school, so I would say no.
13 Q. Did law school reinforce that point?
14 A. Law school gave me the cases, gave me the
15 case law for what my understanding of my
16 rights were.
17 Q. Was there anything you recall saying in
18 the telephone call that morning that was
19 particularly sensitive?
20 A. Which telephone call?
21 Q. The only telephone call you made at Logan
22 Airport.
23 A. Well, I might have made more than one
24 call, but --

Page 49

```
 1   Q.  Well, then let's focus on the call where
 2  Trooper Thompson was, as you described it, within
 3  five feet of the telephone, you and the
 4  telephone.
 5   A.  I might have.
 6   Q.  What sort of sensitive information might
 7  it have been?
 8   A.  I might have been leaving a message about
 9  the meeting, and I might have been leaving agenda
10  items for the meeting.  It may have been a
11  discussion of how to deal with racial profiling.
12  It may have involved an agenda item that might
13  have talked about tactics that might be used to
14  raise awareness or to deal with some of the
15  issues that came up in working where you have
16  police and community working together at times,
17  and at other times having differences of opinion.
18   Q.  As you sit here now, you have no specific
19  recollection of whether any of that was the
20  subject of anything you said in that telephone
21  call?
22   A.  No.
23   Q.  Let's assume for the moment that all of
24  what you said was in fact mentioned.  Why would
```

Page 50

```
 1  you be sensitive to Trooper Thompson overhearing
 2  that?
 3   A.  I don't remember saying that I was
 4  sensitive to Trooper Thompson overhearing that.
 5  I think what I said was I asked him the question
 6  about why he was standing so closely.
 7   Q.  So closely that he could hear your
 8  telephone call, I believe is what you said.
 9   A.  Right.
10   Q.  Why were you concerned about him hearing
11  your telephone call?
12   A.  I wasn't concerned about him hearing my
13  telephone call.  The point for me was why was he
14  standing so closely to the point that he might
15  have been able to hear a telephone call as well.
16   Q.  So, it was his proximity, not the fact
17  that he might have been able to hear what you
18  were saying, that was of concern?
19   A.  It was the proximity and the somewhat
20  unusual circumstance in which that proximity came
21  about.  I can think of circumstances in the
22  airport where it would be very natural for a
23  police officer to be close by.  If you're
24  standing in a line somewhere or if I'm waiting to
```

Page 51

```
 1  go into the secure area or if we're passing by
 2  each other walking or he happens to be in an area
 3  where people are walking past.
 4       This area was somewhat unusual in that it
 5  was a tight space, close to a wall, away from the
 6  foot traffic.  And there was no one on the other
 7  side or on any of the other phones.  Yet, he was
 8  standing in a position that was very close and
 9  where I happened to be.
10   Q.  And I believe your testimony was that
11  without you addressing Trooper Thompson, he was
12  the first to speak, and he spoke to you and he
13  said, "Do you have a problem?"
14   A.  No.  He said, "Is there a problem?"
15   Q.  Let me ask this question.  In the
16  post-9/11 world, where we have heightened
17  security at airports, are you of the view that
18  it's inappropriate for security officials to
19  request identification to determine who is at the
20  airport and travel documents to determine whether
21  or not they have a reason to be at the airport?
22   A.  Could you be a little more specific?
23  You've covered a lot of airport activity, a lot
24  of locations, and a lot of purposes in that
```

Page 52

```
 1  question.
 2          (Question read back as
 3  recorded).
 4       MR. REINSTEIN:  Isn't that why we're
 5  here?
 6       MR. TRIMMIER:  It is, but I'd just
 7  like to hear the answer to the question.
 8       MR. REINSTEIN:  I think he answered
 9  the question.  Where are you talking about, in
10  the secure area or the general area of the
11  airport?
12       MR. TRIMMIER:  Anywhere.
13          (Question read back as
14  recorded).
15   A.  There are times when it's very
16  appropriate, and there are times when it's
17  inappropriate.
18   Q.  I take it, one of those times when it was
19  inappropriate was October 16, 2003, when you
20  arrived on Alaska Airlines Flight 10 that
21  morning?
22   A.  Where I was -- I can't answer that.
23   Q.  You have previously testified that you
24  were of the view that you had a right not to
```

Page 53

```
 1  produce ID, a request by Trooper Thompson, and
 2  not to produce travel documents, requested by one
 3  or more of the troopers involved in this
 4  incident; is that right?
 5   A.  Say that one more time.
 6          (Question read back as
 7  recorded).
 8   A.  At that time and for that incident, yes.
 9   Q.  Why?
10   A.  It's my constitutional right not to
11  produce identification.
12   Q.  But in response to my previous question,
13  you said that under certain circumstances it's
14  entirely appropriate; is that right?
15   A.  Yes.
16   Q.  Why was it inappropriate on October 16,
17  2003 for you?
18   A.  Because I was in a nonsecure area.  I was
19  in a public place, and I wasn't doing anything
20  suspicious.  And even if I had, I still have a
21  right not to identify myself, although the
22  trooper has a right to ask.
23   Q.  Airport security personnel may not ask
24  for identification from people outside the secure
```

Page 54

```
 1  area of the airport?
 2   A.  As I said, they can always ask, but I
 3  have a right not to produce identification.
 4   Q.  If you were in a secured area of the
 5  airport, would you have the same right?
 6   A.  I would have that right not to if I'm not
 7  moving from the nonsecured to the secured area.
 8  If I'm not in the process of making that
 9  transition.
10   Q.  So, even in a secure area, after you've
11  passed through the checkpoint, there is no right
12  of airport security personnel to request
13  identification?
14       MR. REINSTEIN:  I object to the
15  question.  It assumes as to a variety of
16  circumstances that are not before the witness.
17  We're having a debate about the law now, which
18  really seems inappropriate.
19       MR. TRIMMIER:  Even for a lawyer?
20       MR. REINSTEIN:  He wasn't acting as
21  a lawyer then.
22       MS. O'NEIL:  I have a few questions.
23          (Recessed at 10:58 a.m.)
24          (Resumed at 11:09 a.m.).
```

**Page 91**

1  A. Because I never got a New York driver's
2  license.
3  Q. How long have you been living in New
4  York?
5  A. About a year. I lived in New Jersey
6  before that.
7  Q. You lived in Connecticut way back when,
8  isn't that so?
9  A. Right.
10  Q. How long ago? 1978; is that correct?
11  A. Um-hmm.
12  Q. So you haven't lived in Connecticut since
13  1978?
14  A. Right.
15  Q. But the whole time you've had a
16  Connecticut license?
17  A. Um-hmm.
18  Q. That's correct?
19  A. Yes.
20  Q. How many times had you come into Logan
21  Airport before the October 16 incident that we're
22  talking about?
23  A. Dozens of times.
24  Q. And was it common practice during those

**Page 92**

1  dozens of times for somebody to pick you up from
2  the airport?
3  A. I would take the bus, take a cab.
4  Q. So, it was usually public transportation
5  you would take from the airport?
6  A. I don't know as you consider a cab public
7  transportation.
8  Q. Unfortunately, it is.
9  A. Then if cabs are public transportation,
10  yes.
11  Q. Did you often come into Terminal B?
12  A. I most often came into the terminals
13  where the shuttles operate.
14  Q. So, you most often came into the shuttles
15  where the cab stands were?
16  A. I didn't know that there were terminals
17  that even had cab stands.
18  Q. So that was the first time you ran into
19  that?
20  A. Ran into what?
21  Q. The fact that you could not hail a cab on
22  the upper level of Terminal B?
23  A. Yes.
24  Q. That had never happened to you before?

**Page 93**

1  A. No.
2  Q. Did that make you angry?
3  A. Did what?
4  Q. After you tried to flag the cab with
5  Trooper Thompson, did that make you angry that
6  the cabs were just driving by you?
7  A. No. I didn't understand why the cabs
8  were just driving past. I didn't have any
9  reaction to it. All I thought of, the cab went
10  by, and I looked ahead to the next one.
11  Q. You didn't care?
12  A. Didn't care? I cared very much whether I
13  was able to get a cab. But all I did was change
14  my focus from the one that had gone past to look
15  up to see if there was another one on the way.
16  Q. And you had no reaction to those that had
17  passed?
18  A. At that point in time, I was thinking
19  about leaving the airport.
20  Q. Now, Trooper Thompson never touched you,
21  right?
22  A. No.
23  Q. None of the other troopers ever touched
24  you, did they?

**Page 94**

1  A. No.
2  Q. Just for the sake of the record, no one
3  pulled a gun on you, did they?
4  A. No.
5  Q. You weren't ever put in a cruiser, were
6  you?
7  A. No.
8  Q. Actually, you were never moved from the
9  scene at the terminal, were you?
10  A. When you say moved from the scene, what
11  do you mean?
12  Q. Did anybody put you in a room apart from
13  the terminal?
14  A. No.
15  Q. So, I'm curious, how did you get outside
16  the terminal in the first place?
17  A. I was ordered to leave by Trooper
18  Thompson.
19  Q. How did you get there?
20  A. How did I get out of the terminal?
21  Q. Yes.
22  A. I walked.
23  Q. Did anybody stop you from walking?
24  A. No.

**Page 95**

1  Q. Did anybody push you?
2  A. No.
3  Q. You mentioned that the other troopers
4  arrived. How long after you talked to Trooper
5  Thompson did the other troopers arrive?
6  A. I think -- ask the question again.
7  Q. I'm sorry. You had your conversations
8  with Trooper Thompson, and then other troopers
9  arrived. How long after your initial meeting
10  with Trooper Thompson did the other troopers
11  arrive?
12      MR. REINSTEIN: Objection.
13  A. I think we were probably inside the
14  terminal for about five minutes, maybe a little
15  longer. And it took me time to go outside and
16  start trying to hail the cabs. That might have
17  taken another minute or two. By then, he and I
18  had had a conversation out there. By the time
19  the call went out and how long it took them to
20  get there, I can't say.
21  Q. Did Trooper Thompson at any point mention
22  to you that you were considered a terrorist?
23  A. No.
24  Q. That he had any fear of you being a

**Page 96**

1  terrorist in any way?
2  A. No.
3  Q. Did he mention at any point that you were
4  being behaviorally profiled?
5  A. No.
6  Q. How about any of the other troopers, did
7  they bring up any behavioral profiling?
8  A. No.
9  Q. Did any of the other troopers mention
10  anything to you about terrorism?
11  A. The conversations about a watch list made
12  me feel like --
13  Q. I think you corrected that to say
14  trespass list.
15  A. Well, the conversation about that list,
16  nobody ever said that there was a connection.
17  Q. You said you wondered that there was a
18  connection. The word "trespass" was used, right?
19  A. Right.
20  Q. And they asked for your ticket, correct?
21  A. Right.
22  Q. And did any of the troopers say to you
23  what's your business here, we want to see if you
24  have legitimate business here at Logan?

Page 97

1  A. Well, when I questioned them as to why I
2 had to show my ticket, the explanation that if I
3 didn't show it that I would be put on this list
4 and that if I showed up again and I didn't have
5 any reason to be there -- actually, it wasn't
6 didn't have any reason to be there, whatever the
7 statement was that was made to me, led me to
8 respond that I could be here to pick somebody up,
9 so what would a ticket have to do with it.
10  Q. But nobody said anything beyond a
11 trespass list? I think that's what you testified
12 to.
13  A. When you say "said anything beyond", I
14 just gave you an explanation of other things that
15 were said.
16  Q. I'm sorry. The list that was identified,
17 the list that you were fearful of, and correct me
18 if fearful is not the right word, but the list
19 that you were concerned about being put on was a
20 trespass list; is that right?
21  A. That's what they said.
22  Q. And I'm hearing in your voice that you
23 didn't believe it?
24  A. All I'm telling you is that I can't

Page 98

1 represent whether there actually was a list of
2 trespassers or what kind of list it was. All I
3 can tell you is what it is they told me.
4  Q. Well, were you familiar with the
5 behavioral assessment program at all prior to
6 this stop?
7  A. I had seen a press release that announced
8 that the program had been started.
9  Q. When was that?
10  A. I don't remember. It may have been a
11 year prior.
12  Q. And had you had any discussions with
13 anyone in the ACLU, apart from your attorneys,
14 regarding that press release and behavioral
15 assessment at Logan?
16  A. I might have been the one that found the
17 press release and I might have passed it onto
18 them and asked them if they were aware that this
19 program was being announced.
20  Q. So, it's likely you identified that the
21 behavioral assessment program was going on at
22 Logan to your superiors?
23  A. It's possible and in fact likely that
24 they were well aware of it being here in

Page 99

1 Massachusetts before I did. Part of my job was
2 to get in touch with affiliates when I learned of
3 information and to find out whether they were
4 aware of it. And my feeling here is that they
5 were quite aware of the fact that this had been
6 announced.
7  Q. What's the basis for that feeling?
8  A. Well, I don't think I found -- I don't
9 think the press release, I don't think I got hold
10 of the press release on the date it was issued.
11 I believe it may have been out for awhile. So,
12 it's mostly that something had been in the
13 papers.
14  Q. What was your interest in this press
15 release?
16  A. Well, the fact that the program announced
17 that there was going to be an alternative to
18 racial profiling.
19  Q. An alternative to racial profiling?
20  A. Yes.
21  Q. What did that mean to you?
22  A. Well, it meant that Massport was saying
23 in the press release that the new system was
24 going to rely on some kind of behavior-based

Page 100

1 criteria and not rely on racial profiling.
2  Q. Wouldn't that be seen as a positive by
3 you?
4  A. It would be a positive, yes, if it turned
5 out to in fact be carried out the way it was
6 designed to.
7  Q. And do you know whether or not it turned
8 out -- well, do you know if within this
9 behavioral assessment system, for lack of a
10 better term, do you know if there is any
11 encouragement of racial profiling in there?
12  A. Do I know?
13  Q. Um-hmm.
14  A. No, I don't know.
15  Q. And for all you know, it could be totally
16 opposed to racial profiling within this behavior
17 assessment system?
18  A. Well, the press release said it was.
19  Q. That it was against racial profiling?
20  A. Right.
21  Q. And is it fair to say that you do not
22 know if such a program was employed at your stop
23 at Logan Airport on October 16?
24  A. No, I don't know.

Page 101

1  Q. You do not know that, okay. I'm asking
2 you do you know that it was employed?
3  A. No, I do not know that it was or I do not
4 know that it wasn't.
5  Q. Do you have any belief or any basis for
6 believing that this program would condone in any
7 way racial or ethnic profiling?
8  A. I don't have any belief either way.
9  Q. You do know that you stated that in your
10 Complaint, though, that it effectively, and I'm
11 quoting from page 4, "Effectively condones and
12 encourages racial and ethnic profiling." And it
13 is referring to, "The Behavior Assessment
14 Screening program training provided by
15 Massachusetts State Police, Robbins and
16 Didomenica."
17  A. Well, if this incident is an example of
18 that, then it would.
19  Q. Let me see if I understand you. This is
20 speaking of the training provided by. It's
21 saying the training itself. I'm not talking
22 about the result; we'll talk about that in a
23 second. But the training itself effectively
24 condones racial and ethnic profiling. Do you

Page 102

1 have some factual basis to believe that?
2  A. If this incident happened either on the
3 basis of such training or happened despite such
4 training, then that would be true.
5  Q. I don't understand that. Let me see if I
6 can clear that up. You don't know if you were
7 stopped based on the Behavioral Assessment
8 Screening System; is that correct?
9  A. Right.
10  Q. And you don't know for a fact whether or
11 not this Behavioral Assessment Screening System
12 effectively condones racial and ethnic profiling?
13  A. No.
14  Q. And the basis -- let me just ask you.
15 What's the basis for suing the State Police here?
16  MR. REINSTEIN: The appropriate way
17 to do that is in an interrogatory and not a
18 question to the witness. If you have a question
19 of how it fits into the suit, if it's not based
20 on personal knowledge of the deponent, then the
21 way to deal with that is to ask him what the
22 basis for the contention is and to ask it through
23 an interrogatory rather than in questions in a
24 deposition.

**Page 109**

1 the spots that I have some questions about.
2     In particular, on the day of October 16,
3 2003, you indicated that you entered Terminal B,
4 or arrived into Terminal B; is that correct?
5  A. Yes.
6  Q. Do you recall whether you had ever been
7 in Terminal B prior to that day?
8  A. I don't recall. Almost all of my trips
9 up here involved the shuttle.
10  Q. Have there been occasions when you didn't
11 take the shuttle to Boston?
12  A. Yes.
13  Q. Do you recall whether you arrived on
14 Terminal B on those occasions?
15  A. No.
16  Q. When you arrived, did you have any
17 luggage?
18  A. Yes.
19  Q. Did you claim any luggage or check any
20 luggage when you got on the plane in Seattle?
21  A. No.
22  Q. So it was carry-on?
23  A. Yes.
24  Q. And you carried it off?

**Page 110**

1  A. Correct.
2  Q. And once you left the secure area, you
3 then went and used the pay phone; is that
4 correct?
5  A. Yes.
6  Q. At the point in time that you used the
7 pay phone, did you see my client situated there
8 next to the pay phone?
9  A. Could you repeat the question?
10  Q. You indicated that you saw my client
11 within five feet of where you were using the
12 phone; is that correct?
13  A. Yes.
14  Q. Was he there before you started using the
15 phone?
16  A. No.
17  Q. How long had you been on the phone before
18 you noticed him there?
19  A. I was only on the phone for a minute or
20 two. So it was within that time frame.
21  Q. Had you observed my client prior to
22 getting on the phone?
23  A. No.
24  Q. Had you observed my client take a

**Page 111**

1 position five feet away from you?
2  A. Are you asking did I observe him take the
3 position, or did I observe him in the position?
4  Q. Take the position?
5  A. No.
6  Q. Do you know how long he was in that
7 position before you noticed him?
8  A. Pretty immediate because I was facing not
9 directly to the phone but to the side.
10  Q. I believe you testified initially that he
11 was in a stationary position with his arms folded
12 facing out five feet away from you; is that
13 correct?
14  A. Yes.
15  Q. He wasn't moving at the point in time
16 that you first observed him; is that correct?
17  A. Correct, he was not moving.
18  Q. So, within the one to two minutes, he was
19 able to take up a position five feet away from
20 you before you noticed him?
21  A. Within one to two minutes?
22  Q. Right.
23  A. Yes.
24  Q. Why do you think he took that position?

**Page 112**

1  A. I have no idea.
2  Q. Why do you believe he said to you "Do we
3 have a problem?"
4  A. I have no idea.
5  Q. But it's clear in your mind that he spoke
6 to you first; is that correct?
7  A. Yes.
8  Q. And at some point --
9  A. Did you say "Do we have a problem?"
10  Q. What did he say to you?
11  A. "Is there a problem?"
12  Q. Why did he say that to you?
13  A. I'm not sure why he said that to me.
14  Q. Do you have any belief today why he said
15 that to you?
16  A. I'm not sure why he said that to me.
17  Q. Do you have any belief?
18  A. The only thing I could say is I had
19 turned to look at him.
20  Q. How long was this look at my client?
21  A. I turned, and it was immediate.
22  Q. And at that point in time, you were using
23 a pole that had phones on it; is that correct?
24  A. Yes.

**Page 113**

1  Q. And you indicated the diagram on the
2 water bottle there were at least two or three
3 other phones on this pole?
4  A. Correct.
5  Q. Were any of the other phones being used
6 at this time?
7  A. No.
8  Q. What's the circumference of this pole, an
9 estimate?
10  A. I could say that it was a couple of feet
11 across. I don't know circumference, how far
12 around it was. I don't know how far around it
13 was.
14  Q. Did you say two or three phones on this
15 pole, or more?
16  A. Maybe four.
17  Q. And you engaged in a conversation with my
18 client about having some identification produced;
19 is that correct?
20  A. Yes.
21  Q. At that point in time, why didn't you
22 produce your identification?
23  A. Because it was my right not to.
24  Q. Why do you think my client wanted to see

**Page 114**

1 your identification?
2  A. I have no idea why.
3  Q. You agree that at that point in time when
4 my client asked for identification by the phones,
5 he had that right; is that correct?
6  A. It may be correct, he didn't ask me a
7 question.
8  Q. Do you believe he had a right to demand
9 identification from you at that point in time?
10  A. No.
11  Q. Do you believe you had a right to refuse
12 his demand to give him your ID?
13  A. Yes.
14  Q. At that point in time you did, correct?
15  A. Yes.
16  Q. At that point in time did you believe
17 your rights had been violated?
18  A. I believe my rights had been violated.
19  Q. What was the initial point that your
20 rights were violated?
21  A. Well, the first one --
22  Q. That's all I want to know is the first
23 point.
24  A. The first one would be when, if my

**Page 115**

1 privacy was violated by his proximity to the
2 phone call.
3    Q. Do you believe that your privacy was
4 violated by the fact that my client was five feet
5 away from you when you were on the phone? Is
6 that what your belief is?
7    A. My belief is that my rights might have
8 been violated at that time.
9    Q. Sir, I'm asking your belief.
10    A. I'm telling you --
11    Q. Not might. I'm asking you yes or no. I
12 said do you believe that your right was violated
13 at the point in time and first when he was five
14 feet away from you and you were on the phone?
15    A. My belief was that my rights might have
16 been violated at that time. That's my belief.
17    Q. Why do you have any reservations about
18 "might"? Why can't you be sure about that, sir?
19    A. Because I don't know whether he was
20 listening in on my phone call. That's not what
21 my issue was.
22    Q. That's not what your issue was? I didn't
23 understand the end of your answer there, sir.
24 Could you please explain that for me?

**Page 116**

1    A. I wanted to know why it was that he was
2 standing so close to me.
3    Q. Do you believe my client had a right to
4 stand there?
5    A. And I had a right to ask him why.
6    Q. And he had a right not to respond; is
7 that correct?
8    A. A right not to respond?
9    Q. To you.
10    A. I would have preferred that he not
11 respond, actually.
12    Q. But he had that right, did he not, sir?
13    A. Yes.
14    Q. So, everybody is exercising their rights
15 here at this phone bank, am I right?
16    A. No. I never said that he had a right to
17 stand where he was.
18    Q. But somebody had the right to use the
19 phone right next to you; is that correct?
20    A. There's a difference between somebody --
21    Q. Just yes or no, sir. Is that right?
22    A. That somebody, yes, somebody had a right
23 to use the phone next to me. But a police
24 officer is a different situation.

**Page 117**

1    Q. At some point in time he said if you
2 don't use the phone you're going to have to leave
3 the airport; is that right?
4    A. No, he didn't say that.
5    Q. You testified that the trooper ordered
6 you out of the airport. Did you say that
7 earlier?
8    A. The trooper said to me, "If you don't
9 show ID, then you're going to have to leave the
10 airport."
11    Q. And you elected to, instead of produce
12 the ID, to leave the airport; is that correct?
13    A. Yes.
14    Q. And when you did that, you went out the
15 upper level of the terminal, correct?
16    A. Right.
17    Q. And you know that you couldn't leave the
18 airport from there, right? You know that today?
19    A. I know that now.
20    Q. The trooper knew it then, fair to say?
21    A. I don't know if he knew that.
22    Q. And when you went out there, and you were
23 out there for how long before the trooper engaged
24 in another conversation with you?

**Page 118**

1    A. It was immediately, within a minute, the
2 time it took me to walk down the pathway and try
3 to hail the first cab.
4    Q. How far did you walk before Trooper
5 Thompson said anything to you?
6    A. I would say the pathway was about from
7 the wall to about where she is sitting, and then
8 I made a left turn and may have walked about half
9 that distance.
10    Q. Sir, we're not going to have this room in
11 the trial or in the courtroom. Could you give me
12 an estimate in feet how far you walked?
13    A. I'm not clear. I know this is the
14 distance.
15    Q. You can't estimate for me the distance of
16 what you just described?
17    A. No.
18    Q. I just asked for an estimate, sir. Can
19 you give me the best estimate of the amount of
20 distance that you just described here on the
21 record?
22    A. No.
23    Q. Now, when did you first observe my
24 client's name tag?

**Page 119**

1    A. When he came back with my identification.
2    Q. When he came back for your
3 identification?
4    A. With my identification.
5    Q. At that point in time his name tag was
6 backwards?
7    A. It was clipped on so that the name badge
8 faced the front.
9    Q. But you indicated earlier in your
10 testimony at some point prior to that that you
11 noticed that it was clipped so you couldn't see
12 his name; is that correct?
13    A. Right.
14    Q. The question was when did you first
15 notice that name tag positioned in such a way?
16    A. At the point where we were standing in
17 the passageway after I had walked from the phone.
18    Q. So, you're still inside the terminal?
19    A. Right.
20    Q. Now, you stated earlier that he returned
21 with the identification, the name tag was
22 positioned so you could read it; is that correct?
23    A. Yes.
24    Q. At that point, was there a photo on that

**Page 120**

1 name tag?
2    A. No.
3    Q. It's not a photo ID?
4    A. No.
5    Q. Was my client wearing a photo ID at the
6 time?
7    A. Actually, it might have been a photo ID.
8 It might have been. I just know that whichever
9 way it was --
10    Q. And where was it affixed?
11    A. It was clipped up around the chest area.
12    Q. Were you able to see -- did my client
13 have a badge on?
14    A. I don't remember if there was a badge.
15    Q. So, now your memory is that it was a
16 photo ID that you saw after he returned your
17 identification to you; is that correct?
18    A. I'm saying it might have been. All I
19 know is that the identification, I couldn't
20 determine his name.
21    Q. Because you couldn't see. Describe this
22 name tag. What were the measurements of it?
23    A. I don't recall the exact measurements.
24    Q. Can you give me a description of the

Page 121

1 shape of the name tag?
2   A. No.
3   Q. Can you give me the color of the name
4 tag?
5   A. No.
6   Q. So while you're outside the terminal for
7 a minute, my client engages in another
8 conversation demanding your identification. At
9 that point you refused still to give it to him;
10 is that correct?
11   A. Yes.
12   Q. And how many times in this discourse was
13 there between you and my client where he was
14 trying to convince you to give him your
15 identification before he made a radio
16 transmission?
17   A. Two or three times in the terminal, and
18 another one, two, or three times while we were
19 outside.
20   Q. So, up to six times he asked you to
21 produce your identification; is that correct?
22   A. Up to.
23   Q. Up to six times; is that correct?
24   A. Yes.

Page 122

1   Q. And you indicated how much time elapsed
2 from when you first noticed my client next to you
3 at the phones until he makes a radio
4 transmission?
5   A. About a minute or two inside, another
6 minute or two to get outside, and then I would
7 say maybe ten or fifteen minutes during that
8 time, from the beginning until the point that he
9 makes the call.
10   Q. Ten to fifteen minutes from the phone
11 bank until he makes a radio transmission; is that
12 correct?
13   A. Yes.
14   Q. And during that period of time he asked
15 you six times for your identification; is that
16 correct?
17   A. Up to one or two times inside, maybe one
18 or two times outside.
19   Q. So, is it up to four or is it up to six?
20 Which is it?
21   A. I'll say up to six.
22   Q. And so, during the other ten minutes, how
23 was -- strike that.
24       How was the time filled --

Page 123

1   A. You said the other ten minutes.
2   Q. Strike that. During the period of time
3 other than the six times he may have asked you
4 for your identification, how was the rest of the
5 time filled until he made the radio transmission?
6   A. Part of the time was filled with the
7 conversation about me asking if I was free to go
8 and him telling me that if I didn't show him ID I
9 was going to go downtown.
10   Q. There's no question in your mind that my
11 client said to you that if you didn't show him ID
12 that you were going to go downtown?
13   A. Correct.
14   Q. And at some point in time did you say my
15 client told you that you were under arrest?
16   A. I asked him if I was under arrest.
17   Q. And he said what?
18   A. He said yes.
19   Q. Now, and this was before he made the
20 radio transmission; is that correct?
21   A. I don't know that it was before he made
22 the radio transmission or during the time he made
23 the radio transmission or after. It was all
24 during that sequence.

Page 124

1   Q. Did you tell anybody else at the
2 terminal, any of the officers that came up later,
3 that my client had said you were under arrest?
4   A. I don't remember. I had some
5 conversation with Croxton while the others were
6 standing around. I don't remember if I told him
7 that or not.
8   Q. Did you ask Sergeant Kiley whether you
9 were no longer under arrest and free to go?
10   A. It was pretty clear the way the officers
11 were standing around me that I wasn't free to go.
12   Q. You recall at some point in time Sergeant
13 Kiley came to the scene, correct?
14   A. Correct.
15   Q. He's the one you produced the
16 identification for; is that correct?
17   A. Right.
18   Q. At some point in time you received your
19 information back; is that correct?
20   A. Correct.
21   Q. Did you ask him then if you were no
22 longer under arrest?
23   A. Did I ask Kiley?
24   Q. Anybody.

Page 125

1   A. No, I didn't ask Kiley or anybody.
2   Q. Now, in your experience as a criminal
3 defense attorney, is it common that police tell
4 individuals that they are under arrest and then
5 let them walk away?
6   A. Is it common?
7   Q. Right.
8   A. I don't think it's common, but it may
9 happen.
10   Q. In your experience has it happened?
11   A. In my personal experience?
12   Q. As a lawyer, criminal defense attorney.
13 In your experience as a criminal defense
14 attorney, has that happened?
15   A. I have heard reports of people who have
16 complained about being detained, being told that
17 they were under arrest, trying to find out what
18 their charges might have been, ultimately let go.
19   Q. In your experience, have you ever seen
20 anybody placed under arrest?
21   A. Yes.
22   Q. Other than on October 16, 2003, have you?
23   A. Yes.
24   Q. And on those circumstances, aren't you

Page 126

1 usually placed in handcuffs?
2   A. The fact that somebody is usually placed
3 in handcuffs, I would say that's correct.
4   Q. At any point in time were you placed in
5 handcuffs on October 16, 2003?
6   A. No.
7   Q. And today, you can't tell us how you left
8 the airport; is that correct?
9   A. I took a cab.
10   Q. Do you know where you picked up the cab?
11   A. Went downstairs.
12   Q. You do recall that now, you went
13 downstairs? How did you get downstairs?
14   A. I don't know how I got there. I had to
15 go downstairs to get a cab. You couldn't get any
16 upstairs.
17   Q. Now, you indicated that you saw Sergeant
18 Kiley at the scene. How did you identify him as
19 the sergeant?
20   A. He had an insignia.
21   Q. Where?
22   A. On his arm.
23   Q. What was the insignia you observed that
24 led you to believe he was a sergeant?

Page 139

1 answered it depends upon the circumstances to a
2 question that I asked about whether security
3 personnel in an airport have a right to request
4 those in an airport to produce identification.
5 And those who are requested to produce it are
6 obligated to do so. Is that right?
7     A. The question is whether I said that there
8 were circumstances --
9     Q. Whether it depends on the circumstances.
10     A. Right, right.
11     Q. Not included among those circumstances is
12 when someone is stopped and there is racial
13 profiling; is that right?
14     A. Where a person is stopped in the absence
15 of individualized suspicion on the basis of race
16 or ethnicity in a stop which would normally be or
17 any kind of demand -- did you mention a stop or
18 did I add that?
19        At any rate, any kind of law enforcement
20 activity which might be constitutional would then
21 become unconstitutional.
22     Q. And that's your claim here is that
23 Officer Thompson requested that you produce
24 identification based solely upon racial or ethnic

Page 140

1 profiling?
2     A. No.
3     Q. No?
4     A. No. I don't know what the basis was.
5 I'm not able to get into his mind as to what was
6 going through his mind at the time that he did
7 it. But I know that I had a right not to produce
8 that ID, regardless of what race I might have
9 been. And if race also figured into it, then
10 that would, in my view, compound the problem.
11     Q. Why do you think -- you cited two other
12 examples in airports where there had been
13 incidents. One was when you were going through
14 screening and you were selected for special
15 screening, and some literature was removed from
16 your bag and not replaced. Do you recall telling
17 us about that?
18     A. Yes, although it was replaced.
19     Q. Eventually it was replaced?
20     A. Eventually it was replaced.
21     Q. Was that an incidence of racial profiling
22 in your view?
23     A. I have no idea. I would have to get into
24 the mind of the inspector to find out what his

Page 141

1 motivation might have been.
2     Q. Well, why did you cite that as an
3 incident? Just an incident that you had been
4 through that was uncomfortable?
5     A. No. I was asked to give other examples
6 of stops in airports, even though I didn't
7 necessarily consider that to be a stop, but in
8 some ways it was because I was prevented from
9 being able to go through the airport with all my
10 belongings intact.
11     Q. Was that an unconstitutional act on the
12 part of the TSA screening?
13     A. I believe so.
14     Q. Why?
15     A. I don't believe that TSA, that part of
16 their charge is to take examples of my public
17 education materials for their records.
18     Q. The other incident was when you were
19 screened at the gate and your carry-on, I guess,
20 was being searched. And you asked a number of
21 questions about why you were selected. Is that a
22 fair statement?
23     A. It was prior to my bags being searched.
24     Q. Was that an incidence of unconstitutional

Page 142

1 action?
2     A. When you say "that," which part?
3     Q. That incident in which you asked several
4 questions about being specially selected to have
5 your bags screened at the gate.
6     A. I believe that I was wrongly prevented
7 from boarding a plane.
8     Q. And what was the wrongful act?
9     A. That I was at the screening table, had my
10 bag on the table. And while asking why I was
11 selected I was told that if I asked again I would
12 be prevented from boarding the plane.
13     Q. I recall reading some of the material
14 that was produced concerning, I think it's
15 driving while black kids -- had to do with black
16 kids and the like. Isn't it true that part of
17 the public information campaign that you were
18 responsible for advises drivers who are stopped
19 under circumstances where there might be racial
20 profiling, the advice is, included among other
21 things, to produce identification and worry about
22 the lawful effects later?
23     A. No.
24     Q. No? Is it a part of the advice that you

Page 143

1 should make sure your hands are visible?
2     A. Yes.
3     Q. Is it part of the advice that you should
4 not engage in argument or debate with law
5 enforcement officials?
6     A. Yes.
7     Q. Why is that?
8     A. Because although a person has a First
9 Amendment right to engage an officer, the
10 consequences could be fatal.
11     Q. And why did you not follow that advice on
12 October 16, 2003?
13     A. Follow which advice?
14     Q. Don't argue or debate with law
15 enforcement.
16     A. We've never said anything about debate.
17     Q. Argue. Let's leave it at argue.
18     A. I wasn't arguing.
19        MR. TRIMMIER: I have no further
20 questions.
21        MS. O'NEIL: Nothing further.
22        MR. KITTREDGE: Thank you.
23        (Whereupon the deposition
24 concluded at 12:54 p.m.)

Page 144

1 COMMONWEALTH OF MASSACHUSETTS )
2 SUFFOLK COUNTY, ss.                )
3
4     I, KING DOWNING, the witness herein,
5 having read the foregoing testimony of the pages
6 of this deposition, do hereby certify it to be a
7 true and correct transcript, subject to the
8 corrections, if any, shown on the attached page.
9        oOo
10
11
12        _____
13        KING DOWNING
14
15
16
17 Subscribed and sworn to before me
18 this_____day of_____, 20 __
19        _____
20
21
22
23
24

# EXHIBIT B

Page 1

```
 1          UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 2
                    Civil Action No. 04-12513-RBC
 3

 4

 5   *****************************
     KING DOWNING,                *
 6           Plaintiff,           *
                                  *
 7   v.                           *
                                  *
 8   MASSACHUSETTS PORT AUTHORITY, *
     THE MASSACHUSETTS DEPARTMENT *
 9   OF STATE POLICE, STATE POLICE *
     TROOPER THOMPSON, STATE      *
10   POLICE SERGEANT CROXTON,     *
     THOMAS G. ROBBINS, and PETER *
11   J. DIDOMENICA,               *
             Defendants.          *
12   *****************************

13

14                   DEPOSITION OF WILLIAM A. THOMPSON,
     JR., taken pursuant to notice under to the applicable
15   provisions of the Federal Rules of Civil Procedure,
     before Michelle Kaczynski, a Registered Professional
16   Reporter and Notary Public in and for the Commonwealth
     of Massachusetts, at the offices of Lurie & Krupp, LLP,
17   One McKinley Square, Boston, Massachusetts, on
     Thursday, June 22, 2006, at 10:05 a.m.
18

19

20

21

22                 KACZYNSKI REPORTING
23              72 CHANDLER STREET, SUITE 3
                BOSTON, MASSACHUSETTS  02116
24                   (617) 426-6060
```

Page 2

```
 1   APPEARANCES:

 2   ON BEHALF OF PLAINTIFF, KING DOWNING:

 3   PETER B. KRUPP, ESQ.
     JEFFREY ARBEIT, LAW STUDENT
 4   Lurie & Krupp, LLP
     One McKinley Square
 5   Boston, MA  02109
     (617) 367-1970
 6
     JOHN REINSTEIN, ESQ.
 7   American Civil Liberties Union of Massachusetts
     211 Congress Street
 8   Boston, MA  02110
     (617) 482-3170 x324
 9
     ON BEHALF OF MASSACHUSETTS PORT AUTHORITY:
10
     ROSCOE TRIMMIER, JR., ESQ.
11   Ropes & Gray LLP
     One International Place
12   Boston, MA  02110-2624
     (617) 951-7000
13
     JOSEPH M. KAIGLER, ESQ.
14   Legal Department
     Massachusetts Port Authority
15   One Harborside Drive, Suite 200S
     East Boston, MA  02128-2909
16   (617) 568-3142

17   ON BEHALF OF THE MASSACHUSETTS DEPARTMENT OF STATE
     POLICE, THOMAS G. ROBBINS and PETER J. DIDOMENICA:
18
     MARY O'NEIL, ESQ.
19   The Commonwealth of Massachusetts
     Office of The Attorney General
20   One Ashburton Place
     Boston, MA  02108
21   (617) 727-2200, Ext. 2636

22

23

24
```

Page 3

```
 1   APPEARANCES (CONTINUED):

 2   ON BEHALF OF STATE POLICE TROOPER THOMPSON and STATE
     POLICE SERGEANT CROXTON:
 3
     JOSEPH P. KITTREDGE, ESQ.
 4   160 Gould Street, Suite 111
     Needham, MA  02494
 5   (781) 455-0707

 6   ON BEHALF OF TRANSPORTATION SECURITY ADMINISTRATION:

 7   DENNIS J. CRONIN, ESQ.
     TSA Regional Counsel
 8   One Harborside Drive, Box 12
     East Boston, MA  02128
 9   (617) 568-0514

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 4

```
 1                    I N D E X

 2   EXAMINATION BY MR. KRUPP.......................Page 6
     EXAMINATION BY MS. O'NEIL.....................Page 91
 3   EXAMINATION BY MR. TRIMMIER...................Page 91
     EXAMINATION BY MR. KITTREDGE..................Page 94
 4   EXAMINATION BY MR. KRUPP......................Page 95

 5

 6

 7

 8                  E X H I B I T S

 9   No.    Description                        Page No.
     1      PASS Training Document, 3/10/03        25
10   2      PowerPoint Presentation, PASS          28

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 37

1  or authorized to do under the PASS system?
2      A. Nothing.
3      Q. Did you receive training on what was and what
4  is not unusual behavior for purposes of the PASS system
5  for purposes of stopping someone at the airport?
6      A. Yes.
7      Q. And what did that, what were you taught?
8          MR. CRONIN: The response to that
9  question would be SSI.
10         MR. KRUPP: And just because this is the
11 first comment, have you instructed your client --
12         MR. KITTREDGE: I'm instructing --
13         MR. KRUPP: -- to not answer a question
14 that TSA objects to?
15         MR. KITTREDGE: Yes, I have instructed
16 him to.
17     Q. Were you trained as part of the PASS system
18 that you could base unusual behavior on a person's
19 nationality, for example?
20     A. No.
21     Q. Were you trained that you could base your
22 belief that somebody was acting unusual based on a
23 person's residence?
24     A. No.

Page 38

1      Q. Were you trained that you could base a
2  conclusion that someone was acting unusual based on
3  their travel to other countries?
4          MR. CRONIN: Response to that question
5  would be SSI.
6      Q. Were you trained that you could base your
7  conclusion that someone was acting unusual on their
8  appearance?
9      A. No.
10     Q. When -- let me draw your attention on
11 Exhibit 2 to the page at the bottom right which is
12 labeled seven, page seven. At the bottom, the bottom
13 two screen shots are titled racial profiling, do you
14 see that?
15     A. Yes.
16     Q. And they're blacked out, do you see that?
17     A. Yes, yes.
18     Q. It's fair to say that none of the screen
19 shots that you were shown during your training were
20 blacked out, right? When you were trained in March of
21 2003 --
22     A. Yes.
23     Q. -- none of the screen shots that were
24 projected up on the board as part of your training were

Page 39

1  blacked out like this is blacked out on number seven,
2  page seven?
3      A. I don't recall.
4      Q. And another example, and I don't want to
5  belabor this point, but page fifteen, there are four
6  screen shots on page fifteen, all of which have at
7  least some information blocked out, do you see that?
8      A. Yes.
9      Q. Okay. Do you remember attending a training
10 where, for example, the bottom left hand corner, a
11 screen shot said possible, signs of suspicious
12 activity, and then those signs were kept from you?
13     A. I don't remember.
14     Q. Okay. Let me show you page two, ask you to
15 turn to page two of Exhibit 2. On the bottom right
16 there's a screen shot that defines elevated suspicion,
17 do you see that?
18     A. Yes.
19     Q. And is it fair to say that this is the
20 definition that you were going to be searching for in
21 the document when you were asking to look at the
22 document before about what you were taught about what
23 the standard was for you to go and stop someone?
24     A. Yes.

Page 40

1      Q. All right, okay. In your work at Logan
2  Airport as providing security as a trooper or when you
3  were with the anti-terrorism unit, in both capacities,
4  after March of 2003 when you received this training,
5  did you apply this policy?
6      A. No.
7      Q. Did you ever apply this policy?
8      A. I don't remember.
9      Q. In your -- did you understand that the
10 Passenger Assessment and Screening System was a policy
11 that you were supposed to apply in your work at Logan
12 Airport?
13     A. Yes.
14     Q. And did you apply it?
15     A. No.
16     Q. Why not?
17     A. Because I believe with this policy there's a
18 program that you were involved in to specifically
19 concentrate efforts on.
20     Q. I'm not sure I understand your answer. Is it
21 your answer that there was a, there were a group of
22 people within Troop F who were specifically assigned to
23 enforce this PASS policy?
24     A. Yes.

Page 41

1    Q. And is it your testimony that although you
2   were trained in it, you were not one of the people
3   specifically assigned to enforce it?
4    A. I don't understand the question.
5    Q. Okay. You received training in the PASS
6   policy, right?
7    A. Yes.
8    Q. And you did that in March of 2003?
9    A. Yes.
10    Q. Right? But is it your testimony that you
11   were never directed to enforce the policy?
12    A. We were directed to enforce it, yes.
13    Q. And was everybody who was trained in the PASS
14   policy expected to enforce the policy?
15    A. Yes.
16    Q. And everybody who was trained in it was
17   directed to follow it, correct?
18    A. Yes.
19    Q. And now I want to go back to your earlier
20   answer. When you were at Logan Airport, did you follow
21   the policy?
22    A. Yes.
23    Q. Okay. Did you ever stop individuals at Logan
24   Airport based on elevated suspicion as it's defined on

Page 42

1   page two of Exhibit 2?
2    A. No.
3    Q. Did you ever approach any people within Logan
4   Airport to ask them for identification based on
5   elevated suspicion as it's defined on page two?
6    A. No.
7    Q. Was there any particular reason for that?
8    A. Because I dealt with different type of
9   people, I dealt with irates, I didn't deal with the
10   PASS program in general.
11    Q. Okay, so generally you were handling a
12   different kind of person than someone who might have
13   been assigned to a unit or a sub-unit within Troop F
14   that was specifically on the lookout for potential
15   terror suspects?
16        MR. KITTREDGE: Objection.
17        MS. O'NEIL: Objection.
18        MR. KITTREDGE: You can answer.
19    Q. Is that fair to say?
20        THE WITNESS: Hmm?
21        MR. KITTREDGE: You can answer.
22    A. Can you repeat that, please?
23    Q. Sure. It's fair to say that you were dealing
24   with different people than someone might have had they

Page 43

1   been assigned to a unit specifically focused on
2   apprehending or observing potential terror suspects?
3    A. Yes.
4    Q. Let me draw your attention to the events of
5   October 16, 2003 which are at issue in this case. Do
6   you remember having any interaction with an individual
7   named King Downing?
8    A. Yes, yes.
9    Q. When was that first interaction?
10    A. Are you looking for the time?
11    Q. Yes, let's just start with the time. What
12   time was it?
13    A. In the morning hours of October.
14    Q. What shift were you on?
15    A. I was on a seven to three shift.
16    Q. Had you just come on?
17    A. No.
18    Q. Had you received any alerts that morning that
19   there was any particular thing going on or anticipated
20   to be going on at the airport that you should be on the
21   alert for?
22    A. No.
23    Q. How were you assigned on that day, to do
24   what?

Page 44

1    A. On that particular day I was assigned to, to
2   sign in or to allow law enforcement officers to go
3   through the checkpoint.
4    Q. You're talking about the checkpoint between
5   the secure and unsecure areas of the airport?
6    A. Yes.
7    Q. Were you in uniform?
8    A. Yes.
9    Q. And where was that checkpoint?
10    A. US Air main.
11    Q. Which terminal?
12    A. Terminal B.
13    Q. Is that a stationary posting, or is that a
14   posting that allows you to roam in the area of Terminal
15   B?
16    A. Roam.
17    Q. So are you, and the roaming that you do, is
18   that in the secure or nonsecure area of the airport?
19    A. Both.
20    Q. If a law enforcement officer wishes to
21   proceed between the nonsecure and secure areas, they
22   have to contact you, is that right?
23    A. That's correct.
24    Q. They have to find you and contact you and

Page 49

1    in conversation with me.
2        Q. I'm sorry, after he got off the phone he
3    engaged in conversation with you?
4        MR. KITTREDGE: Objection.
5        Q. Is that right, is that right?
6        A. Objection.
7        MR. KITTREDGE: No, you can answer.
8        Q. He'll tell you if he doesn't want you to
9    answer, he'll make a direct comment to you that he
10   doesn't want you to answer, he'll be very clear, so if
11   he's objecting, he's objecting to the form of my
12   question to give me an opportunity to rephrase my
13   question because he thinks there's something unclear
14   about it.
15       A. I wanted it, I wanted to have it rephrased.
16       Q. All right, I'll rephrase it, that's
17   absolutely fair. I wanted to understand your answer,
18   and that's why I asked the question the way I did. You
19   observed King Downing on the phone, right, is that
20   right?
21       A. Yes.
22       Q. And when did you first have conversation with
23   him, was it while he was still on the phone or after he
24   got off the phone?

Page 50

1        A. When he was on the phone.
2        Q. Who initiated the conversation?
3        A. Mr. Downing.
4        Q. What did he say?
5        A. He asked me why I was standing in the
6    position I was.
7        Q. And where were you standing?
8        A. A few feet from where he was on the phone.
9        Q. And what did you say?
10       A. And he continued, he also continued to say
11   why was I listening to the conversation.
12       Q. What did you say?
13       A. I said to him I wasn't listening to his
14   conversation, then I continued to say that if he wanted
15   to talk me about something I'd be glad to listen to him
16   when he's off the phone.
17       Q. Why did you think he wanted to talk to you
18   about something?
19       A. Why did I think he did?
20       Q. Yes.
21       A. Because he asked me why I was standing the
22   way I was.
23       Q. And you said you were standing a few feet
24   away from where he was?

Page 51

1        A. Yes.
2        Q. Were you at a pay phone next to him?
3        A. There was a pay phone, I was next to the pay
4    phone.
5        Q. The pay phone is not a solitary pay phone,
6    right, there are a number of pay phones in that area,
7    right?
8        A. That was the only pay phone in that area.
9        Q. There's only a single pay phone?
10       A. I think it's a double pay phone.
11       Q. Okay, and were you making a call at the
12   adjacent pay phone?
13       A. No, I was watching the checkpoint.
14       Q. Okay. You were watching the security
15   checkpoint?
16       A. The main checkpoint, yes.
17       Q. Okay, and did he beckon you over or give you
18   any indication that he wanted to talk to you?
19       A. He looked at me and asked me the question.
20       Q. And he asked you about where you, why you
21   were standing where you were standing?
22       A. Yes.
23       Q. Okay, and what happened after he -- did you
24   hear any of his conversation?

Page 52

1        A. No.
2        Q. Were you -- and what happened when he got off
3    the phone?
4        A. What happened? I asked him if I could help
5    him with anything.
6        Q. Did he look like he needed your help?
7        A. Yes.
8        Q. Why?
9        A. He implied -- well, he became very
10   condescending, so I figured maybe he was lost or didn't
11   know where he was going, so I just wanted to provide
12   some information if I could.
13       Q. You say he became condescending, what do you
14   mean by that?
15       A. I asked him if he needed help, and he said
16   no. His tone of voice raised and he said no, and I
17   asked, and I began to ask him, do you have any travel
18   documents, are you flying in, are you waiting for
19   somebody, and he said no.
20       Q. Well, before you asked him all these
21   questions you said he became very condescending, right?
22   What did he do that you described as condescending?
23       A. When he, okay, when he asked me why I was
24   standing there, right, I said to him, I'm working here,

Page 53

1 then he raised, then -- and I asked him, why you are
2 asking me why am I standing here, and he raised his
3 voice.
4    Q. What did he say in a raised voice?
5    A. He said, I don't have to say anything to you,
6 and then it just was unusual, it was unusual to see
7 that in somebody, so I continued to ask him, like I
8 said, if I could do anything to help him out.
9    Q. How was he dressed?
10    A. He had on pants, he had on a shirt, and I can
11 remember a Barracuda jacket.
12    Q. What's a Barracuda jacket?
13    A. Summer jacket.
14    Q. Was he clean-shaven?
15    A. I believe he had a beard.
16    Q. Long or short?
17    A. Short.
18    Q. Anything on his head?
19    A. I don't recall.
20    Q. What's his race?
21    A. Black male.
22    Q. Dark-skinned, light-skinned?
23    A. Black male.
24    Q. Would you describe his, the tone of his skin,

Page 54

1 would you say he's dark-skinned black or light-skinned
2 black?
3    A. Black male, I mean, he's a black male.
4    Q. You understand -- as you're sitting here do
5 you know one way or the other whether the tone of his
6 skin is a very dark black color or lighter brown color?
7    A. I don't recall.
8    Q. Okay. What was his height?
9    A. Over six feet.
10    Q. Taller than you are?
11    A. Yes.
12    Q. Did he have any luggage?
13    A. I don't recall seeing any.
14    Q. Did he appear to be traveling with anyone or
15 alone or -- that may assume certain things, I'm sorry,
16 let me just rephrase the question. Did he appear to be
17 alone?
18    A. He appeared to be alone.
19    Q. After you said to him; excuse me, he said, I
20 don't have to say anything to you, words to that
21 effect, is that when you said -- well, what did you say
22 in response to that?
23    A. I said, I said to him that if you're not
24 flying out, if you have no business in the airport then

Page 55

1 you're going to have to leave the airport.
2    Q. And at this point he hadn't said to you one
3 way or the other whether he had business in the
4 airport, correct?
5    A. He said he didn't.
6    Q. He said --
7    A. He wouldn't give me any information.
8    Q. So did he say he didn't have information in
9 the airport, or did he not give you any information?
10    A. He said he's not going to give me any
11 information.
12    Q. Okay, so he just didn't tell you one way or
13 the other whether he had any business at the airport,
14 is that right?
15    A. I don't know if he had anything.
16    Q. You don't know because he didn't tell you,
17 right?
18    A. He said he wouldn't provide me any, so I
19 don't know what was going on with him.
20    Q. Okay, and so you told him that if he wasn't
21 flying out or he didn't have any business at the
22 airport he'd have to leave the airport, is that right?
23    A. Yes.
24    Q. And why was that?

Page 56

1    A. Why?
2    Q. Yes. Why did he have to leave the airport?
3    A. Because the way we're trained in the airport,
4 if you don't have any business there, there's no reason
5 for you to be there, you'd rather have someone not be
6 in the area.
7    Q. And at that time you didn't know whether he
8 had business at the airport one way or the other
9 because he didn't answer your question, right?
10    A. Yes.
11    Q. What was the next thing that happened, either
12 that happened or that you said or he said?
13    A. He left the airport, he left the area, he
14 exited the doors.
15    Q. On what level?
16    A. The upper level.
17    Q. Did he go out through the doors closest to
18 the pay phone where he was, had been on the phone?
19    A. Yes.
20    Q. And then what happened?
21    A. And I followed him.
22    Q. Why?
23    A. I was kind of concerned about his well-being.
24 I didn't know where he was coming from, didn't know

Page 57

1  what he was going to do, so I followed him out of the
2  airport.
3       Q. You say you were concerned about his
4  well-being?
5       A. Yes.
6       Q. Did he give you any indication that he was
7  unstable or he was in peril himself?
8       A. Yes.
9       Q. And what was that?
10      A. Approaching me, asking me, approaching me,
11  asking me questions which were unusual, not listening
12  to what I had to say, totally ignoring me.
13      Q. And what happened next after you followed him
14  outside?
15      A. I followed him outside and I called on my
16  radio to get some assistance.
17      Q. Who did you call?
18      A. I called the state police barracks.
19      Q. Who did you talk to?
20      A. I don't know, I don't remember.
21      Q. Did you call for a particular person?
22      A. No.
23      Q. What did you ask for?
24      A. I asked for assistance, for somebody to come

Page 58

1  to US Air, Terminal B.
2       Q. Why?
3       A. I wanted to find out who this gentleman was.
4       Q. Why?
5       A. I was looking out for his well-being.
6       Q. And you thought if you found out who he was
7  you would be helping him?
8       A. Yes, and the patrons around the airport.
9       Q. So you were really working on security for
10  the airport, is that fair to say?
11      A. Yes.
12      Q. Did you -- how did you call state police
13  barracks?
14      A. I have a portable radio.
15      Q. Is that a cell phone?
16      A. No, portable radio.
17      Q. Okay, and does that go into a dispatcher at
18  the state police barracks?
19      A. Yes.
20      Q. Is that radio call ordinarily recorded by the
21  state police?
22      A. I believe so.
23      Q. Have you ever had to go back to locate a
24  call-in that you made to the state police dispatcher?

Page 59

1       A. No.
2       Q. What happened after you made this call to the
3  state police dispatcher?
4       A. A couple of troopers arrived.
5       Q. Okay. By the way, is the state police
6  dispatcher a Troop F dispatcher, or is it a more
7  centrally located dispatcher?
8       A. A Troop F dispatcher.
9       Q. Okay. You say a couple of troopers arrived?
10      A. Yes.
11      Q. Who arrived?
12      A. Croxton, Trooper Croxton, Trooper Adell and
13  Trooper Moore.
14      Q. Did you say O'Dell?
15      A. Adell.
16      Q. Adell?
17      A. A D E L L.
18      Q. What's his first name?
19      A. Wanza.
20      Q. Could you spell that?
21      A. W A N Z A.
22      Q. And Trooper Moore, what's Trooper Moore's
23  first name?
24      A. Robert.

Page 60

1       Q. And are both Wanza Adell and Robert Moore
2  still state troopers in Troop F?
3       A. Yes.
4       Q. And what's Trooper Croxton's first name?
5       A. Howard.
6       Q. And is Mr. Croxton still associated with
7  Troop F?
8       A. Yes.
9       Q. He's a sergeant, is that right?
10      A. No, he's a trooper.
11      Q. He's a trooper, and what is the rank of Adell
12  and Moore?
13      A. Troopers also.
14      Q. Were any of those three individuals assigned
15  to the, enforce the PASS program at the time of this
16  particular incident?
17      A. I don't know.
18      Q. When you called the dispatcher, what did you
19  tell the dispatcher about why you needed assistance?
20      A. I don't remember what, exactly what I said.
21      Q. Fair to say that you wanted the troopers who
22  were responding to your call for assistance to
23  understand what it was they were coming to, if you
24  will, what kind of an incident they were responding to?

Page 61

1    MR. KITTREDGE: Objection.
2    Q. Did you want them to have some idea what they
3    were responding to at the time you made the call to the
4    dispatcher?
5    A. Yes.
6    Q. And so you had, you gave the dispatcher some
7    description of what it was that these troopers were
8    being asked to assist with, right?
9    A. I don't recall.
10    Q. Did Croxton, Adell and Moore show up in a
11    vehicle?
12    A. No. Well, Adell and Moore did, I believe.
13    Q. Adell and Moore did?
14    A. Adell, Adell came in a vehicle, I'm not sure
15    about Moore.
16    Q. And how about Croxton?
17    A. I believe Croxton was on foot. There was
18    also another officer that was in the area.
19    Q. And who was that?
20    A. Sergeant Mark Kiley.
21    Q. Mark did you say?
22    A. Yes, Mark Kiley.
23    Q. Is that K I L E Y?
24    A. Yes.

Page 62

1    Q. Did all four other officers, now we have
2    Adell, Moore, Croxton and Kiley, respond at the same
3    time, or did they come over a period of minutes, or
4    what was the sequence?
5    A. I don't know what the sequence was.
6    Q. Who got there first?
7    A. Croxton.
8    Q. Do you know where Croxton had been assigned
9    that day?
10    A. I believe he was over at American Airlines.
11    Q. On the secure or nonsecure side?
12    A. Would you repeat that question again?
13    Q. Yes. On the secure or nonsecure side of the
14    airport?
15    A. He was assigned to terminal.
16    Q. So he could have been on either side of the
17    security barrier, is that right?
18    A. Could have been anywhere over there, yes.
19    Q. Did you, where did -- Strike that.
20        Did you stay with Mr. Downing until
21    others responded?
22    A. No, I was in the area.
23    Q. Did -- and what did Mr. Downing do while you
24    were in the area?

Page 63

1    A. He just continued to walk down the sidewalk,
2    he just continued to walk, he walked down the terminal,
3    he continued to walk onto the sidewalk, on the sidewalk
4    away from me --
5    Q. Okay, so he walked out the door, right?
6    A. Yes.
7    Q. And then he walked out to the sidewalk?
8    A. Yes.
9    Q. Okay. Was he pacing up and down, was he
10    pacing up and down back and forth on the sidewalk?
11    A. Yes.
12    Q. Was he looking for a cab, could you tell?
13    A. I don't know.
14    Q. Did you have any conversation with him out on
15    the sidewalk?
16    A. No.
17    Q. How long was it before you, when you were
18    outside the terminal before you called for assistance?
19    A. How long was it?
20    Q. Yes.
21    A. Explain.
22    Q. How long it was when you were outside of the
23    terminal before you called for assistance?
24    A. I was inside the terminal when I called for

Page 64

1    assistance.
2    Q. Oh, okay, and was Mr. Downing still inside
3    the terminal also when you called for assistance?
4    A. No, he walked out of the terminal.
5    Q. How far away from him were you when you
6    called for assistance?
7    A. A few feet.
8    Q. So within proximity for him to hear that you
9    were radioing, is that right?
10    A. Could he hear that I was?
11    Q. Yes.
12    A. I don't know.
13    Q. But you were a few feet away from him?
14    A. Yes.
15    Q. Okay, and let's see. When Officer Croxton
16    arrived, did you talk to him?
17    A. Yes.
18    Q. What did you tell him?
19    A. I mentioned to Croxton that, I pointed out
20    Mr. Downing to him.
21    Q. At that time you didn't know his name, right?
22    A. Yes, didn't know who he was.
23    Q. Okay, okay, so you pointed out the individual
24    to him?

Page 65

1    A. Yes.
2    Q. Okay, and what else did you tell him?
3    A. I mentioned to him that, how unusual he was
4    acting and how he didn't want to give me any
5    information regarding travel documents and just refused
6    to.
7    Q. Just refused to what?
8    A. He refused to listen to anything I had to
9    say.
10    Q. Okay. I just want to better understand
11    exactly what Mr. Downing's conduct was as you are
12    relating it here. You say he was acting unusual?
13    A. Yes.
14    Q. Right, and can you tell me how he was acting
15    unusual?
16    A. He was acting unusual, he kept asking me
17    questions about the reason why I was at the particular
18    point where I was.
19    Q. How many times did he ask you that?
20    A. Twice.
21    Q. Two times?
22    A. Yes.
23    Q. And after the first time he asked, what did
24    you tell him, did you respond or no?

Page 66

1    A. No, I was, I didn't respond at all.
2    Q. Okay, and then he asked you a second time?
3    A. Yes.
4    Q. And did you respond after the second time?
5    A. Yes.
6    Q. What did you tell him?
7    A. I said I work here.
8    Q. Okay. Did you tell him anything more?
9    A. No.
10    Q. You just said I work here?
11    A. Yes.
12    Q. Now, when you say he kept asking you why you
13    were at the point you were, you're talking about the
14    two times, right?
15    A. Yes.
16    Q. All right. Now, how else, if at all, was he
17    acting unusual besides asking you at what point;
18    excuse me, why you were at the point you were?
19    A. Because the question that he asked me, the
20    manner of the questioning was confrontational.
21    Q. And the questioning you're referring to are
22    these two questions?
23    A. Yes.
24    Q. So are you talking about tone of voice?

Page 67

1    A. Yes.
2    Q. All right. Did Mr. Downing say or do
3    anything else that was confrontational besides these
4    two questions?
5    A. Did he say or do anything else?
6    Q. Yes.
7    A. No.
8    Q. And it's fair to say that both of the
9    questions that he asked you about why were you at the
10    point that you were at, right, those were while he was
11    on the phone, right, he was like are you over listening
12    to my conversation kind of thing, right?
13    A. While he was on the phone?
14    Q. Yes.
15    A. Yes.
16    Q. Okay. Now, other than these two questions
17    and the manner of the questions being confrontational
18    in your view, did Mr. Downing say or do anything else
19    that was unusual?
20    A. Other than the questioning?
21    Q. Yes.
22    A. Yes.
23    Q. And what was that?
24    A. When I asked him for travel documents, when I

Page 68

1    asked him for identification.
2    Q. He said, I don't have to give those to you?
3    A. Exactly.
4    Q. Anything else that was unusual besides the
5    two questions, and you asked him for travel documents
6    and ID and he said, I don't have to give those to you,
7    anything else that was unusual in his behavior or words
8    or statements or anything?
9    A. I was there to help him, and obviously he
10    didn't want the help, so I was just kind of confused at
11    why his behavior was like it was.
12    Q. And I just want to understand the unusual --
13        MR. KITTREDGE: I just want to make sure
14    he finishes.
15        MR. KRUPP: Yes, go ahead, fair.
16        MR. KITTREDGE: Did you finish?
17        THE WITNESS: Yes.
18        MR. KITTREDGE: All right.
19    Q. Okay. I want to make sure I understand all
20    the nature, all of the ways in which Mr. Downing's
21    behavior was unusual. We have the questions, we have
22    the manner of the questioning you viewed as
23    confrontational, these two questions, and that when you
24    asked him for travel documents and ID he said, I don't

## Page 69

1  have to give them to you, right?
2      A. That's correct.
3      Q. Okay.  Anything else?
4      A. No.
5      Q. Now, after you finished your conversation
6  with Officer Croxton, what did you do next?
7      A. I remained in the area.
8      Q. Did Croxton remain in the area?
9      A. Yes.
10     Q. And did King Downing, was King Downing still
11 on the sidewalk?
12     A. He was in the area, yes.
13     Q. When you say in the area, what do you mean?
14     A. He was in the area where we were.
15     Q. Outside?
16     A. Outside on the sidewalk.
17     Q. You were keeping an eye on him?
18     A. I was in the area, yes.
19     Q. Were you watching him?
20     A. Yes.
21     Q. Okay, and was Croxton watching him?
22     A. Yes.
23     Q. You and Croxton were together?
24     A. Yes.

## Page 70

1      Q. And did you see Mr. Downing do anything
2  unusual out on the curb?
3      A. No.
4      Q. What happened next?
5      A. I believe Trooper Croxton engaged in
6  conversation with Mr. Downing.
7      Q. Was that before or after Adell and Moore
8  showed up?
9      A. I don't recall.
10     Q. Were you present for that conversation with
11 Mr. Downing between Mr. Downing and Croxton?
12     A. I was in the area.
13     Q. Were you close enough to hear what was said?
14     A. No.
15     Q. Where did that conversation take place?
16     A. On the sidewalk.
17     Q. How long did it last?
18     A. I don't know.
19     Q. Was anybody else present for that
20 conversation?
21     A. I believe Sergeant Kiley was.
22     Q. Did you brief Sergeant Kiley on what the
23 situation was when he arrived?
24     A. Yes, I did.

## Page 71

1      Q. What did you tell Sergeant Kiley?
2      A. The same thing I told Trooper Croxton.
3      Q. Did you brief Sergeant Kiley separately or
4  together with Croxton?
5      A. I don't remember.
6      Q. What was the next thing that happened after
7  the conversation between King Downing and Trooper
8  Croxton?
9      A. Sergeant Kiley engaged in conversation with
10 him.
11     Q. That was a separate conversation from the
12 Croxton-Downing conversation?
13     A. I believe they were.
14     Q. Let me ask you this.
15     A. Okay.
16     Q. Did the three of them talk together?
17     A. Yes.
18     Q. And this is outside on the sidewalk, right?
19     A. Yes.
20     Q. And you don't hear the conversation?
21     A. No.
22     Q. But you can see something going on between
23 the three of them?
24     A. Yes.

## Page 72

1      Q. And what happens next?
2      A. I believe Mr. Downing produced travel
3  documents and his license.
4      Q. Did you see either the travel documents or
5  his license?
6      A. I saw the license.
7      Q. Did you record any of the information from
8  the license?
9      A. Yes, I did.
10     Q. Where did you record that?
11     A. State police barracks.
12     Q. What did you record it on?
13     A. I just --
14     Q. You called it in?
15     A. -- gave the information to the dispatcher
16 and --
17     Q. Okay.  You called it into the barracks?
18     A. Yes.
19     Q. Okay.  It's not like you wrote down the
20 information from his license, you just called it in
21 with the license in front of you --
22     A. No, just called it in --
23     Q. -- is that right?
24     A. That's correct.

Page 81

1    Q. And what's the trespass file?
2    A. People who don't have any business in the
3    airport.
4    Q. Okay, and is that the same as a no-fly list?
5    A. No.
6    Q. Is the no-fly list different? All right.
7    What is a no-fly list?
8    A. No-fly list.
9    Q. Do you know that term?
10    A. Yes, I do.
11    Q. What does it mean?
12    A. It's a list of individuals who may have been
13    arrested in the airport.
14    Q. Okay. Was it your understanding that the
15    state police barracks that you called the information
16    into was also going to check the no-fly list?
17    A. I'm not sure, I don't know.
18    Q. Was Mr. Downing added, his name added to the
19    trespass list at Logan Airport?
20    A. I don't believe so.
21    Q. Is there a form that you'd have to fill out
22    in order to add someone's list, his, excuse me, add
23    someone's name to the trespass list?
24    A. Yes.

Page 82

1    Q. What kind of form is that?
2    A. What type of form is --
3    Q. Yes.
4    A. State police standard form.
5    Q. Similar to the field interview and
6    observation report that I showed you earlier?
7    A. No, no. I actually don't even know what it
8    looks like.
9    Q. Okay. Have you ever filled out a form to put
10    somebody on the trespass list?
11    A. No, we don't actually fill out the forms.
12    Q. Who does that?
13    A. The dispatcher fills out the forms.
14    Q. On your recommendation?
15    A. Yes.
16    Q. And have you ever recommended that someone be
17    added to the trespass list?
18    A. No.
19    Q. At some point; well, what happened after you
20    called in the information from the state police
21    barracks -- Strike that.
22        What happened after you called in the
23    information about Mr. Downing's license to the state
24    police barracks?

Page 83

1    A. What happened afterwards?
2    Q. Yes.
3    A. They came back with information regarding the
4    license information.
5    Q. They had to radio that back to you?
6    A. Yes.
7    Q. And how long did that take?
8    A. Say about a couple minutes.
9    Q. And were you out of a vehicle or in a vehicle
10    at the time?
11    A. Out of vehicle.
12    Q. And what happened after you got -- what
13    information did you get back from the barracks?
14    A. They indicated that he had a valid license,
15    no warrants on him, nothing in the trespass file.
16    Q. And then what happened?
17    A. I believe I gave the license back to
18    Mr. Downing.
19    Q. And did you have any conversation with him?
20    A. No.
21    Q. Did you tell him he was free to go?
22    A. Excuse me?
23    Q. Did you tell him he was free to go?
24    A. I believe the other officers told him.

Page 84

1    Q. Okay. After you gave back, after you gave
2    him back the license?
3    A. Yes.
4    Q. Okay, and who was, who was it that said that,
5    do you know which of the other officers it was?
6    A. No.
7    Q. Prior to this deposition, did you have any
8    conversations with Croxton or Sergeant Kiley or any of
9    the other people that responded about the allegations
10    in this suit?
11    A. I believe with Croxton.
12    Q. And when was the last conversation you had
13    with Croxton about it?
14    A. 2003.
15    Q. Did Croxton tell you anything about his
16    conversation with King Downing during that incident;
17    that is to say, the conversation that he had that you
18    were not present for or you couldn't hear?
19    A. No, I don't recall.
20    Q. Do you remember prior to suit being filed in
21    this case that there was a request for information made
22    about information about this incident?
23    A. Do I remember? No.
24    Q. No? Were you ever asked by anybody at the

Page 93

1   question, is that right?
2       A. That's correct.
3       Q. Was it at that time that you became either
4   suspicious or concerned about his behavior?
5       A. Concerned.
6       Q. And to determine whether or not he had
7   legitimate business in the airport and who he was, you
8   thought it would be appropriate to see his license for
9   identification and any travel documents that he had?
10      A. That's correct.
11      Q. He refused to give those to you, didn't he?
12      A. That's correct.
13      Q. You indicated that part of the training as a
14  state police officer with duties at Logan, you were
15  trained in dealing with what I think you called irates,
16  is that right?
17      A. That's correct.
18      Q. Would you characterize Mr. Downing's behavior
19  subsequent to him questioning why you were standing
20  where you were as being irate?
21      A. Yes.
22      Q. And was all of that the reason why you
23  requested assistance in order to determine who he was
24  and what he was doing at the airport?

Page 94

1       A. Yes.
2       Q. Did any part of the PASS training that you
3   had undergone before that cause you to act as you did?
4       A. No.
5       Q. Did Mr. Downing's race play any part
6   whatsoever in your request to him to provide
7   identification and travel documents?
8       A. No.
9           MR. TRIMMIER: I have no further
10  questions.
11          MR. KITTREDGE: I just have a couple to
12  clear up the record here.
13  EXAMINATION BY MR. KITTREDGE:
14      Q. When you attended basic training, that was to
15  enter the Metropolitan Police Department?
16      A. That's correct.
17      Q. And at that point in time were you provided
18  with any Massachusetts State Police information as part
19  of your basic training for the Metropolitan Police?
20      A. No.
21      Q. And at the point in time that Mr. Downing
22  called attention to himself by questioning you, was it
23  actually a phone booth, or was it just a pole with a
24  phone on it?

Page 95

1       A. A pole with a phone on it.
2       Q. And how long had you maintained that post
3   observing the checkpoint prior to Mr. Downing calling
4   attention to himself?
5       A. Hours, I had been there the whole night and
6   the whole morning at that particular location.
7       Q. And at any point in time did you tell Mr.
8   Downing that he was under arrest?
9       A. No.
10          MR. KITTREDGE: No other questions.
11          MR. KRUPP: I have a couple more.
12  EXAMINATION BY MR. KRUPP:
13      Q. When you were standing where you were
14  standing near the phone booth or the phone pole, you
15  were within a couple of feet of Mr. Downing, is that
16  right?
17      A. That's correct.
18          MR. KRUPP: I oversold how many
19  questions I had, I only had one. Thank you.
20          (Deposition concluded at 12:11 p.m.).
21
22
23
24

Page 96

1       I have read the foregoing transcript and the same
2   contains a true and accurate recording of my answers
3   given to the questions therein set forth.
4
5
6
7
8   _____
9       WILLIAM A. THOMPSON, JR.
10  On this ____ day of _____, 2006, before me, the
11  undersigned notary public, personally appeared
12  William A. Thompson, Jr., proved to me through
13  satisfactory evidence of identification, which were
14  _____, to be the person
15  whose name is signed on the preceding or attached
16  document, and who swore or affirmed to me that the
17  contents of the document are truthful and accurate to
18  the best of his knowledge.
19
20
21  _____
22      NOTARY PUBLIC
23
24

EXHIBIT C

**Page 3**

```
 1                    Volume:    I
                      Pages:    1 to 43
 2                    Exhibits:  No. 1

 3

 4          UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MASSACHUSETTS
 5
    * * * * * * * * * * * * * * * *
 6  KING DOWNING,
                  Plaintiff,
 7
         vs.                  Civil Action
 8                            No. 04-12513-RBC
    MASSACHUSETTS PORT AUTHORITY,
 9  THE MASSACHUSETTS DEPARTMENT OF
    STATE POLICE, STATE POLICE TROOPER
10  THOMPSON, STATE POLICE SERGEANT
    CROXTON, THOMAS G. ROBBINS,
11  and PETER J. DIDOMENICA,
                  Defendants.
12  * * * * * * * * * * * * * * * *

13

14          DEPOSITION OF MARK W. KILEY, a witness
    called on behalf of the Plaintiff, taken pursuant to
15  the applicable provisions of the Federal Rules of
    Civil Procedure before Cynthia A. Powers, Shorthand
16  Reporter and Notary Public in and for the
    Commonwealth of Massachusetts, at the law offices of
17  Lurie & Krupp, LLP, One McKinley Square, Boston,
    Massachusetts, on Tuesday, July 18, 2006, commencing
18  at 1:05 p.m.

19

20                * * * * *
21

22
             KACZYNSKI REPORTING
23         72 Chandler Street, Suite 3
           Boston, Massachusetts 02116
24              (617) 426-6060
```

**Page 2**

```
 1  APPEARANCES:

 2  ON BEHALF OF THE PLAINTIFF, KING DOWNING:

 3      LURIE & KRUPP, LLP
        Peter B. Krupp, Esquire
 4      One McKinley Square
        Boston, Massachusetts 02109
 5      (617) 367-1970

 6      AMERICAN CIVIL LIBERTIES UNION OF
        MASSACHUSETTS
 7      John Reinstein, Esquire
        211 Congress Street
 8      Boston, Massachusetts 02110
        (617) 482-3170
 9
    ON BEHALF OF MASSACHUSETTS PORT AUTHORITY:
10
        ROPES & GRAY LLP
11      Roscoe Trimmier, Jr., Esquire
        One International Place
12      Boston, Massachusetts 02110-2624
        (617) 951-7000
13
        MASSACHUSETTS PORT AUTHORITY
14      Joseph M. Kaigler, Esquire
        One Harborside Drive, Suite 200S
15      East Boston, Massachusetts 02128-2909
        (617) 568-3142
16
    ON BEHALF OF THE MASSACHUSETTS DEPARTMENT OF STATE
17  POLICE, THOMAS G. ROBBINS and PETER J. DIDOMENICA:

18      THE COMMONWEALTH OF MASSACHUSETTS
        OFFICE OF THE ATTORNEY GENERAL
19      Mary O'Neil, Esquire
        One Ashburton Place
20      Boston, Massachusetts 02108
        (617) 727-2200
21

22

23

24
```

**Page 4**

```
 1                    I N D E X
    Examination by:   Direct   Cross   Redirect   Recross
 2  Mr. Krupp            5
    Ms. O'Neil                   39
 3  Mr. Kittredge                40

 4

 5

 6

 7

 8

 9

10

11

12             E X H I B I T S
    Exhibit                            Page
13
     1        Special Order Number 01-S O-5    30

14

15
```

**Page 3 (right column)**

```
 1  APPEARANCES (CONTINUED):

 2  ON BEHALF OF THE STATE POLICE TROOPER THOMPSON and
    STATE POLICE SERGEANT CROXTON:
 3
        JOSEPH P. KITTREDGE, ESQUIRE
 4      160 Gould Street
        Suite 111
 5      Needham, Massachusetts 02494
        (781) 455-0707
 6
    ON BEHALF OF THE TRANSPORTATION SECURITY
 7  ADMINISTRATION:

 8      DENNIS J. CRONIN, ESQUIRE
        TSA Regional Counsel
 9      One Harborside Drive, Box 12
        East Boston, Massachusetts 02128
10      (617) 568-0514
```

Page 17

1   arrive at that area?
2       A. I did not see any -- you know what, I
3   don't know. There might have been -- one might have
4   shown up as I was showing up. I just know there was
5   four troopers down there other than myself.
6       Q. When you responded to the area, what
7   was your understanding as to what the incident was
8   that you were responding to?
9       A. There was no understanding. That's
10  why I approached Trooper Thompson, to see what was
11  going on.
12      Q. Did you approach with your gun drawn?
13      A. No.
14      Q. Was there any kind of a code used to
15  alert you to any particular kind of an incident?
16      A. No.
17      Q. And the first thing that you did when
18  you got to the area was to approach Trooper Thompson;
19  is that right?
20      A. Yes.
21      Q. Is it fair to say that you were the
22  person of highest rank among the troopers present at
23  the scene?
24      A. Yes.

Page 18

1       Q. Did you have any supervisory
2   responsibility for the troopers on the scene, being
3   of higher rank?
4       A. The only responsibility is just chain
5   of command in the state police. If an incident
6   transpired there, they would have called a patrol
7   supervisor stationed to F Troop. On scene right
8   there I was of highest rank, but they would have
9   called somebody from the airport that was assigned
10  there.
11      Q. And that's because you were just on a
12  detail there?
13      A. Yes, I'm not assigned there, that's
14  correct.
15      Q. So when you responded to the scene, it
16  was your view that you were responding to give
17  assistance but not to take control of the situation,
18  if you will?
19      A. Yes.
20      Q. What did Trooper Thompson tell you
21  when you arrived at the scene?
22      A. That he had seen this guy at a phone
23  booth earlier. The guy in so many words, these
24  aren't his words, but basically was being

Page 19

1   uncooperative. He wanted to check him on the
2   trespass list, he wanted his ID, and the gentleman
3   wouldn't provide his ID.
4       Q. Did he tell you why he wanted to check
5   him on the trespass list?
6       A. Just in my opinion I can give you,
7   because the guy --
8       Q. First of all, I want what Trooper
9   Thompson told you.
10      A. No, other than what I told you.
11      Q. Did he tell you why he wanted to check
12  his ID?
13      A. Because of his reaction of being
14  uncooperative at the pay phone and that he felt he
15  may be on the trespass list.
16      Q. Did he tell you what the basis for his
17  belief was that he might be on the trespass list?
18      A. His appearance. He looked like -- not
19  to categorize, but he looked like a homeless person.
20      Q. How was he dressed?
21      A. He was dressed in a -- the only thing
22  I remember is a Members Only jacket that I wore in
23  high school that he had on, but I had mine on in '83,
24  so --

Page 20

1       Q. Do you remember what kind of pants he
2   had on?
3       A. Nope. That's the only thing that
4   stuck out was the Members Only jacket.
5       Q. Did he have a briefcase with him?
6       A. I don't know if it was a suitcase. I
7   thought it was one of those pull suitcases, suitcase
8   on wheels.
9       Q. Okay. The kind that people use
10  commuting on an airplane?
11      A. Yeah, but I'm not sure of that.
12  That's what I thought it was.
13      Q. Did Trooper Thompson tell you why he
14  approached the individual at the pay phone?
15      A. No.
16      Q. Did he tell you how the individual had
17  been uncooperative when he was at the pay phone?
18      A. No.
19      Q. So is it fair to say that in this
20  first conversation you had with Trooper Thompson he
21  tells you he wants to check to determine if this
22  individual is on the trespass list and to check his
23  ID because he had been uncooperative on the pay
24  phone?

Page 21

1     A. Yes.

2     Q. Did you ask him for any follow-up

3 information?

4     A. Nope.

5     Q. What was the next thing that you did?

6     A. I walked over. I asked the gentleman

7 for his ID. He immediately handed it to me.

8     Q. Did you have any conversation with him

9 other than asking him for his ID?

10    A. No.

11    Q. Were you in uniform at the time?

12    A. Yes.

13    Q. How about Trooper Thompson?

14    A. Yes.

15    Q. How about the other three troopers?

16    A. Yes.

17    Q. The police vehicle that was, that

18 Trooper Thompson was standing in front of --

19    A. Mm-hmm.

20    Q. -- was that a marked police vehicle?

21    A. Yes.

22    Q. Were the lights going?

23    A. I don't know.

24    Q. Did you walk down to the -- you said

Page 22

1 you walked down to the midpoint of the terminal area

2 from your own vehicle?

3    A. Yes.

4    Q. Were you driving a marked vehicle?

5    A. No.

6    Q. You had an unmarked vehicle?

7    A. Yes.

8    Q. Was it your own car?

9    A. No.

10    Q. Police vehicle?

11    A. Yes.

12    Q. What kind of ID did the individual

13 give to you?

14    A. I don't recall. Whatever he gave me I

15 immediately handed over to Trooper Thompson.

16    Q. Did you have any discussion with the

17 individual other than to ask him for his ID?

18    A. No.

19    Q. Did you have any other interaction

20 with the individual other than to ask him for his ID

21 over the course of the whole incident?

22    A. No.

23    Q. What happened after you handed over

24 the ID to Trooper Thompson?

Page 23

1     A. He walked over to the marked cruiser.

2     Q. He being Trooper Thompson?

3     A. Trooper Thompson. It appeared from my

4 vantage point that he was running the ID through a

5 radio in the cruiser.

6     Q. What was your vantage point?

7     A. The same place I was before, seven to

8 ten feet away from the cruiser. He was at the

9 driver's door.

10    Q. He, Trooper Thompson?

11    A. Trooper Thompson, yes.

12    Q. Where were the other three troopers at

13 the time that Trooper Thompson went over to the

14 marked cruiser to what you believed run his ID?

15    A. Still at the same spot when I arrived.

16    Q. Roughly four or five feet away from

17 the tall individual?

18    A. Yes.

19    Q. Did you look at the ID when the

20 individual gave it to you?

21    A. No.

22    Q. What happened after Trooper Thompson

23 went over to the marked cruiser and ran the ID?

24    A. What happened when he did it or after

Page 24

1 he did it?

2     Q. After he did it?

3     A. He came back.

4     Q. How long did it take, by the way?

5     A. I don't know.

6     Q. What happened?

7     A. He returned the ID to the person and I

8 left.

9     Q. Did you ask the individual for airline

10 tickets, to see airline tickets?

11    A. Did I not.

12    Q. Do you know if anybody did while you

13 were at the scene?

14    A. I don't know.

15    Q. Did you ask for any travel documents?

16    A. No.

17    Q. Do you know if anybody did while you

18 were at the scene?

19    A. I don't know.

20    Q. Did any of the other three troopers at

21 the scene leave before you left?

22    A. I don't think so, no.

23    Q. Did any of the other three troopers

24 who were there when you responded to the scene have

# EXHIBIT D

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
                  Civil Action No. 04-12513-RBC
 3

 4

 5    *****************************
      KING DOWNING,                 *
 6         Plaintiff,               *
                                    *
 7    v.                            *
                                    *
 8    MASSACHUSETTS PORT AUTHORITY, *
      THE MASSACHUSETTS DEPARTMENT  *
 9    OF STATE POLICE, STATE POLICE *
      TROOPER THOMPSON, STATE       *
10    POLICE SERGEANT CROXTON,      *
      THOMAS G. ROBBINS, and PETER  *
11    J. DIDOMENICA,                *
           Defendants.             *
12    *****************************

13

14              DEPOSITION OF HOWARD G. CROXTON,
      taken pursuant to notice under the applicable
15    provisions of the Federal Rules of Civil Procedure,
      before Michelle Kaczynski, a Registered Professional
16    Reporter and Notary Public in and for the Commonwealth
      of Massachusetts, at the offices of the American Civil
17    Liberties Union of Massachusetts, 211 Congress Street,
      Boston, Massachusetts, on Friday, June 23, 2006, at
18    9:09 a.m.

19

20

21

22
                    KACZYNSKI REPORTING
23               72 CHANDLER STREET, SUITE 3
                  BOSTON, MASSACHUSETTS  02116
24                     (617) 426-6060
```

**Page 2**

```
 1    APPEARANCES:

 2    ON BEHALF OF PLAINTIFF, KING DOWNING:

 3    JOHN REINSTEIN, ESQ.
      American Civil Liberties Union of Massachusetts
 4    211 Congress Street
      Boston, MA  02110
 5    (617) 482-3170 x324

 6    ON BEHALF OF MASSACHUSETTS PORT AUTHORITY:

 7    LAURA G. HOEY, ESQ.
      Ropes & Gray LLP
 8    One International Place
      Boston, MA  02110-2624
 9    (617) 951-7000

10    JOSEPH M. KAIGLER, ESQ.
      Legal Department
11    Massachusetts Port Authority
      One Harborside Drive, Suite 200S
12    East Boston, MA  02128-2909
      (617) 568-3142
13
      ON BEHALF OF THE MASSACHUSETTS DEPARTMENT OF STATE
14    POLICE, THOMAS G. ROBBINS and PETER J. DIDOMENICA:

15    MARY O'NEIL, ESQ.
      The Commonwealth of Massachusetts
16    Office of The Attorney General
      One Ashburton Place
17    Boston, MA  02108
      (617) 727-2200, Ext. 2636
18
      ON BEHALF OF STATE POLICE TROOPER THOMPSON and STATE
19    POLICE SERGEANT CROXTON:

20    JOSEPH P. KITTREDGE, ESQ.
      160 Gould Street, Suite 111
21    Needham, MA  02494
      (781) 455-0707

22

23

24
```

**Page 3**

```
 1    APPEARANCES (CONTINUED):

 2    ON BEHALF OF TRANSPORTATION SECURITY ADMINISTRATION:

 3    DENNIS J. CRONIN, ESQ.
      TSA Regional Counsel
 4    One Harborside Drive, Box 12
      East Boston, MA  02128
 5    (617) 568-0514
```

**Page 4**

```
 1                    I N D E X

 2    EXAMINATION BY MR. REINSTEIN....................Page 5
      EXAMINATION BY MS. HOEY.......................Page 48
 3    EXAMINATION BY MR. KITTREDGE..................Page 48
      EXAMINATION BY MR. REINSTEIN..................Page 50
 4    EXAMINATION BY MS. O'NEIL.....................Page 52

 5

 6

 7

 8                  E X H I B I T S

 9    No.    Description                    Page No.
      1      Department of State Police Special Order
10            No. 01-SO-0                         18
      2      Behavior Pattern Recognition Manual  21
11    3      Document                             26
```

## Page 45

1    Q. Okay, and what about the other officers?
2    A. Two or three, three or four feet.
3    Q. Okay. Were you standing on different sides
4    of him?
5    A. No.
6    Q. You were all standing in a row?
7    A. No, we just, he was standing here, and they
8    were just like there as they was coming up. As a
9    matter of fact, two of them that were coming up was
10   when I was leaving.
11   Q. And so who was, who would arrive before you
12   left?
13   A. Trooper Moore and Trooper Adell.
14   Q. And it was Sergeant Kiley was arriving as you
15   left?
16   A. Correct, right.
17   Q. And does your state police uniform have any
18   form of identification on it?
19   A. Yes.
20   Q. That would identify you?
21   A. Name tag.
22   Q. You have a name tag that has your name on it?
23   A. Yes.
24   Q. So that if someone observed you they would

## Page 46

1    see that you are Trooper Croxton?
2    A. Yes.
3    Q. Now, at some point following this incident,
4    were you advised by anyone in the Department of State
5    Police that a letter about the incident had been sent
6    to the department?
7    A. Yes.
8    Q. Okay, and what information did you get?
9    A. I got a letter from the internal affairs
10   unit.
11   Q. Okay. What did they ask you to -- what did
12   they say in that letter?
13   A. Just said it would, you're -- it was like a
14   formal letter from internal affairs that you're
15   required to be subject to interviews by the internal
16   affairs division, and it was a formal letter that they
17   had to speak to you, and it was from Lieutenant George
18   Credit.
19   Q. And did you subsequently speak to --
20   A. Yes.
21   Q. -- Lieutenant Credit?
22   A. Yes.
23   Q. How many times did you speak to him?
24   A. Once.

## Page 47

1    Q. And did you have counsel present?
2    A. My, I had an union representative from F
3    Troop there.
4    Q. Who was there?
5    A. Walter Butler.
6    Q. And was a report of that interview
7    prepared -- Strike that.
8       Did you submit a written report to
9    internal affairs as well?
10   A. Verbal.
11   Q. Verbal, and was that verbal report
12   transcribed?
13   A. Yes, it was.
14   Q. And did you have an opportunity to read it?
15   A. No.
16   Q. You didn't, okay, and did you ever see it?
17   A. No.
18   Q. But it's your understanding that such a
19   report was prepared?
20   A. Yes.
21      MR. REINSTEIN: I have no further
22   questions.
23      MS. O'NEIL: No questions.
24      - - - - -

## Page 48

1    EXAMINATION BY MS. HOEY:
2    Q. I have one very brief question, Trooper
3    Croxton. Mr. Downing's race played no role whatsoever
4    in your brief interaction with him, is that correct?
5    A. Oh, no.
6       MS. HOEY: That's all I have.
7       MR. KITTREDGE: I have a few questions.
8    EXAMINATION BY MR. KITTREDGE:
9    Q. I'm going to direct your attention to Exhibit
10   No. 1. The very bottom of that document on the first
11   page, it indicates it's a draft, is that correct?
12   A. Yes.
13   Q. And up in the number section it has just two
14   number marks. Have you ever seen a special order
15   actually posted in the, in a barracks without any
16   numbers at the end?
17   A. No.
18   Q. Now, do you know whether Exhibit 1 was ever
19   posted in the barracks?
20   A. No.
21   Q. When you were working that day, you indicated
22   that you were working a zone, is that correct?
23   A. Yes.
24   Q. And you were working Terminal B?

Page 53

1  lot of questions, you've been asked a lot of questions
2  about the behavioral recognition program and
3  training --
4      A. Right.
5      Q. Is that correct?
6      A. Yes.
7      Q. Okay. Could you, and if I understand your
8  testimony, the reason you had anything to do with
9  Mr. Downing that day was because you received or heard
10  a call for assistance by Trooper Thompson, is that
11  correct?
12      A. Yes, yes.
13      Q. Were you using the behavior recognition
14  training to assist Trooper Thompson?
15      A. No, I wasn't.
16          MS. O'NEIL: Nothing further.
17          MR. REINSTEIN: That's it.
18          MS. HOEY: I have nothing.
19          (Deposition concluded at 10:27 a.m.).
20
21
22
23
24

Page 54

1      I have read the foregoing transcript and the same
2  contains a true and accurate recording of my answers
3  given to the questions therein set forth.
4
5
6
7
8      _____
        HOWARD G. CROXTON
9
10  On this ____ day of _____, 2006, before me, the
11  undersigned notary public, personally appeared
12  Howard G. Croxton, proved to me through satisfactory
13  evidence of identification, which were
14  _____, to be the person
15  whose name is signed on the preceding or attached
16  document, and who swore or affirmed to me that the
17  contents of the document are truthful and accurate to
18  the best of his knowledge.
19
20
21  _____
22      NOTARY PUBLIC
23
24

Page 55

1  COMMONWEALTH OF MASSACHUSETTS
2  COUNTY OF SUFFOLK
3      I, Michelle Kaczynski, a Registered Professional
    Reporter and Notary Public duly commissioned in and for
4  the Commonwealth of Massachusetts, do hereby certify
    that there came before me on the 23rd day of June, 2006
5  at 211 Congress Street, Howard G. Croxton, who was by
    me duly sworn to testify to the truth and nothing but
6  the truth of his knowledge touching the
    matters in controversy in this cause; that he was
7  thereupon examined under his oath and his examination
    reduced to typewriting under my direction; and that the
8  deposition is a true record of the testimony given by
    the witness.
9
10      I further certify that I am neither attorney or
    counsel for, nor related to or employed by, any of the
11  parties to the action in which this deposition was
    taken, and further that I am not a relative or employee
12  of any attorney or counsel employed by the parties
    hereto or financially interested in this action.
13
14      IN WITNESS WHEREOF, I have hereunto set my hand
    and affixed my notarial seal this 4th day of July,
15  2006.
16
17
18          _____
            MICHELLE KACZYNSKI
19          NOTARY PUBLIC
            MY COMMISSION EXPIRES ON
20          JUNE 28, 2007
21
22
23
24

# EXHIBIT E

Page 3

```
 1                          Volume:     I
                            Pages:      1 to 69
 2                          Exhibits:   None

 3

 4               UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 5
     * * * * * * * * * * * * * * * *
 6   KING DOWNING,
                      Plaintiff,
 7
         vs.                     Civil Action
 8                               No. 04-12513-RBC
     MASSACHUSETTS PORT AUTHORITY,
 9   THE MASSACHUSETTS DEPARTMENT OF
     STATE POLICE, STATE POLICE TROOPER
10   THOMPSON, STATE POLICE SERGEANT
     CROXTON, THOMAS G. ROBBINS,
11   AND PETER J. DIDOMENICA,
                      Defendants.
12   * * * * * * * * * * * * * * * *

13

14           DEPOSITION OF ROBERT J. MOORE, JR., a
     witness called on behalf of the Plaintiff, taken
15   pursuant to the applicable provisions of the Federal
     Rules of Civil Procedure before Cynthia A. Powers,
16   Shorthand Reporter and Notary Public in and for the
     Commonwealth of Massachusetts, at the law offices of
17   Lurie & Krupp, LLP, One McKinley Square, Boston,
     Massachusetts, on Wednesday, July 19, 2006,
18   commencing at 11:50 a.m.

19

20

21                     * * * * *

22

23               KACZYNSKI REPORTING
                 72 Chandler Street, Suite 3
24               Boston, Massachusetts 02116
                 (617) 426-6060
```

Page 4

```
 1              P R O C E E D I N G S
 2       MS. O'NEIL: Just for the record, I'll
 3   be representing Trooper Moore for the purposes of the
 4   deposition.
 5           ROBERT J. MOORE, JR.,
 6
 7       having been satisfactorily identified
 8       and duly sworn by the Notary Public,
 9       was examined and testified as follows:
10
11           DIRECT EXAMINATION
12   BY MR. KRUPP:
13       Q.  Please state your full name for the
14   record.
15       A.  Robert J. Moore.
16       Q.  And you're Mass. State Police trooper?
17       A.  Yes, I am.
18       Q.  How long have you been so employed?
19       A.  Approximately twenty-one and a half
20   years.
21           MR. KRUPP: Before I question you,
22   let's put on the record the stipulations for the
23   deposition which are between counsel that we will
24   reserve all objections, except as to form, and
```

Page 2

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF, KING DOWNING:

 3       LURIE & KRUPP, LLP
         Peter B. Krupp, Esquire
 4       One McKinley Square
         Boston, Massachusetts 02109
 5       (617) 367-1970

 6   ON BEHALF OF MASSACHUSETTS PORT AUTHORITY:

 7       ROPES & GRAY LLP
         Laura G. Hoey, Esquire
 8       One International Place
         Boston, Massachusetts 02110-2624
 9       (617) 951-7000

10   ON BEHALF OF THE MASSACHUSETTS DEPARTMENT OF STATE
     POLICE, THOMAS G. ROBBINS and PETER J. DIDOMENICA:
11
         THE COMMONWEALTH OF MASSACHUSETTS
12       OFFICE OF THE ATTORNEY GENERAL
         Mary O'Neil, Esquire
13       One Ashburton Place
         Boston, Massachusetts 02108
14       (617) 727-2200

15   ON BEHALF OF THE STATE POLICE TROOPER THOMPSON and
     STATE POLICE SERGEANT CROXTON:
16
         LAW OFFICES OF TIMOTHY M. BURKE
17       Suzanne T. Caravaqqio, Esquire
         160 Gould Street, Suite 111
18       Needham, Massachusetts 02494
         (781) 455-0707
19
     ON BEHALF OF THE TRANSPORTATION SECURITY
20   ADMINISTRATION:

21       U.S. DEPARTMENT OF HOMELAND SECURITY
         Martin J. Ward, Esquire
22       TSA Regional Counsel
         One Harborside Drive, Box 12
23       East Boston, Massachusetts 02128
         (617) 568-0514
24
```

Page 3 (index)

```
 1                  I N D E X
 2   Examination by:   Direct   Cross   Redirect   Recross
     Mr. Krupp           4                  66
 3   Ms. O'Neil                   66

 4

 5

 6

 7

 8

 9

10

11

12              E X H I B I T S
13   Exhibit                              Page
     None marked.
14
```

Page 65

1  Logan Airport?
2       A.  I will run their information through
3  the system.
4       Q.  Okay.  And do you permit them to
5  remain at the airport?
6       A.  Yes.
7       Q.  Do you permit them to remain in the
8  secure area of the airport?
9       A.  Usually when they're on the no-fly
10 list, this is prior to them going into the secure
11 area.
12      Q.  Do you permit them to be in the
13 unsecure area of the airport without a police
14 presence in the area?
15      A.  Yes.
16      MR. KRUPP:  I have nothing else for
17 you.  Thank you very much.
18      A.  One of them was a three-year-old baby,
19 child, was on the no-fly list.  The name.  But they
20 didn't check the date of birth.  They were on the
21 no-fly list, a three-year old.  I guess I wasn't
22 going to arrest them then.
23      MS. O'NEIL:  I just have a couple of
24 questions, Trooper Moore.

Page 66

1            CROSS EXAMINATION
2  BY MS. O'NEIL:
3       Q.  Trooper, did you ever use the PASS or
4  BASS program or any behavior recognition program with
5  Mr. Downing?
6       A.  No, I did not.
7       Q.  And you mentioned earlier that he had
8  on a casual clothes.  Do you have any specific memory
9  of anything he was wearing that day?
10      A.  Yes, a jacket.  It said Members Only.
11      MS. O'NEIL:  Nothing further.
12      MS. HOEY:  I have no questions.
13      MS. CARAVAGGIO:  I have no questions.
14           REDIRECT EXAMINATION
15 BY MR. KRUPP:
16      Q.  What color was the Members Only
17 jacket?
18      A.  It was either tan or burgundy, I
19 believe, tan or olive, or some other like that.
20      Q.  Tan or olive or burgundy?
21      A.  It was one of those two.
22      Q.  Those are three.
23      A.  I'm talking about the same shade or
24 hue.  It could be a greater or lesser degree.  One

Page 67

1  might say olive, one might say tan, one might say
2  brown.
3       Q.  Was it in good condition?
4       A.  I guess it was.  For the dated time
5  that that jacket went out of style, I guess it was
6  pretty good.
7       MR. KRUPP:  Thank you.
8       (Whereupon, the deposition was
9  concluded at 1:19 p.m.)

Page 68

1       I have read the foregoing transcript and the
2  same contains a true and accurate recording of my
3  answers given to the questions therein set forth.
4
5
6  _____
7       ROBERT J. MOORE, JR.
8
9  On this_____day of_____, 2006, before me,
10 the undersigned notary public, personally appeared
11 Robert J. Moore, Jr., proved to me through
12 satisfactory evidence of identification, which were
13 _____, to be the person whose
14 name is signed on the preceding or attached document,
15 and who swore or affirmed to me that the contents of
16 the document are truthful and accurate to the best of
17 his knowledge.
18
19
20 _____
21      NOTARY PUBLIC
22
23
24

**EXHIBIT F**

Page 2

1  APPEARANCES:
2
   ON BEHALF OF THE PLAINTIFF:
3
   JOHN REINSTEIN, ESQ.
4  American Civil Liberties Union of
   Massachusetts
5  211 Congress Street
   Boston, MA  02110
6  (617) 482-3170 x324
7
   ON BEHALF OF THE DEFENDANT
8  MASSACHUSETTS PORT AUTHORITY:
9  ROSCOE TRIMMIER, JR., ESQ.
   ANNMARIE A. TENN, ESQ.
10 Ropes & Gray LLP
   One International Place
11 Boston, MA  02110-2624
   (617) 951-7000
12
13 ON BEHALF OF THE DEFENDANTS
   THE MASSACHUSETTS DEPARTMENT OF STATE POLICE,
14 THOMAS G. ROBBINS and PETER J. DIDOMENICA:
15 MARY O'NEIL, ESQ.
   The Commonwealth of Massachusetts
16 Office of The Attorney General
   One Ashburton Place
17 Boston, MA  02108
   (617) 727-2200, ext. 2636
18
19 ON BEHALF OF THE DEFENDANTS
   STATE POLICE TROOPER THOMPSON and
20 STATE POLICE SERGEANT CROXTON:
21 SUZANNE T. CARAVAGGIO, ESQ.
   Rafanelli & Kittredge, P.C.
22 1 Keefe Road
   Acton, MA  01720
23 (978) 369-6001
24

Page 4

1        I N D E X
2
   EXAMINATION BY MR. REINSTEIN..............Page 6
3
   EXAMINATION BY MS. CARAVAGGIO............Page 56
4
5
6
7
        E X H I B I T S
8
   No.   Description          Page No.
9
   1  Massport press release      15
10
   2  PASS manual             28
11
   3  Special order draft       30
12
   4  3/10/03 document and attachments  32
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1  ALSO PRESENT:
2
   MARTIN WARD, ESQ.
3  U.S. Department of Homeland Security
   Transportation Security Administration
4  Logan International Airport
   1 Harborside Drive
5  East Boston, MA  02128-2907
   (617) 568-0504
6
   ANGELA MUNRO
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1        P R O C E E D I N G S
2        - - - - -
3        PETER J. DIDOMENICA
4    having been satisfactorily identified and duly
5    sworn by the Notary Public, was examined and
6    testified as follows:
7
8        MR. REINSTEIN:  Good morning.  This is
9    the deposition of Peter Didomenica in the case of
10   King Downing against the Massachusetts Port
11   Authority and others.
12       MR. WARD:  My name is Martin Ward and
13   I'm an attorney with the Homeland Security,
14   Transportation Security Administration.  The
15   purpose of my being here is to object to any
16   questions the answer to which would reveal
17   sensitive security information and to inform the
18   witness that if he does provide unauthorized
19   sensitive security information that he would be
20   subject to civil and potentially criminal
21   sanctions.
22       MR. REINSTEIN:  Can we agree on the
23   usual stipulations that all objections except as
24   to form will be reserved until the time of trial?

Page 18

1    assessment and report on threat mitigation for
2    the airport. So I would have to say in the late
3    2001 I probably first met him.
4    Q. Okay. Now, do you know if he did produce a
5       report on threat mitigation?
6    A. Yes.
7    Q. All right. And without telling me the contents
8       of any of that, do you recall approximately when
9       that was done?
10   A. I think it took about a year to complete so I
11      would say mid to late 2002.
12   Q. Okay. And did you see that report?
13   A. Yes.
14   Q. And did it include recommendations with respect
15      to behavioral assessment?
16   A. Yes.
17   Q. And what actions, if any, were taken by Massport
18      and the State Police as a result of their report?
19   A. Well, the report included -- I seem to recall
20      over 100 recommendations.
21   Q. Let's focus on the behavioral threat assessment.
22   A. One of the recommendations was to train and
23      deploy troopers to use behavior pattern
24      recognition techniques.

Page 19

1    Q. All right. And let me ask you a couple questions
2       about the division of responsibility for security
3       at Logan Airport. Are the Massachusetts State
4       Police the only ones who provide security at the
5       airport?
6    A. In terms of law enforcement, they are the only
7       ones.
8    Q. All right. And --
9    A. On the state level. I mean, we have Federal law
10      enforcement there. Air marshals, customs and
11      immigration enforcement, but for the Commonwealth
12      they are the principal agency for law
13      enforcement.
14   Q. And what are the sort of general security
15      responsibilities of the state troopers assigned
16      to Troop F?
17   A. It includes ensuring that the airport operates in
18      a safe and orderly manner, preventing thefts of
19      baggage, preventing acts of violence, securing of
20      the airfield and other secure areas, monitoring
21      the perimeter of the airport from intrusion,
22      responding to calls from the TSA for prohibited
23      items and other disturbances occurring at
24      checkpoints.

Page 20

1       Responding to aircraft with disruptive
2    passengers. Assisting the Federal agencies.
3    Frequently prisoners are taken at the airport and
4    we will house those prisoners for the Federal
5    authorities initially. Those are probably the
6    principal responsibilities.
7    Q. How are the responsibilities divided for security
8       divided between TSA on the one hand and
9       Massachusetts State Police on the other?
10   A. Well, it is a matter of statute. Federal law.
11      There is specific responsibilities that TSA has
12      which include the screening of all passengers on
13      commercial flights. And as part of that security
14      responsibility, they have the authority to
15      designate law enforcement functions to state and
16      local authorities, which they've done, so we in
17      effect serve as the law enforcement branch of TSA
18      when it comes to criminal matters of the airport
19      but the underlying authority is -- on the Federal
20      law is the TSA for what happens at that
21      checkpoint.
22   Q. All right. With respect to the deployment of the
23      state troopers assigned to Troop F at Logan
24      Airport, do some of the state troopers take part

Page 21

1    in the screening of passengers?
2    A. No.
3    Q. Okay. That's the responsibility of TSA?
4    A. The physical screening of passengers is the TSA's
5       responsibility.
6    Q. And in limiting it now to the terminals
7       themselves and not to the other areas of the
8       airport --
9    A. Okay.
10   Q. -- where are the state troopers assigned?
11   A. Throughout the airport. On the airfield --
12   Q. Just in the terminals themselves now.
13   A. They're assigned in the terminals.
14   Q. All right. And is that on both sides of the
15      screening area?
16   A. Yes. On the secure side and they're on the
17      public side.
18   Q. All right. Now, after receiving the report and
19      recommendations from Mr. Ron with respect to
20      behavioral screening, what measures were taken
21      collectively by Massport and the State Police?
22   A. Again, you're talking in terms of behavior
23      pattern?
24   Q. Right. Just in terms of behavior pattern.

6 (Pages 18 to 21)

DIDOMENICA-1/4/07

Page 22

1  A. I asked them to put together a training course
2     specifically in the techniques that they
3     advocated for the State Police and they put
4     together a training course. And it was delivered
5     in October of 2002 to about a dozen troopers.
6  Q. When you say "they," are you referring to Mr.
7     Ron?
8  A. Mr. Ron and his company. I believe it was New
9     Age Aviation Security.
10 Q. Okay. And were there training materials prepared
11    for that?
12 A. Yes.
13 Q. And did you participate in that training?
14 A. I served in an advisory capacity because they
15    were not citizens of this country and the
16    techniques that they were going to train us on
17    evolved at Ben Gurion Airport in Israel. And I
18    was advising them on some of the limitations that
19    would apply in using those techniques in this
20    country.
21 Q. All right. And did you ultimately determine that
22    some of those were not appropriate to the United
23    States?
24 A. Yes.

Page 23

1  Q. All right. And was there any further training
2     done by Mr. Ron or his company?
3  A. There was a follow-up training that was -- lasted
4     maybe a day just to check on people's skills in
5     conducting interviews. And that may have
6     occurred four to six months after the initial
7     training.
8  Q. And how many people, how many troopers were
9     involved in this?
10 A. Initially I think it was between ten and 12 and
11    then when they did the follow-up I think it may
12    have been about eight. Eight troopers.
13 Q. And when was that? When was the initial training
14    and when was the follow-up?
15 A. The initial training was I believe October of
16    2002. And then, like I say, four to six months
17    later I asked them to come back just to check us
18    out and see if we're doing it properly.
19 Q. And how were the troopers who participated in
20    this training selected?
21 A. There was a sign-up sheet posted and the troopers
22    were asked if they were interested in this type
23    of training. They would be welcome to take the
24    training.

Page 24

1  Q. It was not mandatory?
2  A. It was not mandatory.
3  Q. Would it be fair to describe it as experimental
4     or a pilot project?
5  A. Yes.
6  Q. And at some point was a decision made to expand
7     the program?
8  A. Yes.
9  Q. Who made that decision?
10 A. I made it in conjunction with Major Robbins and
11    Tom Canton.
12 Q. Okay. And was there any formal record made of
13    that decision?
14 A. I don't believe so.
15 Q. So there was a meeting between you and Major
16    Robbins and Mr. Canton?
17 A. I would not even classify it as a meeting because
18    I'm not sure there was a meeting. I think it was
19    in the course of conversations so I don't recall
20    a formal meeting to discuss it. It just in the
21    course of working and talking these subjects came
22    up. I just don't have a recollection of a
23    specific meeting.
24 Q. And would it be fair to say, though, that there

Page 25

1     was agreement between Massport and the
2     Massachusetts State Police that an expanded
3     version of the program should go forward?
4  A. Yes.
5  Q. And who was responsible for implementing that
6     decision?
7  A. From the State Police, Major Robbins, and from
8     Massport, Tom Canton.
9  Q. And what steps were taken to follow up on that?
10 A. Well, I initially set out to devise a training
11    program. And the reason being is that I had
12    reservations about some of the techniques that
13    were used in Israel and I felt that there would
14    be a danger, that they would not be lawful in
15    this country.
16       I also had reservations about the
17    behavioral aspect because I felt that in the
18    training we received from the New Age Aviation
19    Security firm, it wasn't specific enough in terms
20    of what behaviors we should be looking for and I
21    was interested in having scientific validation so
22    we could be on firm ground that we were looking
23    for the right things so I set out kind -- I kind
24    of set out from scratch and looked at this

7 (Pages 22 to 25)

KACZYNSKI REPORTING

Page 26

1  problem from the beginning.
2     And I said, How can you design a
3  program that will accurately and lawfully
4  identify people that could potentially be
5  terrorists?
6  Q. What did you do to ensure that that would take
7  place?
8  A. Well, using my experience as an attorney and
9  being director of legal training at the academy,
10 I drew upon that experience. As a racial
11 profiling compliance officer and subject matter
12 expert, I drew on that experience. I researched
13 scientific literature, social psychology,
14 history, security, interview and interrogation,
15 criminal procedure.
16    I basically drew on whatever I could to
17 come up with a rational, logical, objective,
18 lawful way to make that airport safer.
19 Q. You mentioned "scientific validation." Apart
20 from your reading, did you consult with anyone
21 about that?
22 A. Yes. I spoke with and consulted with Dr. Mark
23 Frank, who is a Ph.D. psychologist who had been
24 doing research on deception and human emotion

Page 27

1  through the Rutgers University, State University
2  of New Jersey I believe at Rutgers. Later on I
3  consulted with Dr. Paul Ekman, who is a
4  psychologist at the University of California at
5  Berkeley. And he's a world renowned expert on
6  human emotion and deception.
7     Other people included Dr. Jessica
8  Stern, a Harvard professor. Not so much in the
9  scientific aspect but more in the genesis of
10 terrorism and understanding terrorism. She is
11 recognized as an expert nationally on terrorism.
12 Q. Did your consultation with any of these
13 individuals involve materials that they provided
14 you?
15 A. I don't recall specific materials. I think it
16 was more a discussion of what techniques would
17 work best in the detection of a person with
18 hostile intent or detection of deception in
19 reference to existing research materials.
20 Q. And did you consult any of those research
21 materials?
22 A. Oh, yeah.
23 Q. Do you recall what any of those were?
24 A. One was a study by DePaulo. D E P A U L O. It

Page 28

1  was kind of a metaresearch paper on previous
2  studies. And it included dozens and dozens of
3  deception studies. A textbook by Knapp,
4  K N A P P, on nonverbal behaviors. Those are a
5  couple that come to mind.
6  Q. Was there anyone else you consulted in connection
7  with scientific validation, the method?
8  A. I believe there were. The names are not coming
9  to me at the moment.
10 Q. How long did this process take?
11 A. It's still going on. I mean, it started in the
12 end of 2001 and I'm still doing it today.
13 Q. All right. And at some point did you produce
14 training materials?
15 A. Yes.
16 Q. And what is PASS, P A S S?
17 A. That stands for Passenger Assessment Screening
18 System.
19 Q. And is that part of the training materials that
20 you developed?
21 A. Yes.
22    MR. REINSTEIN: All right. Mark this.
23    (PASS manual marked Exhibit No. 2.)
24 Q. All right. Let me show you what's been marked as

Page 29

1  Exhibit 2. It once had a cover in an earlier
2  version we were provided, but is that a copy of
3  the -- tell me what that is.
4  A. This would be a student manual for the Passenger
5  Assessment Screening System.
6  Q. Is that based on a PowerPoint?
7  A. Yeah. This is based on PowerPoint slides.
8  Q. Okay. And when was this first developed?
9  A. Probably in the middle of 2002.
10 Q. And is this the materials that were used for
11 training the state troopers?
12 A. Yes.
13 Q. We've been provided with something else that is
14 dated October, 2004 which has your name on it
15 called the "Behavior Assessment Screening System
16 Lesson Plan." Is that essentially the same
17 thing?
18 A. It's the same program.
19 Q. And this is based on the same materials that you
20 developed?
21 A. Yes.
22    MR. REINSTEIN: All right. And mark
23 that.
24    MS. O'NEIL: You're not going to mark

Page 34

1    that was kind of a permanent assignment. There
2    are frequently troopers that work shifts there
3    doing traffic as a detail, which is a separate
4    assignment but you're not assigned there.
5    Q. They were assigned but not assigned?
6    A. Exactly. But that word takes on a little more
7    significance because if you're a state trooper
8    assigned to Logan Airport, your check says
9    "Massport" on it and people don't go back and
10    forth that easily or that quickly because it's a
11    big step but there are a lot of people that
12    aren't assigned there working there.
13    Q. Let me ask you. Are the troopers who are
14    assigned in the sense you described to Logan
15    Airport actually paid by Massport?
16    A. Yes.
17    Q. And are considered to be employed by Massport?
18    A. No. There is a special statute that kind of puts
19    the troopers on loan to the Port Authority so for
20    all intents and purposes you work there but
21    legally you're still an employee of the State
22    Police.
23    Q. And the responsibility for supervision is joint
24    or belongs to --

Page 35

1    A. The operational control is strictly the State
2    Police. And that's a matter of statute.
3    Q. Now, going back to these trainings, did you
4    conduct those trainings?
5    A. Yes.
6    Q. All right. And you used the materials that we've
7    identified in the earlier exhibit?
8    A. Yes. Yes.
9    Q. And that's a presentation that was developed by
10    you --
11    A. Yes.
12    Q. -- based on the study and background that you
13    described earlier?
14    A. Yes.
15    Q. There is in these materials discussion of
16    something called "elevated suspicion"?
17    A. Correct.
18    Q. Would you describe that, please?
19    A. What I learned and what we learned after 9/11 is
20    that the 9/11 hijackers gave off signs that they
21    had hostile intent before those attacks and that
22    people actually detected them and felt that they
23    were doing something but they just couldn't
24    articulate what it was they were feeling.

Page 36

1    And what I learned is that there is a
2    scientific basis for what people were feeling
3    about these individuals in the days, weeks and
4    months leading up to the 9/11 attacks. Elevated
5    suspicion is not so much a legal term because the
6    goal of elevated suspicion is to identify
7    potential persons who may have hostile intent as
8    part of a threat mitigation strategy as opposed
9    to criminal law enforcement.
10    It's a new approach for law enforcement
11    but the basis of it is to secure a critical
12    infrastructure and identify potential high-risk
13    people and keep them away from the core of the
14    critical infrastructure. It involves looking for
15    and articulating subtle signs of a person who
16    intends to do future harm.
17    Frequently those subtle signs at least
18    initially would not constitute the legal term of
19    reasonable suspicion but from the lessons of
20    9/11, I learned that we needed to get our
21    officers involved in looking at those subtle
22    signs initially because if you weren't sensitive
23    to them and/or if you were and you ignored them
24    because they didn't meet a standard of reasonable

Page 37

1    suspicion, a terrorist could walk right past you
2    and get on a plane.
3    So what it does is it allows a police
4    officer to be more aware of signs of a person
5    with this potential hostile intent and to get
6    them thinking about a strategy to mitigate that
7    threat.
8    Those strategies in most cases don't
9    involve Constitutional infringements or
10    impositions on an individual. They're designed
11    to mitigate the threat without crossing the line
12    into Fourth Amendment areas.
13    Q. You said "in most cases."
14    A. Well, you may actually develop reasonable
15    suspicion based on a subtle indicator and then
16    you would know, cross that line into the Fourth
17    Amendment world and may detain a person but it
18    would be based on reasonable suspicion or
19    probable cause.
20    Q. Is it fair to say that the training you used
21    contemplates substantial contact between the
22    officer looking for these signs and members of
23    the public?
24    A. I'm not sure what you mean by "substantial" but

10 (Pages 34 to 37)

**Page 38**

1  it contemplates that these interactions could
2  evolve into a detention.
3  Q. Is it fair to say that the training contemplates
4  that officers will approach members of the public
5  and question them?
6  A. Yes.
7  Q. And would part of that questioning -- strike
8  that. Could part of that questioning involve
9  requesting identification and travel documents?
10  A. Yes.
11  Q. And in the scheme of elevated suspicion, what is
12  the -- well, let me go back.
13      Now, under this behavioral pattern
14  recognition system, officers at some point would
15  make a decision to approach individuals --
16  A. Correct.
17  Q. -- to question them?
18      And would it be fair to say that they
19  were allowed to consider nationality?
20  A. No.
21  Q. They couldn't consider nationality under these
22  circumstances?
23  A. No.
24  Q. Would they be able to consider the destination of

**Page 39**

1  the traveler?
2      MR. WARD: I'm going to object. You
3  can't elicit the specific criteria they use in
4  order to make a determination that someone has
5  arisen to an elevated threat. I think if we go
6  down a laundry list, you will soon discover
7  exactly what they're looking for. I think if we
8  continue on this trend of talking about specific
9  elements that you would look to, I think we're
10  going to be revealing sensitive security
11  information.
12      THE WITNESS: I think I can answer his
13  question without doing that if you give me one
14  shot at it.
15      MR. WARD: Okay.
16  A. The decision to approach a person is in no way
17  based on any subjective or objective beliefs
18  about a person's nationality, race, ethnicity or
19  religious beliefs.
20  Q. And -- well, you used the word "based on." The
21  question is not whether it's based on. It's
22  whether it can be considered.
23  A. It cannot be considered.
24  Q. Now, there's discussion in here which suggests

**Page 40**

1  that these should be voluntary encounters.
2  A. Yes.
3  Q. How was it ordinarily made clear or how is it
4  supposed to be made clear that these are
5  voluntary encounters?
6  A. Well, as part of their training they're
7  instructed what the standard is for a voluntary
8  encounter and they're told that absent reasonable
9  suspicion that these interviews have to be in the
10  context of a voluntary encounter.
11  Q. Right. That's what the officers are trained to
12  do?
13  A. Right.
14  Q. But does that training include providing any
15  information to the subject of the encounter?
16  A. When you say "subject," are you talking --
17  Q. The person who is approached.
18  A. Can you just rephrase that question?
19  Q. Sure. An officer comes up to me and wants to ask
20  me some questions. Is he required to tell me
21  that I'm not required to answer them?
22  A. In the training they're told that persons do not
23  have to answer questions nor provide
24  identification except in the limited context of

**Page 41**

1  wanting to get on the plane and enter a screening
2  checkpoint. So yes, they are instructed that
3  people have a right not to respond to their
4  questions.
5  Q. The officers are but do they convey that
6  information to the person they're speaking to?
7  A. I don't know in specific cases if they do or not.
8  Q. You don't train them to do that?
9  A. We don't train them to tell them that they have
10  the right not to ask -- answer the questions.
11  Q. Now, I'm going to ask you to look at what's been
12  marked as Exhibit 2. If you go to page ten.
13  A. Okay.
14  Q. In the lower right-hand corner, there's a --
15  which I guess we'd call a slide which says
16  "Methods of contact."
17  A. Yes.
18  Q. "Officers may request to examine travel
19  documents. However, a person is generally -- not
20  generally required to produce these."
21  A. You want to continue on with what it says?
22  Q. All right. "A person is not required to answer
23  questions or otherwise cooperate. Refusal to
24  cooperate or produce documents may be a factor of

11 (Pages 38 to 41)

Page 46

1   A. If there was no reasonable suspicion at that
2      point, then in my opinion that would be unlawful
3      detention.
4   Q. And as far as you're concerned, failure to
5      produce identification is not the basis for
6      reasonable suspicion?
7         MS. O'NEIL: Objection.
8   Q. You may answer the question.
9         MS. O'NEIL: You can answer.
10  A. I think -- again, it's dependent on the context.
11     In some -- I believe in some cases if the person
12     has already initiated cooperation and provided
13     information about themselves and suddenly decides
14     to stop providing that information, that -- I
15     believe that can be a factor in elevated
16     suspicion.
17        In terms of the criminal standard of
18     reasonable suspicion, if it's in the context of
19     them asserting a right not to speak, then it's
20     not appropriate.
21  Q. Or a right not to produce identification?
22  A. Correct.
23  Q. We had an exchange a few minutes ago about what
24     might be considered, and you testified that race

Page 47

1      and nationality could not be considered. I would
2      like to just direct your attention to page seven
3      of the training material exhibit and ask you to
4      look at the extricated version of the two slides
5      at the bottom of the page.
6         And without telling me what's there --
7      that appears to be sensitive security information
8      -- I'm going to ask you if you want to reconsider
9      your answer to the question I asked you earlier.
10        MR. WARD: I'm going to pose my
11     objection. I think that material was redacted
12     because it is sensitive security information so
13     --
14        MR. REINSTEIN: I appreciate that. The
15     question is simply whether he wants to reconsider
16     his answer.
17        MR. WARD: I know.
18        MR. TRIMMIER: Based on the unredacted
19     portion?
20        MR. REINSTEIN: Based on the unredacted
21     portion.
22  A. No.
23  Q. You don't want to reconsider?
24  A. No. I don't want to reconsider.

Page 48

1   Q. Okay. Now, in general, when you provide training
2      for State Police troopers, it's intended to guide
3      their activities in the enforcement of the law;
4      is that correct?
5   A. Yes.
6   Q. And that would be true of the PASS system as
7      well?
8   A. Yes.
9   Q. And this was not something that was optional for
10     the officers who were trained in this method?
11  A. The training was not optional. It was mandatory.
12  Q. Right. But if they're going to use it, if the
13     officers were going to go and adopt the system,
14     they were expected to use it in the manner that
15     it was given to them?
16  A. Yes.
17  Q. And it was not open to them to use some other
18     system?
19  A. If it's within the subject matter of this
20     program, they should be doing it according to the
21     way they were trained.
22  Q. Okay. And you anticipated in providing this
23     training that the officers should use it?
24  A. Yes.

Page 49

1   Q. And that's what they were instructed?
2   A. They were encouraged to use it.
3   Q. They were encouraged to use it?
4   A. Yes.
5   Q. They didn't have to?
6   A. It's a supplement to their skills as a police
7      officer to identify potential high-risk people,
8      potential criminals, and it was offered as a tool
9      but they weren't told that they had to use these
10     particular techniques. It's training we think is
11     effective and useful and we encourage them to use
12     these techniques.
13  Q. I would like to talk to you about the context in
14     which this training was provided. This was
15     obviously post-9/11?
16  A. Yes.
17  Q. And is it fair to say that the component of the
18     training was a discussion of terrorism and that
19     there was substantial dangers to the
20     transportation that it posed?
21  A. Yes.
22  Q. And there was significant discussion of that at
23     the training?
24  A. Yes.

13 (Pages 46 to 49)