UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KING DOWNING, )<br>    Plaintiff )<br>)<br>V. )<br>)<br>MASSACHUSETTS PORT AUTHORITY, )<br>THE MASSACHUSETTS DEPARTMENT )<br>OF STATE POLICE, STATE POLICE TROOPER )<br>THOMPSON, STATE POLICE SERGEANT )<br>CROXTON, THOMAS G. ROBBINS, and )<br>PETER J. DIDOMENICA, )<br>    Defendants )<br>) | C.A. No. 04-CV-12513-GAO |

DEFENDANTS WILLIAM THOMPSON AND HOWARD CROXTON'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

In the early morning hours of October 16, 2003, Plaintiff King Downing, the National Coordinator for the American Civil Liberties Union's ("ACLU") Campaign Against Racial Profiling ("CARP"), arrived at Logan International Airport on an overnight flight from Seattle, Washington. *Statement of Facts (hereinafter "SOF"), ¶¶* 1, 18. Plaintiff is an African-American male. *SOF*, ¶ 2.

While he was on a payphone outside of the secured area of Terminal B in the airport checking his voicemail messages, Plaintiff observed Defendant William Thompson, a trooper with the Massachusetts State Police, who was standing nearby watching the security checkpoint. *SOF*, ¶¶ 20-21. A verbal exchange between the two men ensued during which Trooper Thompson requested Plaintiff provide him with his

identification. *SOF*, ¶¶ 22-24. Plaintiff refused to do so and subsequently left the terminal to go outside. *SOF*, ¶¶ 25-26.

Trooper Thompson followed Plaintiff outside to the arrival area of Terminal B and radioed for backup due to Plaintiff's irrational behavior. *SOF*, ¶ 28. Other officers with the Massachusetts State Police, including Defendant Howard Croxton, arrived shortly thereafter. *SOF*, ¶ 33. Plaintiff eventually produced his identification to Sergeant Mark Kiley, a Caucasian officer, and left the airport. *SOF*, ¶¶ 34-35, 44. At no time was Plaintiff placed under arrest, charged with a crime or physically touched by the officers. *SOF*, ¶¶ 45-46, 51.

Following the terrorist attacks of September 11, 2001, the Massachusetts State Police formulated a program to train its officers how to identify high-risk passengers. *SOF*, ¶ 13. While officers from the Massachusetts State Police assigned to Logan International Airport subsequently were trained on that program, known both as the Behavior Assessment Screening System ("BASS") and the Passenger Assessment Screening System ("PASS"), it was never implemented as an official state-wide policy of the Massachusetts State Police. *SOF*, ¶¶14-15. In their dealings with Plaintiff on October 16, 2003, neither Trooper Thompson nor Trooper Croxton utilized the BASS/PASS program. *SOF*, ¶ 49. Moreover, neither officer, both of whom are African-American, took into account Plaintiff's race during their encounter with him that morning. *SOF*, ¶ 50.

**STATEMENT OF THE CASE**

Plaintiff filed the instant action in Suffolk Superior Court on November 10, 2004. The case was subsequently removed to the United States District Court. In his

Complaint, Plaintiff sues Troopers Thompson and Croxton, Sergeant Peter DiDomenica, Thomas Robbins, the former Superintendent of the Massachusetts State Police, and the Massachusetts Port Authority pursuant to M.G.L. c. 12, § 11I and 42 U.S.C. § 1983 for alleged violations of his state and federal constitutional rights arising from his October 16, 2003 encounter with members of the Massachusetts State Police. *Complaint,* ¶¶ 27-34. In addition to his civil rights claims, Plaintiff also seeks relief pursuant to M.G.L. c. 231A, § 1 against the aforementioned Defendants as well as the Department of the Massachusetts State Police declaring that the BASS/PASS programs are unconstitutional under the Massachusetts Declaration of Rights and the United States Constitution. *Complaint*, ¶¶ 35-37.

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. (56); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>see also</u> <u>Conward v.Cambridge School Committee</u>, 171 F.3d 12, 18 (1st Cir.1999) ("[The summary judgment] rule acts as a firewall to contain the blaze of cases that are so lacking in either factual foundation or legal merit that trial would be a useless exercise."). "The moving party is entitled to judgment as a matter of law if the nonmoving party does not adduce enough evidence to permit a reasonable trier of fact to find for the nonmoving party on any element essential to its claim." <u>Milton v. Van Dorn Co.</u>, 961 F.2d 965, 969 (1992). In making this determination, the Court must "scrutinize the summary judgment record in the light most congenial to the [nonmoving party and] indulge all reasonable inferences in that party's favor." <u>Vasapolli v. Rostof</u>, 39 F.3d 27, 32 (1st Cir.1994). Once the moving party has

3

met this burden, the burden then shifts to the non-moving party to present "specific facts" to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324 (citing Fed.R.Civ.P. 56(e)). In order to do so, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Summary judgment is then appropriate only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* at 587.

## ARGUMENT

**I.   Troopers Thompson and Croxton Are Entitled to Summary Judgment on the §1983 Claims Where Plaintiff Cannot Prove Defendants Violated His Constitutionally Protected Rights.**

When analyzing claims arising out of 42 U.S.C. §1983, the first and foremost inquiry the courts must make is whether the plaintiff has alleged a constitutional violation. *Baker v. McCollan*, 443 U.S. 137, 140 (1979). Once the court deems a constitutional violation has been pled with sufficiency and the particular constitutional amendment has been identified, the court must then analyze the officer's actions under the applicable standard. *See generally, Graham v. Connor*, 490 U.S. 386 (1989).

### A.   *Seizures Under the Fourth Amendment*

In the instant matter, Plaintiff has alleged in his §1983 claim that his encounter with Troopers Thompson and Croxton and other officers on October 16, 2003 whereby he was asked to produce his identification and travel documents constituted a seizure unsupported by probable cause or reasonable suspicion and thus violated his Fourth Amendment right to be free from an unreasonable seizure. *Complaint,* ¶¶ 23, 26, 30-34. Under the Fourth Amendment, individuals are afforded the right "to be secure in their

4

persons, houses, papers, and effects, against unreasonable searches and seizure." U.S. Const.Amend. 4.  Thus, from the outset of its analysis, the Court must determine whether either Troopers Thompson or Croxton unreasonably seized Plaintiff during their limited encounter with him.

It is well-settled that not every encounter between citizens and law enforcement officers rises to the level of a seizure under the Fourth Amendment.  *United States v. Mendenhall*, 446 U.S. 544, 552 (1980).  Were the courts to characterize every interaction between an individual and the police as such, they "would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices."  *Id.* at 554.  Rather, the United States Supreme Court has recognized the practical need for police questioning, stating that "[w]ithout such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved.  In short, the security of all would be diminished."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973), citing *Haynes v. Washington*, 373 U.S. 503, 515 (1963).

The Supreme Court has consistently held that a police officer does not violate the Constitution by approaching individuals on the street or in other public places and asking them questions.  *United States v. Drayton*, 536 U.S. 194, 200-201 (2002); *United States v. Mendenhall*, *supra*; *Terry v. Ohio*, 392 U.S. 1 (1968) (White, J. concurring). The key inquiry in determining when a permissible encounter morphs into an unconstitutional seizure, therefore, is whether the individual's freedom of movement was objectively restrained either through actual physical restraint by the officer or compelled by a show of authority.  *United States v. Smith*, 423 F.3d 25, 28 (2005).  In other words, an

5

interaction will be deemed a seizure only when an objectively reasonable innocent person would not have felt free to terminate the conversation and leave the scene. *Id.* at 28, n.5, citing *Florida v. Bostick*, 501 U.S. 429, 438 (1991).

While it is anticipated that most, if not all individuals naturally would feel some degree of compulsion or acquiescence to authority in dealing with the police, the courts should examine the particular circumstances "beyond the show of governmental authority inherent in the mere presence of the police." *Commonwealth v. Pimental*, 27 Mass.App.Ct. 557, 560 (1989). Factors which may indicate a seizure occurred are: "1. the threatening presence of several officers; 2. the display of a weapon by an officer; 3. some physical touching of the person; and 4. the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 29, citing *Mendenhall*, *supra* at 554; *see also* *Hatheway v. Thies*, 335 F.3d 1199 (10th Cir.2003) (same factors as well as prolonged retention and interaction in a non-public place). While these factors may be considered during the court's analysis, they certainly are not exhaustive nor may the court rely upon a single factor in making its determination. *Id.* Rather, the court should base its findings on the totality of the circumstances surrounding the interaction. *Florida v. Bostick*, 501 U.S. at 439.

     *i.*    ***Plaintiff's Initial Encounter with Trooper Thompson***

In this case, Plaintiff claims he was seized by Trooper Thompson during his initial encounter with him while Plaintiff was on the public payphone inside Terminal B. It is quite clear from the undisputed material facts, however, that Plaintiff's interaction with Trooper Thompson constituted nothing more than the type of "inoffensive contact"

6

contemplated by *Mendenhall* and its progeny. *United States v. Mendenhall*, 466 U.S. at 555.

  For one, the conversation between Trooper Thompson and Plaintiff occurred in a public place just outside of the security checkpoint for Terminal B at which time Trooper Thompson requested to see Plaintiff's identification. *SOF*, ¶¶ 19-20, 22. At no time did Trooper Thompson unholster his firearm, order Plaintiff to accompany him anywhere or make any physical contact with Plaintiff's person. *SOF*, ¶¶ 45-46. Moreover, upon Plaintiff's refusal to provide him with his identification, Trooper Thompson took no action whatsoever to thwart Plaintiff's attempts to leave the terminal and go outside. *SOF*, ¶¶ 26, 51. *Compare* Brown v. Texas, 443 U.S. 47, 49 (1979) (No seizure found during encounter in alley when police asked individual to identify himself until police frisked him following his refusal and questioning of police authority); *Florida v. Royer*, 460 U.S. 491 (1983) (Seizure occurred when officers approached individual, retained his identification and airplane ticket and took him to a small police room where they searched his luggage).

  The most compelling evidence that there was no seizure, however, is found in Plaintiff's own actions. Plaintiff, upon refusing to provide Trooper Thompson with his identification, terminated the conversation, walked away from him and exited the building on his own volition without either assistance or interference by Trooper Thompson. *SOF*, ¶¶ 26. While Plaintiff's words may state otherwise, his actions definitively show that he was free to leave. Accordingly, where no seizure occurred inside Terminal B, Trooper Thompson is entitled to judgment as a matter of law.

7

### ii.      *Plaintiff's Second Encounter with Trooper Thompson*

As with their initial interaction within the airport building, Trooper Thompson's encounter with Plaintiff along the sidewalk outside Terminal B did not trigger a violation of the Fourth Amendment. While other officers did arrive at the scene in response to Trooper Thompson's call for backup due to Plaintiff's irrational behavior, they took no threatening or coercive action toward Plaintiff.  *SOF*, ¶¶ 32, 45-46.  Rather, the summary judgment record indicates that Plaintiff had a brief conversation with Trooper Croxton, discussed *infra*, concerning why Trooper Thompson had requested to see his identification, as well as a more involved interaction with Sergeant Kiley to whom he provided his driver's license.  *SOF*, ¶¶ 33-38.  With the exception of his alleged statement to Plaintiff that he was under arrest, Trooper Thompson had no other contact with Plaintiff other than asking for his identification after he exited the building and returning it after he checked with dispatch as to whether Plaintiff had any active warrants or was on the "No Trespass" list.  *SOF*, ¶ 39.  Additionally, neither Trooper Thompson nor the other responding officers pulled their weapons on Plaintiff, physically touched him, moved him from the scene or in any way prevented him from leaving the airport. *SOF*, ¶¶ 45-46, 51.

Moreover, the fact that Plaintiff could not access transportation from the upper level of Terminal B has no relevance to the determination of whether a seizure occurred. Plaintiff, who traveled to Boston frequently for his working group meetings, presumably was well aware that the outside upper level of Terminal B was for passengers being dropped off and that he would have to go to the lower level to obtain transportation. *SOF*, ¶¶ 16, 27.  Even assuming Plaintiff somehow was not aware of these procedures,

8

Plaintiff still could have either re-entered the terminal to look for the proper area from which to hail a cab or even inquired of the officers as to where he should he should go. Plaintiff instead made the decision to remain at a location where he could not obtain a ride. Where the officers did not create the physical limitations on his movement, perceived or otherwise, or physically prevent him from leaving that area, they cannot be held responsible for Plaintiff's failure to leave the scene. *See e.g. United States v. Smith*, 423 F.3d at 30-31 (No seizure where police positioned near telephone pole in front of defendant); *United States v. Bostick*, 501 U.S. at 436 (No seizure when defendant on a bus and police came down the aisle toward him, blocking his path); *INS v. Delgado*, 466 U.S. 210, 218-219 (1984) (No seizure where agents stationed at the exits of a factory); *United States v. Brown*, 169 F.3d 89, 92 (1st Cir.1999) (No seizure when officer confronted defendant on a stairwell, blocking his path).

In support of his claim that he was unlawfully seized, Plaintiff has alleged that in response to his inquiry as to whether he was under arrest, Trooper Thompson replied in the affirmative. *SOF*, ¶ 30. While Trooper Thompson denies any such exchange took place, for the purposes of summary judgment only he accepts Plaintiff's allegation as true. Even assuming the truthfulness of Plaintiff's claim, however, Trooper Thompson's purported statement affirming that Plaintiff was under arrest cannot transform this innocuous encounter into a constitutional violation. Here there was nothing indicative of an arrest other than Trooper Thompson's alleged affirmative response. Trooper Thompson did not place Plaintiff in handcuffs, tell him why he was under arrest, physically touch him, put him in a police cruiser or transfer him to anywhere else in the airport. *SOF*, ¶¶ 31, 45-46, 51. When the other officers arrived a short time later, they

did not engage either in any of the aforementioned acts which traditionally would be indicative of placing a subject under arrest such as conducting a pat frisk or physically restraining the person's ability to move. *SOF*, ¶¶ 45-46, 51. Furthermore, after he voluntarily provided his driver's license to Sergeant Kiley and travel documents to an unidentified officer, Plaintiff then left the upper level of Terminal B, went downstairs to obtain transportation and went to his meeting. *SOF*, ¶¶ 35, 44. Applying the objective reasonableness standard to this set of circumstances, it is clear that an objectively reasonable person would have believed he was not under arrest and thus free to leave. As such, Trooper Thompson is entitled to summary judgment relative to Plaintiff's claim that he seized him during their second interaction.

      iii.      *Plaintiff's Encounter with Trooper Croxton*

Plaintiff has also brought civil rights claims against Trooper Croxton relative to his role in the encounter which occurred outside of Terminal B. As with his claims against Trooper Thompson, Plaintiff's case against Trooper Croxton cannot survive summary judgment where the undisputed facts fail to prove Plaintiff was seized.

In his Complaint, Plaintiff alleges that Trooper Croxton was in fact a sergeant – and thus Trooper Thompson's supervisor, that he arrived at the scene outside of Terminal B and that he told Plaintiff that "if he did not produce his airline ticket, he would be placed on Logan Airport's 'trespass list' and his ability to return to the airport without a ticket would result in arrest." *Complaint*, *¶¶ 8, 21-22*. The undisputed facts on the summary judgment record, however, indicate otherwise. For one, Trooper Croxton does not hold the rank of sergeant but has been a trooper with the MSP since consolidation of several law enforcement agencies in 1992. *SOF*, ¶¶ 7-8. The sergeant who did arrive at

the scene and to whom Plaintiff provided his license was Sergeant Mark Kiley, and not Trooper Croxton as Plaintiff had initially alleged. *SOF*, ¶ 33. Accordingly, Trooper Croxton has no supervisory powers over Trooper Thompson.

Furthermore, the undisputed facts clearly show that Trooper Croxton's interaction with Plaintiff was strictly limited to trying to inform him why Trooper Thompson had requested he produce his identification. *SOF*, ¶ 37. Trooper Croxton asked Plaintiff no questions, had no further conversation with him and left the scene prior to Plaintiff providing his travel documents. *SOF*, ¶¶ 37-38. Similar to all of the other officers present, at no point did Trooper Croxton touch Plaintiff, remove him from the area, direct him to a cruiser or physically prevent him from leaving the scene. *SOF*, ¶¶ 45-46, 51. Thus, where Trooper Croxton's encounter with Plaintiff was of an extremely short duration, was clearly benign in nature and lacked any indicia whatsoever of an unreasonable seizure, Trooper Croxton is entitled as a matter of law to summary judgment on Count II of Plaintiff's Complaint.

**II.     Troopers Thompson and Croxton Are Entitled to Summary Judgment on Count I Alleging Plaintiff's State Civil Rights Claims Where Plaintiff Cannot Prove a Constitutional Violation Occurred.**

In addition to his federal civil rights claims against the Defendants, Plaintiff also seeks damages for alleged violations of his state and federal constitutional rights brought pursuant to M.G.L. c. 12, § 11I. As with Count II, Plaintiff alleges in Count I of his Complaint that Defendants violated his constitutional right to be free from unreasonable searches and seizures. *Complaint*, ¶¶ 27-29.

To state a claim under the MCRA, a plaintiff:

> [M]ust prove that (1) his/her exercise or enjoyment of rights secured by the constitution or laws of either the

11

> United States or the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by <u>threats, intimidation or coercion</u>.

<u>Swanset Development Corp. v. Taunton</u>, 423 Mass. 390, 39 (1996) (emphasis supplied) (citations omitted). <u>See also</u> <u>Grant v. John Hancock Mut. Life Ins. Co.</u>, 183 F.Supp. 344 (D.Mass. 2002); <u>Appelton v. Town of Hudson</u>, 397 Mass. 8, 12 (1986) (whether a plaintiff's rights have been interfered with need not be decided where, taking all inferences in favor of the Plaintiff, there are insufficient allegations that a defendant acted through "threats, intimidation or coercion"); <u>Bally v. Northeastern University</u>, 403 Mass. 713, 717 (1989).

The requirement of threats, intimidation or coercion distinguishes the MCRA from § 1983. Thus an action lies only where the defendant attempts "to force that person unwillingly to do or not to do something otherwise lawful." <u>Pheasant Ridge Assoc. v. Burlington</u>, 399 Mass. 771 (1987). No claim is stated where an action, even though in bad faith, "did not itself interfere or attempt to interfere with the Plaintiff's rights by coercion," but rather "was an attempted <u>direct</u>, preemptive act . . . " <u>Id.</u> at 1158 (emphasis supplied); <u>Deas v. Dempsey</u>, 403 Mass. 468 (1989). Moreover, evidence of threats, intimidation or coercion is measured by an objective standard and not by the state of mind of the plaintiff. <u>Sarvis v. Boston Safe Deposit and Trust Co.</u>, 47 Mass.App.Ct. 86 (1999).

Where the MCRA is otherwise similar to 42 U.S.C. § 1983, however, the analysis is essentially the same. In other words, in order to make a valid claim under the MCRA, a plaintiff must first prove "an actual deprivation of [plaintiff's] constitutional rights." <u>Therrien v. Hamilton</u>, 849 F.Supp. 110, 115 (D.Mass.1994) (citations omitted). It is not

enough that a plaintiff show that a defendant merely omitted to take action; rather, he must demonstrate some form of confrontation on the part of the defendant.  *Redgrave v. Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 96 (1987).  *See* also *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 473-474, n.8 (1994) ("[The Supreme Judicial Court] cases holding that the Massachusetts Civil Rights Act was violated have involved actual or potential physical confrontations involving a threat of harm.").

In the instant matter, as is the case with Plaintiff's claim pursuant to 42 U.S.C. § 1983, Plaintiff cannot meet his burden that either Trooper Thompson or Trooper Croxton violated his right to be free from unreasonable searches and seizures.  *See Section II, supra*.  Moreover, for purposes of analyzing the instant matter, it is irrelevant whether Plaintiff's rights were violated under the Fourth Amendment or Article 14.  While Article 14 does provide citizens with greater substantive protections than the Fourth Amendment, the appropriate inquiry under Article 14 reveals the same conclusion:  the officers did not seize Plaintiff as an objectively reasonable person would have felt free to terminate the conversation and walk away.  *See e.g. Commonwealth v. Sanchez*, 403 Mass. 640 (1988)(No seizure took place when police approached the suspect in a public area of an airport and requested he answer a few questions); *Commonwealth v. Fraser*, 410 Mass. 541 (1991)(No seizure when police approached subject and directed him to take his hands out of his pockets).

As Plaintiff will not be able to satisfy this essential element of his claim, i.e. that his encounters with Troopers Thompson and Croxton constituted seizures whereby an

objectively reasonable person would not have felt free to leave, Defendants are entitled to summary judgment on Count I.

### III. Defendants Are Entitled to Summary Judgment Based on Qualified Immunity.

The Supreme Court has long recognized that governmental officials have a qualified immunity from liability for actions taken in the course of their official duties. In <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982), the Court held:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

The determination of whether an officer is entitled to the defense of qualified immunity is a question of law for the courts, <u>Starlight Sugar, Inc. v. Soto</u>, 253 F.3d 137, 141 (1st Cir. 2001), and one which normally is resolved prior to trial on a motion for summary judgment. Moreover, where "[t]he privilege is an *immunity from suit* rather than a mere defense to liability, [the Supreme Court has repeatedly] stressed the importance of resolving immunity questions at the earliest possible stage of litigation." <u>Saucier v. Katz</u>, 533 U.S. 194 (2001) (internal citations omitted); <u>see</u> <u>also</u> <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 24-30 (1985) (The rejection of a qualified immunity defense is immediately reviewable under the collateral order doctrine.).

In analyzing whether qualified immunity applies in a particular case, the reviewing court must resolve the following questions: "1.) whether the plaintiff suffered a constitutional injury, <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999), and 2.) whether 'an objectively reasonable official would have believed that his conduct was lawful 'in light

14

of clearly established law and the information that the official possessed at the time of his allegedly unlawful conduct.'" *Jarrett v. Town of Yarmouth*, 309 F.3d 54, 61 (1st Cir. 2002), quoting *Kelley v. LaForce*, 288 F.3d 1, 7 (1st Cir. 2002).  Thus, assuming evidence of a constitutional injury or violation has been put forth by the plaintiff, the applicability of qualified immunity will hinge on the second prong of reasonableness.

>   Discussing *Harlow*, the Supreme Court stated:

> > [A]n allegation of malice is not sufficient to defeat immunity if the Defendant acted in an objectively reasonable manner . . . Defendants will not be immune if, on an objective basis, it is obvious that <u>no</u> reasonable competent officer would have concluded that a warrant should issue; but <u>if officers of reasonable competence could disagree on this issue, immunity should be recognized</u> . . . the Harlow standard . . . <u>gives ample room for mistaken judgments</u>.

*Malley v. Briggs*, 475 U.S. 335, 341 (emphasis supplied).  The Supreme Court has subsequently reaffirmed the "objective legal reasonableness" standard of *Harlow*, and emphasized the appropriateness of granting summary judgment in these cases. *Anderson v. Creighton*, 483 U.S. 635, 97 L.Ed.2d 523 (1987).  The reasonableness of a defendant's actions may only be determined by examining his actions in light of the particular circumstances known to him at the time of the act.  For an act to fall outside the scope of immunity, "in the light of pre-existing law the unlawfulness must be apparent," *Id*. at 635; *see also Saucier*, 533 U.S. at 201, quoting *Anderson, supra* ("[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").  In

15

other words, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Anderson*, 483 U.S. at 638-639.

In the instant case, Troopers Thompson and Croxton are entitled to qualified immunity where Plaintiff has failed to demonstrate they deprived him of his constitutionally protected rights. Even assuming Plaintiff has made the requisite showing of a constitutional deprivation, qualified immunity is still appropriate where Plaintiff cannot defeat the second prong of reasonableness.

As discussed in greater detail in *Section II*, *supra*, Trooper Thompson – and to an even lesser extent Trooper Croxton – had minimal contact with Plaintiff on the morning of October 16, 2003, the majority of which centered on his trying to ascertain Plaintiff's identity as he was acting irrationally and confrontationally in Logan. Based on the undisputed facts, Plaintiff cannot show that "it is obvious that <u>no</u> reasonable competent officer" would have concluded that it was unconstitutional for law enforcement to attempt to identify an individual acting irrationally in a high security setting such as Logan Airport post-9/11. *Malley*, 475 U.S. 335. On the contrary, it is clear that an objectively reasonable police officer, equipped with the information known to the troopers on October 16, 2003, could have believed that it was reasonable to ask such an individual for his identification and travel documents to verify whether he was on Logan's "No Trespass" list, request that he leave the premises if he did not produce them, or follow him for the purpose of surveillance to ensure that he left the area without causing any disruption to the operation of the airport or posing any risk to the safety of those therein. Based on all of this information, it cannot be said that an objectively reasonable police officer, placed in Troopers Thompson and Croxton's respective

positions on October 16, 2003, would have thought that any of the aforementioned conduct rose to the level of a Fourth Amendment violation. Accordingly, Troopers Thompson and Croxton are entitled to summary judgment based on the doctrine of qualified immunity.

Moreover, the Supreme Judicial Court of Massachusetts has held that the doctrine of qualified immunity as developed under 42 U.S.C. § 1983 applies to claims brought under the Massachusetts Civil Rights Act. *Howcroft v. City of Peabody*, 51 Mass.App.Ct. 573, 595 (2001), citing *Duarte v. Healy*, 405 Mass. 43, 46-47 (1989) (citations omitted); *see also Kelley v. LaForce*, 279 F.3d 129 (1st Cir.2002). Therefore, assuming, *arguendo*, the Court were to find Defendants violated Plaintiff's state constitutional rights as alleged in Count I, summary judgment would still be appropriate based on qualified immunity.

**IV.  Summary Judgment for Defendants Is Appropriate on Count III Seeking Declaratory Relief Where Plaintiff Cannot Prove Defendants Either Engaged in Racial Profiling or Utilized the B.A.S.S. Program.**

In Count III of his Complaint, Plaintiff seeks a declaration that the behavior assessment screening program ("B.A.S.S.") used by the Massachusetts State Police is unconstitutional in that it subjects individuals to unreasonable searches and seizures and condones racial and ethnic profiling. *Complaint*, ¶¶ 10-13, 24-25, 35-38. In support thereof, Plaintiff has alleged that Troopers Thompson and Croxton's "unlawful actions . . . were proximately caused by, or taken pursuant to, the directions of Massport and the State Police, *particularly the behavioral assessment policy*." *Complaint*, ¶ 24. Summary judgment for Defendants is appropriate as to these claims where Plaintiff cannot meet his requisite burden of proof. For one, Trooper Thompson and Trooper Croxton, both of

17

whom are African-American, deny that race was a factor in their dealings with Plaintiff on October 16, 2003, and the record provides no evidence to the contrary. *SOF*, ¶¶ 6, 9, 50. Likewise, the undisputed facts show that neither Trooper Thompson nor Trooper Croxton was responsible for writing or implementing the B.A.S.S. program nor did they utilize it during their encounters with Plaintiff. *SOF*, ¶¶ 13-15, 49. Moreover, Plaintiff testified at his deposition that he does not know whether the officers used their B.A.S.S. training on that morning. *SOF*, ¶ 48. Short of being able to offer anything more than bald conclusions to the contrary, there simply is no evidence to support Plaintiff's contention that the officers utilized the B.A.S.S. program, engaged in racial profiling or that an actual controversy regarding the B.A.S.S. program even exists. Accordingly, summary judgment on Count III should be entered for Defendants and Plaintiff's requested relief denied.

## CONCLUSION

Therefore, where, as a matter of law, Plaintiff will be unable to establish that Trooper Thompson or Croxton violated either his state or federal constitutional rights, summary judgment for Defendant Thompson and Croxton is appropriate as to Counts I and II. Moreover, assuming, *arguendo*, that a constitutional violation did occur, Troopers Thompson and Croxton's conduct is protected by qualified immunity in that they acted as reasonable police officers would have acted under similar circumstances. Lastly, summary judgment for Defendants on Count III of Plaintiff's Complaint is appropriate where Plaintiff, as a matter of law, cannot prove that the unconstitutionality of the B.A.S.S. program or that Trooper Thompson or Croxton utilized the program in their dealings with Plaintiff.

        Respectfully submitted,
        For Defendants William Thompson and
        Howard Croxton,
        By their attorneys,

        RAFANELLI & KITTREDGE, P.C.


        _/s/_ Suzanne T. Caravaggio_____
        Joseph P. Kittredge, BBO #548841
        Suzanne T. Caravaggio, BBO #634175
        One Keefe Road
        Acton, MA 01720-5517
        (978) 369-6001

**CERTIFICATE OF SERVICE**

  I hereby certify that on this date this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants as of March 1, 2007.

Date:  03/01/07        _/s/_ Suzanne T. Caravaggio_____
             Suzanne T. Caravaggio