**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **KING DOWNING,**<br>**Plaintiff,**<br><br>**v.**<br><br>**MASSPORT, MASSACHUSETTS STATE POLICE, ET AL,**<br>**Defendants.** | **Civil Action No. 04-12513-GAO**<br>**(LEAVE TO FILE GRANTED 4/11/2007)** |

**MEMORANDUM OF MASSACHUSETTS STATE POLICE, THOMAS G. ROBBINS, AND PETER J. DIDOMENICA IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Downing accuses the Massachusetts State Police, as well as its former Colonel, Thomas G. Robbins, and Sergeant Peter J. Didomenica of employing an unconstitutional threat assessment tool at Logan Airport. Specifically, he claims that the threat assessment tool either racially profiles or directs an unconstitutional seizure. But, after extensive discovery, Downing has no evidence that either he or anyone else was racially profiled at Logan Airport. Indeed, discovery revealed that the threat assessment tool, specifically the "Behavioral Assessment Security System" ("BASS") [1]does not condone racial profiling; it condemns it. And, in any event, the BASS tool was never used.

Downing's claim that he was the subject of an unconstitutional seizure that was allegedly dictated by the BASS tool fails for two reasons: one, he was not seized. And, again, the BASS

[1]BASS, a threat assessment tool, was previously known as "PASS," the Passenger Assessment Security System.

tool was never used.

Despite Downing's claims in Count I of the complaint, he is not entitled to damages against Colonel Robbins or Sergeant DiDomenica for violation of the Massachusetts Civil Rights Act, because he cannot point to a single threatening, intimidating, or coercive action by them that violated the Act.

Count II of the complaint, alleging violations of 42 U.S.C. § 1983, fares no better. Not only has Downing failed to show that the individual defendants Colonel Robbins and Sergeant DiDomenica committed an unconstitutional act, he also fails to show that they committed any act at all against him. This failure is fatal to Count II, and removes the basis for federal court jurisdiction.

Count III seeks a declaratory judgment against the State Police and Massport under Massachusetts G.L. c. 231A, § 1. Specifically, Downing is asking this Court to declare that the BASS program is unconstitutional. Whether it is unconstitutional or not is irrelevant, as no one used it. For this reason alone, declaratory judgment is improper. Without an actual case or controversy, Downing is asking the Court to opine on the federal constitutionality of a state program. For many reasons beyond its lack of justiciability, i.e., comity and federalism, this request should be denied.

Count III also seeks a declaratory judgment that the BASS threat assessment tool is unconstitutional under the Massachusetts Civil Rights Act. Again, there is no factual or legal basis for such a request.

The foundation of Downing's lawsuit against the State Police, former Colonel Robbins, and Sergeant Didomenica is the alleged use of the BASS tool. Downing has no evidence that the

BASS tool was ever used, and so his lawsuit cannot be sustained. Ultimately, this case is not trial worthy, and summary judgment should enter for the Defendants.

**FACTS**

Logan International Airport hosts tens of thousands of passengers daily. Throughout the secure and non-secure areas of the airport are signs that inform these passengers that they may be asked for identification. [2]

Trooper William Thompson[3] was on duty at Logan International Airport monitoring a security checkpoint. SOF ¶ 1 Apart from monitoring security checkpoints, one of Trooper Thompson's duties was to remove trespassers, and "irates," agitated individuals who had no legitimate reason for being at the airport. SOF ¶¶ 1 & 2. Trooper Thompson had experience with "irates" at the airport. SOF ¶ 2

It was early morning on October 16th, 2003. SOF ¶ 6 He was stationed in Upper Terminal A near a pole that had four public telephones affixed to it. SOF ¶¶ 8 & 9 While stationed there, an over six-foot tall casually dressed male who, apparently, had been on the public phone, [4] turned to look at him. SOF ¶¶ 10 & 11 According to the male, now known as the plaintiff King Downing, Trooper Thompson asked him, "Is there a problem?" SOF ¶ 12

Downing responded: "I just want to know why you're standing here so close to me while

---

[2]"SOF" denotes Statement of Undisputed Facts. Exhibit A are passages from the deposition of Trooper William Thompson. Exhibit B are passages from the deposition of King Downing. And Exhibit C are passages from the deposition of Sergeant Peter Didomenica. A single letter "C" denotes the complaint.

[3]Absent from the Complaint is any mention that Trooper Thompson, and three of the other four troopers at the scene are African-American, like Downing.

[4] Downing was checking, and perhaps, leaving messages. SOF ¶ 8

I'm talking on the phone." SOF ¶ 13 The trooper found Downing confrontational and irate, so he asked him for his identification. [5] SOF ¶ 16 Downing would not provide any; he refused to give any documents showing why he was at the airport. SOF ¶¶ 14 & 15 And he told Trooper Thompson: "Why do I have to show you ID?," and "I'm not showing you my ID." SOF ¶ 15 During their conversation Trooper Thompson told Downing that he would have to leave the airport if he did not provide the identification. C. ¶ 19. Because he did not want to talk to Thompson any longer, Downing left the airport terminal. C. ¶ 20. Trooper Thompson did not attempt to stop him in any way. SOF 19

Once outside the terminal, Trooper Thompson saw Downing attempting to flag a cab in an area where cabs were not permitted to stop. SOF ¶¶ 21 & 22 While Downing continued to try to flag down a cab, Trooper Thompson came out of the terminal. SOF ¶¶ 23 & 24 He again asked for identification, and according to Downing, told him that if he didn't offer the identification, he would be heading "downtown." According to Downing, the Trooper told him he was under arrest. [6] However, Downing admits that he was never handcuffed; he was never placed in another room, a cruiser, or another facility. Indeed, he was never even touched. SOF ¶¶ 41 & 42

Downing further admitted that through his experience as an attorney, and as the national co-ordinator of the American Civil Liberties Union anti-racial profiling campaign, he knew it was unusual for anyone who was told that they were under arrest not to be handcuffed. SOF ¶¶

---

[5]Trooper Thompson denies that he spoke first. But who began the conversation is not a material fact as the conversation quickly became argumentative.

[6]These facts are disputed, but not material to the summary judgment decision.

4 & 43

In the meantime, in response to Trooper Thompson's call for assistance, four other troopers arrived seriatim. SOF ¶ 23 Three of them and Thompson are African-American. Downing provided his identification to the only white trooper, Sergeant Kiley.SOF ¶¶ 32 & 33 Trooper Thompson called the identification in to the dispatcher, and determined that Downing was not on the trespass list maintained at Logan Airport. Thereupon Downing's identification was returned. SOF ¶ 36

Downing was then asked to provide his plane ticket to show that he was legitimately at the airport. He refused, and never produced his ticket. Instead, under protest, he provided a boarding pass from the day before. SOF ¶¶ 34 & 35 He did so because he was afraid he would miss his meeting. SOF ¶ 35 After a little discussion, the troopers returned the boarding pass to Downing. He then left and went to the terminal's lower level where taxi pick-ups were permitted. He was on time for his meeting. SOF ¶ 37

Troopers Thompson, Croxton, Adell, Moore, and Kiley all testified that they did not employ the BASS, or PASS tools. And they further testified that they did not think Downing was a terrorist. Thompson saw him as more a potential garden variety "irate," an airport type with which he was familiar. SOF ¶¶ 3 & 16

As for Downing's take on the airport events, he admitted that: he does not know whether the BASS tool was used with him; he does not know whether the BASS tool racially profiles; he does not even know if his race played a part in the African-American trooper Thompson's encounter with him, or the limited encounter with the white sergeant, and the other three African-American troopers. SOF ¶¶ 38, 39 & 40

**PROCEDURAL HISTORY**

Downing filed his complaint in the Massachusetts Superior Court on November 10, 2004. In Count I he sued the following defendants under the state civil rights act, Massachusetts General Laws c. 12, § 11I: Massport, Trooper Thompson, Trooper Croxton, Colonel Robbins, and Sergeant DiDomenica for alleged violations of Articles 1 and 14 of the Massachusetts Declaration of Rights. In Count II he sued the same defendants under the Federal Civil Rights Act, 42 U.S.C. § 1983 for alleged violations of the Fourth and Fourteenth Amendments. In Count III he sued the Massachusetts State Police and Massport for a declaratory judgment under G.L. c. 231A, § 1, seeking a declaration that the BASS program violates the state and federal constitutions. Twenty days later Massport filed a notice of removal to this court where it was assigned to Judge George O'Toole. The parties later consented to assigning the case to Magistrate Judge Robert B. Collings.

**ARGUMENT**

**SUMMARY JUDGMENT STANDARD**

Summary judgment should be granted only where the court, viewing the evidence in the light most favorable to the non-moving party, determines that no genuine dispute of material fact exists. See Fed. R.Civ. P. 56. Although disputed facts are viewed in the light most favorable to the opposing party, the court does not credit "conclusory allegations, improbable references, and unsupported speculation." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F. 2d 5, 8 (1st Cir. 1990).

The movant has the initial responsibility of informing the district court of the basis for its motion and identifying those portions "of the record showing the absence of a genuine dispute of

material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Then the non-moving party must demonstrate that "*every essential element* of its claim or defense is at least trialworthy." *Price v. General Motors Corp*., 931 F. 2d 162, 164 (1st Cir. 1991)(italics in original). The nonmovant cannot simply rest upon mere allegations. Instead the nonmoving party must produce specific, provable facts, which establish that there is a triable issue. If the evidence is merely colorable or not significantly probative, summary judgment must be granted. *Cronin v. Town of Amesbury*, 895 F. Supp. 375, 382-383 (D. Mass. 1995).

A dispute is genuine if it "may reasonably be resolved in favor of either party." *Cadle Co. v. Hayes*, 116 F. 3d 957, 960 (1st Cir. 1997). "A fact is material if it has the capacity to sway the outcome of the litigation under the applicable law." *Id.*

## I. PLAINTIFF IS NOT ENTITLED TO AN ADJUDICATION OF THE CONSTITUTIONALITY OF THE BASS TOOL

### A. THE BASS TOOL WAS NOT USED

Downing's claims are circular, and nothing more. Their gist is " I am African-American so I must have been singled out because I am African-American." The problem with his argument is that, after extensive discovery, he has no evidence that he was singled out because he was African-American, and thus, no evidence of any racial profiling. This is insufficient to sustain his burden at trial. *See Celotex Corp*., 477 U.S. at 322.

The basis of Downing's racial profiling complaint is that Trooper Thompson, also an African-American, must have employed the BASS anti-terroris protocol when he talked with him. But Trooper Thompson testified that he did not think Downing was a terrorist: he was worried about him being a trespasser, an "irate." SOF ¶¶ 2 & 16 Moreover, Trooper Croxton testified that he was just answering Thompson's call when he came to the scene, and was not

using the BASS tool. Trooper Moore also testified that he was merely responding to Trooper Thompson's call, and was not using the BASS tool when he responded, or when he was on the scene. In fact, Downing concedes he has no idea whether the BASS tool was used by any of the troopers:

> Q. And is it fair to say that you do not know if such a [BASS] program was employed at your stop at Logan on October 16?
>
> A. No, I don't know.
>
> Q. You do not know that, okay. I'm asking you do you know that it was employed?
>
> A. No, I do not know that it was or I do not know that it wasn't.
>
> Q,. Do you have any belief or any basis for believing that this program would condone in any way racial or ethnic profiling?
>
> A. I don't have any belief either way.

Exhibit B at 100:21 -101:18

This is not enough for Downing to sustain his burden at trial. *See Celotex Corp.*, 477 U.S. at 325 ("the burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case.")

Concomitant with Downing's lack of knowledge about whether the BASS tool was used in his encounter, is Downing's lack of knowledge concerning the nature of the BASS tool. The basis for Downing's belief that the BASS tool racially profiles, like his belief that the Bass tool was used, is simply that he is an African-American who was asked questions, and therefore the BASS tool must use racial or ethnic profiling as a basis for asking questions of individuals. There is no evidence of this.

To the contrary, the BASS tool explicitly condemns racial and ethnic profiling. The point of such a program is to avoid ineffective stereotyping, and to more effectively combat terror with a tool more appropriately designed to do so: namely, a tool that focuses on an individual's behavior, not on his or her race or ethnicity. The simple reason for this, apart from constitutional considerations, is that a threat assessment tool based upon behavior works, and one based on racial or ethnic profiling does not. Ex. C 14:3-24 15:1-5 25:9-24 pp. 26 & 27 28:1-12

The defendant Sergeant Peter J. DiDomenica is the author of the BASS tool. He testified that the Behavioral Assessment Screening System does not permit the use of racial or ethnic considerations when making a threat assessment. The point of the tool is to screen out suspicious behavior, not arbitrarily stop people because of their race or ethnicity. Exhibit C 39: 16 - 23 Sergeant DiDomenica further testified that he is an attorney and that he conducted significant national and international research in drafting the BASS tool. He investigated tools used at the Ben Gurion Aiport in Israel. He adapted these tools to conform with constitutional requirements. Exhibit C 21:18-24 22:1-24

DiDomenica further testified that although troopers were encouraged to use BASS, it was not mandatory. Exhibit C 23:19-24 24:1-2 30:1-16 Thus, there is no evidence that supports the notion that the BASS tool was used in this instance. There is no evidence to support the notion that the BASS tool permits racial profiling, and, therefore, there is no basis for liability against Sergeant DiDomenica, Colonel Robbins, or the Massachusetts State Police, because there is no connection between them and any allegedly unconstitutional behavior. *See, e.g., United States v. Green*, 407 F. 3d 434, 444 (1st Cir. 2005)(courts not permitted to provide advisory opinions).

It is indisputable that liability under 42 U.S.C. § 1983 cannot be based upon a theory of respondeat superior. *Barretto-Rivera v. Medina-Vargas*, 168 F. 3d 42, 48 (1st Cir. 1995). Absent direct participation, a supervisor can only be liable when an "affirmative link between the subordinate and the superiors whether through direct participation or through conduct that amounts to tacit authorization" is established. *Velez-Rivera v. Agosto-Alicea*, 437 F. 3d 145, 156 (1st Cir. 2006)(internal cites omitted)

Neither Sergeant Didomenica nor former Colonel Robbins were present at Logan Airport on October 16, 2003. In fact, Sergeant DiDomenica is familiar with Downing only through their work on the anti-racial profiling working group convened by former Secretary of the Executive Office of Public Safety, Edward Flynn. SOF ¶ 47 DiDomenica and Downing frequently attended the monthly meetings convened at Northeastern University. SOF ¶ 47

Despite this opportunity to work together, and despite lacking any real knowledge of the BASS program, Downing accuses the DiDomenica of supervisory liability: specifically, Downing claims that the BASS tool in place at Logan International Airport violates both the state and federal constitutions, and that it "effectively condones and encourages racial and ethnic profiling." C ¶ 13

As set forth above, BASS expressly condemns racial and ethnic profiling. All documentary and testimonial evidence gleaned through discovery supports this. Exhibit C 39:16-23 What Mr. Downing has is merely his belief, without any supporting evidence, that BASS does racially and ethnically profile. This is insufficient to sustain his burden of proof. *DeNovellis v. Shalala*, 124 F. 3d 298, 306 (1st Cir. 1997)(quotations and citations omitted). What Downing is effectively seeking from this Court is an advisory opinion regarding the BASS

program. He is not entitled to one. *See, e.g., United States v. Green*, 407 F. 3d 434, 444 (1st Cir. 2005)(courts not permitted to provide advisory opinions); *Santa Maria v. Owens-Illinois, Inc.*, 808 F. 2d 848, 851 (1st Cir. 1986)(same).

**B. PLAINTIFF HAS NO JUSTICIABLE CLAIM FOR DAMAGES AND LACKS STANDING TO SEEK EQUITABLE OR DECLARATORY RELIEF**

Federal court jurisdiction lies only where an actual case or controversy exists for resolution by the court. *See* U.S. Const. Art. III, §2, cl.1; 28 U.S.C. § 2201. The case or controversy requirement endures throughout the lifetime of an action so that "Article III considerations require that an actual case or controversy 'must be extant at all stages of review, not merely at the time the complaint is filed.'"

*Ramirez v. Sanchez Ramos*, 438 F. 3d 92, 100 (1st Cir. 2006) *quoting Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

Downing has nothing more than his speculation to support his theory that he was racially profiled. This is insufficient to create a case or controversy. His alternative argument that the BASS threat assessment protocol is unconstitutional because it does not comply with the Fourth Amendment is also unavailing. As testified to by Sergeant Didomenica, there is nothing in the BASS protocol that instructs troopers to impermissibly seize anyone. It is based on a voluntary encounter, from which a passenger can walk away. Exhibit C 39: 24 40:1 - 2 As Downing acknowledged, a police officer can properly ask anybody a question. Exhibit B 65:17 - 66:11, and the threat assessment protocol does no more than instruct officers to do that.

Thus, Downing's claims for damages fail for lack of an actual case or controversy. Even if they could survive summary judgment, his demand for equitable relief fails for lack of standing. In *City of Los Angeles v Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L. Ed. 2d 675 (1983), a plaintiff sought

damages and equitable relief after being put in a "choke hold" by the police. He specifically sought an injunction barring the "choke hold." The Supreme Court rejected his argument that he could again be subjected to the "choke hold" as too speculative to confer standing. And it reiterated that a past harm does not provide standing for equitable relief absent "a sufficient likelihood that he will again be wronged in a similar way." *Lyons at* 461 U.S. 111, 103 S.Ct. 1670, 75 L. Ed. 2d 675. Similarly, Downing complains of a past alleged wrong, and demands equitable relief because he speculates that it could happen again. C ¶ 37. But this is insufficient to create standing, particularly when the relief he requests would require this Court to intervene into state, and perhaps federal, police practices, which will prompt concerns about the principles of comity and federalism. *See Lyons*, 461 U.S. at 112, 103 S. Ct. at 1670.

*See also American Postal Workers Union, et al v. Frank, et al.*, 968 F. 2d 1373 (1st Cir. 1992) (where no realistic risk of repetition of alleged harm, no standing for equitable relief ). [7]

Downing also seeks a declaratory judgment under G.L. c. 231A, § 1. Specifically, he requests that this Court opine on BASS's constitutionality under both the federal and state constitutions. As set forth above, he has no case or controversy, and lacks the standing to bring such a request under the federal constitution.

---

[7]While the line of Supreme Court cases addressing the issue of equitable standing deal with injunctive relief, the same principles apply to declaratory judgments. *See American Postal Workers,* 968 F. 2d *at* 1377 n. 4 (citations omitted).

Downing cannot request declaratory judgment under the state constitution. First, the State, and its agencies, such as the defendant Massachusetts State Police, are not considered "persons" covered by the Act, because the Massachusetts state courts have held that the Massachusetts Civil Rights Act, G.L. c. 12, § 11I, does not waive sovereign immunity. *Comm. v. ELM Laboratories*, 33 Mass. App. Ct. 71 (1992).

Even if Downing were somehow able to get around the State Police's sovereign immunity, the Massachusetts Civil Rights Act has additional elements: a plaintiff must prove that the interference with his rights was brought about by threats, intimidation, or coercion. *Swanset Development Corp. v. Taunton*, 423 Mass. 390, 399 (1996). There is no evidence that the State Police, Colonel Robbins, or Sergeant Didomenica threatened, intimidated or coerced Downing. *See Planned Parenthood League of Mass. Inc. v. Blake*, 417 Mass. 467, 473-474, n.8 (1994)(Massachusetts courts require an actual or potential physical confrontation involving threats of harm to support the elements under the Massachusetts Civil Rights Act). Indeed, the only evidence of any association with Downing is Sergeant Didomenica's attendance with him at the anti-racial profiling workshops at Northeastern University. SOF ¶ 47

## II. PLAINTIFF'S OWN ACTIONS CONTROLLED THE PARAMETERS OF THE TROOPERS' INQUIRIES: THERE WAS NO SEIZURE

Downing's claims against the State Police, Robbins, and DeDomenica depend on a finding that the BASS protocol was used with him. As set forth above, Downing has no evidence that this occurred. This is fatal to any claim against these defendants because there is no causal nexus between them and any alleged harm suffered by Downing. Thus, the Court need go no further to enter summary judgment for the State Police, Robbins and DeDomenica. If the Court chooses to go further, an analysis of the encounter between the troopers and Downing illustrates that no seizure, and certainly not an unconstitutional one, occurred.

"To bring an action under 42 U.S.C. § 1983 [Downing] must show both the existence of a federal constitutional or statutory right, and some deprivation of that right as a result of [the defendants'] actions under color of state law." *Watterson v. Page*, 987 F. 2d 1, 7 (1993)(quoting *Willhauck v. Halpin*, 953 F. 2d 689, 7803 (1st Cir. 1991). Section 1983 creates no independent right, but provides a cause of action by which individuals may seek money damages for governmental violations protected by Law. *See, e.g. Albright v. Oliver*, 510 U.S. 266, 271 (1994). Further, the constitutional right alleged must be identified with specificity. It serves no purpose for Downing to claim that he has a Fourth Amendment right; in the abstract that is a given. What is important is the application here, as the right must be stated with particularity. *See e.g. Frazier v. Bailey*, 957 F. 2d 920, 930 (1st Cir. 1992)

Downing concedes that the Troopers could properly ask him questions. The case law is clear that it is not unconstitutional for a police officer to ask questions, including asking for identification. *See United States v Mendenhall*, 446 U.S. 544, 554 (1980)(no seizure where individual at airport approached by DEA agents who asked her questions, and asked for identification and a ticket). He appears to contend that absent probable cause or a "Terry" stop, he has the right not to answer a trooper's question, and he is right again. Where he is wrong is his unreasonable characterization of his encounter with Trooper Thompson. The appropriate test here is an objective one. *United States v. Smith*, 423 F. 3d 25, 28 n. 5 (1st Cir.2005).

Downing's case is based on the assumption that he was seized because the State Police created a protocol that violates his constitutional rights, particularly by racial profiling. His claim must fail for lack of any evidence racial profiling, and because he was not seized.

It would appear that Downing is alternatively arguing that if he was not seized because he is African-American, than he was seized for another unconstitutional reason. The first problem with this claim is, again, that he was not seized. Downing, deciding he did not want to talk to Trooper Thompson anymore, hung up the phone and walked out of the terminal, never giving his identification. Trooper Thompson never stopped him from leaving the terminal. No seizure had

occurred at that point.

Once he did leave the terminal, Downing drew the Trooper's attention because he was repeatedly trying to flag a cab where they were not permitted to stop. Trooper Thompson testified that he went to see if Downing was an "irate," an agitated individual that the Trooper has had to deal with at the airport.

The other troopers who responded to Trooper Thompson's call had started to arrive. After conferring with Thompson, Trooper Croxton told Downing that Thompson thought he was a trespasser. The troopers' goal was to eliminate him as a trespasser. Looking at this objectively, as is required, the question arises: was it unreasonable for Trooper Thompson to ask for information when faced with an argumentative individual at a critical infrastructure who refuses to identify himself or state his business there, and who then proceeds to repeatedly attempt to flag down cabs where they are not permitted to stop?

The second problem with Downing's claim is that every trooper involved was deposed, and testified that they did not use the BASS tool. No trooper thought Downing required a threat assessment, as no trooper thought he was a potential terrorist. Again, as Trooper Thompson stated, they thought he might simply be an "irate" with no legitimate reason for being at the airport.

## III. IF A SEIZURE TOOK PLACE, IT WAS REASONABLE

### A. IT IS PIVOTAL THAT THE INQUIRIES OCCURRED AT AN AIRPORT, WHICH WAS INTIMATELY INVOLVED IN TWO MAJOR TERRORIST ACTS.

"[T]he ultimate measure of constitutionality of a governmental search is 'reasonableness.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L. Ed. 2d 564 (1995). The Fourth Amendment does not prohibit all searches; but only unreasonable ones. *See United*

*States v. Viegas*, 639 F. 2d 42, 44 (1st Cir. 1981)(if a seizure occurred, it would be reasonable given the defendant's evasive actions). In determining whether what occurred here is reasonable it is essential to consider Downing's location: he was at an international airport, specifically Logan International Airport. Apparently, it does bear repeating that this airport was the point of departure for 9/11 terrorists. *Vernonia*, 515 U.S. *at* 654 (privacy expectations necessarily depend on context). Acknowledging these concerns, the airport has provided signs to inform passengers that they may be subject to search. *See United States v. Calderon at* 107. These signs are not limited to the secure areas of the airport. *Cassidy v. Chertoff*, 471 F. 3d 67, 79 (2d Cir. 2006).

The courts have long recognized the unique status of critical infrastructures such as airports. *Id. at* 76. From the late twentieth century concerns with air piracy to the more recent concerns with weaponizing airplanes as terrorist bombs, the courts have allowed for more extensive airport searches in light of the compelling public interest. *See Calderon at* 109-110.

It is not that the airports are Fourth Amendment free zones, it is the recognition that the special needs unique to these critical infrastructures provide support for a standard by which more extensive searches at an airport are not unreasonable. *Chandler v. Miller*, 520 U.S. 305, 117 S.Ct. 1295, 137 L. Ed. 2d 513 (1997). Based on the case of the shoe bomber Richard Reid, passengers can be told to take off your shoes and socks, and can be limited in what items they carry. In order to eliminate persons as threats, police may ask them questions.

**B. THE TEST OF REASONABLENESS IS NOT WHAT DOWNING THOUGHT, BUT WHAT A REASONABLE PERSON WOULD THINK**

Whether a search is reasonable is based on an objective test, which takes into consideration the totality of the circumstances. *Florida v. Bostick*, 501 U.S. 429, 439 (1991).

The circumstances here involve Downing looking at Trooper Thompson who, according to

Downing, asked ”Is there a problem here?” An argumentative exchange followed, which results in Downing leaving the terminal because he did not want to talk to Trooper Thompson any longer. There is no constitutional violation based on these facts. *See Gilmore v. Gonzalez*, 435 F. 3d 1125, 1138 (9th Cir. 2006)(no seizure where airline passenger left airport in response to request for identification). What is represented is a voluntary exchange ended by Downing. It is indisputable that a police officer can talk to an individual - particularly in an airport. The point of such an exchange can be favorable to the individual as it affords him or her the opportunity to be screened out of a problem, *See Schneckloth v. Bustamente*, 412 U.S. 218, 225 (1973), which is exactly what occurred here.

It was Downing’s actions after leaving the terminal that drew Trooper Thompson’s attention, for he never tried to stop Downing after the initial argumentative exchange. He, along with the troopers who responded to his call for assistance, never drew a weapon on Downing; they never handcuffed him; they never even touched him. What they did do was request his identification and his ticket to show that he was legitimately at the airport, and was not a trespasser - a not uncommon occurrence at the airport.

The troopers had a duty to carry out, and that was the protection of all in a critical infrastructure such as the airport. They carried out this duty by merely asking Downing for his license and ticket. Although Downing states that Trooper Thompson did more: namely, tell him he was going to be under arrest and go downtown, this is not material, and, objectively, the fact that Downing admits that no one handcuffed him, or put him in a cruiser, or placed him in another area, or brought him anywhere for that matter, does not support his statement. At best, Downing experienced a short term minimal inconvenience that he ended because he did not want to be late

for his meeting. Balancing this against the well-recognized compelling public need for airport security, as a matter of law no unreasonable seizure occurred.

**IV IF THE COURT DEEMS IT NECESSARY TO ANALYZE PLAINTIFF'S CLAIMS FURTHER, COLONEL ROBBINS AND SERGEANT DIDOMENICA ARE ENTITLED TO QUALIFIED IMMUNITY**

The qualified immunity doctrine provides a tool to the court to eliminate unfounded lawsuits. *Souza v. Pina*, 53 F. 3d 423, 425 (1st Cir. 1995). "Qualified immunity shields state officials exercising discretionary authority from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware." *Souza*, 53 F. 3d at 425 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity doctrine exists to protect state officials from "undue interference with their duties and from potentially disabling threats of liability." *Harlow* at 806.

The First Circuit performs a three-part inquiry to determine whether an individual is entitled to qualified immunity. The first question requires resolving whether the plaintiffs have alleged a violation of a federal constitutional or statutory right. If they have, the second question is whether this right was clearly established at the time of the alleged violation. *Hatch v. Department for Children, Youth and Their Families*, 274 F. 3d 12, 20 (2001). The last inquiry requires determining whether an objectively reasonable official would have believed their acts violated constitutional or federal rights. *Starlight Sugar, Inc. v. Soto*, 253 F. 3d 137, 141 (1st Cir. 2001). The doctrine of qualified immunity provides protection for an individual's mistaken judgments. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986)(qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law").

As demonstrated above, Downing fails to demonstrate that the defendants violated a clearly

established right by creating the BASS protocol. *Siegert v. Gilley*, 500 U.S. 226, 232 (1991); *See Wilson v. Layne*, 526 U.S. 603, 608 - 609 (1999). While his complaint sets forth that he was stopped because of the BASS tool, and that this tool racially profiles, all evidence belies this. If there is some evidentiary basis for his belief, this basis must be pled with particularity. *See, e.g., Frazier at* 930. Without such particularity, there would be no way to apply the objective standard for qualified immunity: reasonable officials would have no way of knowing they would violate the plaintiff's right unless they had reasonable notice as to just what the right was. *Anderson v. Creighton*, 483 U. S. 635, 639 (1987). The notice must have existed at the time the alleged right was violated. *See, e.g., Bailey*, at 929. Thus, both Colonel Robbins and Sergeant DiDomenica would still be entitled to qualified immunity in the absence of any case law establishing that such a protocol violates a clearly established right. *Anderson* at 641. The point of requiring that the right be clearly established is to give the actor "fair warning" that their proposed action is unconstitutional. *See U.S. v. Lanier*, 117 S. Ct. 1219 (1997)(in a case involving the criminal counterpart to section 1983, the Court stated the concept of "fair warning" for the defendant). Absent case law establishing this right, Colonel Robbins and Sergeant DiDomenica could not have received fair warning. *Rodriguez Rodriguez v. Munoz Munoz*, 808 F. 2d 138, 142 (1st Cir 1986).

Both Colonel Robbins and Sergeant DiDomenica are entitled to qualified immunity, and as this immunity is from suit, all counts should be dismissed. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), *Guzman-Rivera v. Rivera-Cruz*, 98 F.3d 664, 667 (1st Cir. 1996).

**CONCLUSION**

For the reasons set forth above summary judgment should enter for defendants Colonel Robbins and Sergeant Di Domenica on Counts I and II. Summary judgment should enter for the Massachusetts State Police on Count III.

Respectfully Submitted,
COMMONWEALTH OF MASSACHUSETTS
MASSACHUSETTS STATE POLICE

By its Attorneys,

MARTHA COAKLEY
ATTORNEY GENERAL

/s/ Ronald F. Kehoe
Ronald F. Kehoe, BBO #264260
Assistant Attorney General
Government Bureau/Trial Division
One Ashburton Place, Room 1813
Boston, MA 02108-1598
(617) 727-2200 x 2626

Date: April 17, 2007

**CERTIFICATE OF SERVICE**

I, Ronald F. Kehoe, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on April 17, 2007.

/s/ Ronald F. Kehoe
Ronald F. Kehoe, Assistant Attorney General
Government Bureau/Trial Division