UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KING DOWNING, ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 04-12513-RBC |
| v. ) | |
| ) | |
| MASSACHUSETTS PORT AUTHORITY, THE ) | |
| MASSACHUSETTS DEPARTMENT OF ) | |
| STATE POLICE, STATE POLICE TROOPER ) | |
| THOMPSON, STATE POLICE SERGEANT ) | |
| CROXTON, THOMAS G. ROBBINS, and ) | |
| PETER J. DIDOMENICA, ) | |
| Defendants. ) | |

## STATEMENT OF UNDISPUTED FACTS OF DEFENDANTS MASSACHUSETTS STATE POLICE, THOMAS G. ROBBINS, AND PETER J. DIDOMENICA

Pursuant to Local Rule 56.1, Defendants Massachusetts Department of State Police, Former Massachusetts State Police Colonel Thomas G. Robbins, and Massachusetts State Police Sergeant Peter J. DiDomenica's statement of undisputed facts in support of their Motion For Summary Judgment.

1. That morning Trooper William Thompson, an African-American, was on duty at the airport. One of his duties was to remove trespassers and "irates." Compl. ¶ 14; *See* Thompson Dep. 43:14-17, June 22, 2006, hereinafter Ex. A.

2. "Irates" were argumentative individuals who lack a proper reason for being at the airport. Trooper Thompson had had experience with "irates" at the airport. *See id*. at 42:8-15, 42:23-43:3.

3. Plaintiff King Downing is a lawyer and currently serves as the National Coordinator of the American Civil Liberties Union's Campaign Against Racial Profiling.

Compl. ¶ 14; *see, e.g.*, Downing Dep. 6:4-5, Sept. 18, 2006, hereinafter Ex. B.[1]

4. In his role as National Coordinator for the Campaign Against Racial Profiling, he is charged with raising "awareness about the existence of racial profiling through public education, media outreach, know-your-rights training, public service announcements," and assisting ACLU affiliates around the country. Ex. B at 11:1-7.

5. Downing is African-American. C ¶ 14.[1]

6. On the morning of October 16, 2003, Downing arrived at Logan Airport on a redeye flight from the West Coast. C. ¶ 15.

7. He flew to Boston to attend a meeting related to a racial-profiling working group that was scheduled to begin at 10:00 a.m. that morning at the Roxbury Defenders Office. Ex. B at 13:4-7, 14:9-11, 14-23, 44:6-9.

8. After deplaning, Downing used one of four public payphones affixed to a single pole located outside the secure gate area of Terminal B to retrieve his voicemail messages. C. ¶ 16; Ex. C at 18:3-22.

9. While Downing was on the payphone, Trooper Thompson was approximately five feet away from him, observing the security checkpoint leading into the gate area of the terminal. *Id.* at 19:1-20:14; Ex. A at 50:7-8, 51:13-16.

10. The first encounter between Downing and Trooper Thompson occurred while Downing was making or completing his call. *See* C ¶¶ 16-17.

11. Before any words were exchanged between the men, Downing turned to look at Trooper Thompson. Ex. B at 112:2-19.

---

[1] All citations to Exhibits contained in this Statement of Undisputed Facts reference the Exhibits attached to the Tenn Affidavit In Support of Defendant Massachusetts Port Authority's Motion For Summary Judgment. *See* L.R. 56.1.

12. Purportedly in response to Downing's look, Trooper Thompson asked Downing, "Is there a problem?" Ex. B at 112:10-11.

13. In answer, Downing told Trooper Thompson: "I just want to know why you're standing here so close to me while I'm talking on the phone." *Id*. at 22:19-21. Trooper Thompson then asked Downing for his identification. Ex. B at 23:6-7, 25:3-12.

14. Downing subsequently refused to provide any information to Trooper Thompson concerning why he was in the airport that morning. Ex. A at 52:15-19, 53:5-8, 55:2-19.

15. Downing also refused to provide any identification to Trooper Thompson, saying: "Why do I have to show you ID?" and "I'm not showing you my ID." Ex. B at 23:14-16.

16. As a result of these comments, Trooper Thompson considered Downing to be condescending and confrontational. Ex. A at 52:9-19, 66:16-23. He also considered him to be an "irate." *Id*. at 93:13-21.

17. At some point during the exchange, Trooper Thompson told Downing that if he would not provide information, he would have to leave the airport. C. ¶ 17.

18. Because he did not want to talk to Trooper Thompson any longer, Downing then left the terminal. Ex. C at 23:20-24, 25:8-18; *see* C ¶ 19. Ex. B at 24:19-23.

19. Trooper Thompson did not try to stop him. Ex. B 94:15-24

20. After refusing to provide any information to Trooper Thompson, Downing exited the terminal and proceeded to attempt to hail a cab while on the upper level of the terminal. C. ¶¶ 17, 19; Ex. C at 25:19-26:2, 117:14-16. He walked up the sidewalk a few times in an effort to obtain a taxi. *See* Ex. B at 25:20-26:3.

21. Cabs are not authorized to pick up passengers at the upper level of the airport terminal. Ex. B 25:19-23

22. The second interaction between Downing and Trooper Thompson occurred on the sidewalk outside the upper level of the airport terminal, where Plaintiff Downing had gone to locate a cab. C. ¶ 19; *see* Ex. A at 56:13-57:5.

23. Trooper Thompson followed Downing outside and radioed for back-up. C. ¶ 19; Ex. B at 27:17-23. In response, four officers arrived. Ex. B at 28:3-7.[2]

24. State Police Trooper Howard Croxton arrived. C. ¶ 21; Ex. B at 32:6-11; Ex. A at 61:16-18.

25. Trooper Croxton is African-American. *See* Ex. B at 28:16-19.

26. State Police Trooper Wanza Adell also arrived. *See id.* at 32:12-14.

27. Trooper Adell is African-American. *See id.* at 28:16-19.

28. State Police Trooper Robert Moore, another African-American, also arrived. *See id.* at 31:12-14..

29. State Police Sergeant Mark Kiley arrived as well. *Id.* at 28:5-29:2; Ex. A at 61:17-20.

30. Sergeant Kiley is white. *See* Ex. B at 28:16-29:2.

31. Downing produced his license to Sergeant Kiley because he wanted to leave, so that he would not miss his meeting. *See id.* at 29:24-30:4, 8-9, 30:20-31:1, 34:8-10.

---

[2] Although Plaintiff Downing describes a conversation between the men, Trooper Thompson testified that he did not say anything to Plaintiff Downing when they were outside on the sidewalk. *See* Ex. A at 57:15-16, 63:14-16. This is not material for summary judgment purposes.

32. After Downing produced the license, Trooper Thompson radioed it in so that it could be checked against the trespass list and then returned the license to Downing. *Id*. at 31:11-23; Ex. A at 72:2-18, 82:19-83:18.

33. Downing was also asked to produce his airline ticket for inspection by one of the officers. Ex. B. at 35:14-17.

34. He initially refused to produce his travel documents, saying: "You asked me to show identification. I've shown identification. Now you're asking for my tickets. I'm not going to show you my tickets." *Id*. at 35:7-23.

35. Concerned about the timing of his meeting, Downing subsequently provided his boarding pass to the officers. *Id*. at 37:15-38:2, 16-18; 43:7-10.

36. Once checked, the travel documents were returned to Downing. *Id*. at 37:15-38:2, 41:11-21; *see* C. ¶ 22.

37. Downing then left the area, proceeded to the lower level of the airport, and took a cab from Logan Airport to his meeting. He was on time. *See* Ex. B at 42:1-16.

38. Downing does not know whether the behavioral assessment screening system program (the "B.A.S.S. program") played any role in his interaction with the officers. *Id*. at 100:21-101:4, 102:6-9.

39. Downing does not know whether the B.A.S.S. program utilizes, condones, or encourages racial profiling. *Id*. at 100:15-20, 101:5-102:4, 10-13.

40. Downing does not know whether race generally played any role in his encounter with police. *Id*. at 139:22-140:7.

41. At no time during his interaction with police was Downing physically restrained in any way, and at no time did any officer ever touch him. *Id*. at 93:20-94:1.

42. During his encounters with police, Downing was never handcuffed, *id.* at 126:4-6, or placed in a police cruiser. *id.* at 94:5-7.

43. Downing admitted that, in his professional experience, it was unusual for someone who was under arrest not to be handcuffed. Exhibit A 125: 2- 24 126:1-3

44. The entire interaction between Downing and the police occurred in and around Logan Airport. C. ¶¶ 16-19, 21-22.

45. At no time did the police instruct Downing to relocate to a different, more private area of the terminal. Ex. B at 94:8-14.

46. Plaintiff Downing refused to produce his identification to Trooper Thompson because he believed he has a constitutional right to refuse to provide it. *See id.* at 23:17-19.

47. Plaintiff Downing was familiar with defendant Sergeant DiDomenica from his regular attendance at the anti-racial profiling workshops created by the former Secretary of the Executive Office of Public Safety that were convened at Northeastern University. Ex. B 55:3-19 63:4-24

DATED: April 17, 2007

        Respectfully Submitted,
        COMMONWEALTH OF MASSACHUSETTS
        MASSACHUSETTS STATE POLICE

        By its Attorneys,

        MARTHA COAKLEY
        ATTORNEY GENERAL

        /s/ Ronald F. Kehoe
        Ronald F. Kehoe, BBO #264260
        Assistant Attorney General
        Government Bureau/Trial Division
        One Ashburton Place, Room 1813
        Boston, MA 02108-1598
        (617) 727-2200 x 2626

**CERTIFICATE OF SERVICE**

      I, Ronald F. Kehoe, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on April 17, 2007.

                                  ___/s/ Ronald F. Kehoe_____
                                  Ronald F. Kehoe, Assistant Attorney General
                                  Government Bureau/Trial Division