1       page two of Exhibit 2?

2              A.   No.

3              Q.   Did you ever approach any people within Logan

4       Airport to ask them for identification based on

5       elevated suspicion as it's defined on page two?

6              A.   No.

7              Q.   Was there any particular reason for that?

8              A.   Because I dealt with different type of

9       people, I dealt with irates, I didn't deal with the

10      PASS program in general.

11             Q.   Okay, so generally you were handling a

12      different kind of person than someone who might have

13      been assigned to a unit or a sub-unit within Troop F

14      that was specifically on the lookout for potential

15      terror suspects?

16                     MR. KITTREDGE:  Objection.

17                     MS. O'NEIL:  Objection.

18                     MR. KITTREDGE:  You can answer.

19             Q.   Is that fair to say?

20                     THE WITNESS:  Hmm?

21                     MR. KITTREDGE:  You can answer.

22             A.   Can you repeat that, please?

23             Q.   Sure.  It's fair to say that you were dealing

24      with different people than someone might have had they

1      been assigned to a unit specifically focused on

2      apprehending or observing potential terror suspects?

3              A.    Yes.

4              Q.    Let me draw your attention to the events of

5      October 16, 2003 which are at issue in this case.  Do

6      you remember having any interaction with an individual

7      named King Downing?

8              A.    Yes, yes.

9              Q.    When was that first interaction?

10             A.    Are you looking for the time?

11             Q.    Yes, let's just start with the time.  What

12     time was it?

13             A.    In the morning hours of October.

14             Q.    What shift were you on?

15             A.    I was on a seven to three shift.

16             Q.    Had you just come on?

17             A.    No.

18             Q.    Had you received any alerts that morning that

19     there was any particular thing going on or anticipated

20     to be going on at the airport that you should be on the

21     alert for?

22             A.    No.

23             Q.    How were you assigned on that day, to do

24     what?

KACZYNSKI REPORTING

```
 1              A.    When he was on the phone.

 2              Q.    Who initiated the conversation?

 3              A.    Mr. Downing.

 4              Q.    What did he say?

 5              A.    He asked me why I was standing in the

 6        position I was.

 7              Q.    And where were you standing?

 8              A.    A few feet from where he was on the phone.

 9              Q.    And what did you say?

10              A.    And he continued, he also continued to say

11        why was I listening to the conversation.

12              Q.    What did you say?

13              A.    I said to him I wasn't listening to his

14        conversation, then I continued to say that if he wanted

15        to talk me about something I'd be glad to listen to him

16        when he's off the phone.

17              Q.    Why did you think he wanted to talk to you

18        about something?

19              A.    Why did I think he did?

20              Q.    Yes.

21              A.    Because he asked me why I was standing the

22        way I was.

23              Q.    And you said you were standing a few feet

24        away from where he was?
```

KACZYNSKI REPORTING

A.   Yes.

2   Q.   Were you at a pay phone next to him?

3   A.   There was a pay phone, I was next to the pay

4   phone.

5   Q.   The pay phone is not a solitary pay phone,

6   right, there are a number of pay phones in that area,

7   right?

8   A.   That was the only pay phone in that area.

9   Q.   There's only a single pay phone?

10   A.   I think it's a double pay phone.

11   Q.   Okay, and were you making a call at the

12   adjacent pay phone?

13   A.   No, I was watching the checkpoint.

14   Q.   Okay.  You were watching the security

15   checkpoint?

16   A.   The main checkpoint, yes.

17   Q.   Okay, and did he beckon you over or give you

18   any indication that he wanted to talk to you?

19   A.   He looked at me and asked me the question.

20   Q.   And he asked you about where you, why you

21   were standing where you were standing?

22   A.   Yes.

23   Q.   Okay, and what happened after he -- did you

24   hear any of his conversation?

KACZYNSKI REPORTING

     A.   No.

2      Q.  Were you -- and what happened when he got off

3  the phone?

4      A.  What happened?  I asked him if I could help

5  him with anything.

6      Q.  Did he look like he needed your help?

7      A.  Yes.

8      Q.  Why?

9      A.  He implied -- well, he became very

10  condescending, so I figured maybe he was lost or didn't

11  know where he was going, so I just wanted to provide

12  some information if I could.

13      Q.  You say he became condescending, what do you

14  mean by that?

15      A.  I asked him if he needed help, and he said

16  no.  His tone of voice raised and he said no, and I

17  asked, and I began to ask him, do you have any travel

18  documents, are you flying in. are you waiting for

19  somebody, and he said no.

20      Q.  Well, before you asked him all these

21  questions you said he became very condescending, right?

22  What did he do that you described as condescending?

23      A.  When he, okay, when he asked me why I was

24  standing there, right, I said to him, I'm working here,

1          then he raised, then -- and I asked him, why you are

2          asking me why am I standing here, and he raised his

3          voice.

4              Q.    What did he say in a raised voice?

5              A.    He said, I don't have to say anything to you,

6          and then it just was unusual, it was unusual to see

7          that in somebody, so I continued to ask him, like I

8          said, if I could do anything to help him out.

9              Q.    How was he dressed?

10             A.    He had on pants, he had on a shirt, and I can

11         remember a Barracuda jacket.

12             Q.    What's a Barracuda jacket?

13             A.    Summer jacket.

14             Q.    Was he clean-shaven?

15             A.    I believe he had a beard.

16             Q.    Long or short?

17             A.    Short.

18             Q.    Anything on his head?

19             A.    I don't recall.

20             Q.    What's his race?

21             A.    Black male.

22             Q.    Dark-skinned, light-skinned?

23             A.    Black male.

24             Q.    Would you describe his, the tone of his skin,

KACZYNSKI REPORTING

1      you're going to have to leave the airport.

2           Q.   And at this point he hadn't said to you one

3      way or the other whether he had business in the

4      airport, correct?

5           A.   He said he didn't.

6           Q.   He said --

7           A.   He wouldn't give me any information.

8           Q.   So did he say he didn't have information in

9      the airport, or did he not give you any information?

10          A.   He said he's not going to give me any

11     information.

12          Q.   Okay, so he just didn't tell you one way or

13     the other whether he had any business at the airport,

14     is that right?

15          A.   I don't know if he had anything.

16          Q.   You don't know because he didn't tell you,

17     right?

18          A.   He said he wouldn't provide me any, so I

19     don't know what was going on with him.

20          Q.   Okay, and so you told him that if he wasn't

21     flying out or he didn't have any business at the

22     airport he'd have to leave the airport, is that right?

23          A.   Yes.

24          Q.   And why was that?

A.    Why?

2          Q.    Yes.  Why did he have to leave the airport?

A.    Because the way we're trained in the airport,

4     if you don't have any business there, there's no reason

5     for you to be there, you'd rather have someone not be

6     in the area.

7          Q.    And at that time you didn't know whether he

8     had business at the airport one way or the other

9     because he didn't answer your question, right?

10         A.    Yes.

11         Q.    What was the next thing that happened, either

12    that happened or that you said or he said?

13         A.    He left the airport, he left the area, he

14    exited the doors.

15         Q.    On what level?

16         A.    The upper level.

17         Q.    Did he go out through the doors closest to

18    the pay phone where he was, had been on the phone?

19         A.    Yes.

20         Q.    And then what happened?

21         A.    And I followed him.

22         Q.    Why?

23         A.    I was kind of concerned about his well-being.

24    I didn't know where he was coming from, didn't know

KACZYNSKI REPORTING

```
 1     what he was going to do, so I followed him out of the
 2     airport.
 3          Q.   You say you were concerned about his
 4     well-being?
 5          A.   Yes.
 6          Q.   Did he give you any indication that he was
 7     unstable or he was in peril himself?
 8          A.   Yes.
 9          Q.   And what was that?
10          A.   Approaching me, asking me, approaching me,
11     asking me questions which were unusual, not listening
12     to what I had to say, totally ignoring me.
13          Q.   And what happened next after you followed him
14     outside?
15          A.   I followed him outside and I called on my
16     radio to get some assistance.
17          Q.   Who did you call?
18          A.   I called the state police barracks.
19          Q.   Who did you talk to?
20          A.   I don't know, I don't remember.
21          Q.   Did you call for a particular person?
22          A.   No.
23          Q.   What did you ask for?
24          A.   I asked for assistance, for somebody to come
```

```
 1                    MR. KITTREDGE:  Objection.
 2        Q.   Did you want them to have some idea what they
 3   were responding to at the time you made the call to the
 4   dispatcher?
 5        A.   Yes.
 6        Q.   And so you had, you gave the dispatcher some
 7   description of what it was that these troopers were
 8   being asked to assist with, right?
 9        A.   I don't recall.
10        Q.   Did Croxton, Adell and Moore show up in a
11   vehicle?
12        A.   No.  Well, Adell and Moore did, I believe.
13        Q.   Adell and Moore did?
14        A.   Adell, Adell came in a vehicle, I'm not sure
15   about Moore.
16        Q.   And how about Croxton?
17        A.   I believe Croxton was on foot.  There was
18   also another officer that was in the area.
19        Q.   And who was that?
20        A.   Sergeant Mark Kiley.
21        Q.   Mark did you say?
22        A.   Yes, Mark Kiley.
23        Q.   Is that K I L E Y?
24        A.   Yes.
```

1          A.   He just continued to walk down the sidewalk,

2     he just continued to walk, he walked down the terminal,

3     he continued to walk onto the sidewalk, on the sidewalk

4     away from me --

5          Q.   Okay, so he walked out the door, right?

6          A.   Yes.

7          Q.   And then he walked out to the sidewalk?

8          A.   Yes.

9          Q.   Okay.  Was he pacing up and down, was he

10    pacing up and down back and forth on the sidewalk?

11         A.   Yes.

12         Q.   Was he looking for a cab. could you tell?

13         A.   I don't know.

14         Q.   Did you have any conversation with him out on

15    the sidewalk?

16         A.   No.

17         Q.   How long was it before you, when you were

18    outside the terminal before you called for assistance?

19         A.   How long was it?

20         Q.   Yes.

21         A.   Explain.

22         Q.   How long it was when you were outside of the

23    terminal before you called for assistance?

24         A.   I was inside the terminal when I called for

```
1          A.    No, I was, I didn't respond at all.

2          Q.    Okay, and then he asked you a second time?

3          A.    Yes.

4          Q.    And did you respond after the second time?

5          A.    Yes.

6          Q.    What did you tell him?

7          A.    I said I work here.

8          Q.    Okay.  Did you tell him anything more?

9          A.    No.

10         Q.    You just said I work here?

11         A.    Yes.

12         Q.    Now, when you say he kept asking you why you

13    were at the point you were, you're talking about the

14    two times, right?

15         A.    Yes.

16         Q.    All right.  Now, how else, if at all, was he

17    acting unusual besides kept asking you at what point;

18    excuse me, why you were at the point you were?

19         A.    Because the question that he asked me, the

20    manner of the questioning was confrontational.

21         Q.    And the questioning you're referring to are

22    these two questions?

23         A.    Yes.

24         Q.    So are you talking about tone of voice?
```

1          Q.    And what happens next?

2          A.    I believe Mr. Downing produced travel

3    documents and his license.

4          Q.    Did you see either the travel documents or

5    his license?

6          A.    I saw the license.

7          Q.    Did you record any of the information from

8    the license?

9          A.    Yes, I did.

10         Q.    Where did you record that?

11         A.    State police barracks.

12         Q.    What did you record it on?

13         A.    I just --

14         Q.    You called it in?

15         A.    -- gave the information to the dispatcher

16    and --

17         Q.    Okay.  You called it into the barracks?

18         A.    Yes.

19         Q.    Okay.  It's not like you wrote down the

20    information from his license, you just called it in

21    with the license in front of you --

22         A.    No, just called it in --

23         Q.    -- is that right?

24         A.    That's correct.

1     Q.    What kind of form is that?

2     A.    What type of form is --

3     Q.    Yes.

      A.    State police standard form.

      Q.    Similar to the field interview and

observation report that I showed you earlier?

      A.    No, no.  I actually don't even know what it

8  looks like.

9     Q.    Okay.  Have you ever filled out a form to put

10  somebody on the trespass list?

11    A.    No, we don't actually fill out the forms.

12    Q.    Who does that?

13    A.    The dispatcher fills out the forms.

14    Q.    On your recommendation?

15    A.    Yes.

16    Q.    And have you ever recommended that someone be

17  added to the trespass list?

18    A.    No.

19    Q.    At some point; well, what happened after you

20  called in the information from the state police

21  barracks -- Strike that.

22         What happened after you called in the

23  information about Mr. Downing's license to the state

24  police barracks?

1          A.    What happened afterwards?

2          Q.    Yes.

3          A.    They came back with information regarding the

4     license information.

5          Q.    They had to radio that back to you?

6          A.    Yes.

7          Q.    And how long did that take?

8          A.    Say about a couple minutes.

9          Q.    And were you out of a vehicle or in a vehicle

10    at the time?

11         A.    Out of vehicle.

12         Q.    And what happened after you got -- what

13    information did you get back from the barracks?

14         A.    They indicated that he had a valid license,

15    no warrants on him, nothing in the trespass file.

16         Q.    And then what happened?

17         A.    I believe I gave the license back to

18    Mr. Downing.

19         Q.    And did you have any conversation with him?

20         A.    No.

21         Q.    Did you tell him he was free to go?

22         A.    Excuse me?

23         Q.    Did you tell him he was free to go?

24         A.    I believe the other officers told him.

1        question, is that right?

2             A.    That's correct.

3             Q.    Was it at that time that you became either

4        suspicious or concerned about his behavior?

5             A.    Concerned.

6             Q.    And to determine whether or not he had

7        legitimate business in the airport and who he was, you

8        thought it would be appropriate to see his license for

9        identification and any travel documents that he had?

10            A.    That's correct.

11            Q.    He refused to give those to you, didn't he?

12            A.    That's correct.

13            Q.    You indicated that part of the training as a

14       state police officer with duties at Logan, you were

15       trained in dealing with what I think you called irates,

16       is that right?

17            A.    That's correct.

18            Q.    Would you characterize Mr. Downing's behavior

19       subsequent to him questioning why you were standing

20       where you were as being irate?

21            A.    Yes.

22            Q.    And was all of that the reason why you

23       requested assistance in order to determine who he was

24       and what he was doing at the airport?

1      New York 10004.  I'm sorry, residence, 2035

2      Second Avenue, New York 10029.

3          Q.    What is your educational background?

4          A.    I have a law degree from Rutgers

5      University.

6          Q.    What year?

7          A.    1992.

8          Q.    Undergraduate?

9          A.    Harvard University, 1975.

10         Q.    And you received an A.B. from Harvard?

11         A.    Yes.

12         Q.    What was your concentration?

13         A.    Government.

14         Q.    What did you do between your graduation

15     from Harvard in 1975 and the year you began

16     studying law at Rutgers?

17         A.    In 1975, I spent a year in Boston right

18     after I got out of school.  Then I moved to New

19     York City.  In both of those instances, I was

20     working in the music industry and also working in

21     a retail store.

22             Then in 1976, I moved to the midwest,

23     where I held several jobs.  I worked as a

24     representative and a member of the International

A.    That's right.  Positions in the

2  communications department, and the basic idea was

3  to raise awareness about the existence of racial

4  profiling through public education, media

5  outreach, know-your-rights training, public

6  service announcements; and to assist our

7  affiliates around the country.

8      Q.   And when you say affiliates, what does

9  that mean?

10     A.   The ACLU has 53 affiliates and chapters

11  around the country organized by state for the

12  most part.

13     Q.   And Massachusetts is an affiliate?

14     A.   Yes.

15     Q.   I'm going to place before you a document

16  that was provided to us I think as a part of the

17  automatic disclosures and ask if you could review

18  that.

19     A.   Yes.

20     Q.   What is it?

21     A.   It's the job posting for the position

22  that I ultimately accepted.

23     Q.   And you currently hold that position?

24     A.   Yes.

1    since about the beginning of 2003.

2    Q.   And generally, what are the purposes of

3    those visits?

4    A.   The purpose of almost all the visits were

5    to take part in the racial profiling working

6    group that was convened by Ed Flynn, who at the

7    time was the Director of DPS.

8    Q.   What is DPS?

9    A.   Department of Public Safety.

10    Q.   So, this was -- well, explain to me what

11    this working group was.

12    A.   The state legislature enacted a statute

13    that banned racial profiling in the State of

14    Massachusetts and required a study of citations

15    that have been issued over approximately a year

16    and a half period.

17    As part of that effort, Director Flynn,

18    on the advice of Northeastern University,

19    convened a group of community members, law

20    enforcement, and civil rights and civil liberties

21    organizations to discuss the issue of racial

22    profiling, advise on the design of the data

23    collection process, and set up a program for the

24    dissemination of the results of the study.

1       Q.    And your participation in that was as a

2    representative of the Campaign Against Racial

3    Profiling?

4       A.    Yes.

5       Q.    And the ACLU?

6       A.    The national ACLU.

7       Q.    On October 16, 2003, were you coming to

8    Boston for a meeting of that working group?

9       A.    I was coming for a meeting that was

10   related to the working group but not an actual

11   working group meeting.

12      Q.    And what was the meeting that you were

13   coming to Boston to attend?

14      A.    A group of community organizations,

15   advocacy groups, were having a caucus.

16      Q.    And what was your role in that meeting?

17      A.    It was similar to the larger working

18   group meeting, to participate as a representative

19   of the national ACLU.

20      Q.    What time was that meeting scheduled for?

21      A.    It was scheduled for 10:00 a.m.

22      Q.    On October 16?

23      A.    Yes.

24      Q.    Now, without testing anybody's memory,

1        Q.    Significant departure?

2        A.    Any significant delay, no.

3        Q.    When you arrived at Logan International

4    Airport, I think it's correct that you arrived at

5    a gate at Terminal B; is that right?

6        A.    Yes.

7        Q.    When you got off the airplane, where did

8    you go?

9        A.    I got off the plane, and I went straight

10   out of the terminal into the general area.

11       Q.    When you say out of the terminal --

12       A.    Out of the secure area of the terminal.

13       Q.    And that's on the second level or the top

14   level of the terminal; is that right?

15       A.    Yes.

16       Q.    And what did you do after you left the

17   secure area?

18       A.    I went to a pay phone.

19       Q.    Did you make a call?

20       A.    Yes.

21       Q.    To whom?

22       A.    I was checking my messages.

23       Q.    From your office in New York?

24       A.    From my office?

1      Q.    Messages left at your office in New York?

2      A.    Right.

3      Q.    Voicemail?

4      A.    Yes.

5      Q.    That was done electronically without you

6      speaking; is that right?

7      A.    Could you explain that?

8      Q.    Did you have to speak in order to

9      retrieve your messages presumably from voicemail?

10     A.    No.

11     Q.    While you were --  by the way, do you

12     have a cell phone?

13     A.    No.

14     Q.    You didn't then, either?

15     A.    No.

16     Q.    While you were retrieving your messages,

17     what happened?

18     A.    I was on the telephone, and for some

19     reason I turned to my right while I was on the

20     phone, and I observed the trooper standing to my

21     right at a very close proximate distance to me,

22     up against the wall in a very tighten closure.

23     Q.    And the trooper you referred to is

24     Trooper Thompson, who is present here today?

1     A.  Yes.

2     Q.  How close was he?

3     A.  About five feet.

4     Q.  And you described the area as very close.

5  Why is that?  It's a confined space?

6     A.  The telephone was very close to the wall

7  that faced the street.  There were a row of

8  phones, and there wasn't a lot of clearance

9  between the phones and the wall.

10    Q.  And he was standing between the phones

11  and the wall?

12    A.  He was standing that certain number of

13  feet to my right, but he wasn't between the

14  phones; he was against the wall.

15    Q.  He was between you and the so-called

16  secure area?

17    A.  No, no.  The secure area was where you

18  are now sitting, and the wall to the outside and

19  the street was behind me.  And he was to my

20  right.  He would have also been facing you.

21    Q.  Let me see if I can describe this in

22  a way without the diagram.  You were facing the

23  secure area with your back to the window of the

24  terminal.  Trooper Thompson --

1      A.    Standing against the wall with his arms

2      folded in front of him.

3      Q.    At some point, did you speak to Trooper

4      Thompson?

5      A.    At some point I spoke to Trooper

6      Thompson, but not until he had spoken to me.

7      Q.    When did -- did he speak to you while

8      you were still on the phone?

9      A.    Yes.

10     Q.    What did he say?

11     A.    Well, when I turned and looked over my

12     right shoulder and I saw him there, he asked me

13     if there was a problem.  His words were, "Is

14     there a problem?"

15     Q.    Those were his exact words, as you

16     recall?

17     A.    Yes.

18     Q.    And what did you say?

19     A.    I said, "I just want to know why you're

20     standing here so close to me while I'm talking on

21     the telephone."

22     Q.    Were you in fact talking on the telephone

23     or were you just on the telephone?

24     A.    Well, I was retrieving messages, but at

1      that time I may have also been leaving messages.

2      So, for me, talking on the telephone meant while

3      I have a phone in use.

4          Q.    And in response to your statement, what

5      did Trooper Thompson say, if anything?

6          A.    He said, "All right.  I want to see some

7      ID."

8          Q.    Were you still on the phone at that

9      point?

10         A.    I was holding the phone in my hand.  I

11     don't know if I was in the middle of leaving a

12     message at that point or retrieving a message.

13         Q.    What did you do at that point?

14         A.    I said, "Why do I have to show you ID?"

15     And he requested to see my ID again.  I said,

16     "I'm not showing you my ID."

17         Q.    Why did you refuse?

18         A.    Because I believe under the Constitution

19     I have a right not to show my identification.

20         Q.    What happened next?

21         A.    Well, he had requested my ID again, and I

22     said I wasn't going to show it.  And at that

23     point, I hung up the phone, and I started walking

24     away towards the passageway that I said was at a

1       45-degree angle.  It was an open walkway there,

2       and I started walking away.

3            He came around from the other side and

4       stood probably maybe, well, I don't know the

5       distance, but he took a position that was facing

6       me and requested my identification again.

7            Q.   And this was still inside the terminal?

8            A.   Yes.

9            Q.   Were you attempting to leave the terminal

10      at that point?

11           A.   No.

12           Q.   Why not?

13           A.   I didn't have any reason to.

14           Q.   Well, what do you mean?  You were going

15      to just stay in the terminal area in the upper

16      level of terminal B until you had a reason to

17      leave?  I don't understand your statement.

18           A.   I didn't understand the question.

19           Q.   Okay.  When you said you hung up the

20      phone, after you hung up the phone where were you

21      headed?

22           A.   At that point, I just wanted to terminate

23      the conversation with the trooper.

24           Q.   And so, you moved to another area of the

1    terminal?

2        A.    Yes.

         Q.    What did you do in response to this
     second request for identification?

         A.    I told him I wasn't going to show ID and
     I didn't have to show ID.

         Q.    What did he say?

         A.    We may have had another round back and

9    forth about that, and then he said, "If you don't

10   show ID, you're going to have to leave the

11   terminal."

12       Q.    And what did you do then?

13       A.    I said, "Okay, I'll leave."

14       Q.    And did you?

15       A.    Yes, I left.

16       Q.    You departed from the upper level of

17   Terminal B?

18       A.    Yes.

19       Q.    And what happened after you got outside?

20       A.    I walked outside, and I saw a cab coming.

21   I tried to hail a cab, but it drove past.  I

22   later realized that I was on the wrong level to

23   get a cab.  So, I tried to walk a little further

24   out.  I still didn't realize that the cabs

1    weren't stopping because it was not an authorized

2    place.  So I would walk a little further up, and

3    then the trooper accosted me again.

4        Q.    When you say you weren't in the right

5    place to get a cab, by that you mean the cab

6    stand is on the lower level of the terminals?

7        A.    Right.

8        Q.    And that is where the taxi pool

9    dispatches taxis for pick-ups; is that right?

10       A.    Yes.

11       Q.    You walked a little further, and you said

12   you and Trooper Thompson had another encounter.

13   What happened in that encounter?

14       A.    He came up to me while I was waiting to

15   hail a cab, and he demanded my identification.

16       Q.    And what did you say?

17       A.    He told me if I didn't want to show ID

18   that I would have to leave the terminal.  Well, I

19   left the terminal.

20       Q.    And you were attempting to leave the

21   airport at that point in time; is that right?

22       A.    Yes.

23       Q.    What happened next?

24       A.    We went back and forth some more.

1          Q.    Do you recall what the back and forth was

2      at that point?

3          A.    Him requesting my ID and me saying that I

4      wasn't going to show it and that I had left the

5      terminal.  And then at one point, I tried to walk

6      away further down, and he told me I couldn't go.

7      And I asked him if I was under arrest.

8          Q.    And what did he say?

9          A.    He said yes.

10         Q.    "Yes" unequivocally?

11         A.    He was very clear.

12         Q.    And what happened next?

13         A.    I asked him what the charges were.

14         Q.    And what did he say?

15         A.    He said he didn't have to tell me.

16         Q.    What happened next?

17         A.    At that point, he got on the radio, and

18     that's --

19         Q.    Trooper Thompson?

20         A.    Trooper Thompson got on the radio.

21         Q.    Trooper Thompson made a call on his

22     portable hand-held radio?

23         A.    Yes.

24         Q.    Did you hear what he said?

1      A.   I don't remember at this time.

2      Q.   What happened next?

3      A.   Then another officer showed up.

4      Q.   How many?

5      A.   A sergeant and three other officers.  I

6 think one of them also may have been a sergeant

7 as well.

8      Q.   Did you engage in any conversation with

9 any of the four officers that arrived?

10     A.   They stood around me for awhile, and then

11 a white sergeant went and spoke to the trooper

12 and then came over to me.

13     Q.   Thompson?

14     A.   Yes, spoke to Thompson and then came to

15 me.

16     Q.   When you say a white officer, am I

17 correct that the other three of the four officers

18 who arrived were African-American?

19     A.   Yes.

20     Q.   And Trooper Thompson is also

21 African-American?

22     A.   Yes.

23     Q.   And the white officer that came to you,

24 have you subsequently learned his name to be

1      Sergeant Mark Kiley?

2          A.    Yes.

3          Q.    And what was the conversation, if any,

4      between the two of you?

5          A.    He said words to the effect of, "The

6      reason why the trooper asked for your ID is

7      because you were acting suspiciously."

8          Q.    And did you respond to that?

9          A.    I asked him what did he say that I was

10     doing suspiciously.

11         Q.    What did he then say?

12         A.    He said, "I didn't ask him that."  And I

13     said, "You're a supervisor, and you didn't ask

14     him what it was that I was doing?"

15         Q.    And he said?

16         A.    He said, "He's been on the force,"

17     referring to Trooper Thompson, I don't remember

18     the years, seven years comes to mind, "And if he

19     says you're acting suspiciously, you're acting

20     suspiciously."

21         Q.    What happened next?

22         A.    There may have been some other words, but

23     nothing of substance that I remember.

           Q.    Did Sergeant Kiley request that you

1      produce identification?

2          A.    Yes.

3          Q.    Did you?

4          A.    Yes, I eventually did.

5          Q.    Was there any other conversation that we

6      haven't discussed between before he made his

7      request for identification and you produced it?

8          A.    No.  At that point in time I had a ten

9      o'clock meeting, and it was becoming clear --

10     oh, I need to add something else here.  The words

11     that the trooper used that if I didn't show ID,

12     this is one of the other exchanges, he said, "If

13     you don't show ID, you're going downtown."

14         Q.    And this is Trooper Thompson that said

15     that?

16         A.    Right.

17         Q.    Before the other four officers arrived?

18         A.    Yes.

19         Q.    And --

20         A.    And what that told me was that I very

21     likely flew the red eye into Seattle to Boston to

22     attend a meeting which I now probably would miss,

23     but it was very likely that I wouldn't make it

24     back to Seattle for the rest of the Indian

conference.  Being told that I was being put

2  under arrest and taken downtown, I had a clear

3  impression in my mind that I might not see the

4  light of day until Monday.

5       So, at that point, I turned over my ID.

6  Q.  And what did Sergeant -- what kind of ID

7  did you provide?

8  A.  A driver's license.

9  Q.  What did Sergeant Kiley do with the

10 driver's license?

11 A.  I don't recall exactly, but I know at

12 some point Trooper Thompson took it over to the

13 vehicle.  I assume that he ran the license.

14 Q.  And by ran the license, you mean he

15 radioed the information on the license to some

16 authority for it to be checked?

17 A.  Yes.

18 Q.  Do you know what the check was for?

19 A.  Do I know what the check was for?  I was

20 not told what the check was for.

21 Q.  Nor do you know to whom the radio call

22 was made?

23 A.  No.

24 Q.  What happened after he ran the license?

1          A.    Well, before I get into that, I also --

2    you had asked about other conversation, and I did

3    have a brief conversation with the other three

4    troopers while we were standing there.

5          Q.    Do you at this point know their names?

6          A.    I know that one's name is Croxton, and --

7          Q.    And he was the sergeant, the other

8    sergeant?

9          A.    I learned that he was a sergeant.  The

10   other two, I don't recall their names right now,

11   but I have since learned their names.

12         Q.    The other is Robert Moore, one of the

13   others, and Trooper Adell?

14         A.    Yes.

15         Q.    I'm sorry, I interrupted.  You were going

16   to say you had a conversation with those three as

17   a group, or individually?

18         A.    No, as a group, yes.

19         Q.    And what was that conversation?

20         A.    I believe one of them was trying to

21   explain.  I know the conversation was about

22   identification.  I remember I didn't want to get

23   into much of a conversation about identification,

24   but I did use the time to mention the fact that

1          At some point in time, when he came back,

2    I don't know if they had an opportunity to speak

3    to him at some point, but when he came back, the

4    badge was clipped, the clip had been turned

5    around so that the name tag was visible.  And

6    that's how I was able to identify him.  Prior to

7    that, I would not have been able to.

8          So, at that point, I had to leave, and I

9    knew who I had been dealing with.  So, that's

10   when I turned over the ID.

11   Q.   At that point, were you able to identify

12   not only Trooper Thompson but the other four

13   officers who were involved?

14   A.   I didn't have clear recollection of them.

15   I was really trying to concentrate on who it was

16   that all of this had started with.

17   Q.   The initial contact?

18   A.   Yes.

19   Q.   Did you notice whether or not any of the

20   other four troopers had their name tags on

21   backwards?

22   A.   I don't recall that any of the others

23   did.

24   Q.   So, you were able to see their name tags?

1      A.   No.  I said I don't recall.

2      Q.   You just don't recall at all?

3      A.   Right.  Actually, I did have a

4  recollection of the name Croxton.

5      Q.   From that encounter on October 16?

6      A.   Yes.

7      Q.   Were you asked to produce airline

8  tickets?

9      A.   Yes.

10     Q.   By whom?

11     A.   After I had given the ID, I was gathering

12  up my things to go.

13     Q.   What happened?

14     A.   I was asked to produce my airline

15  tickets.

16     Q.   By whom?

17     A.   I'm not sure who it was that asked me.

18     Q.   And did you produce those tickets, a

19  ticket?

20     A.   After some conversation, I said, "You

21  asked me to show identification.  I've shown

22  identification.  Now you're asking for my

23  tickets.  I'm not going to show you my tickets."

24     Q.   Why did you refuse?

1      A.    Part of it.

2      Q.    What's the rest of it?

3      A.    I was told that if I didn't show my

4      identification that I was going to be put on a

5      watch list, some words to that effect, and I

6      asked what the watch list was.  They said that if

7      I got placed on the watch list and I ever came

8      back to the airport and I wasn't able to account

9      for why I was there, I would be arrested.

10     Q.    Did they say watch list, or did they say

11     trespass list?

12     A.    They might have used the word trespass

13     list.

14     Q.    Was there any other conversation?

15     A.    Might have had another round of saying

16     that I wasn't going to show the ticket, but I

17     think at that point the same issues that came up

18     before about time, needing to get away from

19     there, not being sure whether I might be subject

20     to arrest again, that I showed them the travel

21     tickets.

22     Q.    And what happened after you -- who did

23     you produce the travel tickets to?

24     A.    I gave them --  I just handed them to the

1    group.  The sergeant was there, Trooper Thompson

2    was there.  I turned them over to the group.

3        Q.   You don't recall specifically who you

4    handed them to?

5        A.   No.

6        Q.   What did the group then do with the

7    tickets?

8        A.   Well, they got into a discussion among

9    themselves about whether my ticket qualified me

10   to not be a trespasser because of the fact that

11   the ticket said October 15, and it was October

12   16.  So, they got into a discussion for awhile.

13   And then --

14       Q.   Go ahead.

15       A.   No, please, go ahead.

16       Q.   What ticket did you produce?

17       A.   It was the boarding pass from Seattle to

18   Boston.

19       Q.   I'm placing before you another document.

20   There appears to be xeroxed copies of two

21   boarding passes.  Do you recognize that?

22       A.   Yes.

23       Q.   Are there in fact images of two boarding

24   passes on this sheet?

1    day?

2        A.    No.

3        Q.    These were electronic tickets?

4        A.    Yes.

5        Q.    Did you have a copy of the itinerary that

6    we had marked as Exhibit D-1?

7        A.    I most likely did.

8        Q.    Had you been issued a boarding pass yet

9    for the flight from Boston to Seattle?

10       A.    No.

11       Q.    You said there ensued a discussion among

12   the troopers about whether the boarding pass you

13   presented them was adequate to justify your

14   presence in the airport because the boarding pass

15   is dated October 15, and it was the morning of

16   October 16; is that right?

17       A.    Right.

18       Q.    What was the result of that conversation?

19       A.    Well, the result of the conversation was

20   that they realized that I caught a flight that

21   left on the 15th and arrived on the 16th.

22       Q.    And what did they do upon that

23   realization?

24       A.    They told me I was free to go.

1        Q.    And what did you do then?

2        A.    I left.

3        Q.    How?

4        A.    Quickly.

5        Q.    By what means?

6        A.    By cab.

7        Q.    Where did you catch the cab?

8        A.    Downstairs, where I should have caught it

9   in the first place.

10       Q.    How did you get there?  Did you go back

11  through the terminal?

12       A.    I don't remember.  I don't even know if

13  there's a way --  I don't know if there's a way

14  to go --

15       Q.    Other than through the terminal?

16       A.    Other than through the terminal.

17       Q.    From the first encounter you had with

18  Trooper Thompson at the telephone to the time of

19  your departure, how much time do you estimate

20  elapsed?

21       A.    I would say thirty to forty minutes.

22       Q.    So, assuming the flight landed at or

23  about the time it was scheduled to land, we're

24  now somewhere around 7:40 or 7:45 in the morning

1          when you departed the airport?

2          A.    My feeling was that --

3          Q.    Please, answer my question first.    Was it

4     about 7:45 when you left the airport?

5          A.    Then I'll say no.

6          Q.    What time was it?

7          A.    My feeling was that I ended my portion of

8     the issue by showing the ID at a time when I felt

9     that I might have had approximately an hour left

10    to get to my meeting.    And so, it may not have

11    been accurate to say it was 7:40.    It may have

12    been even getting closer to 9:00.

13         Q.    If it were getting close to 9:00 and your

14    flight landed at seven, are you saying that these

15    encounters with the State of Massachusetts state

16    troopers in the airport lasted two hours?

17         A.    No, because the flight lands, that's the

18    time the plane touches down.    Then it takes time

19    to get to the terminal.    Takes time to de-board,

20    got out, might have stopped to go to the

21    bathroom, then walked out.

22         Q.    So, the total time that had elapsed

23    between the time of the plane arriving and your

24    departure from the airport could have been as

1    long as two hours?

2        A.    Could have been as long as an hour and

3    fifty minutes.   I thought it was getting close to

4    the time that I had an hour left to get to my

5    meeting.

6        Q.    Did you get to your meeting?

7        A.    Yes.

8        Q.    Where was the meeting held?

9        A.    At the Roxbury Defender's Office.

10       Q.    How long did that meeting last?

11       A.    I don't recall.   It wouldn't have been

12   more than two hours, but I don't recall how long

13   it lasted.

14       Q.    Sometime around midday it ended?

15       A.    Yes.

16       Q.    How many people attended that meeting

17   roughly?

18       A.    Less than a dozen.

19       Q.    Did you discuss the incidents that we've

20   been discussing this morning at Logan Airport

21   with anyone who attended that meeting?

22       A.    I may have discussed it with the

23   executive director of our organization but not

24   with people who were at the meeting.

1     CROSS EXAMINATION

2     BY MS. O'NEIL:

3        Q.    You've testified that you were coming to

4     Boston, that you frequently came to Boston to

5     represent the national ACLU at a working group, a

6     racial profiling working group at Northeastern;

7     is that correct?

8        A.    No.    It was the Department of Public

9     Safety's profiling group.

10       Q.    Did it convene at Northeastern Law

11    School?

12       A.    It convened at Northeastern.

13       Q.    So, it was sponsored by the Department of

14    Public Safety.   That's a Massachusetts

15    governmental entity; is that correct?

16       A.    Yes.

17       Q.    But it happened to be at Northeastern Law

18    School?

19       A.    Yes.

20       Q.    It wasn't affiliated with the law school

21    at all?

22       A.    It was affiliated with one of the justice

23    programs.

24       Q.    And apart from representing the national

1      A.    There were probably conversations about

2   ways that the auditing could be improved.    There

3   were budgetary limitations to the study.

4      Q.    Did you have any conversations with

5   Sergeant Peter Didomenica at the working group?

6      A.    I'm sure I did.

7      Q.    Why are you sure?

8      A.    We met monthly for quite a long period of

9   time.

10      Q.    How long would you say?

11      A.    We started meeting the beginning of 2003,

12   and we met monthly up until around the beginning

13   of the summer.

14      Q.    And what was your understanding of

15   Sergeant Didomenica's function at the racial

16   profiling working group?

17      A.    I don't remember what his function was,

18   but I'll assume that he was there for the same

19   reason everyone else was, to identify racial

20   profiling and try to get to a way to give input

21   to the data designs reported.

22      Q.    Did you have any disagreements with

23   Sergeant Didomenica regarding the working group,

24   the working group's functions?

1      A.    Yes.

2      Q.    So, this is the first time you had ever

3    been stopped at an airport?

4      A.    It's the first time that anybody had ever

5    requested ID from me or detained me.

6      Q.    I'm not sure I understand that.  Has any

7    other security entity stopped you at an airport,

8    other than this one time on October 16 of '03?

9      A.    I've never been stopped, but I've been in

10   circumstances where I have questioned an action

11   that was taken.

12     Q.    Let's look into that then.  When you do

13   your traveling, you do know that you have to

14   produce an ID at the ticket counter; is that

15   correct?

16     A.    Yes.

17     Q.    You do know that once you're in the

18   secure area --  what is your understanding of

19   once you're in the secure area regarding your

20   identification?  Can anybody ask for it?

21     A.    Can anybody?

22     Q.    Once you're in the secure area in an

23   airport, if any TSA employee, any airport

24   employee, or any security entity, be it

1       governmental or private, can they ask you for

2       your ID?

3           A.    It all depends on the circumstances.

4           Q.    So, there would have to be particular

5       circumstances before you could be asked for your

6       ID in a secure area in an airport?

7           A.    It depends on the circumstances.  It

8       depends on whether a person is moving from the

9       secure or unsecure area.

10          Let me correct that.  Law enforcement has

11      a right to ask for ID any time, anywhere.

12          Q.    Are we talking beyond the secured area?

13          A.    They have a right to ask for ID anywhere,

14      secured area or nonsecured area.

15          Q.    Within the secured area, can anyone

16      beyond law enforcement, I'm excluding passengers,

17      can anyone beyond law enforcement ask you for

18      your ID in the secure area of an airport?

19          A.    Give me an example.

20          Q.    Again, any kind of security entity,

21      private or public, any TSA employee, any airport

22      employee, apart from custodians?

23          A.    Yes.

24          Q.    So, these individuals could ask you for

1       A.    To retrieve messages and leave messages

2    on a public phone?  Yes, that is common practice

3    for me.

4       Q.    And is it common practice for you to

5    leave messages regarding sensitive, I think that

6    was your word, sensitive information regarding

7    ACLU strategizing on such phones in such places?

8       A.    Yes.

9       Q.    Was there something about your ID that

10   you didn't want Trooper Thompson to see when he

11   asked for it?

12      A.    I wasn't even thinking about my

13   identification.

14      Q.    It was a license, right?

15      A.    Right.

16      Q.    What kind of license did you have?

17      A.    A Connecticut driver's license.

18      Q.    Okay.  What kind of license do you have

19   now?

20      A.    Connecticut driver's license.

21      Q.    I thought you said you lived in New York?

22      A.    I did.

23      Q.    How come you have a Connecticut driver's

24   license?

1       A.   Because I never got a New York driver's

2  license.

3       Q.   How long have you been living in New

4  York?

5       A.   About a year.  I lived in New Jersey

6  before that.

7       Q.   You lived in Connecticut way back when,

8  isn't that so?

9       A.   Right.

10      Q.   How long ago?  1978; is that correct?

11      A.   Um-hmm.

12      Q.   So you haven't lived in Connecticut since

13  1978?

14      A.   Right.

15      Q.   But the whole time you've had a

16  Connecticut license?

17      A.   Um-hmm.

18      Q.   That's correct?

19      A.   Yes.

20      Q.   How many times had you come into Logan

21  Airport before the October 16 incident that we're

22  talking about?

23      A.   Dozens of times.

24      Q.   And was it common practice during those

1       A.    No.

2       Q.    Did that make you angry?

3       A.    Did what?

4       Q.    After you tried to flag the cab with

5    Trooper Thompson, did that make you angry that

6    the cabs were just driving by you?

7       A.    No.  I didn't understand why the cabs

8    were just driving past.  I didn't have any

9    reaction to it.  All I thought of, the cab went

10   by, and I looked ahead to the next one.

11      Q.    You didn't care?

12      A.    Didn't care?  I cared very much whether I

13   was able to get a cab.  But all I did was change

14   my focus from the one that had gone past to look

15   up to see if there was another one on the way.

16      Q.    And you had no reaction to those that had

17   passed?

18      A.    At that point in time, I was thinking

19   about leaving the airport.

20      Q.    Now, Trooper Thompson never touched you,

21   right?

22      A.    No.

23      Q.    None of the other troopers ever touched

24   you, did they?

1      A.   No.

2      Q.   Just for the sake of the record, no one

3    pulled a gun on you, did they?

4      A.   No.

5      Q.   You weren't ever put in a cruiser, were

6    you?

7      A.   No.

8      Q.   Actually, you were never moved from the

9    scene at the terminal, were you?

10      A.   When you say moved from the scene, what

11    do you mean?

12      Q.   Did anybody put you in a room apart from

13    the terminal?

14      A.   No.

15      Q.   So, I'm curious, how did you get outside

16    the terminal in the first place?

17      A.   I was ordered to leave by Trooper

18    Thompson.

19      Q.   How did you get there?

20      A.   How did I get out of the terminal?

21      Q.   Yes.

22      A.   I walked.

23      Q.   Did anybody stop you from walking?

24      A.   No.

1    criteria and not rely on racial profiling.

2    Q.    Wouldn't that be seen as a positive by

3    you?

4    A.    It would be a positive, yes, if it turned

5    out to in fact be carried out the way it was

6    designed to.

7    Q.    And do you know whether or not it turned

8    out -- well, do you know if within this

9    behavioral assessment system, for lack of a

10   better term, do you know if there is any

11   encouragement of racial profiling in there?

12   A.    Do I know?

13   Q.    Um-hmm.

14   A.    No, I don't know.

15   Q.    And for all you know, it could be totally

16   opposed to racial profiling within this behavior

17   assessment system?

18   A.    Well, the press release said it was.

19   Q.    That it was against racial profiling?

20   A.    Right.

21   Q.    And is it fair to say that you do not

22   know if such a program was employed at your stop

23   at Logan Airport on October 16?

24   A.    No, I don't know.

1      Q.    You do not know that, okay.  I'm asking

2   you do you know that it was employed?

3      A.    No, I do not know that it was or I do not

4   know that it wasn't.

5      Q.    Do you have any belief or any basis for

6   believing that this program would condone in any

7   way racial or ethnic profiling?

8      A.    I don't have any belief either way.

9      Q.    You do know that you stated that in your

10   Complaint, though, that it effectively, and I'm

11   quoting from page 4, "Effectively condones and

12   encourages racial and ethnic profiling."  And it

13   is referring to, "The Behavior Assessment

14   Screening program training provided by

15   Massachusetts State Police, Robbins and

16   Didomenica."

17      A.    Well, if this incident is an example of

18   that, then it would.

19      Q.    Let me see if I understand you.  This is

20   speaking of the training provided by.  It's

21   saying the training itself.  I'm not talking

22   about the result; we'll talk about that in a

23   second.  But the training itself effectively

24   condones racial and ethnic profiling.  Do you

have some factual basis to believe that?

2     A.   If this incident happened either on the

3    basis of such training or happened despite such

4    training, then that would be true.

5     Q.   I don't understand that.  Let me see if I

6    can clear that up.  You don't know if you were

7    stopped based on the Behavioral Assessment

8    Screening System; is that correct?

9     A.   Right.

10     Q.   And you don't know for a fact whether or

11    not this Behavioral Assessment Screening System

12    effectively condones racial and ethnic profiling?

13     A.   No.

14     Q.   And the basis --  let me just ask you.

15    What's the basis for suing the State Police here?

16          MR. REINSTEIN:  The appropriate way

17    to do that is in an interrogatory and not a

18    question to the witness.  If you have a question

19    of how it fits into the suit, if it's not based

20    on personal knowledge of the deponent, then the

21    way to deal with that is to ask him what the

22    basis for the contention is and to ask it through

23    an interrogatory rather than in questions in a

24    deposition.

```
1              A.    I have no idea.

2              Q.    Why do you believe he said to you "Do we

3       have a problem?"

4              A.    I have no idea.

5              Q.    But it's clear in your mind that he spoke

6       to you first; is that correct?

7              A.    Yes.

8              Q.    And at some point --

9              A.    Did you say "Do we have a problem?"

10             Q.    What did he say to you?

11             A.    "Is there a problem?"

12             Q.    Why did he say that to you?

13             A.    I'm not sure why he said that to me.

14             Q.    Do you have any belief today why he said

15      that to you?

16             A.    I'm not sure why he said that to me.

17             Q.    Do you have any belief?

18             A.    The only thing I could say is I had

19      turned to look at him.

20             Q.    How long was this look at my client?

21             A.    I turned, and it was immediate.

22             Q.    And at that point in time, you were using

23      a pole that had phones on it; is that correct?

24             A.    Yes.
```

1       Q.   At some point in time he said if you

2   don't use the phone you're going to have to leave

3   the airport; is that right?

4       A.   No, he didn't say that.

5       Q.   You testified that the trooper ordered

6   you out of the airport.  Did you say that

7   earlier?

8       A.   The trooper said to me, "If you don't

9   show ID, then you're going to have to leave the

10  airport."

11      Q.   And you elected to, instead of produce

12  the ID, to leave the airport; is that correct?

13      A.   Yes.

14      Q.   And when you did that, you went out the

15  upper level of the terminal, correct?

16      A.   Right.

17      Q.   And you know that you couldn't leave the

18  airport from there, right?  You know that today?

19      A.   I know that now.

20      Q.   The trooper knew it then, fair to say?

21      A.   I don't know if he knew that.

22      Q.   And when you went out there, and you were

23  out there for how long before the trooper engaged

24  in another conversation with you?

1     A.    No, I didn't ask Kiley or anybody.

2     Q.    Now, in your experience as a criminal

3     defense attorney, is it common that police tell

4     individuals that they are under arrest and then

5     let them walk away?

      A.    Is it common?

7     Q.    Right.

8     A.    I don't think it's common, but it may

      happen.

10    Q.    In your experience has it happened?

11    A.    In my personal experience?

12    Q.    As a lawyer, criminal defense attorney.

13    In your experience as a criminal defense

14    attorney, has that happened?

15    A.    I have heard reports of people who have

16    complained about being detained, being told that

17    they were under arrest, trying to find out what

18    their charges might have been, ultimately let go.

19    Q.    In your experience, have you ever seen

20    anybody placed under arrest?

21    A.    Yes.

22    Q.    Other than on October 16, 2003, have you?

23    A.    Yes.

24    Q.    And on those circumstances, aren't you

126

```
 1     usually placed in handcuffs?

 2         A.   The fact that somebody is usually placed

 3     in handcuffs, I would say that's correct.

 4         Q.   At any point in time were you placed in

 5     handcuffs on October 16, 2003?

 6         A.   No.

 7         Q.   And today, you can't tell us how you left

 8     the airport; is that correct?

 9         A.   I took a cab.

10         Q.   Do you know where you picked up the cab?

11         A.   Went downstairs.

12         Q.   You do recall that now, you went

13     downstairs?  How did you get downstairs?

14         A.   I don't know how I got there.  I had to

15     go downstairs to get a cab.  You couldn't get any

16     upstairs.

17         Q.   Now, you indicated that you saw Sergeant

18     Kiley at the scene.  How did you identify him as

19     the sergeant?

20         A.   He had an insignia.

21         Q.   Where?

22         A.   On his arm.

23         Q.   What was the insignia you observed that

24     led you to believe he was a sergeant?
```

1    answered it depends upon the circumstances to a

2    question that I asked about whether security

3    personnel in an airport have a right to request

4    those in an airport to produce identification.

5    And those who are requested to produce it are

6    obligated to do so.  Is that right?

7        A.    The question is whether I said that there

8    were circumstances --

9        Q.    Whether it depends on the circumstances.

10       A.    Right, right.

11       Q.    Not included among those circumstances is

12   when someone is stopped and there is racial

13   profiling; is that right?

14       A.    Where a person is stopped in the absence

15   of individualized suspicion on the basis of race

16   or ethnicity in a stop which would normally be or

17   any kind of demand --  did you mention a stop or

18   did I add that?

19           At any rate, any kind of law enforcement

20   activity which might be constitutional would then

21   become unconstitutional.

22       Q.    And that's your claim here is that

23   Officer Thompson requested that you produce

     identification based solely upon racial or ethnic

16   your bag and not replaced.  Do you recall telling

17   us about that?

18       A.    Yes, although it was replaced.

19       Q.    Eventually it was replaced?

20       A     Eventually, it was replaced.

21       Q.    Was that an incidence of racial profiling

22   in your view?

23       A.    I have no idea.  I would have to get into

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12513-RBC

*****************************************

KING DOWNING,                                    *
          Plaintiff,                             *
                                                 *
v.                                               *
                                                 *
MASSACHUSETTS PORT AUTHORITY, THE                *
MASSACHUSETTS DEPARTMENT OF STATE                *
POLICE, STATE POLICE TROOPER                     *
THOMPSON, STATE POLICE SERGEANT                  *
CROXTON, THOMAS G. ROBBINS, and                  *
PETER J. DIDOMENICA,                             *
          Defendants.                            *
*****************************************


          DEPOSITION OF PETER J. DIDOMENICA,
taken pursuant to the applicable provisions of
the Federal Rules of Civil Procedure, before
Susan L. Prokopik, Registered Merit Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Lurie & Krupp,
LLP, One McKinley Square, Boston, Massachusetts,
on Thursday, January 4, 2007, at 9:57 a.m.


KACZYNSKI REPORTING
72 CHANDLER STREET, SUITE 3
BOSTON, MASSACHUSETTS 02116
(617) 426-6060

DIDOMENICA-1/4/07

---

**Page 2**

1  APPEARANCES:
2
   ON BEHALF OF THE PLAINTIFF:
3
   JOHN REINSTEIN, ESQ.
4  American Civil Liberties Union of
   Massachusetts
5  211 Congress Street
   Boston, MA  02110
6  (617) 482-3170 x324

7
   ON BEHALF OF THE DEFENDANT
8  MASSACHUSETTS PORT AUTHORITY:
9  ROSCOE TRIMMIER, JR., ESQ.
   ANNMARIE A. TENN, ESQ.
10 Ropes & Gray LLP
   One International Place
11 Boston, MA  02110-2624
   (617) 951-7000
12
13 ON BEHALF OF THE DEFENDANTS
   THE MASSACHUSETTS DEPARTMENT OF STATE POLICE,
14 THOMAS G. ROBBINS and PETER J. DIDOMENICA:
15 MARY O'NEIL, ESQ.
   The Commonwealth of Massachusetts
16 Office of The Attorney General
   One Ashburton Place
17 Boston, MA  02108
   (617) 727-2200, ext. 2636
18
19 ON BEHALF OF THE DEFENDANTS
   STATE POLICE TROOPER THOMPSON and
20 STATE POLICE SERGEANT CROXTON:
21 SUZANNE T. CARAVAGGIO, ESQ.
   Rafanelli & Kittredge, P.C
22 1 Keefe Road
   Acton, MA  01720
23 (978) 369-6001
24

---

**Page 4**

1
2                    I N D E X
3  EXAMINATION BY MR. REINSTEIN..............Page 6
4
5  EXAMINATION BY MS. CARAVAGGIO...........Page 56
6
7
8                  E X H I B I T S

9  No.   Description          Page No

10 1  Massport press release      15

11 2  PASS manual              28

12 3  Special order draft       30

13 4  3/10/03 document and attachments  32
14
15
16
17
18
19
20
21
22
23
24

---

**Page 3**

1  ALSO PRESENT:
2
   MARTIN WARD, ESQ.
3  U.S. Department of Homeland Security
   Transportation Security Administration
4  Logan International Airport
   1 Harborside Drive
5  East Boston, MA  02128-2907
   (617) 568-0504
6
   ANGELA MUNRO
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**Page 5**

                  P R O C E E D I N G S
                       - - - - -
2
3              PETER J. DIDOMENICA
4  having been satisfactorily identified and duly
5  sworn by the Notary Public, was examined and
6  testified as follows:
7
8      MR. REINSTEIN:  Good morning.  This is
9  the deposition of Peter Didomenica in the case of
10 King Downing against the Massachusetts Port
11 Authority and others.
12     MR. WARD:  My name is Martin Ward and
13 I'm an attorney with the Homeland Security,
14 Transportation Security Administration.  The
15 purpose of my being here is to object to any
16 questions the answer to which would reveal
17 sensitive security information and to inform the
18 witness that if he does provide unauthorized
19 sensitive security information that he would be
20 subject to civil and potentially criminal
21 sanctions.
22     MR. REINSTEIN:  Can we agree on the
23 usual stipulations that all objections except as
24 to form will be reserved until the time of trial?

---

2 (Pages 2 to 5)

DIDOMENICA-1/4/07

Page 10

1   performed general investigative functions for
2   state properties in the metropolitan Boston area.
3   And we also did the similar investigations that I
4   did at the Registry involving license fraud and
5   financial crimes involving identification
6   documents. I specialized in those type of
7   crimes. The ones involving identity theft,
8   financial crimes, white collar crime.
9   Q. And how long did you do that?
10  A. Approximately eight years.
11  Q. So that would have been to roughly 2000?
12  A. Roughly 2000. I was assigned to the State Police
13      Academy in New Braintree as the director of legal
14      training.
15  Q. And what were your responsibilities as director
16      of legal training?
17  A. I designed and supervised a curriculum related to
18      criminal law, criminal procedure. I taught
19      criminal law, criminal procedure. I set up
20      specialized training in courses related to
21      criminal law, criminal procedure.
22  Q. And apart from your law school experience, did
23      you have any other training that prepared you for
24      that position?

Page 11

1   A. I don't recall anything else.
2   Q. You were never provided any additional training
3      by the Massachusetts State Police?
4   A. When you said "position," you're referring to the
5      director of legal training position --
6   Q. Yes.
7   A. -- or just the generic position of a State Police
8      officer?
9   Q. No. The position of director of training.
10  A. No.
11  Q. Okay. You did receive some training as a State
12      Police trooper?
13  A. Yes.
14  Q. What was the nature of that training?
15  A. Well, the initial training -- actually, my
16      academy training was before I was on the State
17      Police but I was allowed to join the Registry
18      Division of Law Enforcement based upon having --
19      as a recruit in the police academy. That was in
20      1986. And over the course of my career, I've
21      taken several courses through our academy related
22      to criminal law enforcement.
23  Q. Now, what's the current position you currently
24      hold?

Page 12

1   A. I'm on the staff of the superintendent of the
2      Massachusetts State Police. I work out of our
3      headquarters in Framingham.
4   Q. And what are your responsibilities there?
5   A. I prepare reports for the colonel and the deputy
6      superintendent. I prepare briefings for the
7      colonel and superintendent. I serve as a subject
8      matter expert on racial profiling for the colonel
9      and the deputy superintendent and whatever else
10     is asked of me but I think those are the
11     principal tasks.
12  Q. How long have you held that particular position?
13  A. I've actually had it twice. Starting in 2001 I
14      was assigned there. And then after the 9/11
15      attacks at Logan Airport, I was assigned to Logan
16      Airport for about two years. And then I went
17      back to working in the superintendent's office so
18      total amount of time assigned there would be
19      about three or four years.
20  Q. Now, so let me see if I have the chronology
21      correct.
22  A. Okay.
23  Q. How long were you the director of training at the
24      academy?

Page 13

1   A. About a year and a half.
2   Q. And what was the time?
3   A. From like the beginning of 2000 to about the
4      middle of 2001.
5   Q. And then you went to the staff of the
6      superintendent?
7   A. Yes.
8   Q. All right. And you were there for -- to the end
9      of the year or --
10  A. I was there until the beginning of 2002.
11  Q. And then you were at Troop F?
12  A. Troop F at Logan Airport.
13  Q. What were your duties at Troop F?
14  A. I was assigned to the troop commander's office.
15  Q. Okay.
16  A. And I was assigned to work with Massport, which
17      runs the airport, on developing security
18      programs.
19  Q. Okay. And how long were you there?
20  A. About two years. Early 2004 I was called back to
21      headquarters and assigned again to the
22      superintendent's office.
23  Q. And that's where you have been since then?
24  A. Correct.

4 (Pages 10 to 13)

DIDOMENICA-1/4/07

Page 6

1    MR. TRIMMIER: Agreed.
2    MS. O'NEIL: Agreed.
3    MR. REINSTEIN: And the deposition is
4  to be read and signed. We'll waive signing in
5  front of a notary.
6    MS. O'NEIL: Correct.
7    MR. REINSTEIN: Thirty days after --
8    MS. O'NEIL: That's fine.
9    MR. REINSTEIN: All right. Is that
10  time enough?
11    MR. TRIMMIER: Acceptable.
12
13    EXAMINATION BY MR. REINSTEIN:
14  Q. Would you state your name for the record, please?
15  A. Peter Didomenica.
16  Q. Would you spell it, please?
17  A. Last name is spelled D I D O M E N I C A.
18  Q. And where are you employed, sir?
19  A. Massachusetts State Police.
20  Q. What's your position there?
21  A. I'm a sergeant.
22  Q. Now, have you been deposed before?
23  A. Yes.
24  Q. All right. You understand that there will be a

Page 7

1  series of questions. And if there are
2  objections, you may still answer the question
3  unless otherwise instructed.
4  A. Yes.
5  Q. Okay. And this is an informal proceeding. If
6  you want to take a break for any reason, if you
7  want to consult with counsel, please say so and
8  we'll make whatever accommodations are necessary.
9  A. Yes.
10  Q. How long have you been employed by the
11  Massachusetts State Police?
12  A. Nineteen years. Going on 20 this October.
13  Q. All right. And were you employed before you
14  joined the State Police?
15  A. Yes.
16  Q. What did you do then?
17  A. I had various jobs on campus police departments.
18  Q. Which campus police departments were those?
19  A. The first one going back to about 1981 was Mt.
20  Ida College in Newton. After that, Babson
21  College in Wellesley. After that, Boston College
22  in Chestnut Hill.
23  Q. What were the dates of those?
24  A. Mt. Ida was the first job and that was I believe

Page 8

1  1981 to 1984. And then approximately 1984 to
2  1986 at Babson College. And then '86 to '87 at
3  Boston College.
4  Q. And in 1987 you joined the Massachusetts State
5  Police?
6  A. At that time it was the Division of Law
7  Enforcement in the Registry of Motor Vehicles and
8  it was absorbed into the State Police in 1992.
9  Q. And when you were at the Division of Law
10  Enforcement of the RMV, what were your
11  responsibilities there?
12  A. Well, I had various jobs. The first job which
13  only lasted a few months was motor vehicle
14  examiner, which was basically giving road tests
15  and assisting in other administrative tasks
16  related to the law enforcement function of the
17  agency at branch offices.
18    The next assignment I had was called
19  vehicle inspection services, which involved
20  enforcing regulatory laws involving school buses
21  and inspection stations. And I did that for
22  probably about three years. And then just before
23  the consolidation of the State Police, I was
24  assigned to the special investigations unit,

Page 9

1  which was like an internal affairs unit. And it
2  also did investigations involving fraudulent use
3  of licenses, employee theft, corruption-type
4  cases.
5  Q. Could you tell me what your educational
6  background is?
7  A. I have a Bachelor of music from the New England
8  Conservatory of Music. I got that in 1982. And
9  then in '84 I got a Master's degree in music from
10  the same school. New England Conservatory.
11  Graduated in 1984. And then in '91 I went -- I
12  entered Western New England College School of Law
13  and got my law degree in 1995.
14  Q. You said 1995?
15  A. That's when I graduated from Western New England.
16  Q. And when the Registry of Motor Vehicles and the
17  law enforcement component was consolidated with
18  the Massachusetts State Police, did you come in
19  at the level of a trooper?
20  A. I came in as a trooper.
21  Q. All right. And what were your initial
22  responsibilities with the Massachusetts State
23  Police?
24  A. I was assigned to the major crime unit, which

3 (Pages 6 to 9)

DIDOMENICA- 1/4/07

Page 14

1  Q. So roughly three years since then?
2  A. Yeah. We're going on three years.
3  Q. Okay. Now, at some point were you asked to
4     become involved in the training of the troopers
5     assigned to Troop F?
6  A. Yes.
7  Q. And when was that and what -- how did that come
8     about?
9  A. This was in the spring of 2003, I believe. I was
10    asked to train all the personnel assigned to
11    Troop F in a behavioral assessment program
12    designed to identify high-risk passengers.
13 Q. And you say you were asked to do that. Who asked
14    you to do it?
15 A. The troop commander, which was then Major Tom
16    Robbins.
17 Q. Now, was this the first time you had heard of
18    this particular technique?
19 A. I have been aware of it in some form throughout
20    my career in the sense that it uses some of the
21    same techniques that drug and addiction programs
22    have used. So for the extent of my career I
23    think I've had some knowledge of the type of
24    techniques being used.

Page 15

1        In terms of specializing training to
2     identify potential terrorists, that occurred
3     shortly after 9/11 in trying to design programs
4     that would give us a better chance to prevent
5     another 9/11 from occurring.
6  Q. Now, when you were assigned to Troop F, did you
7     work with Massport officials as well?
8  A. Yes.
9  Q. And did you work with Mr. Treece, T R E E C E?
10 A. Dennis Treece was the and still is the corporate
11    security director for Massport. And yes, I did
12    work with him.
13 Q. What is the director of corporate security?
14 A. Well, Massport is not just the airport. Massport
15    actually comprises the Tobin Bridge and the
16    Seaport. And the corporate director of security
17    has general oversight of security programs for
18    the whole of Massport, which again includes the
19    Seaport, the Tobin Bridge and the airport.
20        MR. REINSTEIN: Can I have this marked
21    as Exhibit 1?
22        (Massport press release marked Exhibit
23    No. 1.)
24 Q. Let me show you what's been marked as Exhibit 1.

Page 16

1     First let me ask you if you've ever seen that
2     before.
3  A. I believe I have.
4  Q. Okay. And for the record, can you just explain
5     what it is?
6  A. It's a press release from Massport dated November
7     15, 2002 that announces that State Police
8     personnel at Logan Airport have been trained in
9     the behavior pattern recognition program.
10 Q. Okay. And had you had discussions with Mr.
11    Treece and other Massport officials about that
12    program before that announcement was made?
13 A. I don't recall any conversations specifically
14    about this announcement with those people.
15 Q. Okay. Leaving aside the announcement, had you
16    had discussions with Massport officials about the
17    general subject matter of that press release?
18 A. Of behavior pattern recognition?
19 Q. Right.
20 A. Yes.
21 Q. Okay. And when did those discussions first
22    begin?
23 A. I would say in the weeks after the 9/11 attacks.
24    I mean, we began talking about approaches to

Page 17

1     identifying potential terrorists.
2  Q. Who took part in those discussions?
3  A. It would be Major Robbins. He may have been a
4     captain initially when he first went to the
5     airport. He was promoted in early 2002. The
6     director of aviation, Tom Canton, who is now the
7     CEO of Massport. There were several people on
8     the staff that we had weekly meetings with after
9     the 9/11 attacks.
10        Ed Freni, who was a deputy director of
11    aviation security. Sam Sleiman, who was director
12    of construction and engineering. Those are the
13    names that come to mind.
14 Q. Is it fair to say there was general agreement
15    among all those people that you were to go
16    forward with this program?
17 A. Yes.
18 Q. Now, there is some discussion and I don't know if
19    it's in there of an individual named Rafi Ron.
20    Do you know Mr. Ron?
21 A. Yes.
22 Q. When did you first meet him?
23 A. Shortly after arriving at the airport, he was
24    brought on as a consultant to do like a threat

5 (Pages 14 to 17)

DIDOMENICA-1/4/07

Page 18

1    assessment and report on threat mitigation for
2    the airport.  So I would have to say in the late
3    2001 I probably first met him.
4  Q.  Okay.  Now, do you know if he did produce a
5    report on threat mitigation?
6  A.  Yes.
7  Q.  All right.  And without telling me the contents
8    of any of that, do you recall approximately when
9    that was done?
10  A.  I think it took about a year to complete so I
11    would say mid to late 2002.
12  Q.  Okay.  And did you see that report?
13  A.  Yes.
14  Q.  And did it include recommendations with respect
15    to behavioral assessment?
16  A.  Yes.
17  Q.  And what actions, if any, were taken by Massport
18    and the State Police as a result of their report?
19  A.  Well, the report included -- I seem to recall
20    over 100 recommendations.
21  Q.  Let's focus on the behavioral threat assessment.
22  A.  One of the recommendations was to train and
23    deploy troopers to use behavior pattern
24    recognition techniques.

Page 19

1  Q.  All right.  And let me ask you a couple questions
2    about the division of responsibility for security
3    at Logan Airport.  Are the Massachusetts State
4    Police the only ones who provide security at the
5    airport?
6  A.  In terms of law enforcement, they are the only
7    ones.
8  Q.  All right.  And --
9  A.  On the state level.  I mean, we have Federal law
10    enforcement there.  Air marshals, customs and
11    immigration enforcement, but for the Commonwealth
12    they are the principal agency for law
13    enforcement.
14  Q.  And what are the sort of general security
15    responsibilities of the state troopers assigned
16    to Troop F?
17  A.  It includes ensuring that the airport operates in
18    a safe and orderly manner, preventing thefts of
19    baggage, preventing acts of violence, securing of
20    the airfield and other secure areas, monitoring
21    the perimeter of the airport from intrusion,
22    responding to calls from the TSA for prohibited
23    items and other disturbances occurring at
24    checkpoints.

Page 20

1       Responding to aircraft with disruptive
2    passengers.  Assisting the Federal agencies.
3    Frequently prisoners are taken at the airport and
4    we will house those prisoners for the Federal
5    authorities initially.  Those are probably the
6    principal responsibilities.
7  Q.  How are the responsibilities divided for security
8    divided between TSA on the one hand and
9    Massachusetts State Police on the other?
10  A.  Well, it is a matter of statute.  Federal law.
11    There is specific responsibilities that TSA has
12    which include the screening of all passengers on
13    commercial flights.  And as part of that security
14    responsibility, they have the authority to
15    designate law enforcement functions to state and
16    local authorities, which they've done, so we in
17    effect serve as the law enforcement branch of TSA
18    when it comes to criminal matters of the airport
19    but the underlying authority is -- on the Federal
20    law is the TSA for what happens at that
21    checkpoint.
22  Q.  All right.  With respect to the deployment of the
23    state troopers assigned to Troop F at Logan
24    Airport, do some of the state troopers take part

Page 21

1    in the screening of passengers?
2  A.  No.
3  Q.  Okay.  That's the responsibility of TSA?
4  A.  The physical screening of passengers is the TSA's
5    responsibility.
6  Q.  And in limiting it now to the terminals
7    themselves and not to the other areas of the
8    airport --
9  A.  Okay.
10  Q.  -- where are the state troopers assigned?
11  A.  Throughout the airport.  On the airfield --
12  Q.  Just in the terminals themselves now.
13  A.  They're assigned in the terminals.
14  Q.  All right.  And is that on both sides of the
15    screening area?
16  A.  Yes.  On the secure side and they're on the
17    public side.
18  Q.  All right.  Now, after receiving the report and
19    recommendations from Mr. Ron with respect to
20    behavioral screening, what measures were taken
21    collectively by Massport and the State Police?
22  A.  Again, you're talking in terms of behavior
23    pattern?
24  Q.  Right.  Just in terms of behavior pattern.

6 (Pages 18 to 21)

DIDOMENICA-1/4/07

Page 22

1    A. I asked them to put together a training course
2        specifically in the techniques that they
3        advocated for the State Police and they put
4        together a training course. And it was delivered
5        in October of 2002 to about a dozen troopers.
6    Q. When you say "they," are you referring to Mr.
7        Ron?
8    A. Mr. Ron and his company. I believe it was New
9        Age Aviation Security.
10   Q. Okay. And were there training materials prepared
11       for that?
12   A. Yes.
13   Q. And did you participate in that training?
14   A. I served in an advisory capacity because they
15       were not citizens of this country and the
16       techniques that they were going to train us on
17       evolved at Ben Gurion Airport in Israel. And I
18       was advising them on some of the limitations that
19       would apply in using those techniques in this
20       country.
21   Q. All right. And did you ultimately determine that
22       some of those were not appropriate to the United
23       States?
24   A. Yes.

Page 24

1    Q. It was not mandatory?
2    A. It was not mandatory.
3    Q. Would it be fair to describe it as experimental
4        or a pilot project?
5    A. Yes.
6    Q. And at some point was a decision made to expand
7        the program?
8    A. Yes.
9    Q. Who made that decision?
10   A. I made it in conjunction with Major Robbins and
11       Tom Canton.
12   Q. Okay. And was there any formal record made of
13       that decision?
14   A. I don't believe so.
15   Q. So there was a meeting between you and Major
16       Robbins and Mr. Canton?
17   A. I would not even classify it as a meeting because
18       I'm not sure there was a meeting. I think it was
19       in the course of conversations so I don't recall
20       a formal meeting to discuss it. It just in the
21       course of working and talking these subjects came
22       up. I just don't have a recollection of a
23       specific meeting.
24   Q. And would it be fair to say, though, that there

Page 23

1    Q. All right. And was there any further training
2        done by Mr. Ron or his company?
3    A. There was a follow-up training that was -- lasted
4        maybe a day just to check on people's skills in
5        conducting interviews. And that may have
6        occurred four to six months after the initial
7        training.
8    Q. And how many people, how many troopers were
9        involved in this?
10   A. Initially I think it was between ten and 12 and
11       then when they did the follow-up I think it may
12       have been about eight. Eight troopers.
13   Q. And when was that? When was the initial training
14       and when was the follow-up?
15   A. The initial training was I believe October of
16       2002. And then, like I say, four to six months
17       later I asked them to come back just to check us
18       out and see if we're doing it properly.
19   Q. And how were the troopers who participated in
20       this training selected?
21   A. There was a sign-up sheet posted and the troopers
22       were asked if they were interested in this type
23       of training. They would be welcome to take the
24       training.

Page 25

1        was agreement between Massport and the
2        Massachusetts State Police that an expanded
3        version of the program should go forward?
4    A. Yes.
5    Q. And who was responsible for implementing that
6        decision?
7    A. From the State Police, Major Robbins, and from
8        Massport, Tom Canton.
9    Q. And what steps were taken to follow up on that?
10   A. Well, I initially set out to devise a training
11       program. And the reason being is that I had
12       reservations about some of the techniques that
13       were used in Israel and I felt that there would
14       be a danger, that they would not be lawful in
15       this country.
16           I also had reservations about the
17       behavioral aspect because I felt that in the
18       training we received from the New Age Aviation
19       Security firm, it wasn't specific enough in terms
20       of what behaviors we should be looking for and I
21       was interested in having scientific validation so
22       we could be on firm ground that we were looking
23       for the right things so I set out kind -- I kind
24       of set out from scratch and looked at this

DIDOMENICA-1/4/07

Page 26

1   problem from the beginning.
2           And I said, How can you design a
3       program that will accurately and lawfully
4       identify people that could potentially be
5       terrorists?
6   Q.  What did you do to ensure that that would take
7       place?
8   A.  Well, using my experience as an attorney and
9       being director of legal training at the academy,
10      I drew upon that experience. As a racial
11      profiling compliance officer and subject matter
12      expert, I drew on that experience. I researched
13      scientific literature, social psychology,
14      history, security, interview and interrogation,
15      criminal procedure.
16          I basically drew on whatever I could to
17      come up with a rational, logical, objective,
18      lawful way to make that airport safer.
19  Q.  You mentioned "scientific validation." Apart
20      from your reading, did you consult with anyone
21      about that?
22  A.  Yes. I spoke with and consulted with Dr. Mark
23      Frank, who is a Ph.D. psychologist who had been
24      doing research on deception and human emotion

Page 27

1       through the Rutgers University, State University
2       of New Jersey I believe at Rutgers. Later on I
3       consulted with Dr. Paul Ekman, who is a
4       psychologist at the University of California at
5       Berkeley. And he's a world renowned expert on
6       human emotion and deception.
7           Other people included Dr. Jessica
8       Stern, a Harvard professor. Not so much in the
9       scientific aspect but more in the genesis of
10      terrorism and understanding terrorism. She is
11      recognized as an expert nationally on terrorism.
12  Q.  Did your consultation with any of these
13      individuals involve materials that they provided
14      you?
15  A.  I don't recall specific materials. I think it
16      was more a discussion of what techniques would
17      work best in the detection of a person with
18      hostile intent or detection of deception in
19      reference to existing research materials.
20  Q.  And did you consult any of those research
21      materials?
22  A.  Oh, yeah.
23  Q.  Do you recall what any of those were?
24  A.  One was a study by DePaulo. D E P A U L O. It

Page 28

1       was kind of a metaresearch paper on previous
2       studies. And it included dozens and dozens of
3       deception studies. A textbook by Knapp,
4       K N A P P, on nonverbal behaviors. Those are a
5       couple that come to mind.
6   Q.  Was there anyone else you consulted in connection
7       with scientific validation, the method?
8   A.  I believe there were. The names are not coming
9       to me at the moment.
10  Q.  How long did this process take?
11  A.  It's still going on. I mean, it started in the
12      end of 2001 and I'm still doing it today.
13  Q.  All right. And at some point did you produce
14      training materials?
15  A.  Yes.
16  Q.  And what is PASS, P A S S?
17  A.  That stands for Passenger Assessment Screening
18      System.
19  Q.  And is that part of the training materials that
20      you developed?
21  A.  Yes.
22          MR. REINSTEIN: All right. Mark this.
23          (PASS manual marked Exhibit No. 2.)
24  Q.  All right. Let me show you what's been marked as

Page 29

1       Exhibit 2. It once had a cover in an earlier
2       version we were provided, but is that a copy of
3       the -- tell me what that is.
4   A.  This would be a student manual for the Passenger
5       Assessment Screening System.
6   Q.  Is that based on a PowerPoint?
7   A.  Yeah. This is based on PowerPoint slides.
8   Q.  Okay. And when was this first developed?
9   A.  Probably in the middle of 2002.
10  Q.  And is this the materials that were used for
11      training the state troopers?
12  A.  Yes.
13  Q.  We've been provided with something else that is
14      dated October, 2004 which has your name on it
15      called the "Behavior Assessment Screening System
16      Lesson Plan." Is that essentially the same
17      thing?
18  A.  It's the same program.
19  Q.  And this is based on the same materials that you
20      developed?
21  A.  Yes.
22          MR. REINSTEIN: All right. And mark
23      that.
24          MS. O'NEIL: You're not going to mark

8 (Pages 26 to 29)

DIDOMENICA-1/4/07

Page 30

1    that?
2          MR. REINSTEIN:  No.
3          (Special order draft marked Exhibit No.
4    3.)
5    Q. I'm going to show you what's marked as Exhibit 3.
6       Can you tell me what that is?
7    A. It's a draft of a special order establishing a
8       behavior-pattern recognition program for the
9       State Police.
10   Q. And it's marked as a draft.  What does that
11      indicate, that it's a draft?  Is there a
12      subsequent version of this as far as you know?
13   A. No.  I mean, I know it's a draft because I
14      drafted it.  And it was never implemented.
15      There's no date.  There's no special order number
16      on it.  It's stamped "draft."
17   Q. You said you drafted it?
18   A. Yes.
19   Q. And what did you do with it after you drafted it?
20   A. I provided it to Major Robbins as a draft for
21      having a specific written policy for a state-wide
22      program.
23   Q. And what was the purpose of having the state-wide
24      program?

Page 31

1  . A. Well, we felt what we were doing at the airport
2       was very successful and I wanted to get this type
3       of threat mitigation strategy out job-wide
4       because there was a lot of other critical
5       infrastructure that we're responsible for.  And I
6       thought it would be an effective program but to
7       do it on a state-wide basis, I felt it would
8       require a written policy.
9    Q. Okay.  And did you receive a response from
10      Colonel Robbins?
11   A. I don't recall a specific response.  I submitted
12      it and it seems to just have faded away and not
13      have been acted on in terms of enactment so I
14      don't remember a specific moment in time where
15      there was a decision made that we're not going to
16      do this.
17   Q. Was this ever distributed as far as you know?
18   A. As far as I know, it went to Major Robbins at
19      Troop F and possibly some other command staff
20      people at Troop F but that's as far as I think it
21      got.
22   Q. Were you ever told anything about the reasons why
23      it was not received?
24   A. No.  I was not.

Page 32

1    Q. You had no further conversations with the
2       superintendent about it?
3    A. Superintendent or the major?
4    Q. The major.  Excuse me.
5    A. I don't recall any conversations.
6    Q. Okay.  Now, when did you begin training troopers
7       at Troop F in the behavior pattern recognition?
8    A. I believe in the spring of 2003 we started the
9       training program.
10   Q. All right.  That was intended to be for all the
11      troopers assigned to Troop F?
12   A. Yes.
13   Q. All right.  How was that done?
14   A. There were lists posted with various times
15      available for the training and people signed up
16      for training.
17   Q. Was everyone required to receive the training?
18   A. Yes.
19          MR. REINSTEIN:  Let's have this marked.
20          (3/10/03 document and attachments
21      marked Exhibit No. 4.)
22   Q. Let me show you what's been marked as Exhibit 4.
23      It's a collection of separate documents.  If you
24      could look through it for a minute.

Page 33

1    A. Okay.
2    Q. All right.  Can you describe what those are?
3    A. Sign-in sheets for the PASS training program.
4    Q. And those indicate that each of the troopers
5       identified there took the training?
6    A. Yes.
7    Q. And there's also a roster there of all the
8       troopers assigned to Troop F?
9          Sorry.  Three pages back from the end.
10   A. Yes.  I see that.
11   Q. As far as you know, was that a full roster of the
12      troopers assigned to Troop F at that time?
13   A. It appears to be a full roster.
14   Q. And --
15   A. I'm just wondering if it has all the command
16      staff on it.  That's all.  It looks like the
17      whole -- it does look like the whole troop.
18   Q. All right.  Now, were other officers, State
19      Police troopers, assigned to Troop F from time to
20      time to supplement the officers there?
21   A. It depends how you define "assign."  I mean, in
22      the sense of being -- assigned to Troop F would
23      mean you were on their payroll, which was a big
24      step so that didn't happen frequently.  I mean,

DIDOMENICA-1/4/07

| Page 34 | Page 36 |
|---|---|

**Page 34**

1  that was kind of a permanent assignment. There
2  are frequently troopers that work shifts there
3  doing traffic as a detail, which is a separate
4  assignment but you're not assigned there.
5  Q. They were assigned but not assigned?
6  A. Exactly. But that word takes on a little more
7  significance because if you're a state trooper
8  assigned to Logan Airport, your check says
9  "Massport" on it and people don't go back and
10  forth that easily or that quickly because it's a
11  big step but there are a lot of people that
12  aren't assigned there working there.
13  Q. Let me ask you. Are the troopers who are
14  assigned in the sense you described to Logan
15  Airport actually paid by Massport?
16  A. Yes.
17  Q. And are considered to be employed by Massport?
18  A. No. There is a special statute that kind of puts
19  the troopers on loan to the Port Authority so for
20  all intents and purposes you work there but
21  legally you're still an employee of the State
22  Police.
23  Q. And the responsibility for supervision is joint
24  or belongs to --

**Page 36**

1  And what I learned is that there is a
2  scientific basis for what people were feeling
3  about these individuals in the days, weeks and
4  months leading up to the 9/11 attacks. Elevated
5  suspicion is not so much a legal term because the
6  goal of elevated suspicion is to identify
7  potential persons who may have hostile intent as
8  part of a threat mitigation strategy as opposed
9  to criminal law enforcement.
10  It's a new approach for law enforcement
11  but the basis of it is to secure a critical
12  infrastructure and identify potential high-risk
13  people and keep them away from the core of the
14  critical infrastructure. It involves looking for
15  and articulating subtle signs of a person who
16  intends to do future harm.
17  Frequently those subtle signs at least
18  initially would not constitute the legal term of
19  reasonable suspicion but from the lessons of
20  9/11, I learned that we needed to get our
21  officers involved in looking at those subtle
22  signs initially because if you weren't sensitive
23  to them and/or if you were and you ignored them
24  because they didn't meet a standard of reasonable

| Page 35 | Page 37 |
|---|---|

**Page 35**

1  A. The operational control is strictly the State
2  Police. And that's a matter of statute.
3  Q. Now, going back to these trainings, did you
4  conduct those trainings?
5  A. Yes.
6  Q. All right. And you used the materials that we've
7  identified in the earlier exhibit?
8  A. Yes. Yes.
9  Q. And that's a presentation that was developed by
10  you --
11  A. Yes.
12  Q. -- based on the study and background that you
13  described earlier?
14  A. Yes.
15  Q. There is in these materials discussion of
16  something called "elevated suspicion"?
17  A. Correct.
18  Q. Would you describe that, please?
19  A. What I learned and what we learned after 9/11 is
20  that the 9/11 hijackers gave off signs that they
21  had hostile intent before these attacks and that
22  people actually detected them and felt that they
23  were doing something but they just couldn't
24  articulate what it was they were feeling.

**Page 37**

1  suspicion, a terrorist could walk right past you
2  and get on a plane.
3  So what it does is it allows a police
4  officer to be more aware of signs of a person
5  with this potential hostile intent and to get
6  them thinking about a strategy to mitigate that
7  threat.
8  Those strategies in most cases don't
9  involve Constitutional infringements or
10  impositions on an individual. They're designed
11  to mitigate the threat without crossing the line
12  into Fourth Amendment areas.
13  Q. You said "in most cases."
14  A. Well, you may actually develop reasonable
15  suspicion based on a subtle indicator and then
16  you would know, cross that line into the Fourth
17  Amendment world and may detain a person but it
18  would be based on reasonable suspicion or
19  probable cause.
20  Q. Is it fair to say that the training you used
21  contemplates substantial contact between the
22  officer looking for these signs and members of
23  the public?
24  A. I'm not sure what you mean by "substantial" but

10 (Pages 34 to 37)

DIDOMENICA-1/4/07

Page 38

1   it contemplates that these interactions could
2   evolve into a detention.
3   Q. Is it fair to say that the training contemplates
4       that officers will approach members of the public
5       and question them?
6   A. Yes.
7   Q. And would part of that questioning -- strike
8       that. Could part of that questioning involve
9       requesting identification and travel documents?
10  A. Yes.
11  Q. And in the scheme of elevated suspicion, what is
12      the -- well, let me go back.
13          Now, under this behavioral pattern
14      recognition system, officers at some point would
15      make a decision to approach individuals --
16  A. Correct.
17  Q. -- to question them?
18          And would it be fair to say that they
19      were allowed to consider nationality?
20  A. No.
21  Q. They couldn't consider nationality under these
22      circumstances?
23  A. No.
24  Q. Would they be able to consider the destination of

Page 39

1   the traveler?
2           MR. WARD: I'm going to object. You
3   can't elicit the specific criteria they use in
4   order to make a determination that someone has
5   arisen to an elevated threat. I think if we go
6   down a laundry list, you will soon discover
7   exactly what they're looking for. I think if we
8   continue on this trend of talking about specific
9   elements that you would look to, I think we're
10  going to be revealing sensitive security
11  information.
12          THE WITNESS: I think I can answer his
13  question without doing that if you give me one
14  shot at it.
15          MR. WARD: Okay.
16  A. The decision to approach a person is in no way
17  based on any subjective or objective beliefs
18  about a person's nationality, race, ethnicity or
19  religious beliefs.
20  Q. And -- well, you used the word "based on." The
21  question is not whether it's based on. It's
22  whether it can be considered.
23  A. It cannot be considered.
24  Q. Now, there's discussion in here which suggests

Page 40

1   that these should be voluntary encounters.
2   A. Yes.
3   Q. How was it ordinarily made clear or how is it
4       supposed to be made clear that these are
5       voluntary encounters?
6   A. Well, as part of their training they're
7       instructed what the standard is for a voluntary
8       encounter and they're told that absent reasonable
9       suspicion that these interviews have to be in the
10      context of a voluntary encounter.
11  Q. Right. That's what the officers are trained to
12      do?
13  A. Right.
14  Q. But does that training include providing any
15      information to the subject of the encounter?
16  A. When you say "subject," are you talking --
17  Q. The person who is approached.
18  A. Can you just rephrase that question?
19  Q. Sure. An officer comes up to me and wants to ask
20      me some questions. Is he required to tell me
21      that I'm not required to answer them?
22  A. In the training they're told that persons do not
23      have to answer questions nor provide
24      identification except in the limited context of

Page 41

1   wanting to get on the plane and enter a screening
2   checkpoint. So yes, they are instructed that
3   people have a right not to respond to their
4   questions.
5   Q. The officers are but do they convey that
6       information to the person they're speaking to?
7   A. I don't know in specific cases if they do or not.
8   Q. You don't train them to do that?
9   A. We don't train them to tell them that they have
10      the right not to ask -- answer the questions.
11  Q. Now, I'm going to ask you to look at what's been
12      marked as Exhibit 2. If you go to page ten.
13  A. Okay.
14  Q. In the lower right-hand corner, there's a --
15      which I guess we'd call a slide which says
16      "Methods of contact."
17  A. Yes.
18  Q. "Officers may request to examine travel
19      documents. However, a person is generally -- not
20      generally required to produce these."
21  A. You want to continue on with what it says?
22  Q. All right. "A person is not required to answer
23      questions or otherwise cooperate. Refusal to
24      cooperate or produce documents may be a factor of

11 (Pages 38 to 41)

DIDOMENICA-1/4/07

Page 42

1   ES."
2   A. Correct.
3   Q. What does it mean to be a factor of ES?
4   A. It means that in terms of the decision of
5       allowing them to proceed into the critical
6       infrastructure, the person that refuses to
7       provide their identification or answer questions
8       about their purpose of what they're doing at that
9       location, that can be considered in the decision
10      as to whether they proceed into critical
11      infrastructure.
12  Q. Suppose a person is not proceeding to critical
13      infrastructure.
14  A. Well, then --
15  Q. Suppose they're at the airport. Is that a
16      sufficient basis for asking them to produce
17      documents?
18  A. Yes. Because the entire airport is considered
19      critical infrastructure.
20  Q. So anyone who is at the airport is going to be
21      asked to produce documents?
22  A. They may be asked to produce documents.
23  Q. They may be asked. Okay. That's a fair
24      statement.

Page 43

1           And is it fair to say also that --
2       well, actually turn to the next page.
3   A. Okay.
4   Q. There is a series of slides called "Guidelines
5       for elevated suspicion and reasonable suspicion."
6       And the next one is "prima facie evidence of
7       elevated suspicion. ES."
8   A. Yes.
9   Q. What's the first prima facie evidence of ES?
10  A. "Refuses to answer questions or provide
11      identification or travel documents."
12  Q. So to go back to your previous page, a person is
13      not required to answer them --
14  A. Correct.
15  Q. -- or to provide the documents?
16  A. Correct.
17  Q. But if they do that makes them -- that's prima
18      facie evidence of elevated suspicion?
19  A. Yes.
20  Q. And what is the consequence of that?
21  A. It depends on the totality of the circumstances.
22      In some cases it may involve just letting them
23      continue on. In other cases it may involve
24      preventing them from getting into a secure area.

Page 44

1       In some cases it may involve asking them to leave
2       an area so it's dependent on all that's going on
3       at that time and what's known to the officer at
4       that time.
5   Q. And consistent with that, the officer, is one of
6       the officer's options is to run a records check?
7   A. Yes.
8   Q. If the person has not provided the
9       identification, how would they run a records
10      check?
11  A. They could ask them verbally for their name.
12  Q. And during that time, would the person be free to
13      leave?
14  A. Yes.
15  Q. I don't see that anywhere in the training
16      materials. Is that there? I don't see the part
17      about where the person is free to leave.
18  A. I'm not -- I don't believe there is a specific
19      statement that in the context of running a
20      records check that they can walk away but in
21      terms of the total training, that's what's
22      conveyed to the people in the training, that
23      unless you have a reasonable suspicion, the
24      person is free to walk away and leave.

Page 45

1   Q. So if an officer -- in your opinion if an officer
2       detains someone and didn't make it clear to them
3       that they were free to leave, that would be
4       inconsistent with your training?
5   A. If an officer detains someone --
6   Q. To do a records check, for example.
7   A. Well, I mean, that word is a loaded word.
8       Detained. I assume when you say "detain" that
9       they already have reasonable suspicion because if
10      they don't and they were detained, then what
11      they've done is wrong.
12  Q. How can you do a records check if I'm free -- if
13      a person is free to leave?
14  A. You ask them their name and then you get on your
15      radio and you give it to your dispatcher and ask
16      them to do a records check.
17  Q. And if the person was told they're not free to
18      leave, that would be inconsistent with your
19      training?
20  A. If they were told they were not free to leave,
21      yes.
22  Q. You have no question that that would be a
23      violation of the Constitution and the Fourth
24      Amendment?

12 (Pages 42 to 45)

DIDOMENICA-1/4/07

Page 46

1  A. If there was no reasonable suspicion at that
2     point, then in my opinion that would be unlawful
3     detention.
4  Q. And as far as you're concerned, failure to
5     produce identification is not the basis for
6     reasonable suspicion?
7         MS. O'NEIL: Objection.
8  Q. You may answer the question.
9         MS. O'NEIL: You can answer.
10 A. I think -- again, it's dependent on the context.
11    In some -- I believe in some cases if the person
12    has already initiated cooperation and provided
13    information about themselves and suddenly decides
14    to stop providing that information, that -- I
15    believe that can be a factor in elevated
16    suspicion.
17        In terms of the criminal standard of
18    reasonable suspicion, if it's in the context of
19    them asserting a right not to speak, then it's
20    not appropriate.
21 Q. Or a right not to produce identification?
22 A. Correct.
23 Q. We had an exchange a few minutes ago about what
24    might be considered, and you testified that race

Page 47

1     and nationality could not be considered. I would
2     like to just direct your attention to page seven
3     of the training material exhibit and ask you to
4     look at the extricated version of the two slides
5     at the bottom of the page.
6         And without telling me what's there --
7     that appears to be sensitive security information
8     -- I'm going to ask you if you want to reconsider
9     your answer to the question I asked you earlier.
10        MR. WARD: I'm going to pose my
11    objection. I think that material was redacted
12    because it is sensitive security information so
13    --
14        MR. REINSTEIN: I appreciate that. The
15    question is simply whether he wants to reconsider
16    his answer.
17        MR. WARD: I know.
18        MR. TRIMMIER: Based on the unredacted
19    portion?
20        MR. REINSTEIN: Based on the unredacted
21    portion.
22 A. No.
23 Q. You don't want to reconsider?
24 A. No. I don't want to reconsider.

Page 48

1  Q. Okay. Now, in general, when you provide training
2     for State Police troopers, it's intended to guide
3     their activities in the enforcement of the law;
4     is that correct?
5  A. Yes.
6  Q. And that would be true of the PASS system as
7     well?
8  A. Yes.
9  Q. And this was not something that was optional for
10    the officers who were trained in this method?
11 A. The training was not optional. It was mandatory.
12 Q. Right. But if they're going to use it, if the
13    officers were going to go and adopt the system,
14    they were expected to use it in the manner that
15    it was given to them?
16 A. Yes.
17 Q. And it was not open to them to use some other
18    system?
19 A. If it's within the subject matter of this
20    program, they should be doing it according to the
21    way they were trained.
22 Q. Okay. And you anticipated in providing this
23    training that the officers should use it?
24 A. Yes.

Page 49

1  Q. And that's what they were instructed?
2  A. They were encouraged to use it.
3  Q. They were encouraged to use it?
4  A. Yes.
5  Q. They didn't have to?
6  A. It's a supplement to their skills as a police
7     officer to identify potential high-risk people,
8     potential criminals, and it was offered as a tool
9     but they weren't told that they had to use these
10    particular techniques. It's training we think is
11    effective and useful and we encourage them to use
12    these techniques.
13 Q. I would like to talk to you about the context in
14    which this training was provided. This was
15    obviously post-9/11?
16 A. Yes.
17 Q. And is it fair to say that the component of the
18    training was a discussion of terrorism and that
19    there was substantial dangers to the
20    transportation that it posed?
21 A. Yes.
22 Q. And there was significant discussion of that at
23    the training?
24 A. Yes.

13 (Pages 46 to 49)

DIDOMENICA-1/4/07

Page 50

1  Q. And I want to simply make sure that I understand
2     that this was conveyed to be very important.
3  A. Yes.
4  Q. And all of the troopers were led to believe that
5     in the course of the training?
6  A. Yes.
7  Q. So to suggest it was optional under the
8     circumstances is probably an understatement?
9  A. I don't think it was framed in terms like, This
10    is an option for you.
11         Here is the training. We think it's a
12    good idea. We encourage you to do this.
13         So I think that's a more accurate
14    statement of how it was framed.
15 Q. But you encouraged them, and this was a
16    significant component of the antiterrorist
17    interdiction?
18 A. Yes.
19         MR. REINSTEIN: Why don't we do this?
20    It's 11 o'clock. Let's take like a five-minute
21    break.
22         (Recess.)
23 Q. Sergeant, you mentioned in the training one of
24    the options was to -- in the case of elevated

Page 51

1     suspicion was to, correct me if I'm wrong, escort
2     the individual away from critical infrastructure?
3  A. Yes.
4  Q. What does that mean for someone at Logan Airport?
5  A. To a passenger or an officer or --
6  Q. For the passenger. What happens to them if they
7     are escorted away?
8  A. You're asked to leave.
9  Q. To leave?
10 A. The airport.
11 Q. The airport. And is that a one-time only thing
12    or is that permanent or --
13 A. It would be at the discretion of the officer.
14    There is a trespass list so for people that they
15    determine to be a threat to the airport or
16    involved in criminal activity, they could put
17    them on a trespass list, which would be more
18    permanent. That's not to say it can't be undone.
19 Q. How is that done?
20 A. The information is provided to the dispatcher and
21    there's a database of names of people that have
22    been given trespass notices.
23 Q. How is that database used by the troopers
24    assigned to Troop F?

Page 52

1  A. Well, they enter names into it if the
2     circumstances warrant. And if they have a
3     situation and they're running a name, they may
4     check that person they're involved with against
5     that list.
6  Q. So explain to me for the record how that would be
7     done. How a person's name would be put on the
8     trespass list, how the officer would make that
9     decision what he or she would do.
10 A. Well, let me preface my response. That isn't --
11    beyond the scope of this training was the
12    trespass list. And I have never put someone on
13    the list myself so I'm not that familiar with it
14    because it's not part of this training that I
15    conducted.
16         I have an awareness of it but I don't
17    know if I can give you the specificity you're
18    looking for in terms of access and people using
19    it. I know there is a database containing names
20    of people that have been given a trespass notice
21    and that troopers can request names be put into
22    it and they can in -- in the field they can ask
23    that a name be checked against that list.
24 Q. Let's talk about it simply as a consequence of

Page 53

1     elevated suspicion. An individual is, as you
2     say, escorted away from the critical
3     infrastructure. On what basis would an officer
4     determine that that should be made permanent?
5  A. If they reasonably believe this person has no
6     lawful purpose at the airport and they constitute
7     a threat to the security of the airport, they can
8     request that person be put on the trespass list.
9  Q. And a threat to the security of the airport would
10    be someone who showed signs that amounted to
11    elevated suspicion?
12 A. Well, that would be the foundation for that
13    request. But in terms of actually putting them
14    on the list, they would need -- I think the
15    equivalent of what would be probable cause or a
16    well-founded belief that this person has no basis
17    to be at the airport, that they intend to commit
18    a crime or they may be conducting surveillance
19    preliminary to a terrorist attack.
20         The elevated suspicion gets you to the
21    point where you recognize their potential for
22    those beliefs but in the course of that
23    interaction, they would need to have -- firm that
24    up and have a reasonable belief that would

14 (Pages 50 to 53)

DIDOMENICA-1/4/07

Page 54

1    warrant that action.
2  Q. Is there anything in the training materials that
3     really addresses that issue?
4  A. I don't believe there's anything specifically on
5     that issue. Again, because the trespass list
6     went on for a long time before this. And I
7     believe they're still using it now. And the
8     context of it are people that are not there as
9     lawful travelers and are engaged in -- or engaged
10    in possibly conducting criminal activity.
11         A common occurrence are bag thefts.
12    And people will come to the airport specifically
13    to hang around the bag belts and steal bags off
14    the bag belt. And they may not have stolen the
15    bag but these people are known for this activity
16    and, you know, once they're identified as being a
17    person involved in that type of activity, they're
18    told to leave.
19  Q. That's interesting but let's see if we can stay
20    within the context of someone who is the focus of
21    one of these behavior pattern recognition
22    encounters and who is being escorted away.
23  A. In that context, it would mean that there was
24    enough information available that this person

Page 55

1     presents a threat to the airport and that they
2     were asked to leave. But the training never got
3     into putting them on a trespass list. It was a
4     threat mitigation strategy designed to address
5     that moment.
6          I don't recall the training saying that
7     you should be putting these people on a trespass
8     list.
9  Q. That's simply one of the options that the police
10    officers already had?
11  A. Yeah. That was around long before this program.
12  Q. Would you say that the program, behavioral
13    assessment program, has been a success?
14  A. Yes.
15  Q. And that it's been used effectively by the
16    troopers at Troop F?
17  A. Yes.
18  Q. Do you know Trooper Thompson?
19  A. Just casually from having worked at the airport.
20  Q. Do you know Trooper Kiley? Kiley.
21  A. I don't think he -- he was assigned to the
22    airport. I don't believe I know him that well.
23  Q. You've met him?
24  A. I'm sure I have. I just -- I mean, I can't even

Page 56

1     picture him at this point in time. I mean, I
2     know the name and I know he's on the job. I just
3     -- I don't think I've ever worked with him on
4     anything or had any serious interactions.
5  Q. This is one last question. This training has
6     been provided in at least some form to other
7     employees at Logan, hasn't it?
8  A. There's a derivative program called Logan Watch
9     for civilian airport employees.
10  Q. Okay. And is it fair to say that the training
11    that you provided to the State Police
12    contemplates that it's going to be used in all
13    areas of the airport?
14  A. Yes.
15  Q. It's not just at the checkpoints?
16  A. Airport-wide is the intent.
17  Q. Airport-wide. Okay. I have no further
18    questions.
19       MR. TRIMMIER: I have no questions.
20       MS. CARAVAGGIO: I just have a couple.
21
22    EXAMINATION BY MS. CARAVAGGIO:
23  Q. Sir, I represent Troopers Thompson and Croxton.
24    I just have a few questions for you.

Page 57

1          They were present on the date of this
2     particular incident that's the subject matter of
3     this complaint in October of '03. Were you
4     present during that incident?
5  A. No, I was not.
6  Q. Is it fair to say based on your testimony today
7     that in your opinion officers present at a scene
8     are required to assess the totality of the
9     circumstances before making any decision to act
10    one way or another?
11  A. Yes.
12  Q. That's all I have.
13       MS. O'NEIL: No questions. Thank you.
14       (Whereupon, the deposition was
15    concluded at 11:23 a.m.)
16
17
18
19
20
21
22
23
24

15 (Pages 54 to 57)

DIDOMENICA-1/4/07

---

Page 58

1  Excerpt from Rule 30(e):
   Submission to Witness; Changes; Signing

2

3     When the testimony is fully transcribed,
   the deposition shall be submitted to the witness
   for examination and shall be read to or by
4  him/her, unless such examination and reading are
   waived by the witness and by the parties. Any
5  changes in form or substance which the witness
   desires to make shall be entered upon the
6  deposition by the officer with a statement of the
   reasons given by the witness for making them.

7

   **************************************

8

9     I, Peter J. Didomenica, have examined the
   above transcript of my testimony and it is true
10 and correct to the best of my knowledge,
   information and belief. Any corrections are
11 noted on the errata sheet.

12

13    Signed under the pains and penalties of
   perjury this    day of    , 2007

14

15

16    ---------------------------
17             Deponent's Signature

      On this    day of    , 2007, before
18 me, the undersigned notary public, personally
   appeared    , proved to me through
19 satisfactory evidence of identification, which
   were    , to be the person whose name is
20 signed on the preceding or attached document, and
   who swore or affirmed to me that the contents of
21 the document are truthful and accurate to the
   best of his/her knowledge and belief.

22

23

24    ---------------------------
            Notary Public
   My commission expires.

---

Page 59

1  COMMONWEALTH OF MASSACHUSETTS
   ESSEX, SS.

2

3     I, Susan L. Prokopik, Registered Merit
4  Reporter and Notary Public duly commissioned and
5  qualified in and for the Commonwealth of
6  Massachusetts do hereby certify that there came
7  before me on the 4th day of January, 2007 the
8  person hereinbefore named, who was satisfactorily
9  identified by me and duly sworn to testify to the
10 truth of his knowledge concerning the matters in
11 controversy in this cause; that he was thereupon
12 carefully examined upon his oath and his
13 examination reduced to typewriting under my
14 direction; and that the deposition is a true and
15 accurate record of the testimony given by the
16 witness.
17    I further certify that I am not
18 interested in the cause of this action.

19

20

      SUSAN L. PROKOPIK, RMR, CRR
21             (CSR #124893)

22

   My commission expires:
23    March 23, 2012

24

---

16 (Pages 58 to 59)