# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KING DOWNING, | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 04-12513-RBC |
| v. | ) |
| | ) |
| MASSACHUSETTS PORT AUTHORITY, THE | ) |
| MASSACHUSETTS DEPARTMENT OF | ) |
| STATE POLICE, STATE POLICE TROOPER | ) |
| THOMPSON, STATE POLICE SERGEANT | ) |
| CROXTON, THOMAS G. ROBBINS, and | ) |
| PETER J. DIDOMENICA, | ) |
| Defendants. | ) |

## AMENDED STATEMENT OF UNDISPUTED FACTS OF DEFENDANTS MASSACHUSETTS STATE POLICE, THOMAS G. ROBBINS, AND PETER J. DIDOMENICA

Pursuant to Local Rule 56.1, Defendants Massachusetts Department of State Police, Former Massachusetts State Police Colonel Thomas G. Robbins, and Massachusetts State Police Sergeant Peter J. DiDomenica are filing an amended statement of undisputed facts in support of their Motion For Summary Judgment. The reason for the amended statement of facts is that a number of pages in Exhibits A and B in the original filing were missing page numbers. Otherwise, the Statement of Undisputed Facts is the same.

1. That morning Trooper William Thompson, an African-American, was on duty at the airport. One of his duties was to remove trespassers and "irates." Compl. ¶ 14; *See* Thompson Dep. 43:14-17, June 22, 2006, hereinafter Ex. A.

2.  "Irates" were argumentative individuals who lack a proper reason for being at the airport.  Trooper Thompson had had experience with "irates" at the airport. *See id*. at 42:8-15, 42:23-43:3.

3. Plaintiff King Downing is a lawyer and currently serves as the National Coordinator of the American Civil Liberties Union's Campaign Against Racial Profiling. Compl. ¶ 14; *see, e.g.*, Downing Dep. 6:4-5, Sept. 18, 2006, hereinafter Ex. B.[1]

4. In his role as National Coordinator for the Campaign Against Racial Profiling, he is charged with raising "awareness about the existence of racial profiling through public education, media outreach, know-your-rights training, public service announcements," and assisting ACLU affiliates around the country. Ex. B at 11:1-7.

5. Downing is African-American. C ¶ 14.[1]

6. On the morning of October 16, 2003, Downing arrived at Logan Airport on a redeye flight from the West Coast. C. ¶ 15.

7. He flew to Boston to attend a meeting related to a racial-profiling working group that was scheduled to begin at 10:00 a.m. that morning at the Roxbury Defenders Office. Ex. B at 13:4-7, 14:9-11, 14-23, 44:6-9.

8. After deplaning, Downing used one of four public payphones affixed to a single pole located outside the secure gate area of Terminal B to retrieve his voicemail messages. C. ¶ 16; Ex. C at 18:3-22.

---

[1] All citations to Exhibits contained in this Statement of Undisputed Facts reference the Exhibits attached to the Tenn Affidavit In Support of Defendant Massachusetts Port Authority's Motion For Summary Judgment. *See* L.R. 56.1.

9. While Downing was on the payphone, Trooper Thompson was approximately five feet away from him, observing the security checkpoint leading into the gate area of the terminal. *Id*. at 19:1-20:14; Ex. A at 50:7-8, 51:13-16.

10. The first encounter between Downing and Trooper Thompson occurred while Downing was making or completing his call. *See* C ¶¶ 16-17.

11. Before any words were exchanged between the men, Downing turned to look at Trooper Thompson. Ex. B at 112:2-19.

12. Purportedly in response to Downing's look, Trooper Thompson asked Downing, "Is there a problem?" Ex. B at 112:10-11.

13. In answer, Downing told Trooper Thompson: "I just want to know why you're standing here so close to me while I'm talking on the phone." *Id*. at 22:19-21. Trooper Thompson then asked Downing for his identification. Ex. B at 23:6-7, 25:3-12.

14. Downing subsequently refused to provide any information to Trooper Thompson concerning why he was in the airport that morning. Ex. A at 52:15-19, 53:5-8, 55:2-19.

15. Downing also refused to provide any identification to Trooper Thompson, saying: "Why do I have to show you ID?" and "I'm not showing you my ID." Ex. B at 23:14-16.

16. As a result of these comments, Trooper Thompson considered Downing to be condescending and confrontational. Ex. A at 52:9-19, 66:16-23. He also considered him to be an "irate." *Id*. at 93:13-21.

17. At some point during the exchange, Trooper Thompson told Downing that if he would not provide information, he would have to leave the airport. C. ¶ 17.

18. Because he did not want to talk to Trooper Thompson any longer, Downing then left the terminal. Ex. C at 23:20-24, 25:8-18; *see* C ¶ 19. Ex. B at 24:19-23.

19. Trooper Thompson did not try to stop him. Ex. B 94:15-24

20. After refusing to provide any information to Trooper Thompson, Downing exited the terminal and proceeded to attempt to hail a cab while on the upper level of the terminal. C. ¶¶ 17, 19; Ex. C at 25:19-26:2, 117:14-16. He walked up the sidewalk a few times in an effort to obtain a taxi. *See* Ex. B at 25:20-26:3.

21. Cabs are not authorized to pick up passengers at the upper level of the airport terminal. Ex. B 25:19-23

22. The second interaction between Downing and Trooper Thompson occurred on the sidewalk outside the upper level of the airport terminal, where Plaintiff Downing had gone to locate a cab. C. ¶ 19; *see* Ex. A at 56:13-57:5.

23. Trooper Thompson followed Downing outside and radioed for back-up. C. ¶ 19; Ex. B at 27:17-23. In response, four officers arrived. Ex. B at 28:3-7.[2]

24. State Police Trooper Howard Croxton arrived. C. ¶ 21; Ex. B at 32:6-11; Ex. A at 61:16-18.

25. Trooper Croxton is African-American. *See* Ex. B at 28:16-19.

26. State Police Trooper Wanza Adell also arrived. *See id*. at 32:12-14.

27. Trooper Adell is African-American. *See id*. at 28:16-19.

28. State Police Trooper Robert Moore, another African-American, also arrived. *See id*. at 31:12-14..

---

[2] Although Plaintiff Downing describes a conversation between the men, Trooper Thompson testified that he did not say anything to Plaintiff Downing when they were outside on the sidewalk. *See* Ex. A at 57:15-16, 63:14-16. This is not material for summary judgment purposes.

29. State Police Sergeant Mark Kiley arrived as well. *Id*. at 28:5-29:2; Ex. A at 61:17-20.

30. Sergeant Kiley is white. *See* Ex. B at 28:16-29:2.

31. Downing  produced his license to Sergeant Kiley because he wanted to leave, so that he would not miss his meeting. *See id*. at 29:24-30:4, 8-9, 30:20-31:1, 34:8-10.

32. After Downing produced the license, Trooper Thompson radioed it in so that it could be checked against the trespass list and then returned the license to Downing. *Id*. at 31:11-23; Ex. A at 72:2-18, 82:19-83:18.

33. Downing was also asked to produce his airline ticket for inspection by one of the officers. Ex. B. at 35:14-17.

34. He initially refused to produce his travel documents, saying: "You asked me to show identification. I've shown identification. Now you're asking for my tickets. I'm not going to show you my tickets." *Id*. at 35:7-23.

35. Concerned about the timing of his meeting, Downing subsequently provided his boarding pass to the officers. *Id*. at 37:15-38:2, 16-18; 43:7-10.

36. Once checked, the travel documents were returned to Downing. *Id*. at 37:15-38:2, 41:11-21; *see* C. ¶ 22.

37. Downing then left the area, proceeded to the lower level of the airport, and took a cab from Logan Airport to his meeting. He was on time.  *See* Ex. B at 42:1-16.

38. Downing does not know whether the behavioral assessment screening system program (the "B.A.S.S. program") played any role in his interaction with the officers. *Id*. at 100:21-101:4, 102:6-9.

39. Downing does not know whether the B.A.S.S. program utilizes, condones, or

5

encourages racial profiling. *Id*. at 100:15-20, 101:5-102:4, 10-13.

40.  Downing does not know whether race generally played any role in his encounter with police. *Id*. at 139:22-140:7.

41. At no time during his interaction with police was Downing physically restrained in any way, and at no time did any officer ever touch him. *Id*. at 93:20-94:1.

42. During his encounters with police, Downing was never handcuffed, *id*. at 126:4-6, or placed in a police cruiser. *id*. at 94:5-7.

43.  Downing admitted that, in his professional experience, it was unusual for someone who was under arrest not to be handcuffed.  Exhibit A 125: 2- 24 126:1-3

44. The entire interaction between Downing and the police occurred in and around Logan Airport. C. ¶¶ 16-19, 21-22.

45. At no time did the police instruct Downing to relocate to a different, more private area of the terminal. Ex. B at 94:8-14.

46. Plaintiff Downing refused to produce his identification to Trooper Thompson because he believed he has a constitutional right to refuse to provide it. *See id*. at 23:17-19.

47.  Plaintiff Downing was familiar with defendant Sergeant DiDomenica from his regular attendance at the anti-racial profiling workshops created by the former Secretary of the Executive Office of Public Safety that were convened at Northeastern University. Ex. B 55:3-19 63:4-24

DATED:  May 18, 2007

Respectfully Submitted,

COMMONWEALTH OF
MASSACHUSETTS
MASSACHUSETTS STATE POLICE

By its Attorneys,

MARTHA COAKLEY
ATTORNEY GENERAL

_____/s/ Mary O'Neil_____
Mary O'Neil, BBO #379430
Assistant Attorney General
Government Bureau/Trial Division
One Ashburton Place, Room 1813
Boston, MA 02108-1598
(617) 727-2200 x 2636

## <u>CERTIFICATE OF SERVICE</u>

I, Mary O'Neil, hereby certify that on May17, 2007, I served the foregoing **Motion** and **Certificate Of Service** upon the attorneys of record, by mailing a copy first class, postage prepaid mail to:

Peter B. Krupp, Esquire
LURIE & KRUPP
One McKinley Square
Boston, MA 02109

John Reinstein, Esquire
ACLU
211 Congress Street
Boston, MA 02130

Roscoe Trimmier, Jr., Esquire
Sarah L. Levine, Esquire
Annmarie E. Tenn, Esq.
ROPES & GRAY LLP
One International Place
Boston, MA 02110

Brian Rogal, Esq.
Law Offices of Brian Rogal
160 Gould Street, Suite 111
Needham, MA 02494

Joseph P. Kittredge, Esq.

Suzanne Caravaggio
Rafanelli & Kittredge, P.C.
1 Keefe Road
Acton, MA 01720-5517

Mark T. Quinlivan, Esq.
U. S. Attorneys Office
One Courthouse Way
Boston, MA 02210

Jeffrey D. Kahn, Esq.
U. S. Department of Justice
Federal Programs Branch
P. O. Box 883
Washington, DC 20044

_____/s/ Mary O'Neil_____
Mary O'Neil, Assistant Attorney General
Government Bureau/Trial Division

EXHIBIT A

```
1        page two of Exhibit 2?

2              A.    No.

3              Q.    Did you ever approach any people within Logan

4        Airport to ask them for identification based on

5        elevated suspicion as it's defined on page two?

6              A.    No.

7              Q.    Was there any particular reason for that?

8              A.    Because I dealt with different type of

9        people, I dealt with irates, I didn't deal with the

10       PASS program in general.

11             Q.    Okay, so generally you were handling a

12       different kind of person than someone who might have

13       been assigned to a unit or a sub-unit within Troop F

14       that was specifically on the lookout for potential

15       terror suspects?

16                       MR. KITTREDGE:  Objection.

17                       MS. O'NEIL:  Objection.

18                       MR. KITTREDGE:  You can answer.

19             Q.    Is that fair to say?

20                       THE WITNESS:  Hmm?

21                       MR. KITTREDGE:  You can answer.

22             A.    Can you repeat that, please?

23             Q.    Sure.  It's fair to say that you were dealing

24       with different people than someone might have had they
```

KACZYNSKI REPORTING

43

1          been assigned to a unit specifically focused on

2          apprehending or observing potential terror suspects?

3               A.   Yes.

4               Q.   Let me draw your attention to the events of

5          October 16, 2003 which are at issue in this case.   Do

6          you remember having any interaction with an individual

7          named King Downing?

8               A.   Yes, yes.

9               Q.   When was that first interaction?

10              A.   Are you looking for the time?

11              Q.   Yes, let's just start with the time.   What

12         time was it?

13              A.   In the morning hours of October.

14              Q.   What shift were you on?

15              A.   I was on a seven to three shift.

16              Q.   Had you just come on?

17              A.   No.

18              Q.   Had you received any alerts that morning that

19         there was any particular thing going on or anticipated

20         to be going on at the airport that you should be on the

21         alert for?

22              A.   No.

23              Q.   How were you assigned on that day, to do

24         what?

50

1        A.    When he was on the phone.

2        Q.    Who initiated the conversation?

3        A.    Mr. Downing.

4        Q.    What did he say?

5        A.    He asked me why I was standing in the

6    position I was.

7        Q.    And where were you standing?

8        A.    A few feet from where he was on the phone.

9        Q.    And what did you say?

10       A.    And he continued, he also continued to say

11   why was I listening to the conversation.

12       Q.    What did you say?

13       A.    I said to him I wasn't listening to his

14   conversation, then I continued to say that if he wanted

15   to talk me about something I'd be glad to listen to him

16   when he's off the phone.

17       Q.    Why did you think he wanted to talk to you

18   about something?

19       A.    Why did I think he did?

20       Q.    Yes.

21       A.    Because he asked me why I was standing the

22   way I was.

23       Q.    And you said you were standing a few feet

24   away from where he was?

*51*

A.    Yes.

2      Q.    Were you at a pay phone next to him?

3      A.    There was a pay phone, I was next to the pay

4      phone.

5      Q.    The pay phone is not a solitary pay phone,

6      right, there are a number of pay phones in that area,

7      right?

8      A.    That was the only pay phone in that area.

9      Q.    There's only a single pay phone?

10     A.    I think it's a double pay phone.

11     Q.    Okay, and were you making a call at the

12     adjacent pay phone?

13     A.    No, I was watching the checkpoint.

14     Q.    Okay.  You were watching the security

15     checkpoint?

16     A.    The main checkpoint, yes.

17     Q.    Okay, and did he beckon you over or give you

18     any indication that he wanted to talk to you?

19     A.    He looked at me and asked me the question.

20     Q.    And he asked you about where you, why you

21     were standing where you were standing?

22     A.    Yes.

23     Q.    Okay, and what happened after he -- did you

24     hear any of his conversation?

KACZYNSKI REPORTING

52

A.    No.

2        Q.    Were you -- and what happened when he got off

3    the phone?

4        A.    What happened?  I asked him if I could help

5    him with anything.

6        Q.    Did he look like he needed your help?

7        A.    Yes.

8        Q.    Why?

9        A.    He implied -- well, he became very

10    condescending, so I figured maybe he was lost or didn't

11    know where he was going, so I just wanted to provide

12    some information if I could.

13        Q.    You say he became condescending, what do you

14    mean by that?

15        A.    I asked him if he needed help, and he said

16    no.  His tone of voice raised and he said no, and I

17    asked, and I began to ask him, do you have any travel

18    documents, are you flying in. are you waiting for

19    somebody, and he said no.

20        Q.    Well, before you asked him all these

21    questions you said he became very condescending, right?

22    What did he do that you described as condescending?

23        A.    When he, okay, when he asked me why I was

24    standing there, right, I said to him, I'm working here,

53

1    then he raised, then -- and I asked him, why you are

2    asking me why am I standing here, and he raised his

3    voice.

4        Q.    What did he say in a raised voice?

5        A.    He said, I don't have to say anything to you,

6    and then it just was unusual, it was unusual to see

7    that in somebody, so I continued to ask him, like I

8    said, if I could do anything to help him out.

9        Q.    How was he dressed?

10       A.    He had on pants, he had on a shirt, and I can

11   remember a Barracuda jacket.

12       Q.    What's a Barracuda jacket?

13       A.    Summer jacket.

14       Q.    Was he clean-shaven?

15       A.    I believe he had a beard.

16       Q.    Long or short?

17       A.    Short.

18       Q.    Anything on his head?

19       A.    I don't recall.

20       Q.    What's his race?

21       A.    Black male.

22       Q.    Dark-skinned, light-skinned?

23       A.    Black male.

24       Q.    Would you describe his, the tone of his skin,

35

1    you're going to have to leave the airport.

2         Q.    And at this point he hadn't said to you one

3    way or the other whether he had business in the

4    airport, correct?

5         A.    He said he didn't.

6         Q.    He said --

7         A.    He wouldn't give me any information.

8         Q.    So did he say he didn't have information in

9    the airport, or did he not give you any information?

10        A.    He said he's not going to give me any

11   information.

12        Q.    Okay, so he just didn't tell you one way or

13   the other whether he had any business at the airport,

14   is that right?

15        A.    I don't know if he had anything.

16        Q.    You don't know because he didn't tell you,

17   right?

18        A.    He said he wouldn't provide me any, so I

19   don't know what was going on with him.

20        Q.    Okay, and so you told him that if he wasn't

21   flying out or he didn't have any business at the

22   airport he'd have to leave the airport, is that right?

23        A.    Yes.

24        Q.    And why was that?

56

A.   Why?

2        Q.   Yes.  Why did he have to leave the airport?

A.   Because the way we're trained in the airport,

4   if you don't have any business there, there's no reason

5   for you to be there, you'd rather have someone not be

6   in the area.

7        Q.   And at that time you didn't know whether he

8   had business at the airport one way or the other

9   because he didn't answer your question, right?

10       A.   Yes.

11       Q.   What was the next thing that happened, either

12   that happened or that you said or he said?

13       A.   He left the airport, he left the area, he

14   exited the doors.

15       Q.   On what level?

16       A.   The upper level.

17       Q.   Did he go out through the doors closest to

18   the pay phone where he was, had been on the phone?

19       A.   Yes.

20       Q.   And then what happened?

21       A.   And I followed him.

22       Q.   Why?

23       A.   I was kind of concerned about his well-being.

24   I didn't know where he was coming from, didn't know

57

1    what he was going to do, so I followed him out of the

2    airport.

3         Q.   You say you were concerned about his

4    well-being?

5         A.   Yes.

6         Q.   Did he give you any indication that he was

7    unstable or he was in peril himself?

8         A.   Yes.

9         Q.   And what was that?

10        A.   Approaching me, asking me, approaching me,

11   asking me questions which were unusual, not listening

12   to what I had to say, totally ignoring me.

13        Q.   And what happened next after you followed him

14   outside?

15        A.   I followed him outside and I called on my

16   radio to get some assistance.

17        Q.   Who did you call?

18        A.   I called the state police barracks.

19        Q.   Who did you talk to?

20        A.   I don't know, I don't remember.

21        Q.   Did you call for a particular person?

22        A.   No.

23        Q.   What did you ask for?

24        A.   I asked for assistance, for somebody to come

61

```
 1              MR. KITTREDGE:  Objection.
 2         Q.   Did you want them to have some idea what they
 3    were responding to at the time you made the call to the
 4    dispatcher?
 5         A.   Yes.
 6         Q.   And so you had, you gave the dispatcher some
 7    description of what it was that these troopers were
 8    being asked to assist with, right?
 9         A.   I don't recall.
10         Q.   Did Croxton, Adell and Moore show up in a
11    vehicle?
12         A.   No.  Well, Adell and Moore did, I believe.
13         Q.   Adell and Moore did?
14         A.   Adell, Adell came in a vehicle, I'm not sure
15    about Moore.
16         Q.   And how about Croxton?
17         A.   I believe Croxton was on foot.  There was
18    also another officer that was in the area.
19         Q.   And who was that?
20         A.   Sergeant Mark Kiley.
21         Q.   Mark did you say?
22         A.   Yes, Mark Kiley.
23         Q.   Is that K I L E Y?
24         A.   Yes.
```

63

1       A.   He just continued to walk down the sidewalk,

2   he just continued to walk, he walked down the terminal,

3   he continued to walk onto the sidewalk, on the sidewalk

4   away from me --

5       Q.   Okay, so he walked out the door, right?

6       A.   Yes.

7       Q.   And then he walked out to the sidewalk?

8       A.   Yes.

9       Q.   Okay.  Was he pacing up and down, was he

10   pacing up and down back and forth on the sidewalk?

11       A.   Yes.

12       Q.   Was he looking for a cab, could you tell?

13       A.   I don't know.

14       Q.   Did you have any conversation with him out on

15   the sidewalk?

16       A.   No.

17       Q.   How long was it before you, when you were

18   outside the terminal before you called for assistance?

19       A.   How long was it?

20       Q.   Yes.

21       A.   Explain.

22       Q.   How long it was when you were outside of the

23   terminal before you called for assistance?

24       A.   I was inside the terminal when I called for

66

1       A.   No, I was, I didn't respond at all.

2       Q.   Okay, and then he asked you a second time?

3       A.   Yes.

4       Q.   And did you respond after the second time?

5       A.   Yes.

6       Q.   What did you tell him?

7       A.   I said I work here.

8       Q.   Okay.  Did you tell him anything more?

9       A.   No.

10      Q.   You just said I work here?

11      A.   Yes.

12      Q.   Now, when you say he kept asking you why you

13 were at the point you were, you're talking about the

14 two times, right?

15      A.   Yes.

16      Q.   All right.  Now, how else, if at all, was he

17 acting unusual besides kept asking you at what point;

18 excuse me, why you were at the point you were?

19      A.   Because the question that he asked me, the

20 manner of the questioning was confrontational.

21      Q.   And the questioning you're referring to are

22 these two questions?

23      A.   Yes.

24      Q.   So are you talking about tone of voice?

72

1          Q.    And what happens next?

2          A.    I believe Mr. Downing produced travel

3     documents and his license.

4          Q.    Did you see either the travel documents or

5     his license?

6          A.    I saw the license.

7          Q.    Did you record any of the information from

8     the license?

9          A.    Yes, I did.

10         Q.    Where did you record that?

11         A.    State police barracks.

12         Q.    What did you record it on?

13         A.    I just --

14         Q.    You called it in?

15         A.    -- gave the information to the dispatcher

16    and --

17         Q.    Okay.  You called it into the barracks?

18         A.    Yes.

19         Q.    Okay.  It's not like you wrote down the

20    information from his license, you just called it in

21    with the license in front of you --

22         A.    No, just called it in --

23         Q.    -- is that right?

24         A.    That's correct.

82

1      Q.    What kind of form is that?

2      A.    What type of form is --

3      Q.    Yes.

       A.    State police standard form.

       Q.    Similar to the field interview and

observation report that I showed you earlier?

       A.    No, no.  I actually don't even know what it

8  looks like.

9      Q.    Okay.  Have you ever filled out a form to put

10  somebody on the trespass list?

11      A.    No, we don't actually fill out the forms.

12      Q.    Who does that?

13      A.    The dispatcher fills out the forms.

14      Q.    On your recommendation?

15      A.    Yes.

16      Q.    And have you ever recommended that someone be

17  added to the trespass list?

18      A.    No.

19      Q.    At some point; well, what happened after you

20  called in the information from the state police

21  barracks -- Strike that.

22              What happened after you called in the

23  information about Mr. Downing's license to the state

24  police barracks?

KACZYNSKI REPORTING

83

1          A.    What happened afterwards?

2          Q.    Yes.

3          A.    They came back with information regarding the

4     license information.

5          Q.    They had to radio that back to you?

6          A.    Yes.

7          Q.    And how long did that take?

8          A.    Say about a couple minutes.

9          Q.    And were you out of a vehicle or in a vehicle

10    at the time?

11         A.    Out of vehicle.

12         Q.    And what happened after you got -- what

13    information did you get back from the barracks?

14         A.    They indicated that he had a valid license,

15    no warrants on him, nothing in the trespass file.

16         Q.    And then what happened?

17         A.    I believe I gave the license back to

18    Mr. Downing.

19         Q.    And did you have any conversation with him?

20         A.    No.

21         Q.    Did you tell him he was free to go?

22         A.    Excuse me?

23         Q.    Did you tell him he was free to go?

24         A.    I believe the other officers told him.

93

1      question, is that right?

2           A.    That's correct.

3           Q.    Was it at that time that you became either

4      suspicious or concerned about his behavior?

5           A.    Concerned.

6           Q.    And to determine whether or not he had

7      legitimate business in the airport and who he was, you

8      thought it would be appropriate to see his license for

9      identification and any travel documents that he had?

10          A.    That's correct.

11          Q.    He refused to give those to you, didn't he?

12          A.    That's correct.

13          Q.    You indicated that part of the training as a

14     state police officer with duties at Logan, you were

15     trained in dealing with what I think you called irates,

16     is that right?

17          A.    That's correct.

18          Q.    Would you characterize Mr. Downing's behavior

19     subsequent to him questioning why you were standing

20     where you were as being irate?

21          A.    Yes.

22          Q.    And was all of that the reason why you

23     requested assistance in order to determine who he was

24     and what he was doing at the airport?

# EXHIBIT B

# PART 1

DEPOSITION OF Plaintiff King Downing 6

1    New York 10004. I'm sorry, residence, 2035

2    Second Avenue, New York 10029.

3         Q.   What is your educational background?

4         A.   I have a law degree from Rutgers

5    University.

6         Q.   What year?

7         A.   1992.

8         Q.   Undergraduate?

9         A.   Harvard University, 1975.

10        Q.   And you received an A.B. from Harvard?

11        A.   Yes.

12        Q.   What was your concentration?

13        A.   Government.

14        Q.   What did you do between your graduation

15   from Harvard in 1975 and the year you began

16   studying law at Rutgers?

17        A.   In 1975, I spent a year in Boston right

18   after I got out of school. Then I moved to New

19   York City. In both of those instances, I was

20   working in the music industry and also working in

21   a retail store.

22        Then in 1976, I moved to the midwest,

23   where I held several jobs. I worked as a

24   representative and a member of the International

A.    That's right.  Positions in the
communications department, and the basic idea was
to raise awareness about the existence of racial
profiling through public education, media
outreach, know-your-rights training, public
service announcements; and to assist our
affiliates around the country.

Q.    And when you say affiliates, what does
that mean?

A.    The ACLU has 53 affiliates and chapters
around the country organized by state for the
most part.

Q    And Massachusetts is an affiliate?

A.    Yes.

Q.    I'm going to place before you a document
that was provided to us I think as a part of the
automatic disclosures and ask if you could review
that.

A.    Yes.

Q.    What is it?

A.    It's the job posting for the position
that I ultimately accepted.

Q.    And you currently hold that position?

A.    Yes.

13

1    since about the beginning of 2003.

2         Q.   And generally, what are the purposes of

3    those visits?

4         A.   The purpose of almost all the visits were

5    to take part in the racial profiling working

6    group that was convened by Ed Flynn, who at the

7    time was the Director of DPS.

8         Q.   What is DPS?

9         A.   Department of Public Safety.

10        Q.   So, this was -- well, explain to me what

11   this working group was.

12        A.   The state legislature enacted a statute

13   that banned racial profiling in the State of

14   Massachusetts and required a study of citations

15   that have been issued over approximately a year

16   and a half period.

17            As part of that effort, Director Flynn,

18   on the advice of Northeastern University,

19   convened a group of community members, law

20   enforcement, and civil rights and civil liberties

21   organizations to discuss the issue of racial

22   profiling, advise on the design of the data

23   collection process, and set up a program for the

24   dissemination of the results of the study.

14

1          Q.    And your participation in that was as a

2     representative of the Campaign Against Racial

3     Profiling?

4          A.    Yes.

5          Q.    And the ACLU?

6                The national ACLU.

7          Q.    On October 16, 2003, were you coming to

8     Boston for a meeting of that working group?

9          A.    I was coming for a meeting that was

10    related to the working group but not an actual

11    working group meeting.

12         Q.    And what was the meeting that you were

13    coming to Boston to attend?

14         A.    A group of community organizations,

15    advocacy groups, were having a caucus.

16         Q.    And what was your role in that meeting?

17         A.    It was similar to the larger working

18    group meeting, to participate as a representative

19    of the national ACLU.

20         Q.    What time was that meeting scheduled for?

21         A.    It was scheduled for 10:00 a.m.

22         Q.    On October 16?

23         A.    Yes.

24         Q.    Now, without testing anybody's memor

18

1      Q.   . Significant departure?

2      A.   Any significant delay, no.

3      Q.   When you arrived at Logan International

4   Airport, I think it's correct that you arrived at

5   a gate at Terminal B; is that right?

6      A.   Yes.  .

7      Q.   When you got off the airplane, where did

8   you go?

9      A.   I got off the plane, and I went straight

10   out of the terminal into the general area.

11      Q.   When you say out of the terminal --

12      A.   Out of the secure area of the terminal.

13      Q.   And that's on the second level or the top

14   level of the terminal; is that right?

15      A.   Yes.

16      Q.   And what did you do after you left the

17   secure area?

18      A.   I went to a pay phone.

19      Q.   Did you make a call?

20      A.   Yes.

21      Q.   To whom?

22      A.   I was checking my messages.

23      Q.   From your office in New York?

24      A.   From my office?

19

1       Q.    Messages left at your office in New York?

2       A.    Right.

3       Q.    Voicemail?

4       A.    Yes.

5       Q.    That was done electronically without you

6    speaking; is that right?

7       A.    Could you explain that?

8       Q.    Did you have to speak in order to

9    retrieve your messages presumably from voicemail?

10      A.    No.

11      Q.    While you were -- by the way, do you

12   have a cell phone?

13      A.    No.

14      Q.    You didn't then, either?

15      A.    No.

16      Q.    While you were retrieving your messages,

17   what happened?

18      A.    I was on the telephone, and for some

19   reason I turned to my right while I was on the

20   phone, and I observed the trooper standing to my

21   right at a very close proximate distance to me,

22   up against the wall in a very tighten closure.

23      Q.    And the trooper you referred to is

24   Trooper Thompson, who is present here today?

1          A.   Yes.

2          Q.   How close was he?

3          A.   About five feet.

4          Q.   And you described the area as very close.

5     Why is that?  It's a confined space?

6          A.   The telephone was very close to the wall

7     that faced the street.  There were a row of

8     phones, and there wasn't a lot of clearance

9     between the phones and the wall.

10          Q.   And he was standing between the phones

11     and the wall?

12          A.   He was standing that certain number of

13     feet to my right, but he wasn't between the

14     phones; he was against the wall.

15          Q.   He was between you and the so-called

16     secure area?

17          A.   No, no.  The secure area was where you

18     are now sitting, and the wall to the outside and

19     the street was behind me.  And he was to my

20     right.  He would have also been facing you.

21          Q   Let me see if I can describe this in

22     a way without the diagram.  You were facing the

23     secure area with your back to the window of the

24     terminal.  Trooper Thompson --

22

```
 1        A.   Standing against the wall with his arms
 2   folded in front of him.
 3        Q.   At some point, did you speak to Trooper
 4   Thompson?
 5        A.   At some point I spoke to Trooper
 6   Thompson, but not until he had spoken to me.
 7        Q.   When did -- did he speak to you while
 8   you were still on the phone?
 9        A.   Yes.
10        Q.   What did he say?
11        A.   Well, when I turned and looked over my
12   right shoulder and I saw him there, he asked me
13   if there was a problem.  His words were, "Is
14   there a problem?"
15        Q.   Those were his exact words, as you
16   recall?
17        A.   Yes.
18        Q.   And what did you say?
19        A.   I said, "I just want to know why you're
20   standing here so close to me while I'm talking on
21   the telephone."
22        Q.   Were you in fact talking on the telephone
23   or were you just on the telephone?
24        A.   Well, I was retrieving messages, but at
```

23

that time I may have also been leaving messages.
So, for me, talking on the telephone meant while
I have a phone in use.

Q.    And in response to your statement, what
did Trooper Thompson say, if anything?

A.    He said, "All right.  I want to see some
ID."

Q.    Were you still on the phone at that
point?

A.    I was holding the phone in my hand.  I
don't know if I was in the middle of leaving a
message at that point or retrieving a message.

Q.    What did you do at that point?

A.    I said, "Why do I have to show you ID?"
And he requested to see my ID again.  I said,
"I'm not showing you my ID."

Q.    Why did you refuse?

A.    Because I believe under the Constitution
I have a right not to show my identification.

Q.    What happened next?

A.    Well, he had requested my ID again, and I
said I wasn't going to show it.  And at that
point, I hung up the phone, and I started walking
away towards the passageway that I said was at a

24

1    45-degree angle.  It was an open walkway there,

2    and I started walking away.

3         He came around from the other side and

4    stood probably maybe, well, I don't know the

5    distance, but he took a position that was facing

6    me and requested my identification again.

7    Q.   And this was still inside the terminal?

8    A.   Yes.

9    Q.   Were you attempting to leave the terminal

10   at that point?

11   A.   No.

12   Q.   Why not?

13   A.   I didn't have any reason to.

14   Q.   Well, what do you mean?  You were going

15   to just stay in the terminal area in the upper

16   level of terminal B until you had a reason to

17   leave?  I don't understand your statement.

18   A.   I didn't understand the question.

19   Q.   Okay.  When you said you hung up the

20   phone, after you hung up the phone where were you

21   headed?

22   A.   At that point, I just wanted to terminate

23   the conversation with the trooper.

24   Q.   And so, you moved to another area of the

25

1     terminal?

2           A.     Yes.

            Q.     What did you do in response to this

      second request for identification?

            A.     I told him I wasn't going to show ID and

      I didn't have to show ID.

            Q.     What did he say?

            A.     We may have had another round back and

9     forth about that, and then he said, "If you don't

10    show ID, you're going to have to leave the

11    terminal."

12          Q.     And what did you do then?

13          A.     I said, "Okay, I'll leave "

14          Q.     And did you?

15          A.     Yes, I left.

16          Q.     You departed from the upper level of

17    Terminal B?

18          A.     Yes.

19          Q.     And what happened after you got outside?

20          A.     I walked outside, and 1 saw a cab coming.

21    I tried to hail a cab, but it drove past.  I

22    later realized that I was on the wrong level to

23    get a cab.  So, I tried to walk a little further

24    out.  I still didn't realize that the cabs

26

weren't stopping because it was not an authorized
place. So I would walk a little further up, and
then the trooper accosted me again.

    Q.  When you say you weren't in the right
place to get a cab, by that you mean the cab
stand is on the lower level of the terminals?

    A.  Right.

    Q.  And that is where the taxi pool
dispatches taxis for pick-ups; is that right?

    A.  Yes.

    Q.  You walked a little further, and you said
you and Trooper Thompson had another encounter.
What happened in that encounter?

    A.  He came up to me while I was waiting to
hail a cab, and he demanded my identification.

    Q.  And what did you say?

    A.  He told me if I didn't want to show ID
that I would have to leave the terminal. Well, I
left the terminal.

    Q.  And you were attempting to leave the
airport at that point in time; is that right?

    A.  Yes.

    Q.  What happened next?

    A.  We went back and forth some more.

27

```
 1          Q.   Do you recall what the back and forth was
 2     at that point?
 3          A.   Him requesting my ID and me saying that I
 4     wasn't going to show it and that I had left the
 5     terminal.  And then at one point, I tried to walk
 6     away further down, and he told me I couldn't go.
 7     And I asked him if I was under arrest.
 8          Q.   And what did he say?
 9          A.   He said yes.
10          Q.   "Yes" unequivocably?
11          A.   He was very clear.
12          Q.   And what happened next?
13          A.   I asked him what the charges were.
14          Q.   And what did he say?
15          A.   He said he didn't have to tell me.
16          Q.   What happened next?
17          A.   At that point, he got on the radio, and
18     that's --
19          Q.   Trooper Thompson?
20          A.   Trooper Thompson got on the radio.
21          Q.   Trooper Thompson made a call on his
22     portable hand-held radio?
23          A.   Yes.
24          Q.   Did you hear what he said?
```

28

```
1        A.    I don't remember at this time.

2        Q.    What happened next?

3        A.    Then another officer showed up.

4        Q.    How many?

5        A.    A sergeant and three other officers.  I

6   think one of them also may have been a sergeant

7   as well.

8        Q.    Did you engage in any conversation with

9   any of the four officers that arrived?

10        A.    They stood around me for awhile, and then

11  a white sergeant went and spoke to the trooper

12  and then came over to me.

13        Q.    Thompson?

14        A.    Yes, spoke to Thompson and then came to

15  me.

16        Q.    When you say a white officer, am I

17  correct that the other three of the four officers

18  who arrived were African-American?

19        A.    Yes.

20        Q.    And Trooper Thompson is also

21  African-American?

22        A.    Yes.

23        Q.    And the white officer that came to you,

24  have you subsequently learned his name to be
```

29

1    Sergeant Mark Kiley?

2        A.    Yes.

3        Q.    And what was the conversation, if any,

4    between the two of you?

5        A.    He said words to the effect of, "The

6    reason why the trooper asked for your ID is

7    because you were acting suspiciously."

8        Q.    And did you respond to that?

9        A.    I asked him what did he say that I was

10   doing suspiciously.

11       Q.    What did he then say?

12       A.    He said, "I didn't ask him that."  And I

13   said, "You're a supervisor, and you didn't ask

14   him what it was that I was doing?"

15       Q.    And he said?

16       A.    He said, "He's been on the force,"

17   referring to Trooper Thompson, I don't remember

18   the years, seven years comes to mind, "And if he

19   says you're acting suspiciously, you're acting

20   suspiciously."

21       Q.    What happened next?

22       A.    There may have been some other words, but

23   nothing of substance that I remember.

         Q.    Did Sergeant Kiley request that you

30

1    produce identification?

2        A.    Yes.

3        Q.    Did you?

4        A.    Yes, I eventually did.

5        Q.    Was there any other conversation that we

6    haven't discussed between before he made his

7    request for identification and you produced it?

8        A.    No.   At that point in time I had a ten

9    o'clock meeting, and it was becoming clear --

10    oh, I need to add something else here.   The words

11    that the trooper used that if I didn't show ID,

12    this is one of the other exchanges, he said, "If

13    you don't show ID, you're going downtown."

14        Q.    And this is Trooper Thompson that said

15    that?

16        A.    Right.

17        Q.    Before the other four officers arrived?

18        A.    Yes.

19        Q.    And --

20        A.    And what that told me was that I very

21    likely flew the red eye into Seattle to Boston to

22    attend a meeting which I now probably would miss,

23    but it was very likely that I wouldn't make it

24    back to Seattle for the rest of the Indian

31

conference.  Being told that I was being put
2    under arrest and taken downtown, I had a clear
3    impression in my mind that I might not see the
4    light of day until Monday.
5         So, at that point, I turned over my ID.
6         Q.   And what did Sergeant -- what kind of ID
7    did you provide?
8         A.   A driver's license.
9         Q.   What did Sergeant Kiley do with the
10   driver's license?
11        A.   I don't recall exactly, but I know at
12   some point Trooper Thompson took it over to the
13   vehicle.  I assume that he ran the license.
14        Q.   And by ran the license, you mean he
15   radioed the information on the license to some
16   authority for it to be checked?
17        A.   Yes.
18        Q.   Do you know what the check was for?
19        A.   Do I know what the check was for?  I was
20   not told what the check was for.
21        Q.   Nor do you know to whom the radio call
22   was made?
23        A.   No.
24        Q.   What happened after he ran the license?

A.    Well, before I get into that, I also --
you had asked about other conversation, and I did
have a brief conversation with the other three
troopers while we were standing there.

Q.    Do you at this point know their names?

A.    I know that one's name is Croxton, and --

Q.    And he was the sergeant, the other
sergeant?

A.    I learned that he was a sergeant.  The
other two, I don't recall their names right now,
but I have since learned their names.

Q.    The other is Robert Moore, one of the
others, and Trooper Adell?

A.    Yes.

Q.    I'm sorry, I interrupted.  You were going
to say you had a conversation with those three as
a group, or individually?

A.    No, as a group, yes.

Q.    And what was that conversation?

A.    I believe one of them was trying to
explain.  I know the conversation was about
identification.  I remember I didn't want to get
into much of a conversation about identification,
but I did use the time to mention the fact that

34

1          At some point in time, when he came back,

2     I don't know if they had an opportunity to speak

3     to him at some point, but when he came back, the

4     badge was clipped, the clip had been turned

5     around so that the name tag was visible.  And

6     that's how I was able to identify him.  Prior to

7     that, I would not have been able to.

8          So, at that point, I had to leave, and I

9     knew who I had been dealing with.  So, that's

10    when I turned over the ID.

11    Q.   At that point, were you able to identify

12    not only Trooper Thompson but the other four

13    officers who were involved?

14    A.   I didn't have clear recollection of them.

15    I was really trying to concentrate on who it was

16    that all of this had started with.

17    Q.   The initial contact?

18    A.   Yes.

19    Q.   Did you notice whether or not any of the

20    other four troopers had their name tags on

21    backwards?

22    A.   I don't recall that any of the others

23    did.

24    Q.   So, you were able to see their name tags?

35

1          A.   No.   I said I don't recall.

2          Q.   You just don't recall at all?

3          A.   Right.   Actually, I did have a

4     recollection of the name Croxton.

5          Q.   From that encounter on October 16?

6          A.   Yes.

           Q.   Were you asked to produce airline

8     tickets?

9          A.   Yes.

10         Q.   By whom?

11         A.   After I had given the ID, I was gathering

12    up my things to go.

13         Q.   What happened?

14         A.   I was asked to produce my airline

15    tickets.

16         Q.   By whom?

17         A.   I'm not sure who it was that asked me.

18         Q.   And did you produce those tickets, a

19    ticket?

20         A.   After some conversation, I said, "You

21    asked me to show identification.  I've shown

22    identification.  Now you're asking for my

23    tickets.  I'm not going to show you my tickets."

24         Q.   Why did you refuse?

# EXHIBIT B

# PART 2

*Deposition of Plaintiff, King Downing*    37

1    A.    Part of it.

2    Q.    What's the rest of it?

3    A.    I was told that if I didn't show my

4    identification that I was going to be put on a

5    watch list, some words to that effect, and I

6    asked what the watch list was.  They said that if

7    I got placed on the watch list and I ever came

8    back to the airport and I wasn't able to account

9    for why I was there, I would be arrested.

10    Q.    Did they say watch list, or did they say

11    trespass list?

12    A.    They might have used the word trespass

13    list.

14    Q.    Was there any other conversation?

15    A.    Might have had another round of saying

16    that I wasn't going to show the ticket, but I

17    think at that point the same issues that came up

18    before about time, needing to get away from

19    there, not being sure whether I might be subject

20    to arrest again, that I showed them the travel

21    tickets.

22    Q.    And what happened after you -- who did

23    you produce the travel tickets to?

24    A.    I gave them -- I just handed them to the

38.

1    group.  The sergeant was there, Trooper Thompson

2    was there.  I turned them over to the group.

3        Q.  You don't recall specifically who you

4    handed them to?

5        A.  No.

6        Q.  What did the group then do with the

7    tickets?

8        A.  Well, they got into a discussion among

9    themselves about whether my ticket qualified me

10   to not be a trespasser because of the fact that

11   the ticket said October 15, and it was October

12   16.  So, they got into a discussion for awhile.

13   And then --

14       Q.  Go ahead.

15       A.  No, please, go ahead.

16       Q.  What ticket did you produce?

17       A.  It was the boarding pass from Seattle to

18   Boston.

19       Q.  I'm placing before you another document.

20   There appears to be xeroxed copies of two

     boarding passes.  Do you recognize that?

22       A.  Yes.

23       Q.  Are there in fact images of two boarding

24   passes on this sheet?

4/1

day?

2      A.    No.

3      Q.    These were electronic tickets?

4      A.    Yes.

5      Q.    Did you have a copy of the itinerary that

6    we had marked as Exhibit D-1?

7      A.    I most likely did.

8      Q.    Had you been issued a boarding pass yet

9    for the flight from Boston to Seattle?

10     A.    No.

11     Q.    You said there ensued a discussion among

12   the troopers about whether the boarding pass you

13   presented them was adequate to justify your

14   presence in the airport because the boarding pass

15   is dated October 15, and it was the morning of

16   October 16; is that right?

17     A.    Right.

18     Q.    What was the result of that conversation?

19     A.    Well, the result of the conversation was

20   that they realized that I caught a flight that

21   left on the 15th and arrived on the 16th.

22     Q.    And what did they do upon that

23   realization?

24     A.    They told me I was free to go.

42

```
 1          Q.   And what did you do then?

 2          A.   I left.

 3          Q.   How?

 4          A.   Quickly.

 5          Q.   By what means?

 6          A.   By cab.

 7          Q.   Where did you catch the cab?

 8          A.   Downstairs, where I should have caught it

 9     in the first place.

10          Q.   How did you get there?  Did you go back

11     through the terminal?

12          A.   I don't remember.  I don't even know if

13     there's a way --  I don't know if there's a way

14     to go --

15          Q.   Other than through the terminal?

16          A.   Other than through the terminal.

17          Q.   From the first encounter you had with

18     Trooper Thompson at the telephone to the time of

19     your departure, how much time do you estimate

20     elapsed?

21          A.   I would say thirty to forty minutes.

22          Q.   So, assuming the flight landed at or

23     about the time it was scheduled to land, we're

24     now somewhere around 7:40 or 7:45 in the morning
```

43

```
        when you departed the airport?

  2          A.    My feeling was that --

  3          Q.    Please, answer my question first.  Was it

  4     about 7:45 when you left the airport?

  5          A.    Then I'll say no.

  6          Q.    What time was it?

  7          A.    My feeling was that I ended my portion of

  8     the issue by showing the ID at a time when I felt

  9     that I might have had approximately an hour left

 10     to get to my meeting.  And so, it may not have

 11     been accurate to say it was 7:40.  It may have

 12     been even getting closer to 9:00.

 13          Q.    If it were getting close to 9:00 and your

 14     flight landed at seven, are you saying that these

 15     encounters with the State of Massachusetts state

 16     troopers in the airport lasted two hours?

 17          A.    No, because the flight lands, that's the

 18     time the plane touches down.  Then it takes time

 19     to get to the terminal.  Takes time to de-board,

 20     got out, might have stopped to go to the

 21     bathroom, then walked out.

 22          Q.    So, the total time that had elapsed

 23     between the time of the plane arriving and your

 24     departure from the airport could have been as
```

44

1     long as two hours?

2          A.   Could have been as long as an hour and

3     fifty minutes.  I thought it was getting close to

4     the time that I had an hour left to get to my

5     meeting.

6          Q.   Did you get to your meeting?

7          A.   Yes.

8          Q.   Where was the meeting held?

9          A.   At the Roxbury Defender's Office.

10         Q.   How long did that meeting last?

11         A.   I don't recall.  It wouldn't have been

12    more than two hours, but I don't recall how long

13    it lasted.

14         Q.   Sometime around midday it ended?

15         A.   Yes.

16         Q.   How many people attended that meeting

17    roughly?

18         A.   Less than a dozen.

19         Q.   Did you discuss the incidents that we've

20    been discussing this morning at Logan Airport

21    with anyone who attended that meeting?

22         A.   I may have discussed it with the

23    executive director of our organization but not

24    with people who were at the meeting.

55

1    CROSS EXAMINATION

2    BY MS. O'NEIL:

3        Q.    You've testified that you were coming to

4    Boston, that you frequently came to Boston to

5    represent the national ACLU at a working group, a

6    racial profiling working group at Northeastern;

7    is that correct?

8        A.    No.   It was the Department of Public

9    Safety's profiling group.

10        Q.    Did it convene at Northeastern Law

11    School?

12        A.    It convened at Northeastern.

13        Q.    So, it was sponsored by the Department of

14    Public Safety.   That's a Massachusetts

15    governmental entity; is that correct?

16        A.    Yes.

17        Q.    But it happened to be at Northeastern Law

18    School?

19        A.    Yes.

20        Q.    It wasn't affiliated with the law school

21    at all?

22        A.    It was affiliated with one of the justice

23    programs.

24        Q.    And apart from representing the national

1          A.    There were probably conversations about

2     ways that the auditing could be improved.    There

3     were budgetary limitations to the study.

4          Q.    Did you have any conversations with

5     Sergeant Peter Didomenica at the working group?

6          A.    I'm sure I did.

7          Q.    Why are you sure?

8          A.    We met monthly for quite a long period of

9     time.

10          Q.    How long would you say?

11          A.    We started meeting the beginning of 2003,

12     and we met monthly up until around the beginning

13     of the summer.

14          Q.    And what was your understanding of

15     Sergeant Didomenica's function at the racial

16     profiling working group?

17          A.    I don't remember what his function was,

18     but I'll assume that he was there for the same

19     reason everyone else was, to identify racial

20     profiling and try to get to a way to give input

21     to the data designs reported.

22          Q.    Did you have any disagreements with

23     Sergeant Didomenica regarding the working group,

24     the working group's functions?

65

A.    Yes.

Q.    So, this is the first time you had ever been stopped at an airport?

A.    It's the first time that anybody had ever requested ID from me or detained me.

Q.    I'm not sure I understand that.  Has any other security entity stopped you at an airport, other than this one time on October 16 of '03?

A.    I've never been stopped, but I've been in circumstances where I have questioned an action that was taken.

Q.    Let's look into that then.  When you do your traveling, you do know that you have to produce an ID at the ticket counter; is that correct?

A.    Yes.

Q.    You do know that once you're in the secure area --  what is your understanding of once you're in the secure area regarding your identification?  Can anybody ask for it?

A.    Can anybody?

Q.    Once you're in the secure area in an airport, if any TSA employee, any airport employee, or any security entity, be it

66

1    governmental or private, can they ask you for

2    your ID?

3        A.    It all depends on the circumstances.

4        Q.    So, there would have to be particular

5    circumstances before you could be asked for your

     ID in a secure area in an airport?

7        A.    It depends on the circumstances.  It

     depends on whether a person is moving from the

9    secure or unsecure area.

10       Let me correct that.  Law enforcement has

11   a right to ask for ID any time, anywhere.

12       Q.    Are we talking beyond the secured area?

13       A.    They have a right to ask for ID anywhere,

14   secured area or nonsecured area.

15       Q.    Within the secured area, can anyone

16   beyond law enforcement, I'm excluding passengers,

17   can anyone beyond law enforcement ask you for

18   your ID in the secure area of an airport?

19       A.    Give me an example.

20       Q.    Again, any kind of security entity,

21   private or public, any TSA employee, any airport

22   employee, apart from custodians?

23       A.    Yes.

24       Q.    So, these individuals could ask you for

1          A.    To retrieve messages and leave messages

2     on a public phone?  Yes, that is common practice

3     for me.

4          Q.    And is it common practice for you to

5     leave messages regarding sensitive, I think that

6     was your word, sensitive information regarding

7     ACLU strategizing on such phones in such places?

8          A.    Yes.

9          Q.    Was there something about your ID that

10    you didn't want Trooper Thompson to see when he

11    asked for it?

12         A.    I wasn't even thinking about my

13    identification.

14         Q.    It was a license, right?

15         A.    Right.

16         Q.    What kind of license did you have?

17         A.    A Connecticut driver's license.

18         Q.    Okay.  What kind of license do you have

19    now?

20         A.    Connecticut driver's license.

21         Q.    I thought you said you lived in New York?

22         A.    I did.

23         Q.    How come you have a Connecticut driver's

24    license?

91

```
 1        A.    Because I never got a New York driver's
 2    license.
 3        Q.    How long have you been living in New
 4    York?
 5        A.    About a year.  I lived in New Jersey
 6    before that.
 7        Q.    You lived in Connecticut way back when,
 8    isn't that so?
 9        A.    Right.
10        Q.    How long ago?  1978; is that correct?
11        A.    Um-hmm.
12        Q.    So you haven't lived in Connecticut since
13    1978?
14        A.    Right.
15        Q.    But the whole time you've had a
16    Connecticut license?
17        A.    Um-hmm.
18        Q.    That's correct?
19        A.    Yes.
20        Q.    How many times had you come into Logan
21    Airport before the October 16 incident that we're
22    talking about?
23        A.    Dozens of times.
24        Q.    And was it common practice during those
```

93

A.    No.

Q.    Did that make you angry?

A.    Did what?

Q.    After you tried to flag the cab with
Trooper Thompson, did that make you angry that
the cabs were just driving by you?

A.    No.  I didn't understand why the cabs
were just driving past.  I didn't have any
reaction to it.  All I thought of, the cab went
by, and I looked ahead to the next one.

Q.    You didn't care?

A.    Didn't care?  I cared very much whether I
was able to get a cab.  But all I did was change
my focus from the one that had gone past to look
up to see if there was another one on the way

Q.    And you had no reaction to those that had
passed?

A.    At that point in time, I was thinking
about leaving the airport.

Q.    Now, Trooper Thompson never touched you,
right?

A.    No.

Q.    None of the other troopers ever touched
you, did they?

94

```
1.      A.   No.

2.      Q.   Just for the sake of the record, no one

3  pulled a gun on you, did they?

4.      A.   No.

5.      Q.   You weren't ever put in a cruiser, were

6  you?

7.      A.   No.

8.      Q.   Actually, you were never moved from the

9  scene at the terminal, were you?

10.     A.   When you say moved from the scene, what

do you mean?

12.     Q.   Did anybody put you in a room apart from

13  the terminal?

14.     A.   No.

15.     Q.   So, I'm curious, how did you get outside

16  the terminal in the first place?

17.     A.   I was ordered to leave by Trooper

18  Thompson.

19.     Q.   How did you get there?

20.     A.   How did I get out of the terminal?

21.     Q.   Yes.

22.     A.   I walked.

23.     Q.   Did anybody stop you from walking?

24.     A.   No.
```

1    criteria and not rely on racial profiling.

2        Q.   Wouldn't that be seen as a positive by

3    you?

4        A.   It would be a positive, yes, if it turned

5    out to in fact be carried out the way it was

6    designed to.

7        Q.   And do you know whether or not it turned

8    out -- well, do you know if within this

9    behavioral assessment system, for lack of a

10   better term, do you know if there is any

11   encouragement of racial profiling in there?

12       A.   Do I know?

13       Q.   Um-hmm.

14       A.   No, I don't know.

15       Q.   And for all you know, it could be totally

16   opposed to racial profiling within this behavior

17   assessment system?

18       A.   Well, the press release said it was.

19       Q.   That it was against racial profiling?

20       A.   Right.

21       Q.   And is it fair to say that you do not

22   know if such a program was employed at your stop

23   at Logan Airport on October 16?

24       A.   No, I don't know.

101

1    Q.   You do not know that, okay.  I'm asking

2  you do you know that it was employed?

3    A.   No, I do not know that it was or I do not

4  know that it wasn't.

5    Q.   Do you have any belief or any basis for

6  believing that this program would condone in any

7  way racial or ethnic profiling?

8    A.   I don't have any belief either way.

9    Q.   You do know that you stated that in your

10  Complaint, though, that it effectively, and I'm

11  quoting from page 4, "Effectively condones and

12  encourages racial and ethnic profiling."  And it

13  is referring to, "The Behavior Assessment

14  Screening program training provided by

15  Massachusetts State Police, Robbins and

16  Didomenica."

17    A.   Well, if this incident is an example of

18  that, then it would.

19    Q.   Let me see if I understand you.  This is

20  speaking of the training provided by.  It's

21  saying the training itself.  I'm not talking

22  about the result; we'll talk about that in a

23  second.  But the training itself effectively

24  condones racial and ethnic profiling.  Do you

102

have some factual basis to believe that?

2      A.   If this incident happened either on the

3   basis of such training or happened despite such

4   training, then that would be true.

5      Q.   I don't understand that.  Let me see if I

6   can clear that up.  You don't know if you were

7   stopped based on the Behavioral Assessment

8   Screening System; is that correct?

9      A.   Right.

10     Q.   And you don't know for a fact whether or

11  not this Behavioral Assessment Screening System

12  effectively condones racial and ethnic profiling?

13     A.   No.

14     Q.   And the basis -- let me just ask you.

15  What's the basis for suing the State Police here?

16              MR. REINSTEIN:   The appropriate way

17  to do that is in an interrogatory and not a

18  question to the witness.  If you have a question

19  of how it fits into the suit, if it's not based

20  on personal knowledge of the deponent, then the

21  way to deal with that is to ask him what the

22  basis for the contention is and to ask it through

23  an interrogatory rather than in questions in a

24  deposition.

112

```
          A.    I have no idea.

 2        Q.    Why do you believe he said to you "Do we

 3    have a problem?"

 4        A.    I have no idea.

 5        Q.    But it's clear in your mind that he spoke

 6    to you first; is that correct?

 7        A.    Yes.

 8        Q.    And at some point --

 9        A.    Did you say "Do we have a problem?"

10        Q.    What did he say to you?

11        A.    "Is there a problem?"

12        Q.    Why did he say that to you?

13        A.    I'm not sure why he said that to me.

14        Q.    Do you have any belief today why he said

15    that to you?

16        A.    I'm not sure why he said that to me.

17        Q.    Do you have any belief?

18        A.    The only thing I could say is I had

19    turned to look at him.

20        Q.    How long was this look at my client?

21        A.    I turned, and it was immediate.

22        Q.    And at that point in time, you were using

23    a pole that had phones on it; is that correct?

24        A     Yes.
```

117

```
 1          Q.   At some point in time he said if you
 2     don't use the phone you're going to have to leave
 3     the airport; is that right?
 4          A.   No, he didn't say that.
 5          Q.   You testified that the trooper ordered
 6     you out of the airport.  Did you say that
 7     earlier?
 8          A.   The trooper said to me, "If you don't
 9     show ID, then you're going to have to leave the
10     airport."
11          Q.   And you elected to, instead of produce
12     the ID, to leave the airport; is that correct?
13          A.   Yes.
14          Q.   And when you did that, you went out the
15     upper level of the terminal, correct?
16          A.   Right.
17          Q.   And you know that you couldn't leave the
18     airport from there, right?  You know that today?
19          A.   I know that now.
20          Q.   The trooper knew it then, fair to say?
21          A.   I don't know if he knew that.
22          Q.   And when you went out there, and you were
23     out there for how long before the trooper engaged
24     in another conversation with you?
```

125

1          A.    No, I didn't ask Kiley or anybody.

2          Q.    Now, in your experience as a criminal

3     defense attorney, is it common that police tell

4     individuals that they are under arrest and then

5     let them walk away?

           A.    Is it common?

7          Q.    Right.

8          A.    I don't think it's common, but it may

      happen.

10         Q.    In your experience has it happened?

11         A.    In my personal experience?

12         Q.    As a lawyer, criminal defense attorney.

13    In your experience as a criminal defense

14    attorney, has that happened?

15         A.    I have heard reports of people who have

16    complained about being detained, being told that

17    they were under arrest, trying to find out what

18    their charges might have been, ultimately let go.

19         Q.    In your experience, have you ever seen

20    anybody placed under arrest?

21         A.    Yes.

22         Q.    Other than on October 16, 2003, have you?

23         A.    Yes.

24         Q.    And on those circumstances, aren't you

126

1       usually placed in handcuffs?

2           A.    The fact that somebody is usually placed

3       in handcuffs, I would say that's correct.

4           Q.    At any point in time were you placed in

5       handcuffs on October 16, 2003?

6           A.    No.

7           Q.    And today, you can't tell us how you left

8       the airport; is that correct?

9           A.    I took a cab.

10          Q.    Do you know where you picked up the cab?

11          A.    Went downstairs.

12          Q.    You do recall that now, you went

13      downstairs?  How did you get downstairs?

14          A.    I don't know how I got there.  I had to

15      go downstairs to get a cab.  You couldn't get any

16      upstairs.

17          Q.    Now, you indicated that you saw Sergeant

18      Kiley at the scene.  How did you identify him as

19      the sergeant?

20          A.    He had an insignia.

21          Q.    Where?

22          A.    On his arm.

23          Q.    What was the insignia you observed that

24      led you to believe he was a sergeant?