UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KING DOWNING,<br>      Plaintiff,<br><br>v.<br><br>MASSACHUSETTS PORT AUTHORITY; THE<br>MASSACHUSETTS DEPARTMENT OF STATE<br>POLICE, STATE POLICE TROOPER<br>THOMPSON, STATE POLICE SERGEANT<br>CROXTON, THOMAS G. ROBBINS, and<br>PETER J. DIDOMENICA,<br>      Defendants. | Civil Action No. 04-12513-RBC |

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, plaintiff, King Downing, hereby opposes Defendant Massachusetts Port Authority's Motion for Summary Judgment (Docket #41), Defendant William Thompson and Howard Croxton's Motion for Summary Judgment (Docket #45), and the Motion for Summary Judgment by Defendants: Massachusetts State Police, Thomas G. Robbins, and Peter J. DiDomenica (Docket #50).[1]

Summary judgment is inappropriate in this case because there are material disputes of fact surrounding the threshold question of whether Mr. Downing was stopped within the meaning of Terry v. Ohio ("Terry"), 392 U.S. 1 (1968), either (i) when defendant Trooper

---

[1] For purposes of this memorandum, Defendant Massachusetts Port Authority's Memorandum of Law in Support of its Motion for Summary Judgment (Docket #42) is cited as "Massport's Memo"; Defendant William Thompson and Howard Croxton's Memorandum of Law in Support of Their Motion for Summary Judgment (Docket #46) is cited as "Officers' Memo"; and the Memorandum of Massachusetts State Police, Thomas G. Robbins, and Peter J. DiDomenica in Support of Their Motion for Summary Judgment (Docket #51) is cited as "State Police's Memo".

William Thompson ("Tpr. Thompson") approached Mr. Downing inside the airport terminal and demanded to see his identification; or (ii) when Tpr. Thompson approached Mr. Downing outside the airport terminal, told him he would be "going downtown" if he did not produce his identification, told Mr. Downing that he was under arrest, called for and received backup police support from four more uniformed Massachusetts State Police officers, and also demanded to see Mr. Downing's travel documents. The summary judgment motions notably do not claim that the police ever had reasonable suspicion to affect a Terry stop of Mr. Downing.

There is also a material dispute about whether the Behavior Assessment Screening System program implemented at Logan Airport, and in which most of the officers involved in this incident had recently been trained, played a role in the police interactions with Mr. Downing.

Finally, there is no merit to the individual defendants' claims to qualified immunity.

In opposition to the three motions for summary judgment, Mr. Downing relies on his Statement of Material Disputes of Fact and Consolidated Response to Defendants' Statements of Undisputed Facts ("Downing Statement"), the Affidavit of King Downing ("Downing Aff."), and the Affidavit of Peter B. Krupp, with exhibits thereto.

Factual Background[2]

In 2002, Massport and the Massachusetts State Police jointly decided to train all Massachusetts State Police officers assigned to Logan Airport in a program to identify potential terrorists known as the Behavior Assessment Screening System ("BASS") program.[3] This

---

[2] All facts contained herein are supported by the authorities cited in Plaintiff's Statement of Material Disputes of Fact and Consolidated Response to Defendants' Statements of Undisputed Facts, including but not limited to the Affidavit of King Downing, all of which are being filed herewith.

[3] At various points, this program was also known as the Passenger Assessment and Screening System ("PASS"). PASS and BASS were the same and are referred to here as BASS.

program, which was separate and distinct from the screening and search of passengers boarding aircraft at Logan Airport, was based on a notion termed "elevated suspicion," which was "[m]ore than a hunch but less than [the] reasonable suspicion required [under Terry] to detain a person for criminal investigation." Under the BASS program, a law enforcement officer was directed to question persons anywhere on property controlled by Massport if the person raised an "elevated suspicion" or presented even "unresolved elevated suspicion."[4] Although these directed questionings were supposed to be "voluntary," and were not based on "reasonable suspicion," under the BASS program "[r]efus[ing] to answer questions or provide identification or travel documents" in response to such questioning constituted prima facie evidence of "elevated suspicion." And, according to BASS, anyone who presented "elevated suspicion" should be barred from or escorted away from "critical infrastructure," including the Logan Airport terminal.

Although the BASS program materials acknowledge that "[r]acial profiling practices are contrary to the fundamental values of our nation and serve to disenfranchise whole segments of our population," they do not expressly prohibit the use of race or ethnicity in forming "elevated suspicion." Indeed, the program materials which have been produced to the plaintiff in redacted form strongly suggest that race and/or ethnicity may be considered in assessing "elevated suspicion." One slide entitled "Racial Profiling," for example, states "In forming ES [elevated suspicion] or reasonable suspicion that a person is high-risk, officers may consider [REDACTED]". (Emphasis added). Another slide, also under the heading "Racial Profiling,"

---

[4] A person who presents unresolved elevated suspicion, that is, a person about whom law enforcement has not even been able to determine if they present "elevated suspicion" is deemed under BASS to be a "High Risk Passenger."

states "A person's [REDACTED] should not be the <u>sole</u> or <u>principal</u> reason in forming ES [elevated suspicion] or reasonable suspicion."  (Emphasis added).

    Beginning in the spring of 2003, Massport and the Massachusetts State Police required that all Massachusetts State Police officers be trained in the BASS program.  Tpr. Thompson was trained in the BASS program on March 13, 2003.  Most of the other officers who responded on October 16, 2003 in connection with the stop of Mr. Downing had been trained in the BASS program between March 2003 and September 2003.

    On October 16, 2003, Mr. Downing, who is African-American, arrived at Logan on an Alaska Airlines overnight flight from the west coast.  He was dressed like any other passenger, and had with him a brief case and a carry-on, which had been strapped to a two-wheeled, portable luggage carrier.  He was wearing casual slacks, a button-down striped shirt, and a jacket.

    After deplaning in Boston, Mr. Downing left the gate area and stopped to make a phone call from a public telephone on the upper level of the terminal near the airport exit.  Within a minute of Mr. Downing getting on the phone, Tpr. Thompson, who was wearing a Massachusetts State Police uniform, approached where Mr. Downing was on the telephone, and stood only about five feet away, close enough to overhear anything Mr. Downing might say on the telephone.  Tpr. Thompson had no reason to be in the position he was only a few feet away from Mr. Downing other than to observe Mr. Downing, listen to anything Mr. Downing might say on the telephone, or speak with Mr. Downing.

    Within a minute, Tpr. Thompson initiated conversation with Mr. Downing, while Mr. Downing was still on the telephone, by asking "Is there a problem?" in an aggressive and confrontational tone and in an manner designed to assert his authority.  When Mr. Downing

4

asked why Tpr. Thompson was standing so close to him, Tpr. Thompson demanded to see Mr. Downing's identification.  Mr. Downing did not raise his voice, become upset or irate, or act in an irritable, condescending, combative or confrontational way.  But Mr. Downing respectfully declined to produce any identification, fully believing that he was well within his rights to do so.  At this point, Mr. Downing was in the non-secure area of the airport, and had done nothing to give Tpr. Thompson any belief that he had committed, was committingor was about to commit a crime, nor did Mr. Downing believe that there was any other lawful basis for Tpr. Thompson to demand Mr. Downing's identification.

Given Tpr. Thompson's proximity, his show of authority and his demand to see Mr. Downing's identification, Mr. Downing reasonably believed that he had been stopped by Tpr. Thompson, and that he was not free to go without responding to Tpr. Thompson's demands.  After some discussion, Tpr. Thompson told Mr. Downing that if he did not produce identification, he would have to leave the airport terminal.  Although suspicious that Tpr. Thompson had singled him out based on considerations of race, Mr. Downing agreed and left the terminal.

Outside the terminal, Mr. Downing attempted to hail a taxi.  Tpr. Thompson, however, followed Mr. Downing outside and again demanded that Mr. Downing show him some identification.  Tpr. Thompson told Mr. Downing that if he did not produce identification he would be "going downtown" and that Mr. Downing was under arrest, although Tpr. Thompson refused to tell Mr. Downing why he was under arrest.  Tpr. Thompson also radioed for additional police backup.  Until backup came, Tpr. Thompson stayed with Mr. Downing who was not free to leave.

Five or more minutes after Tpr. Thompson called for backup, four Massachusetts State Police uniformed officers, together with at least one police cruiser, responded to the area. The officers took up positions near Mr. Downing so that he could not leave. They continued to attempt to have Mr. Downing turn over identification.

At this point, afraid that he was going to be handcuffed and taken to a police lockup, Mr. Downing gave one of the officers his driver's license. The police ran Mr. Downing's license, gave it back to him, but then demanded to also see Mr. Downing's travel documents. Mr. Downing protested having to produce his travel documents. The police made it clear to Mr. Downing that he was not free to go unless he produced his travel documents and, additionally, if he did not produce the travel documents his name would be placed on Logan Airport's "watch list" or "trespass list" and he would be subject to arrest if he returned to the airport without a ticket. Again, fearing the threatened consequences, Mr. Downing handed over his travel document.

## ARGUMENT

I.  The Summary Judgment Standard

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of affirmatively proving that there is no genuine issue as to any material fact and that it is entitled to judgment as matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). To satisfy this burden, the moving party must either submit affirmative evidence that negates an element essential to an adverse party's case, or demonstrate that the adverse party has no

6

reasonable expectation whatsoever of proving an essential element of his case at trial. Id. The court must consider all the evidence and draw all inferences from the underlying facts in a light most favorable to the nonmoving party, in order to determine whether a trial worthy issue exists as to some material fact. Lehman v. Prudential Ins. Co. of America, 74 F.3d 323, 323 (1st Cir. 1996).

In the context of civil rights cases, courts have recognized that questions such as the objective reasonableness of searches under the Fourth Amendment "while requiring a legal determination, [are] highly fact specific, and may not be resolved on a motion for summary judgment when material facts are substantially in dispute." Swain v. Spinney, 117 F.3d 1, 9-10 (1st Cir. 1997) (issues of material fact concerning the basis for search barred summary judgment for police defendants on issues of objective reasonableness and qualified immunity). See also, e.g., Alexis v. McDonald's Restaurants of Massachusetts, Inc., 67 F.3d 341, 341 (1st Cir. 1995) (factual dispute about whether officer's arrest of customer was objectively reasonable precluded summary judgment for officer on customer's § 1983 claim).

II. Material Disputes of Fact Bar Entry Of Summary Judgment On The Merits.

    A. There Are Material Disputes Of Fact About Whether A Seizure Occurred.

"Security of one's privacy against arbitrary intrusion by police" lies at the heart of the Fourth Amendment. Mapp v. Ohio., 367 U.S. 643, 650 (1961) (internal quotation marks omitted). Under Terry and its progeny, a brief investigatory detention does not violate the Fourth Amendment so long as the officers have a reasonable and articulable suspicion that the person detained is or has engaged in criminal activity. Terry, 392 U.S. at 21-22; United States v. Cook, 277 F.3d 82, 85 (1st Cir. 2002); United States v. McCarthy, 77 F.3d 522, 529 (1st Cir.), cert. denied, 519 U.S. 991 (1996). To determine whether reasonable suspicion exits, courts

7

"look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002), citing United States v. Cortez, 449 U.S. 411, 417-18 (1981).  A "gut instinct" does not provide a particularized or objective basis for reasonable suspicion; rather, officers must be able to point to specific and articulable facts, which, taken together with all rational inferences, reasonably warrant a suspicion of criminal activity.  United States v. Gilliard, 847 F.2d 21, 24 (1st Cir. 1988), cert. denied, 488 U.S. 1033 (1989).  "Hunches" or "inchoate and unparticularized suspicion" are not sufficient.  Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000); Terry, 392 U.S. at 22, 27.  This means that "[a]t a minimum, the officer must have a particularized and objective basis for [that] suspicion."  United States v. Cook, 277 F.3d at 85 (internal quotation marks omitted).

    Here, there can be no fair contention that Tpr. Thompson, or the officers later assisting him, had "a reasonable and articulable suspicion" that Mr. Downing was committing or had committed any crime.  In any event, there would be material disputes of fact that would prevent entry of judgment on this issue, given that Mr. Downing gave Tpr. Thompson no valid basis to seize him, or to detain him even briefly, in order to obtain Mr. Downing's identification.  See Downing Aff. ¶¶ 5-13.  See also Massport Memo at 17 n.9.

    Instead, the defendants make the factually disputed claim that there was no constitutional violation because there was no Terry stop --  i.e. that there was no seizure -- because Mr. Downing was at all times free to go, and that therefore there was no violation of Mr. Downing's rights protected under the Fourth Amendment to the United States Constitution and Article 1 and 14 of the Massachusetts Declaration of Rights.  See Massport's Memo at 2 ("[n]either Downing's first nor second encounter with police constituted a seizure"), 12-17; Officers' Memo

8

at 4-10; State Police's Memo at 1 ("Downing's claim that he was subject of an unconstitutional seizure . . . fails for two reasons: one, he was not seized"), 14 ("he was not seized").

To be sure, consensual encounters between individuals and law enforcement officials do not trigger Fourth Amendment concerns. In fact, law enforcement officials can approach an individual, without cause, and put questions to him, ask for identification, and request permission to conduct a search. Florida v. Bostick, 501 U.S. 429, 434-35 (1991). However, "if, in view of all of the circumstances surrounding the incident, a reasonable person [believes] that he [is] not free to leave," a seizure has occurred. United States v. Mendenhall, 446 U.S. 544, 554 (1980).

Here, there is a factual dispute about whether a seizure occurred when Tpr. Thompson approached Mr. Downing while he was on the telephone, stood in uniform only five feet away for no apparent reason other than an interest in Mr. Downing, initiated conversation with Mr. Downing by asking "Is there a problem?" while Mr. Downing was on the telephone, by using an aggressive and confrontational tone, and by then demanding Mr. Downing's identification. During that exchange, even if brief, Mr. Downing reasonably felt from all of the attendant circumstances that he was not free to leave the presence of the police officer without addressing the police officer's inquiry. As the First Circuit has recently said, describing well-established law, "a seizure may certainly occur without actual physical restraint. If an officer, by means of show of authority, even briefly restrains the liberty of a citizen, we may conclude that a seizure has occurred." United States v. Smith, 423 F.3d 25, 28 (1st Cir. 2005) (citing Terry, 392 U.S. at 19), cert. denied, 126 S.Ct. 2287 (2006). Here, only after the police officer ultimately indicated that if Mr. Downing did not show his identification he would have to leave the airport terminal did Mr. Downing again feel free to go. Given that the question of whether there has been a seizure is evaluated given all of the surrounding circumstances, there is certainly a material

9

dispute of fact as to whether a seizure occurred during Tpr. Thompson's confrontation with Mr. Downing inside the airport terminal.  See, e.g., Downing Aff. ¶¶ 5-8.

The defendants do not seem to claim, and cannot fairly do so, that the fact that Mr. Downing declined to show his identification provides any support for a conclusion that, if a seizure occurred, it was based on reasonable suspicion.  It is well established that an individual has a constitutional right to refuse to identify himself when stopped by a law enforcement officer where the officer lacks "any reasonable suspicion to believe [the individual is] engaged or had engaged in criminal conduct."[5]  Brown v. Texas, 443 U.S. 47, 53 (1979).  The First Circuit has explicitly declared that "[t]he exercise of one's constitutional rights is not the sort of specific and articulable fact that will itself, or in combination with other less-than-sufficient facts, justify a Terry-type investigative stop."  United States v. Berryman, 717 F.2d 650, 651 (1st Cir. 1983), (internal quotation marks and citation omitted), cert. denied, 465 U.S. 1100 (1984).  See also Carey v. Nevada Gaming Control Bd., 279 F.3d 873, 882 n.8 (9th Cir. 2002) (individual's right to refuse to identify himself during a Terry stop is clearly established).  Moreover, the Supreme Court has "consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."  Florida v. Bostick, 501 U.S. at 437.  Therefore, an individual's refusal to speak with law enforcement agents when requested to do so categorically cannot "provide[ ] any legal justification for even brief involuntary detention."  United States v. Berryman, 717 F.2d at 651.

---

[5] Although the Supreme Court has upheld state stop-and-identify statutes, it made clear that those laws do nothing to alter the requirements for conducting a Terry stop.  Hiibel v. Sixth Judicial Dist. Ct. of Nevada, 542 U.S. 177, 188 (2004) ("state law requiring a suspect to disclose his name *in the course of a valid* Terry *stop* is consistent with Fourth Amendment prohibitions against unreasonable searches and seizures" (emphasis added)).  Moreover, Massachusetts does not have a stop-and-identify statute, thus making Hiibel inapposite here.

Despite this clear and well-established law, it appears Tpr. Thompson violated these constitutional principles, although acted consistently with the BASS program, which instructs law enforcement officers at Logan Airport to treat a refusal to show identification as prima facie evidence of elevated suspicion, sufficient to justify removing the person -- in this case Mr. Downing -- from the airport terminal.

There is also a material dispute of fact about whether Mr. Downing was seized outside of the terminal, when Tpr. Thompson approached Mr. Downing, demanded his identification, told Mr. Downing that he was "going downtown" if he did not produce his identification, told Mr. Downing that he was under arrest, called for and received the backup of four additional uniformed Massachusetts State Police officers (who positioned themselves near Mr. Downing so that he could not leave) and at least one cruiser, and also demanded to see Mr. Downing's travel documents. Such circumstances would be more than sufficient to support a finding that Mr. Downing was reasonable in his belief that he was not free to leave. Downing Aff. ¶¶ 9-13.

There is no legal support for the argument advanced by the State Police that telling Mr. Downing "he was going to be under arrest and go downtown" is "not material" because "no one handcuffed him, or put him in a cruiser, or placed him in another area, or brought him anywhere for that matter." State Police's Memo at 17. As discussed above, "a seizure may certainly occur without actual physical restraint." United States v. Smith, 423 F.3d at 28. Such evidence of control, while perhaps useful to show that a suspect has been arrested without a warrant, which might be challenged due to the absence of probable cause, United States v. Watson, 423 U.S. 411, 418, 422 n.11 (1976), is not necessary to show a reasonable belief by Mr. Downing that he was not free to leave the presence of the police.

The defendants dispute whether Mr. Downing was told he was under arrest, but Massport argues that the dispute is immaterial by trying to recharacterize Mr. Downing's version as simply "a conditional threat of arrest." Massport's Memo at 16. In fact, Mr. Downing has testified that he specifically asked Tpr. Thompson if he was under arrest and that Tpr. Thompson said that he was, although Tpr. Thompson refused to tell Mr. Downing why he was under arrest. Downing Aff. ¶ 9. See also Downing Statement ¶¶ I.B.4 - I.B.6. Moreover, the police actions, including Tpr. Thompson's call for police backup, his remaining with Mr. Downing until backup arrived, the arrival of four uniformed State Police officers, and their positioning around Mr. Downing, were consistent with placing Mr. Downing under arrest. Even if, however, Tpr. Thompson merely threatened arrest or threatened to delay Mr. Downing further in order to get access first to Mr. Downing's identification and then to his travel documents, this is still the type of "show of authority" and "coercion" necessary to constitute a seizure under the Fourth Amendment because it clearly evidences that Mr. Downing was not free to go.

    B.    There Are Material Disputes Of Fact About Whether The Seizure Of Mr. Downing Was Lawful In Light Of A Governmental Interest In Airport Security After September 11, 2001.

The defendants contend that, even if seizures of Mr. Downing occurred inside the airport terminal and/or outside, "they were nonetheless constitutionally permissible given the government's interest in airport safety and security following September 11th." Massport Memo at 17. See also State Police Memo at 15-18 (asking the court to balance the "short term minimal inconvenience" against "well-recognized compelling public need for airport security"). Notably, there are no facts in the record that would permit the Court to assess such governmental interest in the public (as opposed to the secure) area of the airport terminal, or on the sidewalk area outside of the terminal. See generally Defendant Massachusetts Port Authority's Statement of

Undisputed Facts (Docket #43). Absent such facts, the Court cannot determine the extent of the governmental interest in security in particular areas of an airport in comparison to, for example, the secure area of an airport, the outside of a public office building, an entertainment venue for large public gatherings, or a prominent bridge, tunnel or other key transportation infrastructure.

Nor do the defendants cite any cases that hold that the limits of the Fourth Amendment are restricted, or the threshold for a Terry stop lessened, in the context of post-9/11 airport security. Instead, the defendants cite cases like United States v. Doe, 61 F.3d 107, 109-10 (1st Cir. 1995), that recognize the constitutionality of airport searches of passengers passing from the public area of airports through checkpoints into the secure passenger area in an effort to curtail "air piracy." These cases are plainly inapposite. And the defendants cite more recent cases in which well-publicized random searches of public transportation passengers was upheld in Cassidy v. Chertoff, 471 F.3d 67 (2d Cir. 2006), and MacWade v. Kelly, 2005 WL 3338573 (S.D.N.Y. Dec. 7, 2005), aff'd, 460 F.3d 260 (2d Cir. 2006). In those cases, not unlike the airport security checkpoint cases, passengers were screened upon voluntarily seeking to board public transportation. Here, in contrast, Mr. Downing was seized first in the public, non-secure area of the airport terminal, and then outside the terminal. Moreover, in Cassidy and MacWade there was ample evidence that potential riders had ample prior notice of the searches[6] and the searches were specifically designed to address a clear and articulated threat. Here, there is no evidence or facts to support a finding that the possibility of random searches in the public area of

---

[6] Although the State Police argues that there were signs up at Logan Airport indicating that passengers were subject to search, see, e.g., State Police Memo at 16 ("the airport has provided signs to inform passengers that they may be subject to search"), there are no facts stated about these signs and no basis for the Court to determine the extent and content of such signs, whether such signage was in the vicinity where Mr. Downing was located, or whether such signage was sufficient to put a reasonable person on notice that simply by being present in the public area of the airport would subject him to search without other Fourth Amendment protections.

or outside the airport terminal should be foreseeable to the public, nor are there facts to support a finding that such searches would be justified by any particularized threat.

      C.      There Are Material Disputes Of Fact About Whether The BASS Program Played A Role In The Stop Of Mr. Downing.

Massport and the State Police claim that Mr. Downing does not know if the BASS program was used during his interaction with the police and therefore any claim for declaratory or injunctive relief based on the unconstitutionality of the BASS program must fail. Massport's Memo at 8-11; State Police's Memo at 7-11. This argument is based on the defendants' hope that the Court will take Tpr. Thompson's word that BASS did not play a role in his actions. In fact, however, it is keenly disputed whether the BASS program played a role in connection with the interactions between Tpr. Thompson, and later supported by other law enforcement officers, and Mr. Downing.

First, it is clear that Tpr. Thompson, and most of the other Massachusetts State Police officers who responded to assist him, had been trained in the BASS program in the months prior to the interaction with Mr. Downing, and were expected to implement that training in their day-to-day work at Logan Airport. Downing's Statement ¶¶ I.C.7, 8 and 10.

Second, there was no reason for Tpr. Thompson to confront Mr. Downing on October 16, 2003, to question him, or to demand to see his identification other than in carrying out the BASS program of questioning individuals who aroused some "elevated suspicion." Mr. Downing had not done anything to create a nuisance, was not acting other than as any traveler would, and did not appear to be a vagrant or other trespasser. Id. ¶ I.C.9; Downing Aff. ¶¶ 5-13.

Third, Tpr. Thompson's actions in interacting with Mr. Downing were entirely consistent with the BASS training. Tpr. Thompson approached Mr. Downing and asked him a series of questions, including to see Mr. Downing's identification. When Mr. Downing respectfully

declined to provide his identification, Tpr. Thompson was unable to resolve his "elevated suspicion" (indeed, this refusal was prima facie evidence under BASS of elevated suspicion, requiring Mr. Downing to be removed and kept away from the airport terminal) and therefore, consistent with the BASS training, told Mr. Downing that he would have to leave the airport terminal. Downing Statement ¶ I.C.9; Downing Aff. ¶¶ 5-8.

Once outside the airport terminal, when Mr. Downing was unable to hail a cab, Tpr. Thompson again approached Mr. Downing to question him and obtain his identification, even called for police backup, and, again consistent with the BASS training, asked to see Mr. Downing's travel documents. Downing Statement ¶ I.C.9; Downing Aff. ¶¶ 9-13.

In short, although Tpr. Thompson protests to the contrary, it is entirely open to the fact finder at trial to conclude based on this evidence that Tpr. Thompson did employ, in whole or in part, the BASS program in his interactions with Mr. Downing.

III.     The Individual Defendants Are Not Entitled To Summary Judgment Based On Their Claims Of Qualified Immunity.

The claims of qualified immunity asserted by the four individual defendants fare no better than their request for summary judgment on the merits. The First Circuit has established a three part test for determining the availability of a qualified immunity defense. Under the first part of this test, the court must examine whether the plaintiff has alleged the violation of a constitutional right. If so, the court must then determine if the contours of the right were sufficiently established at the time of the alleged violation. Finally, if the claim meets the requirements of the first two parts of this test, the court should inquire whether an objectively reasonable official would have believed that the action taken or omitted violated that right. Hatch v. Department for Children, Youth and their Families, 274 F.3d 12, 20 (1st Cir. 2001).

15

A.     Defendants Robbins and DiDomenica

The senior State Police defendants, Thomas Robbins and Peter DiDomenica, who are alleged to have been responsible for the development and implementation of the BASS program, focus on the first of these requirements, arguing on the basis of the First Circuit's decsion in Frazier v. Bailey, 957 F.2d 920 (1st Cir. 1992), that constitutional violations must be pled with particularity. State Police Memo at 18-19. While the applicability of Frazier to the circumstances of this case is at best doubtful,[7] the Complaint in this action cannot be faulted for lack of particularity.

The Complaint asserts the constitutional violation here in more than sufficient particularity. In paragraph 1 of the Complant, the plaintiff asserts that

> his unlawful stop, questioning, arrest and temporary detention was carried out pursuant to the policy and practice of the Massachusetts Port Authority and the Massachusetts State Police directing law enforcement officials at Logan to question and remove from the airport persons who meet particular "behavioral" profiles notwithstanding the absence of reasonable suspicion to believe the person engaged in any wrongdoing.

More specifically, the claim is set forth in paragraph 25 of the Complaint, which alleges that:

> the behavior assessment screening system authorizes or directs law enforcement officers at Logan to stop and question "suspicious persons" on the basis of less justification than reasonable suspicion, to use race and ethnicity as a factor in identifying "suspicious persons," and to use a person's assertion of his constitutional right to question the stop, or not to cooperate or

---

[7] The issue in Frazier was whether an allegation asserting "an abstract due process liberty interest in family relationships" was sufficient to give notice to the defendants in that case of the nature of the claim. Frazier, however, has limited applicability to a straightforward Fourth Amendment claim under Terry where the police have the burden of establishing that the search was reasonable.

16

        produce documents to law enforcement, as a basis for further
detention and interrogation.[8]

In <u>Wagner v. City of Holyoke</u>, the First Circuit explained that "qualified immunity requires that the general right [asserted by the plaintiff] be placed in a reasonably specific context." 404 F.3d 504, 509 (1st Cir.), <u>cert</u>. <u>denied</u>, 126 S.Ct. 552 (2005). <u>See also</u>, e.g., <u>Fuerschbach v. Soutwest Airlines Co.</u>, 439 F.3d 1197, 1205 (10th Cir. 2006) (clear that "seizing a private citizen without any legitimate basis was unlawful"). Moreover, even the absence of preexisting case law speaking to the exact facts at hand does not automatically result in qualified immunity:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that <u>in the light of preexisting law the unlawfulness must be apparent.</u>

---

[8] The Complaint describes the responsibility of defendants Robbins and DiDomenica for the violation of plaintiff's rights at some length. <u>See</u> Complaint ¶ 11 ("Robbins and DiDomenica devised and implemented a similar training program for State Police troopers using 'behavior assessment' for the purpose of determining whether to stop and question persons at Logan and other locations."), ¶ 13 ("the behavior assessment screening system training provided by Massport, the State Police, Robbins and DiDomenica: (a) directs or authorizes State Police troopers to stop, question and/or arrest certain individuals at Logan despite the absence of reasonable suspicion to believe that the individuals were committing, had committed or were about to commit any crime; (b) authorizes State Police officers to deny access to Logan to any person who refuses to cooperate with police requests for identification or other information; and (c) effectively condones and encourages racial and ethnic profiling."); ¶ 33 ("The actions of Massport, Robbins and DiDomenica in adopting and implementing the behavioral assessment policy and in training Thompson and Croxton to stop and question individuals without reasonable suspicion, and to compel disclosure of identification papers and travel documents under threat of arrest or exclusion from Logan, resulted in the unconstitutional search and seizure of Downing and deprived him of his right to be secure in his person and property in violation of the Fourth and Fourteenth Amendments to the United States Constitution.").

Anderson v. Creighton, 483 U.S. 635, 640 (1987) (emphasis added).  See also Saucier v. Katz, 533 U.S. 194, 202 (2001) (preexisting law should "not [be] distinguishable in a fair way from the facts presented in the case at hand").

As set forth in the preceding sections of this memorandum, the Fourth Amendment violation alleged by the plaintiff here rests on well settled law.  The State Police were constitutionally constrained from conducting a Terry stop absent a "reasonable and articulable suspicion of criminal activity."  United States v. Cook, 277 F.3d at 85.

Here, defendants Robbins and DiDomenica simply assert that the BASS training does not encourage or direct a constitutional violation.  Oddly, however, their memorandum does not even address Mr. Downing's basic Fourth Amendment claim.  It addresses only the assertion that the policy condones racial profiling.  While it should not be necessary to address claims that have not been made, it is clear from the face of the BASS training materials that they instruct officers to detain individual under circumstances which are inconsistent with the requirements of Terry.  The record shows that BASS training expressly states that an individual's assertion of his right not to provide identification demanded by a police constitutes prima facie evidence of "elevated suspicion," authorizing removal of the individual from the airport terminal; a sequence of events which precisely describes Mr. Downing's encounter with Tpr. Thompson and his fellow officers.

With respect to the question of whether the BASS training encourages racial profiling, it is of course difficult for Mr. Downing definitively to contest the defendants' position in view of the fact that significant portions of the training materials have been withheld, including those which appear to deal expressly with factors which may be considered.  The materis that have been produced, however, strongly suggest that a person's race mae be considered in assessing "elevated suspicion" within the BASS program.  Downing Statement ¶ I.C.9.

18

B.  <u>Defendants Thompson and Croxton</u>

Defendants Thompson and Croxton rest their claims on the third prong of the qualified immunity test, asserting that no reasonable competent officer would have believed that it was unconstitutional to have detained the plaintiff under the circumstances of this case. "While the first two steps in the qualified immunity pavane deal with abstract legal principles, the final step deals with the facts of the particular case." <u>Hatch v. Department for Children, Youth and their Families</u>, 274 F.3d at 24. Moreover, the Court of Appeals has recognized that objective reasonableness under the Fourth Amendment is "highly fact specific." <u>Swain v. Spinney</u>, 117 F.3d at 9-10. For this reason, "pre-trial resolution sometimes will be impossible because of a dispute as to material facts. In such a case, the factual issues must be decided by the trier of fact, thereby precluding summary judgment. Only after the facts have been settled can the court determine whether the actions were objectively reasonable so as to fall under the qualified immunity umbrella." <u>Kelley v. Laforce</u>, 288 F.3d 1, 7 (1st Cir. 2002), <u>citing</u> <u>Swain v. Spinney</u>, 117 F.3d at 10.

The difficulty with the claim raised by Thompson and Croxton is that it rests on facts which are clearly disputed, making summary judgment unavailable. <u>Sheehy v. Town of Plymouth</u>, 191 F.3d 15, 22-23 (1st Cir. 1999).

<u>Conclusion</u>

For these reasons, the Court should deny the three different summary judgment motions filed by the various defendants.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), plaintiff requests oral argument in connection with the defendants' various motions for summary judgment.

                                      KING DOWNING
                                      By his attorneys,

                                      / S /  Peter B. Krupp

Dated:  May 29, 2007               Peter B. Krupp
                                        BBO #548112
                                      Lurie & Krupp, LLP
                                      One McKinley Square
                                      Boston, MA  02109
                                      Tel:  (617) 367-1970

                                      John Reinstein
                                        BBO # 416120
                                      American Civil Liberties Union of
                                      Massachusetts
                                      99 Chauncy Street, Suite 310
                                      Boston, MA 02111
                                      Tel:  (617) 482-3170

## CERTIFICATE OF SERVICE

I, Peter B. Krupp, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on May 29, 2007.

                                      / S / Peter B. Krupp

                                      Peter B. Krupp