UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| KING DOWNING, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-12513-RBC |
| | ) | |
| MASSACHUSETTS PORT AUTHORITY; THE | ) | |
| MASSACHUSETTS DEPARTMENT OF STATE | ) | |
| POLICE, STATE POLICE TROOPER | ) | |
| THOMPSON, STATE POLICE SERGEANT | ) | |
| CROXTON, THOMAS G. ROBBINS, and | ) | |
| PETER J. DIDOMENICA, | ) | |
| Defendants. | ) | |
| _____ | ) | |

PLAINTIFF'S STATEMENT OF MATERIAL DISPUTES OF FACT
AND CONSOLIDATED RESPONSE TO
DEFENDANTS' STATEMENTS OF UNDISPUTED FACTS

Pursuant to Local Rule 56.1, plaintiff, King Downing, hereby submits his statement of

the material facts of record as to which there exists a genuine issue to be tried; and responds to

(i)     Defendant Massachusetts Port Authority's Statement of Undisputed Facts
        (Docket #43) ("Massport's Statement");

(ii)    Defendant William Thompson and Howard Croxton's Statement of
        Undisputed Material Facts (Docket #45 and #47) ("Officers' Statement");
        and

(iii)   Amended Statement of Undisputed Facts of Defendants Massachusetts
        State Police, Thomas G. Robbins, and Peter J. DiDomenica (Docket #55)
        ("State Police's Amended Statement").[1]

---

[1]     The State Police's Amended Statement seems to supersede, although appears
identical to, the Statement of Undisputed Facts of Defendants Massachusetts State Police,
Thomas G. Robbins, and Peter J. DiDomenica ("Docket #52), which was filed on April 17, 2007
with the motion for summary judgment filed by the Massachusetts State Police and defendants
Robbins and DiDomenica.  Both documents rely only on exhibits attached to the Tenn Affidavit
in Support of Defendant Massachusetts Port Authority's Motion for Summary Judgment.  See
State Police's Amended Statement at 2 n. 1.

I.      Statement of Material Facts in Dispute[2]

        Mr. Downing submits that the following facts are in dispute and are material to the

resolution of the claims presented in the Complaint and the issues presented on summary

judgment:

        A.      The Initial Stop Inside The Terminal

                1.      It is disputed whether on October 16, 2003 Trooper William Thompson

("Tpr. Thompson") affected a stop of Mr. Downing within the meaning of Terry v. Ohio

("Terry"), 392 U.S. 1 (1968), when he demanded identification from Mr. Downing while Mr.

Downing was on the payphone inside the non-secure area of Logan Airport.  Affidavit of King

Downing ("Downing Aff.") ¶ 7.

                2.      It is disputed whether Mr. Downing was seized or gave Tpr. Thompson

any cause to stop him and demand identification.  Mr. Downing submits that he was not acting

suspiciously in any way, but was behaving as any traveler would.  Nonetheless, less than a

minute or so after Mr. Downing began using a payphone near the exit of the terminal, and

outside the secure area of the terminal, Tpr. Thompson took up a position about five feet away

from Mr. Downing, with no apparent purpose for being in that position except to observe Mr.

Downing, to listen to anything Mr. Downing said while on the phone, and/or to question Mr.

Downing.  Tpr. Thompson then assumed a confrontational posture and tone, with his arms

crossed over his chest, asking Mr. Downing "Is there a problem?"  After Mr. Downing, still on

the phone, asked the officer why he was standing so close to him, Tpr. Thompson demanded to

---

[2]      All factual material cited herein is attached to the Affidavit of Peter B. Krupp,
with the exception of the Affidavit of King Downing, which is being separately filed.  All
deposition transcripts are cited herein as "[Deponent's last name] Dep. [page]."

see Mr. Downing's identification.  At this point, Mr. Downing reasonably felt that he had been stopped by, and was not free to leave the presence of, the officer.  <u>Downing Aff</u>. ¶¶ 5-8.

3.       This action by Tpr. Thompson amounted to an unconstitutional <u>Terry</u> stop of Mr. Downing, without reasonable suspicion that Mr. Downing was engaged in any criminal activity.  <u>Downing Aff</u>. ¶ 8.

B.       <u>The Second Stop Outside The Terminal</u>

4.       It is disputed whether on October 16, 2003 Tpr. Thompson, and later with the support of other officers, affected a <u>Terry</u> stop of Mr. Downing when he demanded identification from Mr. Downing, told Mr. Downing that he was under arrest, called and received police backup, and demanded to see Mr. Downing's travel documents, while Mr. Downing was outside the terminal after Mr. Downing had left the terminal at Tpr. Thompson's direction. <u>Downing Aff</u>. ¶¶ 9-13.

5.        It is disputed whether Mr. Downing was seized or gave Tpr. Thompson any cause to stop him and demand identification outside the terminal.  Mr. Downing had left the terminal, as Tpr. Thompson indicated he could, if he did not show identification.  Mr. Downing was not acting suspiciously in any way, and had not been irritable, condescending, combative or confrontational.  Tpr. Thompson nonetheless followed Mr. Downing outside the terminal and again demanded to see Mr. Downing's identification.  Tpr. Thompson told Mr. Downing that if he did not produce his identification, he would be "going downtown."  Tpr. Thompson also told Mr. Downing that he was under arrest, although Tpr. Thompson would not tell Mr. Downing why he was under arrest.  Tpr. Thompson called for police reinforcements, and remained with Mr. Downing until four uniformed Massachusetts State Police officers arrived and took up positions so that Mr. Downing could not leave.   The police also told Mr. Downing that he would

have to turn over travel documents if he wanted to leave, and if he wanted to avoid being put on a "watch list" or "trespass list" at Logan Airport.  <u>Downing Aff</u>. ¶¶ 9-13.

6.     These actions by Tpr. Thompson, supported by the actions of the responding police officers, amounted to an unconstitutional <u>Terry</u> stop of Mr. Downing, without reasonable suspicion that Mr. Downing was engaged in any criminal activity.  <u>Downing Aff</u>. ¶¶ 9-13.

C.     <u>Role Of The Behavior Assessment Screening System Program</u>

7.     It is disputed whether Tpr. Thompson and the other responding officers were, in their interactions with Mr. Downing, following the program implemented at Logan Airport known as the Behavior Assessment Screening System ("BASS"), or Passenger Assessment Screeening System ("PASS"), program.  The BASS or PASS program were the same thing and for simplicity will be referred to herein as the BASS program.  <u>DiDomenica Dep</u>. 29.

8.     The BASS program was implemented by Massport and the Massachusetts State Police at Logan Airport in 2003.  It grew out of a post-9/11 study of security issues at Logan Airport by Rafi Ron, an Israeli security consultant.  Massport and the Massachusetts State Police, including defendants Peter J. DiDomenica and Thomas Robbins,  jointly decided to implement the BASS program at Logan Airport and to train all Massachusetts State Police officers assigned to Logan Airport in the program starting in the spring of 2003.  <u>DiDomenica Dep</u>. 13-19, 21-22, 24-25, 29, 32-34.

9.     The BASS program, which was separate and distinct from the screening and search of passengers boarding aircraft at Logan Airport, was based on a notion termed "elevated suspicion," which was "[m]ore than a hunch but less than reasonable suspicion

required [under <u>Terry</u>] to detain a person for criminal investigation."  Under the BASS program,

a law enforcement officer was directed to question persons anywhere on property controlled by

Massport if the person raised an "elevated suspicion" or presented even "unresolved elevated

suspicion."[3]  Although these directed questionings were supposed to be "voluntary," and were

not based on "reasonable suspicion," under the BASS program "[r]efus[ing] to answer questions

or provide identification or travel documents" in response to such "voluntary" questioning

constituted prima facie evidence of "elevated suspicion."  And, according to BASS, anyone who

presented "elevated suspicion" should be barred from or escorted away from "critical

infrastructure."  Although the BASS program materials acknowledge that "[r]acial profiling

practices are contrary to the fundamental values of our nation and serve to disenfranchise whole

segments of our population," they do not expressly prohibit the use of race or ethnicity in

forming "elevated suspicion."  Indeed, the program materials which have been produced to the

plaintiff in redacted form strongly suggest that race and/or ethnicity may be considered in

assessing "elevated suspicion."  One slide, for example, entitled "Racial Profiling" states "In

forming ES [elevated suspicion] or reasonable suspicion that a person is high-risk, officers <u>may</u>

<u>consider</u> [REDACTED]".  (Emphasis added).  Another slide, also under the heading "Racial

Profiling", states "A person's [REDACTED] should not be the <u>sole</u> or <u>principal</u> reason in

forming ES [elevated suspicion] or reasonable suspicion."  (Emphasis added).  <u>DiDomenica Dep</u>.

Ex. 2.

       10.    All Massachusetts State Police officers assigned to Logan Airport,

including during the relevant period Troopers Thompson, Croxton, Adell and Moore, were paid

---

[3]    A person who presents unresolved elevated suspicion, that is, a person about
whom law enforcement has not even been able to determine if they present "elevated suspicion"
is deemed under BASS to be a "High Risk Passenger."

by Massport, but under the operational control of the Massachusetts State Police.  All Massachusetts State Police officers assigned to Logan Airport were required to be trained in the BASS program, and were expected to carry out that program in their work at Logan Airport. DiDomenica Dep. 33-35, 48-50, 56.

11.     Tpr. Thompson was trained in the BASS program on March 13, 2003. Thompson Dep. 25-28 and Ex. 1 thereto.

12.     Tpr. Howard Croxton, who responded to the scene in response to Tpr. Thompson's radio call, was trained in the BASS program on August 20, 2003.  Croxton Dep. 26-27; Thompson Dep. Ex. 1.

13.     Tpr. Wanza Adell, who responded to the scene in response to Tpr. Thompson's radio call, was trained in the BASS program on September 3, 2003.  Adell Dep. 16; Thompson Dep. Ex. 1.

14.     Tpr. Robert Moore, who responded to the scene in response to Tpr. Thompson's radio call, was trained in the BASS program on March 10, 2003.  Moore Dep. 13-14; Thompson Dep. Ex. 1.


II.     Response to Defendants' Various Statements of Undisputed Facts

The three sets of statements of undisputed facts filed by the various defendants are largely repetitive of each other and in some instances virtually identical.  Mr. Downing therefore responds below to the statements of undisputed facts in order, paragraph-by-paragraph, but incorporates by reference prior responses where appropriate to avoid needless repetition.

A.     Massport's Statement

1.     Admitted.

2.     Admitted.

3.    Admitted.

4.    Admitted.

5.    Admitted.

6.    Admitted.  Further responding, Mr. Downing was retrieving, and believes he was also been responding to, his voicemail messages.  Downing Aff. ¶ 5; Downing Dep. 22-23.

7.    Admitted.

8.    It is admitted that, among other duties, Tpr. Thompson is involved with dealing with irate passengers and travelers.  Tpr. Thompson was also specifically trained in the BASS program on March 13, 2003, and was expected by his supervisors to use that BASS training in identifying and gathering information on suspicious persons at Logan Airport. DiDomenica Dep. 48-50, 56; Thompson Dep. 25-28 and Ex. 1 thereto.

9.    Admitted.

10.    It is admitted only that while Mr. Downing was on the payphone, Tpr. Thompson was approximately five feet away from him.  It appeared to Mr. Downing that Tpr. Thompson had no reason to be standing where he was standing other than his interest in Mr. Downing, was listening or trying to listen to his telephone call, and within a minute after taking up his position about five feet away from Mr. Downing engaged Mr. Downing in conversation. Downing Aff. ¶ 6; Downing Dep. 87-88.

11.    The phrase "first encounter" is ambiguous.  It is admitted only that Tpr. Thompson came to the area five feet away from Mr. Downing while Mr. Downing was on the payphone; as between Mr. Downing and Tpr. Thompson, Tpr. Thompson was the first person to

speak; and Tpr. Thompson spoke to Mr. Downing while Mr. Downing was still using the payphone.  <u>Downing Aff</u>. ¶¶ 6, 7; <u>Downing Dep</u>. 110-112.

       12.     Admitted.

       13.     At the outset of the interaction between Mr. Downing and Tpr. Thompson, and while Mr. Downing was still on the telephone, Tpr. Thompson asked Mr. Downing "is there a problem?"  He asked this question in a confrontational, aggressive tone, seemingly designed to assert his authority.   In response, Mr. Downing asked Tpr. Thompson why Tpr. Thompson was standing so close to him.  Mr. Downing did not raise his voice or ask the question in anything but a respectful manner.  In response, Tpr. Thompson demanded to see Mr. Downing identification. <u>Downing Aff</u>. ¶ 7; <u>Downing Dep</u>. 22-23, 50-51.

       14.     Disputed.  In response to Tpr. Thompson's demand for identification while Mr. Downing was at the payphone, Mr. Downing declined.   <u>Downing Aff</u>. ¶ 7.  Mr. Downing ultimately provided his license and his travel documents outside.  <u>See</u> Massport's Statement ¶¶ 32, 36; <u>Downing Aff</u>. ¶¶ 12, 13.

       15.     Admitted.

       16.     Tpr. Thompson had no reasonable basis to consider Mr. Downing condescending or confrontational.  Mr. Downing was not condescending, confrontational or irate.  Mr. Downing simply indicated that he did not believe he was obligated to show his identification to the officer, who was standing close enough to Mr. Downing to listen to anything Mr. Downing said on the phone.  Mr. Downing was not irate.  He did not raise his voice, did not act in any was suspiciously, and did not do anything other than assert his lawful right not to show the officer his identification.  <u>Downing Aff</u>. ¶ 7; <u>Downing Dep</u>. 23-25.

       17.     Admitted.

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Admitted.

27.     Admitted.

28.     Admitted.

29.     Admitted.

30.     Admitted.

31.     Admitted.  Tpr. Thompson had told Mr. Downing that he was under arrest, and the statements by the police and the show of force by the police (including the presence of five uniformed officers and at least one police vehicle, their proximity to Mr. Downing, their unwillingness to permit Mr. Downing to leave) had made clear to Mr. Downing that he was not free to go -- and indeed would be taken into police custody -- if he did not produce to the police his identification documents.  Downing Aff. ¶¶ 9-12; Downing Dep. 30-31, 106, 124.

32.     Admitted, but further answering, please see paragraph 26 of the Officers' Statement.

33.     Admitted.  Mr. Downing only had carry-on luggage, so he simply picked up his carry-ons.  Downing Aff. ¶ 4; Downing Dep. 35.

34.    Admitted.  Despite having produced his identification, it was made clear to Mr. Downing that he was not free to leave unless he produced his airline ticket for inspection by the officers.  <u>Downing Aff</u>. ¶ 13; <u>Downing Dep</u>. 35-38.

35.    Admitted.

36.    Admitted.  Tpr. Thompson had told Mr. Downing that he was under arrest, and the statements by the police and the show of force by the police (including the presence of five uniformed officers and at least one police vehicle, their proximity to Mr. Downing, their unwillingness to permit Mr. Downing to leave, and their insistence on seeing Mr. Downing's identification) had made clear to Mr. Downing that he was not free to go, and would be placed on a "watch list" or "trespass list," if he did not produce to the police his airline travel documents.  <u>Downing Aff</u>. ¶ 13; <u>Downing Dep</u>. 30-31, 35-38, 106, 124.

37.    Admitted.

38.    Admitted.

39.    Mr. Downing knows that the BASS program did not play a role in his interactions with the police, but he reasonably believes that the BASS program played a role in the way in which the police acted towards him on October 16, 2003.  Tpr. Thompson and most of the other officers involved had been recently trained in BASS just prior to the date in question. Moreover, it was the expectation of the State Police that the officers trained in BASS would implement the policies which were a part of the BASS, and Tpr. Thompson's actions, and the actions of the other officers responding to the scene, were consistent with the BASS program. <u>See</u> Statement of Material Facts in Dispute ¶¶ 7-14, <u>supra</u>.

40.    Admitted.  Mr. Downing does know, however, that the BASS program permits the police to question individuals on less that reasonable suspicion, to use their lawful

refusal to answer questions as a basis to conclude that there is "elevated suspicion," which is a level of suspicion far less than "reasonable suspicion" under <u>Terry</u>, and to then remove such a person from "critical infrastructure," which is defined to include an airport.  <u>See</u> Statement of Material Facts in Dispute ¶ 9, <u>supra</u>.

     41.    Admitted.

     42.    Admitted.

     43.    Admitted.

     44.    Admitted.

     45.    Admitted.

     46.    Mr. Downing refused to produce his identification to Tpr. Thompson inside the non-secure area of the airport because he did not believe the officer had reasonable suspicion to believe that he (Mr. Downing) was engaged in any criminal activity, and that therefore, he (Tpr. Thompson) had no lawful basis to stop Mr. Downing, and that Mr. Downing was well within his rights not to show identification.  Tpr. Thompson also had no basis to believe that Mr. Downing was a trespasser at the airport, or was an irate passenger who had to be dealt with in any way by the police.  <u>Downing Aff</u>. ¶¶ 7-8.

    B.    <u>Officers' Statement</u>

     1.    Mr. Downing's full name is Lylburn King Downing.  With that clarification, Mr. Downing admits the remaining portion of paragraph 1.

     2.    Admitted.

     3.    Admitted.

     4.    Admitted.

     5.    Admitted.

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Admitted.

10.      Admitted.

11.      Admitted.

12.      Admitted.

13.      Admitted.

14.      Admitted.

15.      Admitted.  All troopers of Troop F, which was assigned to Logan Airport, who received BASS training in connection with their work at Logan Airport were expected to employ that training in their work while on patrol at Logan Airport.  See Statement of Material Facts in Dispute ¶¶ 7-9, supra.

16.      It is admitted that Mr. Downing traveled to Boston almost once per month from about the beginning of 2003 through about June 2006.  Downing Dep. 12-13.

17.      Admitted.

18.      Admitted.

19.      Admitted.

20.      Admitted.

21.      It is admitted that Tpr. Thompson was assigned to patrol at Terminal B.  It is disputed that Tpr. Thompson was watching the security checkpoint.  It appeared to Mr. Downing that Tpr. Thompson had no reason to be standing where he was standing five feet away from Mr. Downing, other than his interest in Mr. Downing.  From his (Tpr. Thompson's)

position, it appeared to Mr. Downing that Tpr. Thompson was listening or trying to listen to his telephone call, and within a minute after taking up his position about five feet away from Mr. Downing, engaged Mr. Downing in conversation even while Mr. Downing was still using the telephone. Downing Aff. ¶¶ 6, 7; Downing Dep. 18-22, 87-88.

22.    This paragraph is similar to paragraph 13 in Massport's Statement. Mr. Downing incorporates herein his response above to paragraph 13 in Massport's Statement.

23.    Mr. Downing was using the phone to check his voicemail messages. He may have also been returning voicemail messages, including leaving messages for people who had called him. Downing Aff. ¶ 5; Downing Dep. 22-23.

24.    After asking Mr. Downing "Is there a problem?", Tpr. Thompson asked to see Mr. Downing's identification. Mr. Downing disputes that Tpr. Thompson asked to see Mr. Downing's identification in response to anything Mr. Downing did, unless it was simply in response to Mr. Downing respectfully asking the officer why he was standing so close to him (Mr. Downing). Further answering, see Mr. Downing's response above to paragraph 16 in Massport's Statement. Downing Aff. ¶ 7.

25.    Admitted.

26.    Admitted.

27.    It is admitted that the outside portion of the upper level of Terminal B at Logan International Airport is for departing flights only. Those individuals wishing to leave the airport, i.e. those on arriving flights, cannot ordinarily access transportation from that level.

28.    It is admitted that Tpr. Thompson followed Mr. Downing outside the terminal, but disputes that it was because Tpr. Thompson was concerned about Mr. Downing's well-being due to Mr. Downing's unusual and confrontational behavior. Tpr. Thompson had no

reasonable basis to be concerned for Mr. Downing's well-being, nor was there anything unusual

or confrontational about Mr. Downing's behavior.  All Mr. Downing did was refuse to provide

his identification after Tpr. Thompson demanded it without reasonable suspicion to believe that

Mr. Downing was engaged in any criminal conduct.  Mr. Downing did not raise his voice, did

not act in any way suspiciously, and did not do anything other than assert his lawful right not to

show the officer his identification.  Downing Aff. ¶ 7.

29.     After Mr. Downing had left the terminal, as directed by Tpr. Thompson, as

an alternative to producing his identification; Tpr. Thompson again demanded Mr. Downing to

provide his identification.  When Mr. Downing again reasonably refused, Tpr. Thompson told

Mr. Downing that he was not free to leave.

30.     Admitted.

31.     Admitted.

32.     It is admitted that after Tpr. Thompson told Mr. Downing that he was

under arrest, Tpr. Thompson made a call on his portable hand-held radio for backup support

from other police officers.  Mr. Downing disputes that the reason for Tpr. Thompson's call was

"due to Plaintiff's irrational behavior."  There was nothing irrational, irascible or confrontational

about Mr. Downing's behavior.  Further answering, please see Mr. Downing's response above to

paragraph 28 in the Officers' Statement.

33.     Admitted.

34.     Admitted.

35.      Admitted.  Further answering, please see Mr. Downing's response above

to paragraph 31 of Massport's Statement.

36.     Admitted.

37.     While at the scene, Tpr. Croxton stood in close enough proximity to Mr. Downing to make sure that Mr. Downing could not leave the vicinity before his identification could be checked by Tpr. Thompson.  Tpr. Croxton also engaged Mr. Downing in conversation, telling Mr. Downing that he (Mr. Downing) was suppose to show identification to Tpr. Thompson if asked.  Croxton Dep. 36, 37; Downing Aff. ¶ 11.

38.     Admitted, except that Tpr. Croxton was on the scene giving assistant to Tpr. Thompson for approximately 10 minutes.  Croxton Dep. 39-40.

39.     Admitted.

40.     Admitted.

41.     Admitted.

42.     Admitted.

43.     Admitted.

44.     Admitted.

45.     Admitted.

46.     It is admitted that none of the officers put Mr. Downing in a police cruiser, moved him from the scene at the terminal or pushed him.  It is disputed that the police "stopped him from walking to leave the terminal" because this phrase is ambiguous.  It is true that the police did not stop Mr. Downing when he left the terminal.  Once just outside the terminal building, however, Tpr. Thompson told Mr. Downing that he was under arrest and through the show of force by the police made clear that he had been stopped by the police and was not free to go.  Further responding, please see Mr. Downing's response above to paragraph 31 in Massport's Statement.

47.     Admitted.

15

48.     Mr. Downing does not know, but he believes, that the officers were using the BASS program when he was stopped at Logan.  Further responding, please see Mr. Downing's response above to paragraph 39 in Massport's Statement.

49.     Disputed.  Further responding, please see Mr. Downing's response above to paragraph 39 in Massport's Statement.

50.     Mr. Downing does not know if his race was a consideration in connection with the police interaction with him at Logan Airport.  To the extent the BASS program was used in connection with Mr. Downing's stop at Logan, Mr. Downing's race may well have played a factor in the decision to observe, engage and seek identification and travel documents from Mr. Downing.

51.     Disputed.  <u>Downing Aff</u>. ¶¶ 6-13.

C.     <u>State Police's Amended Statement</u>

1.     It is admitted on the morning of October 16, 2003, Tpr. William Thompson, who is African-American, was on duty at Logan Airport.  Among other duties, Tpr. Thompson was responsible for removing trespassers and irate passengers.

2.     Far from a term of art, "irates" was a term Tpr. Thompson used.

3.     This paragraph is identical to paragraph 1 in Massport's Statement. Admitted.

4.     This paragraph is identical to paragraph 2 in Massport's Statement. Admitted.

5.     This paragraph is identical to paragraph 3 in Massport's Statement. Admitted.

6.     This paragraph is identical to paragraph 4 in Massport's Statement. Admitted.

7.     This paragraph is identical to paragraph 5 in Massport's Statement. Admitted.

8.     Admitted.  Further responding, Mr. Downing was retrieving, and may have also been responding to, his voicemail messages.  <u>Downing Aff</u>. ¶ 5; <u>Downing Dep</u>. 22-23.

9.      This paragraph is identical to paragraph 10 in Massport's Statement.  Mr. Downing incorporates herein his response above to paragraph 10 in Massport's Statement.

10.     This paragraph is identical to paragraph 11 in Massport's Statement.  Mr. Downing incorporates herein his response above to paragraph 11 in Massport's Statement.

11.     This paragraph is identical to paragraph 12 in Massport's Statement. Admitted.

12.     Disputed.  Tpr. Thompson's question to Mr. Downing of "Is there a problem?" was unprovoked by any action or look by Mr. Downing.  <u>Downing Aff</u>. ¶¶ 6-7.

13.     This paragraph is identical to paragraph 13 in Massport's Statement.  Mr. Downing incorporates herein his response above to paragraph 13 in Massport's Statement.

14.    This paragraph is identical to paragraph 14 in Massport's Statement.  Mr. Downing incorporates herein his response above to paragraph 14 in Massport's Statement.

15.    This paragraph is identical to paragraph 15 in Massport's Statement.  Mr. Downing incorporates herein his response above to paragraph 15 in Massport's Statement.

16.    This paragraph is identical to paragraph 16 in Massport's Statement.  Mr. Downing incorporates herein his response above to paragraph 16 in Massport's Statement.

17.    This paragraph is identical to paragraph 17 in Massport's Statement.  Mr. Downing incorporates herein his response above to paragraph 17 in Massport's Statement.

18.    Mr. Downing left the terminal because Tpr. Thompson said that if he did not show his identification, Mr. Downing would have to leave the terminal.  Downing Aff. ¶¶ 7, 9; Downing Dep. 25.

19.    Admitted.

20.    This paragraph is identical to paragraph 19 in Massport's Statement. Admitted.

21.    This paragraph is identical to paragraph 20 in Massport's Statement. Admitted.

22.    This paragraph is identical to paragraph 21 in Massport's Statement.  Mr. Downing incorporates herein his response above to paragraph 21 in Massport's Statement.

23.    This paragraph is identical to paragraph 22 in Massport's Statement. Admitted.

24.    This paragraph is identical to paragraph 23 in Massport's Statement. Admitted.

25.    This paragraph is identical to paragraph 24 in Massport's Statement. Admitted.

26.    This paragraph is identical to paragraph 25 in Massport's Statement. Admitted.

27.    This paragraph is identical to paragraph 26 in Massport's Statement. Admitted.

28.    Admitted.

29.    This paragraph is identical to paragraph 29 in Massport's Statement. Admitted.

30.    This paragraph is identical to paragraph 30 in Massport's Statement. Admitted.

31.    This paragraph is virtually identical to paragraph 31 in Massport's Statement.  Mr. Downing incorporates herein his response above to paragraph 31 in Massport's Statement.

32.    This paragraph is identical to paragraph 32 in Massport's Statement.  Mr. Downing incorporates herein his response above to paragraph 32 in Massport's Statement.

33.    This paragraph is identical to paragraph 34 in Massport's Statement.  Mr. Downing incorporates herein his response above to paragraph 34 in Massport's Statement.

34.    This paragraph is identical to paragraph 35 in Massport's Statement. Admitted.

35.    This paragraph is identical to paragraph 36 in Massport's Statement.  Mr. Downing incorporates herein his response above to paragraph 36 in Massport's Statement.

36.     This paragraph is identical to paragraph 37 in Massport's Statement.

Admitted.

37.     Admitted.

38.     This paragraph is identical to paragraph 39 in Massport's Statement.  Mr. Downing incorporates herein his response above to paragraph 39 in Massport's Statement.

39.     This paragraph is identical to paragraph 40 in Massport's Statement.  Mr. Downing incorporates herein his response above to paragraph 40 in Massport's Statement.

40.     This paragraph is identical to paragraph 39 in Massport's Statement.

Admitted.

41.     This paragraph is identical to paragraph 42 in Massport's Statement.  Mr. Downing incorporates herein his response above to paragraph 42 in Massport's Statement.

42.     This paragraph is virtually identical to paragraph 43 in Massport's Statement.  Admitted.

43.     Admitted.

44.     This paragraph is identical to paragraph 44 in Massport's Statement.

Admitted.

45.     This paragraph is identical to paragraph 45 in Massport's Statement.

Admitted.

46.     This paragraph is identical to paragraph 46 in Massport's Statement.

Admitted.

47.     Admitted.

KING DOWNING
By his attorneys,


/ S /  Peter B. Krupp

Dated:  May 29, 2007

Peter B. Krupp
  BBO #548112
Lurie & Krupp, LLP
One McKinley Square
Boston, MA  02109
Tel:  (617) 367-1970

John Reinstein
  BBO # 416120
American Civil Liberties Union of
Massachusetts
99 Chauncy Street, Suite 310
Boston, MA 02111
Tel:  (617) 482-3170


<u>CERTIFICATE OF SERVICE</u>

 I, Peter B. Krupp, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on May 29, 2007.

/ S / Peter B. Krupp


Peter B. Krupp