UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KING DOWNING,<br>　　　　Plaintiff,<br><br>　　v.<br><br>MASSACHUSETTS PORT AUTHORITY; THE MASSACHUSETTS DEPARTMENT OF STATE POLICE, STATE POLICE TROOPER THOMPSON, STATE POLICE SERGEANT CROXTON, THOMAS G. ROBBINS, and PETER J. DIDOMENICA,<br>　　　　Defendants. | Civil Action No. 04-12513-RBC |

AFFIDAVIT OF KING DOWNING

I, King Downing, hereby on oath state as follows:

1. I am the plaintiff in the above-captioned matter. I make this affidavit in opposition to the various summary judgment motions filed by the defendants.

2. I am a 1975 graduate from Harvard College, and a 1992 graduate from Rutgers University Law School. Since 2001, I have worked for the American Civil Liberties Union ("ACLU"), serving as the National Coordinator of the ACLU's Campaign Against Racial Profiling. My work requires that I frequently travel to and from Boston, among other places, by air.

3. I am African–American.

4. On the morning of October 16, 2003, I arrived at Logan Airport on an Alaska Airlines overnight flight from the west coast. I had a short beard, and had with me a brief case and a carry-on, which had been strapped to a portable two-wheeled, luggage carrier. I was

wearing casual slacks and a button-down striped shirt with a narrow collar. My shirt was worn loose over my pants, and I was wearing a jacket. I was dressed no differently from other travelers. I did not appear homeless or vagrant, but was acting as any traveler would upon disembarking from a plane.

5.   After deplaning in Boston, I left the gate area, exited from the secure area of the airport, and stopped to make a phone call from a public telephone on the upper level of the terminal near the airport exit. I was using the public telephone to call in to listen to my voicemail messages and, I believe, I may have also been returning some voicemail messages. I was not near security, I was not attempting to pass through security, and I was not trying to board a plane.

6.   Within a minute of getting onto the phone, I noticed that Troooper William Thompson ("Tpr. Thompson"), who was wearing a Massachusetts State Police uniform, had approached me and was standing about five feet away, close enough to overhear anything I said on the telephone. Tpr. Thompson had not been at that location when I got onto the telephone. I noticed that Tpr. Thompson had no reason to be in this position only a few feet away from me other than to observe me, to listen to anything I said on the phone, or to speak with me.

7.   While I was using the phone, Tpr. Thompson asked me "Is there a problem?" He asked this question with his arms crossed over his chest, in an aggressive and confrontational tone, in a manner I thought was designed to assert his authority. In response, I asked him why he was standing close enough to listen to what I said on the phone. He did not answer me. Instead, he demanded that I produce identification. Given his close proximity and aggressive questioning, I felt that I was not free to leave his presence, although I felt he had no basis to stop me and no lawful basis to require me to produce my identification. Although I did not believe

2

that I was free to leave without responding to Tpr. Thompson's demands, I respectfully declined to produce any identification without receiving an explanation of why I was being stopped. At no time did I raise my voice, become upset or irate, or act in an irritable, condescending, combative or confrontational way. Tpr. Thompson refused to provide any explanation, but he did say that if I was not going to produce identification I would have to leave the airport terminal.

       8.     At this point, I was in an area of the terminal which was generally accessible to the public, and could only have been observed by Tpr. Thompson for a very short time. Tpr. Thompson did not have had a reasonable suspicion that I had committed, was committing or was about to commit a crime; had no basis to believe that I was on any type of "no trespass" list; and did not have any other lawful basis to stop or detain me or to require me to produce identification as a condition of remaining in the non-secure area of the terminal. Although I was suspicious that Tpr. Thompson had singled me out based on considerations of race, and had stopped me without reasonable suspicion that I had committed any crime, I agreed to leave the airport to avoid further delay, humiliation and confrontation.

       9.     After Tpr. Thompson said that if I did not provide identification, then I would have to leave the airport terminal, I left the airport terminal through the nearby door, which was out onto the upper level of the airport. I attempted to locate a taxi. I noticed that Tpr. Thompson followed me out of the terminal. Outside of the terminal, as I was trying to flag down a taxi, Tpr. Thompson approached me again and demanded that I show him some identification. He said that if I did not produce identification, that I would be "going downtown," which I understood meant being taken into custody by the police. I asked Tpr. Thompson if I was under arrest. Tpr. Thompson told me that I was under arrest and that I was no longer free to leave. Tpr. Thompson

3

refused to tell me why he had placed me under arrest. Tpr. Thompson appeared agitated and upset that I was unwilling to hand over my identification documents. In my presence, Tpr. Thompson used his radio to request police backup or assistance, which I though was consistent with being placed under arrest.

10. Other than asking me for identification, prior to detaining me outside the terminal, and certainly prior to questioning me inside the terminal, Tpr. Thompson did not ask me any questions about my flight plans, the reason I was at the airport, on what flight I had arrived, or any other questions designed to dispel any suspicion that Tpr. Thompson may have had about my presence at the airport. Tpr. Thompson remained with me until the additional police arrived.

11. Five or more minutes after Tpr. Thompson called for backup, four Massachusetts State Police uniformed officers, together with at least one police cruiser, responded to the area outside the terminal where I had been trying to hail a taxi and where Tpr. Thompson told me I was under arrest. The officers took up positions near me to assure that I could not leave the area. After speaking with Tpr. Thompson separately, a white officer, who I now understand was Sergeant Mark Kiley ("Sgt. Kiley"), informed me that Tpr. Thompson had asked for my identification because Tpr. Thompson had concluded that I was behaving suspiciously. I knew that this was unfounded because I had not done anything that could be considered suspicious, and knew I had given the police no reason to stop me. I asked Sgt. Kiley how I had allegedly acted suspiciously. Sgt. Kiley gave me the impression that he had not asked Tpr. Thompson for any details. Sgt. Kiley also refused to ask Tpr. Thompson how I had allegedly aroused Tpr. Thompson's suspicion, stating to the effect that if his subordinate tells him he has suspicion "it is good enough for him." During this exchange, and from the time they arrived on the scene, the other uniformed State Police officers were positioned near me to make sure I could not leave.

12. At this point, I was afraid that I was going to be handcuffed and taken to a police lockup. I wished and hoped to avoid further delay and harassment, and so I gave Sgt. Kiley my driver's license. Tpr. Thompson took the license and brought it to a State Police cruiser, where he appeared to make a radio call. At least two other troopers remained with me to prevent me from leaving.

13. After some time, my driver's license was returned to me, but then I was informed by one of the officers that I would also have to produce, and the police would have to inspect, my airline ticket. The police through their actions, including the number of uniformed officers present, their proximity to me, and their demeanor, made clear that I still was not free to go unless I produced my travel documents. When I refused, one of the officers also told me that if I did not produce my airline ticket, I would be placed on Logan Airport's "watch list" or "trespass list," and my ability to return to the airport without a ticket would result in arrest. Again fearing I would in fact suffer the threatened consequences, including arrest and being placed on a "watch list" or "trespass list," all of which would interfere with my professional duties, I gave the police my airline ticket or boarding pass. All of the officers at the scene looked at my travel document to determine if it was valid. When my flight document was finally returned, I was permitted to leave the airport.

Signed subject to the pains of perjury this 29th day of May, 2007.

/ S /  King Downing

King Downing

<u>CERTIFICATE OF SERVICE</u>

      I, Peter B. Krupp, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on May 29, 2007.

                / S / Peter B. Krupp

                Peter B. Krupp