UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                    )
KING DOWNING,                       )
              Plaintiff,            )
                                    )
       v.                           )          Civil Action No. 04-12513-RBC
                                    )
MASSACHUSETTS PORT AUTHORITY; THE   )
MASSACHUSETTS DEPARTMENT OF STATE   )
POLICE, STATE POLICE TROOPER        )
THOMPSON, STATE POLICE SERGEANT     )
CROXTON, THOMAS G. ROBBINS, and     )
PETER J. DIDOMENICA,                )
              Defendants.           )
_____)

<u>AFFIDAVIT OF PETER B. KRUPP</u>

I, Peter B. Krupp, hereby on oath state as follows:

1.      I am an attorney for plaintiff King Downing in the above-referenced matter.  I make this affidavit in opposition to the various summary judgment motions filed by the defendants.

2.      Attached as Exhibit 1 is a true and accurate copy of pages 1, 4, 12-13, 18-25, 30-31, 35-38, 50-51, 87-88, 106, 110-112, 124 of the transcript of the deposition of King Downing taken on September 18, 2006.

3.      Attached as Exhibit 2 is a true and accurate copy of pages 1, 5, 6, 13-19, 21-22, 24-25, 28-29, 32-35, 48-50 and 56 of the transcript of the deposition of Peter J. DiDomenica taken on January 4, 2007, and Exhibit 2 marked during that deposition.

4.    Attached as Exhibit 3 is a true and accurate copy of pages 1, 5, 6 and 25-28 of the transcript of the deposition of William A. Thompson, Jr. taken on June 22, 2006, and Exhibit 1 marked during that deposition.

5.    Attached as Exhibit 4 is a true and accurate copy of pages 1, 5, 26-27, 36-37 and 39-40 of the transcript of the deposition of Howard G. Croxton taken on June 23, 2006.

6.    Attached as Exhibit 5 is a true and accurate copy of pages 1, 5 and 16 of the transcript of the deposition of Wanza Adell taken on July 19, 2006.

7.    Attached as Exhibit 6 is a true and accurate copy of pages 1, 4 and 13-14 of the transcript of the deposition of Robert J. Moore, Jr. taken on July 19, 2006.

Signed subject to the pains of perjury this 29th day of May, 2007.

/ S /  Peter B. Krupp

Peter B. Krupp

## CERTIFICATE OF SERVICE

I, Peter B. Krupp, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on May 29, 2007.

/ S / Peter B. Krupp

Peter B. Krupp

1

VOLUME:  1
PAGES:  1 through 146

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
KING DOWNING,                          )
                    Plaintiff,         )
                                       )
    VS.                                )
                                       )
MASSACHUSETTS PORT AUTHORITY; THE)
MASSACHUSETTS DEPARTMENT OF STATE)
POLICE, STATE POLICE TROOPER     )
THOMPSON, STATE POLICE SARGEANT  )
CROXTON, THOMAS G. ROBBINS, and  )
PETER J. DIDOMENICA,             )
                    Defendant.         )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

        DEPOSITION OF KING DOWNING, a witness called

on behalf of the Defendants, taken pursuant to

the provisions of the Federal Rules of Civil

Procedure, before Lisa W. Starr, a Registered

Professional Reporter/Certified Realtime Reporter

and Notary Public in and for the Commonwealth of

Massachusetts, at the offices of Ropes & Gray,

LLP, One International Place, Boston,

Massachusetts, on September 18, 2006, commencing

at 9:30 a.m.

                COPLEY COURT REPORTING, INC.
                101 Tremont Street, Suite 500
                Boston, Massachusetts 02108
                    (617) 423-5841

4

```
 1                    P R O C E E D I N G S

 2                    MR. TRIMMIER:   The first thing, the

 3        first order of business is the stipulations.   I

 4        propose that we stipulate that all objections,

 5        except as to form, are reserved until the time of

 6        trial and that the deposition transcript be

 7        signed in the presence of any notary.  Is that

 8        acceptable?

 9                    MR. REINSTEIN:   In the presence of a

10        notary?

11                    MR. TRIMMIER:   Yes.

12                    MR. REINSTEIN:   That's fine.  I'm

13        not sure that we need that, but if you prefer

14        that, that's agreeable.

15                    MR. TRIMMIER:   Are there any other

16        stipulations?

17                    MR. KITTREDGE:   That's fine.

18                    KING DOWNING

19        of lawful age, being first properly identified

20        and duly sworn to tell the truth, the whole

21        truth, and nothing but the truth, deposes and

22        says as follows in answer to direct

23        interrogatories by Attorney Trimmier:

24          Q.   Mr. Downing, I represent Massachusetts
```

12

```
 1        Q.   Does that fairly and accurately describe

 2        the duties, qualifications, responsibility of

 3        your position?

 4        A.   Yes.

 5             MR. TRIMMIER:   I ask that that be

 6        marked as Defendants' Exhibit 1.

 7                       (Job posting dated

 8        3/8/2001 was marked as Exhibit D-1 for

 9        identification).

10        Q.   Mr. Downing, since you assumed this

11        position as National Coordinator in June of 2001,

12        have you received any specialized training

13        regarding issues of racial profiling?

14        A.   No.

15        Q.   Have you taken part in any training since

16        you assumed this position with the ACLU at all?

17        A.   No.

18        Q.   In connection with your duties, do you

19        travel to Boston frequently?

20        A.   Yes.

21        Q.   How frequently?

22        A.   Approximately once a month until

23        recently, until over the last, I'd say, three

24        months.  But prior to that, almost once a month
```

13

1    since about the beginning of 2003.

2        Q.   And generally, what are the purposes of

3    those visits?

4        A.   The purpose of almost all the visits were

5    to take part in the racial profiling working

6    group that was convened by Ed Flynn, who at the

7    time was the Director of DPS.

8        Q.   What is DPS?

9        A.   Department of Public Safety.

10       Q.   So, this was -- well, explain to me what

11   this working group was.

12       A.   The state legislature enacted a statute

13   that banned racial profiling in the State of

14   Massachusetts and required a study of citations

15   that have been issued over approximately a year

16   and a half period.

17           As part of that effort, Director Flynn,

18   on the advice of Northeastern University,

19   convened a group of community members, law

20   enforcement, and civil rights and civil liberties

21   organizations to discuss the issue of racial

22   profiling, advise on the design of the data

23   collection process, and set up a program for the

24   dissemination of the results of the study.

18

1        Q.    Significant departure?

2        A.    Any significant delay, no.

3        Q.    When you arrived at Logan International

4    Airport, I think it's correct that you arrived at

5    a gate at Terminal B; is that right?

6        A.    Yes.

7        Q.    When you got off the airplane, where did

8    you go?

9        A.    I got off the plane, and I went straight

10   out of the terminal into the general area.

11       Q.    When you say out of the terminal --

12       A.    Out of the secure area of the terminal.

13       Q.    And that's on the second level or the top

14   level of the terminal; is that right?

15       A.    Yes.

16       Q.    And what did you do after you left the

17   secure area?

18       A.    I went to a pay phone.

19       Q.    Did you make a call?

20       A.    Yes.

21       Q.    To whom?

22       A.    I was checking my messages.

23       Q.    From your office in New York?

24       A.    From my office?

19

1       Q.    Messages left at your office in New York?

2       A.    Right.

3       Q.    Voicemail?

4       A.    Yes.

5       Q.    That was done electronically without you

6    speaking; is that right?

7       A.    Could you explain that?

8       Q.    Did you have to speak in order to

9    retrieve your messages presumably from voicemail?

10      A.    No.

11      Q.    While you were -- by the way, do you

12   have a cell phone?

13      A.    No.

14      Q.    You didn't then, either?

15      A.    No.

16      Q.    While you were retrieving your messages,

17   what happened?

18      A.    I was on the telephone, and for some

19   reason I turned to my right while I was on the

20   phone, and I observed the trooper standing to my

21   right at a very close proximate distance to me,

22   up against the wall in a very tighten closure.

23      Q.    And the trooper you referred to is

24   Trooper Thompson, who is present here today?

20

1       A.    Yes.

2       Q.    How close was he?

3       A.    About five feet.

4       Q.    And you described the area as very close.

5   Why is that?  It's a confined space?

6       A.    The telephone was very close to the wall

7   that faced the street.  There were a row of

8   phones, and there wasn't a lot of clearance

9   between the phones and the wall.

10      Q.    And he was standing between the phones

11  and the wall?

12      A.    He was standing that certain number of

13  feet to my right, but he wasn't between the

14  phones; he was against the wall.

15      Q.    He was between you and the so-called

16  secure area?

17      A.    No, no.  The secure area was where you

18  are now sitting, and the wall to the outside and

19  the street was behind me.  And he was to my

20  right.  He would have also been facing you.

21      Q.    Let me see if I can describe this in

22  a way without the diagram.  You were facing the

23  secure area with your back to the window of the

24  terminal.  Trooper Thompson --

1              MS. O'NEIL:   Can you just state that

2        for the record?

3          Q.   Is that right?

4          A.   The question again.

5          Q.   You were facing the secure area with your

6        back to the windows of the terminal while you

7        were on the phone; is that right?

8          A.   Well, let me correct that.  I was facing,

9        the secure area was off and to our left.  I was

10       not facing directly into the secure area.  The

11       passageway that people would leave was probably

12       about a 45-degree angle from where I was.  People

13       would not have walked right out of the secure

14       area and run into the telephones.  The phones

15       were out of the way of the secure area.

16         Q.   And that was at a 45-degree angle to your

17       left; is that right?

18         A.   Yes.

19         Q.   And Trooper Thompson was also to your

20       left?

21         A.   No.  He was to my right.

22         Q.   He was to your right.  What to your

23       recollection do you recall Trooper Thompson was

24       doing, or what did you observe him doing?

22

1     A.   Standing against the wall with his arms

2    folded in front of him.

3     Q.   At some point, did you speak to Trooper

4    Thompson?

5     A.   At some point I spoke to Trooper

6    Thompson, but not until he had spoken to me.

7     Q.   When did -- did he speak to you while

8    you were still on the phone?

9     A.   Yes.

10     Q.   What did he say?

11     A.   Well, when I turned and looked over my

12    right shoulder and I saw him there, he asked me

13    if there was a problem.  His words were, "Is

14    there a problem?"

15     Q.   Those were his exact words, as you

16    recall?

17     A.   Yes.

18     Q.   And what did you say?

19     A.   I said, "I just want to know why you're

20    standing here so close to me while I'm talking on

21    the telephone."

22     Q.   Were you in fact talking on the telephone

23    or were you just on the telephone?

24     A.   Well, I was retrieving messages, but at

23

1      that time I may have also been leaving messages.

2      So, for me, talking on the telephone meant while

3      I have a phone in use.

4          Q.    And in response to your statement, what

5      did Trooper Thompson say, if anything?

6          A.    He said, "All right.  I want to see some

7      ID."

8          Q.    Were you still on the phone at that

9      point?

10         A.    I was holding the phone in my hand.  I

11     don't know if I was in the middle of leaving a

12     message at that point or retrieving a message.

13         Q.    What did you do at that point?

14         A.    I said, "Why do I have to show you ID?"

15     And he requested to see my ID again.  I said,

16     "I'm not showing you my ID."

17         Q.    Why did you refuse?

18         A.    Because I believe under the Constitution

19     I have a right not to show my identification.

20         Q.    What happened next?

21         A.    Well, he had requested my ID again, and I

22     said I wasn't going to show it.  And at that

23     point, I hung up the phone, and I started walking

24     away towards the passageway that I said was at a

24

1          45-degree angle.  It was an open walkway there,

2          and I started walking away.

3                He came around from the other side and

4          stood probably maybe, well, I don't know the

5          distance, but he took a position that was facing

6          me and requested my identification again.

7          Q.    And this was still inside the terminal?

8          A.    Yes.

9          Q.    Were you attempting to leave the terminal

10         at that point?

11         A.    No.

12         Q.    Why not?

13         A.    I didn't have any reason to.

14         Q.    Well, what do you mean?  You were going

15         to just stay in the terminal area in the upper

16         level of terminal B until you had a reason to

17         leave?  I don't understand your statement.

18         A.    I didn't understand the question.

19         Q.    Okay.  When you said you hung up the

20         phone, after you hung up the phone where were you

21         headed?

22         A.    At that point, I just wanted to terminate

23         the conversation with the trooper.

24         Q.    And so, you moved to another area of the

25

```
 1    terminal?

 2         A.    Yes.

 3         Q.    What did you do in response to this

 4    second request for identification?

 5         A.    I told him I wasn't going to show ID and

 6    I didn't have to show ID.

 7         Q.    What did he say?

 8         A.    We may have had another round back and

 9    forth about that, and then he said, "If you don't

10    show ID, you're going to have to leave the

11    terminal."

12         Q.    And what did you do then?

13         A.    I said, "Okay, I'll leave."

14         Q.    And did you?

15         A.    Yes, I left.

16         Q.    You departed from the upper level of

17    Terminal B?

18         A.    Yes.

19         Q.    And what happened after you got outside?

20         A.    I walked outside, and I saw a cab coming.

21    I tried to hail a cab, but it drove past.  I

22    later realized that I was on the wrong level to

23    get a cab.  So, I tried to walk a little further

24    out.  I still didn't realize that the cabs
```

30

```
 1        produce identification?

 2            A.   Yes.

 3            Q.   Did you?

 4            A.   Yes, I eventually did.

 5            Q.   Was there any other conversation that we

 6        haven't discussed between before he made his

 7        request for identification and you produced it?

 8            A.   No.  At that point in time I had a ten

 9        o'clock meeting, and it was becoming clear --

10        oh, I need to add something else here.  The words

11        that the trooper used that if I didn't show ID,

12        this is one of the other exchanges, he said, "If

13        you don't show ID, you're going downtown."

14            Q.   And this is Trooper Thompson that said

15        that?

16            A.   Right.

17            Q.   Before the other four officers arrived?

18            A.   Yes.

19            Q.   And --

20            A.   And what that told me was that I very

21        likely flew the red eye into Seattle to Boston to

22        attend a meeting which I now probably would miss,

23        but it was very likely that I wouldn't make it

24        back to Seattle for the rest of the Indian
```

31

1    conference.  Being told that I was being put

2    under arrest and taken downtown, I had a clear

3    impression in my mind that I might not see the

4    light of day until Monday.

5         So, at that point, I turned over my ID.

6    Q.    And what did Sergeant --  what kind of ID

7    did you provide?

8    A.    A driver's license.

9    Q.    What did Sergeant Kiley do with the

10    driver's license?

11    A.    I don't recall exactly, but I know at

12    some point Trooper Thompson took it over to the

13    vehicle.  I assume that he ran the license.

14    Q.    And by ran the license, you mean he

15    radioed the information on the license to some

16    authority for it to be checked?

17    A.    Yes.

18    Q.    Do you know what the check was for?

19    A.    Do I know what the check was for?  I was

20    not told what the check was for.

21    Q.    Nor do you know to whom the radio call

22    was made?

23    A.    No.

24    Q.    What happened after he ran the license?

1      A.    No.  I said I don't recall.

2      Q.    You just don't recall at all?

3      A.    Right.  Actually, I did have a

4   recollection of the name Croxton.

5      Q.    From that encounter on October 16?

6      A.    Yes.

7      Q.    Were you asked to produce airline

8   tickets?

9      A.    Yes.

10      Q.    By whom?

11      A.    After I had given the ID, I was gathering

12   up my things to go.

13      Q.    What happened?

14      A.    I was asked to produce my airline

15   tickets.

16      Q.    By whom?

17      A.    I'm not sure who it was that asked me.

18      Q.    And did you produce those tickets, a

19   ticket?

20      A.    After some conversation, I said, "You

21   asked me to show identification.  I've shown

22   identification.  Now you're asking for my

23   tickets.  I'm not going to show you my tickets."

24      Q.    Why did you refuse?

36

1       A.   I had reluctantly relinquished my rights

2   not to show ID, and I saw no reason now why I had

3   to relinquish additional rights.

4       Q.   Well, after providing identification,

5   what additional rights were you relinquishing by

6   showing travel documents?

7       A.   My understanding is that once we

8   relinquish any right, it doesn't apply to every

9   right that may arise from that point on.

10      Q.   I understand that.  But what specific

11  right were you foregoing by showing travel

12  documents?  You had already identified yourself;

13  is that right?

14      A.   Right.

15      Q.   What was the additional --

16      A.   I'm under no obligation to provide any

17  information, whether I've given my name or not,

18  my travel plans, or where I plan to eat or

19  anything else that's in my pockets, or anything.

20      Q.   Have you described the conversation that

21  took place subsequent to the request that you

22  produce airline tickets?

23      A.   Have I described it?

24      Q.   Yes.

37

```
1        A.   Part of it.

2        Q.   What's the rest of it?

3        A.   I was told that if I didn't show my

4    identification that I was going to be put on a

5    watch list, some words to that effect, and I

6    asked what the watch list was.  They said that if

7    I got placed on the watch list and I ever came

8    back to the airport and I wasn't able to account

9    for why I was there, I would be arrested.

10       Q.   Did they say watch list, or did they say

11   trespass list?

12       A.   They might have used the word trespass

13   list.

14       Q.   Was there any other conversation?

15       A.   Might have had another round of saying

16   that I wasn't going to show the ticket, but I

17   think at that point the same issues that came up

18   before about time, needing to get away from

19   there, not being sure whether I might be subject

20   to arrest again, that I showed them the travel

21   tickets.

22       Q.   And what happened after you --  who did

23   you produce the travel tickets to?

24       A.   I gave them --  I just handed them to the
```

1      group.  The sergeant was there, Trooper Thompson

2      was there.   I turned them over to the group.

3          Q.   You don't recall specifically who you

4      handed them to?

5          A.   No.

6          Q.   What did the group then do with the

7      tickets?

8          A.   Well, they got into a discussion among

9      themselves about whether my ticket qualified me

10     to not be a trespasser because of the fact that

11     the ticket said October 15, and it was October

12     16.  So, they got into a discussion for awhile.

13     And then --

14         Q.   Go ahead.

15         A.   No, please, go ahead.

16         Q.   What ticket did you produce?

17         A.   It was the boarding pass from Seattle to

18     Boston.

19         Q.   I'm placing before you another document.

20     There appears to be xeroxed copies of two

21     boarding passes.  Do you recognize that?

22         A.   Yes.

23         Q.   Are there in fact images of two boarding

24     passes on this sheet?

50

1       you be sensitive to Trooper Thompson overhearing

2       that?

3           A.    I don't remember saying that I was

4       sensitive to Trooper Thompson overhearing that.

5       I think what I said was I asked him the question

6       about why he was standing so closely.

7           Q.    So closely that he could hear your

8       telephone call, I believe is what you said.

9           A.    Right.

10          Q.    Why were you concerned about him hearing

11      your telephone call?

12          A.    I wasn't concerned about him hearing my

13      telephone call.  The point for me was why was he

14      standing so closely to the point that he might

15      have been able to hear a telephone call as well.

16          Q.    So, it was his proximity, not the fact

17      that he might have been able to hear what you

18      were saying, that was of concern?

19          A.    It was the proximity and the somewhat

20      unusual circumstance in which that proximity came

21      about.  I can think of circumstances in the

22      airport where it would be very natural for a

23      police officer to be close by.  If you're

24      standing in a line somewhere or if I'm waiting to

51

1       go into the secure area or if we're passing by

2       each other walking or he happens to be in an area

3       where people are walking past.

4               This area was somewhat unusual in that it

5       was a tight space, close to a wall, away from the

6       foot traffic.  And there was no one on the other

7       side or on any of the other phones.  Yet, he was

8       standing in a position that was very close and

9       where I happened to be.

10      Q.    And I believe your testimony was that

11      without you addressing Trooper Thompson, he was

12      the first to speak, and he spoke to you and he

13      said, "Do you have a problem?"

14      A.    No.  He said, "Is there a problem?"

15      Q.    Let me ask this question.  In the

16      post-9/11 world, where we have heightened

17      security at airports, are you of the view that

18      it's inappropriate for security officials to

19      request identification to determine who is at the

20      airport and travel documents to determine whether

21      or not they have a reason to be at the airport?

22      A.    Could you be a little more specific?

23      You've covered a lot of airport activity, a lot

24      of locations, and a lot of purposes in that

87

1       standing was not directly in front of the phone

2       but slightly to the side, the secure area would

3       have been at that angle, that distance.

4           Q.   If somebody had screamed in the secure

5       area, would you have been able to see what was

6       going on at any point while you were on the

7       phone?

8               MR. REINSTEIN:    Objection.  If

9       somebody had screamed?

10              MS. O'NEIL:   Yes.

11          Q.   If there was a commotion going on in the

12      secure area, was your vision blocked so you would

13      not be able to see what was going on while you

14      were on the phone?

15          A.   It depends because --  it depends how

16      loud it was or what you're talking about.  The

17      inspection area wasn't right there.  It was quite

18      a distance in that direction.

19          Q.   Okay.  Do you know if the trooper could

20      see into the secure area from where he was?

21          A.   I don't think so.

22          Q.   Why not?

23          A.   Because there was my pay phone standing

24      there, and he was right next to me, and the pay

88

1     phone was at that same angle.

2         Q.    So you believe his vision was blocked?

3         A.    I believe so.

4         Q.    Going back to the pay phone for a second,

5     you testified earlier that you don't have a cell

6     phone?

7         A.    No.

8         Q.    And you didn't have a cell phone then?

9         A.    No.

10        Q.    Why not?

11        A.    I don't have a cell phone.

12        Q.    I mean, you're working as a national

13    coordinator.  You're flying all around the

14    country, and you're using pay phones to do what

15    you testified earlier what might be sensitive

16    business?  Why don't you have a cell phone?

17        A.    Well, there have been some reports of

18    harm that cell phone use can cause.  It's not

19    something that's very much published here, but

20    there have been some studies in Europe to talk

21    about electromagnetic frequencies.

22        Q.    So you're concerned about EMF and cancer?

23        A.    I'm concerned about EMF.  I don't know

24    exactly what the harms are.  I think brain cancer

1      ID again.  Again, that can be humiliating.  And

2      when you ask if you're free to go and you're told

3      that you're being placed under arrest and no

4      cause is given, you're not free to go or you can

5      go downtown, each step of the way compounds that.

6            And then when you're standing in an

7      airport surrounded by troopers and it's very

8      clear you're not free to go by the position that

9      they've taken, with another trooper and a ranking

10     officer there, that's publicly humiliating as

11     well.  And to have to turn over documents in that

12     circumstance, including travel documents, all of

13     that is humiliating.

14        Q.   Did you suffer from any emotional

15     distress after the incident?

16        A.   It still weighs on me.

17        Q.   How so?

18        A.   In the first case, to have to come back

19     through that airport time and time again and not

20     know whether the same thing could happen again,

21     whether somebody might decide that they don't

22     appreciate the fact that I have gone to court and

23     tried to assert my rights, having to replay that

24     over again, those two things are distressful.

110

1       A.   Correct.

2       Q.   And once you left the secure area, you

3   then went and used the pay phone; is that

4   correct?

5       A.   Yes.

6       Q.   At the point in time that you used the

7   pay phone, did you see my client situated there

8   next to the pay phone?

9       A.   Could you repeat the question?

10      Q.   You indicated that you saw my client

11  within five feet of where you were using the

12  phone; is that correct?

13     A.   Yes.

14     Q.   Was he there before you started using the

15  phone?

16     A.   No.

17     Q.   How long had you been on the phone before

18  you noticed him there?

19     A.   I was only on the phone for a minute or

20  two.  So it was within that time frame.

21     Q.   Had you observed my client prior to

22  getting on the phone?

23     A.   No.

24     Q.   Had you observed my client take a

111

1       position five feet away from you?

2            A.   Are you asking did I observe him take the

3       position, or did I observe him in the position?

4            Q.   Take the position?

5            A.   No.

6            Q.   Do you know how long he was in that

7       position before you noticed him?

8            A.   Pretty immediate because I was facing not

9       directly to the phone but to the side.

10           Q.   I believe you testified initially that he

11      was in a stationary position with his arms folded

12      facing out five feet away from you; is that

13      correct?

14           A.   Yes.

15           Q.   He wasn't moving at the point in time

16      that you first observed him; is that correct?

17           A.   Correct, he was not moving.

18           Q.   So, within the one to two minutes, he was

19      able to take up a position five feet away from

20      you before you noticed him?

21           A.   Within one to two minutes?

22           Q.   Right.

23           A.   Yes.

24           Q.   Why do you think he took that position?

112

```
 1        A.   I have no idea.

 2        Q.   Why do you believe he said to you "Do we

 3   have a problem?"

 4        A.   I have no idea.

 5        Q.   But it's clear in your mind that he spoke

 6   to you first; is that correct?

 7        A.   Yes.

 8        Q.   And at some point --

 9        A.   Did you say "Do we have a problem?"

10        Q.   What did he say to you?

11        A.   "Is there a problem?"

12        Q.   Why did he say that to you?

13        A.   I'm not sure why he said that to me.

14        Q.   Do you have any belief today why he said

15   that to you?

16        A.   I'm not sure why he said that to me.

17        Q.   Do you have any belief?

18        A.   The only thing I could say is I had

19   turned to look at him.

20        Q.   How long was this look at my client?

21        A.   I turned, and it was immediate.

22        Q.   And at that point in time, you were using

23   a pole that had phones on it; is that correct?

24        A.   Yes.
```

124

1      Q.  Did you tell anybody else at the

2     terminal, any of the officers that came up later,

3     that my client had said you were under arrest?

4      A.  I don't remember.  I had some

5     conversation with Croxton while the others were

6     standing around.  I don't remember if I told him

7     that or not.

8      Q.  Did you ask Sergeant Kiley whether you

9     were no longer under arrest and free to go?

10     A.  It was pretty clear the way the officers

11    were standing around me that I wasn't free to go.

12     Q.  You recall at some point in time Sergeant

13    Kiley came to the scene, correct?

14     A.  Correct.

15     Q.  He's the one you produced the

16    identification for; is that correct?

17     A.  Right.

18     Q.  At some point in time you received your

19    information back; is that correct?

20     A.  Correct.

21     Q.  Did you ask him then if you were no

22    longer under arrest?

23     A.  Did I ask Kiley?

24     Q.  Anybody.

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12513-RBC

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

KING DOWNING,                                    \*
          Plaintiff,                             \*
                                                 \*
v.                                               \*
                                                 \*
MASSACHUSETTS PORT AUTHORITY, THE                \*
MASSACHUSETTS DEPARTMENT OF STATE                \*
POLICE, STATE POLICE TROOPER                     \*
THOMPSON, STATE POLICE SERGEANT                  \*
CROXTON, THOMAS G. ROBBINS, and                  \*
PETER J. DIDOMENICA,                             \*
          Defendants.                            \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

          DEPOSITION OF PETER J. DIDOMENICA,
taken pursuant to the applicable provisions of
the Federal Rules of Civil Procedure, before
Susan L. Prokopik, Registered Merit Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Lurie & Krupp,
LLP, One McKinley Square, Boston, Massachusetts,
on Thursday, January 4, 2007, at 9:57 a.m.

KACZYNSKI REPORTING
72 CHANDLER STREET, SUITE 3
BOSTON, MASSACHUSETTS 02116
(617) 426-6060

5

1        P R O C E E D I N G S

2            - - - - -

3            PETER J. DIDOMENICA

4    having been satisfactorily identified and duly

5    sworn by the Notary Public, was examined and

6    testified as follows:

7

8            MR. REINSTEIN:  Good morning.  This is

9    the deposition of Peter Didomenica in the case of

10   King Downing against the Massachusetts Port

11   Authority and others.

12           MR. WARD:  My name is Martin Ward and

13   I'm an attorney with the Homeland Security,

14   Transportation Security Administration.  The

15   purpose of my being here is to object to any

16   questions the answer to which would reveal

17   sensitive security information and to inform the

18   witness that if he does provide unauthorized

19   sensitive security information that he would be

20   subject to civil and potentially criminal

21   sanctions.

22           MR. REINSTEIN:  Can we agree on the

23   usual stipulations that all objections except as

24   to form will be reserved until the time of trial?

6

1              MR. TRIMMIER:  Agreed.

2              MS. O'NEIL:  Agreed.

3              MR. REINSTEIN:  And the deposition is

4      to be read and signed.  We'll waive signing in

5      front of a notary.

6              MS. O'NEIL:  Correct.

7              MR. REINSTEIN:  Thirty days after --

8              MS. O'NEIL:  That's fine.

9              MR. REINSTEIN:  All right.  Is that

10     time enough?

11             MR. TRIMMIER:  Acceptable.

12

13     EXAMINATION BY MR. REINSTEIN:

14  Q.  Would you state your name for the record, please?

15  A.  Peter Didomenica.

16  Q.  Would you spell it, please?

17  A.  Last name is spelled D I D O M E N I C A.

18  Q.  And where are you employed, sir?

19  A.  Massachusetts State Police.

20  Q.  What's your position there?

21  A.  I'm a sergeant.

22  Q.  Now, have you been deposed before?

23  A.  Yes.

24  Q.  All right.  You understand that there will be a

13

```
 1   A.   About a year and a half.

 2   Q.   And what was the time?

 3   A.   From like the beginning of 2000 to about the

 4        middle of 2001.

 5   Q.   And then you went to the staff of the

 6        superintendent?

 7   A.   Yes.

 8   Q.   All right.  And you were there for -- to the end

 9        of the year or --

10   A.   I was there until the beginning of 2002.

11   Q.   And then you were at Troop F?

12   A.   Troop F at Logan Airport.

13   Q.   What were your duties at Troop F?

14   A.   I was assigned to the troop commander's office.

15   Q.   Okay.

16   A.   And I was assigned to work with Massport, which

17        runs the airport, on developing security

18        programs.

19   Q.   Okay.  And how long were you there?

20   A.   About two years.  Early 2004 I was called back to

21        headquarters and assigned again to the

22        superintendent's office.

23   Q.   And that's where you have been since then?

24   A.   Correct.
```

14

1  Q.  So roughly three years since then?

2  A.  Yeah.  We're going on three years.

3  Q.  Okay.  Now, at some point were you asked to

4      become involved in the training of the troopers

5      assigned to Troop F?

6  A.  Yes.

7  Q.  And when was that and what -- how did that come

8      about?

9  A.  This was in the spring of 2003, I believe.  I was

10     asked to train all the personnel assigned to

11     Troop F in a behavioral assessment program

12     designed to identify high-risk passengers.

13 Q.  And you say you were asked to do that.  Who asked

14     you to do it?

15 A.  The troop commander, which was then Major Tom

16     Robbins.

17 Q.  Now, was this the first time you had heard of

18     this particular technique?

19 A.  I have been aware of it in some form throughout

20     my career in the sense that it uses some of the

21     same techniques that drug and addiction programs

22     have used.  So for the extent of my career I

23     think I've had some knowledge of the type of

24     techniques being used.

15

```
 1              In terms of specializing training to

 2       identify potential terrorists, that occurred

 3       shortly after 9/11 in trying to design programs

 4       that would give us a better chance to prevent

 5       another 9/11 from occurring.

 6  Q.   Now, when you were assigned to Troop F, did you

 7       work with Massport officials as well?

 8  A.   Yes.

 9  Q.   And did you work with Mr. Treece, T R E E C E?

10  A.   Dennis Treece was the and still is the corporate

11       security director for Massport.  And yes, I did

12       work with him.

13  Q.   What is the director of corporate security?

14  A.   Well, Massport is not just the airport.  Massport

15       actually comprises the Tobin Bridge and the

16       Seaport.  And the corporate director of security

17       has general oversight of security programs for

18       the whole of Massport, which again includes the

19       Seaport, the Tobin Bridge and the airport.

20              MR. REINSTEIN:  Can I have this marked

21       as Exhibit 1?

22              (Massport press release marked Exhibit

23       No. 1.)

24  Q.   Let me show you what's been marked as Exhibit 1.
```

KACZYNSKI REPORTING

16

1     First let me ask you if you've ever seen that

2     before.

3  A.  I believe I have.

4  Q.  Okay.  And for the record, can you just explain

5     what it is?

6  A.  It's a press release from Massport dated November

7     15, 2002 that announces that State Police

8     personnel at Logan Airport have been trained in

9     the behavior pattern recognition program.

10  Q.  Okay.  And had you had discussions with Mr.

11     Treece and other Massport officials about that

12     program before that announcement was made?

13  A.  I don't recall any conversations specifically

14     about this announcement with those people.

15  Q.  Okay.  Leaving aside the announcement, had you

16     had discussions with Massport officials about the

17     general subject matter of that press release?

18  A.  Of behavior pattern recognition?

19  Q.  Right.

20  A.  Yes.

21  Q.  Okay.  And when did those discussions first

22     begin?

23  A.  I would say in the weeks after the 9/11 attacks.

24     I mean, we began talking about approaches to

17

```
 1        identifying potential terrorists.
 2   Q.   Who took part in those discussions?
 3   A.   It would be Major Robbins.  He may have been a
 4        captain initially when he first went to the
 5        airport.  He was promoted in early 2002.  The
 6        director of aviation, Tom Canton, who is now the
 7        CEO of Massport.  There were several people on
 8        the staff that we had weekly meetings with after
 9        the 9/11 attacks.
10               Ed Freni, who was a deputy director of
11        aviation security.  Sam Sleiman, who was director
12        of construction and engineering.  Those are the
13        names that come to mind.
14   Q.   Is it fair to say there was general agreement
15        among all those people that you were to go
16        forward with this program?
17   A.   Yes.
18   Q.   Now, there is some discussion and I don't know if
19        it's in there of an individual named Rafi Ron.
20        Do you know Mr. Ron?
21   A.   Yes.
22   Q.   When did you first meet him?
23   A.   Shortly after arriving at the airport, he was
24        brought on as a consultant to do like a threat
```

18

```
 1        assessment and report on threat mitigation for
 2        the airport.  So I would have to say in the late
 3        2001 I probably first met him.
 4   Q.   Okay.  Now, do you know if he did produce a
 5        report on threat mitigation?
 6   A.   Yes.
 7   Q.   All right.  And without telling me the contents
 8        of any of that, do you recall approximately when
 9        that was done?
10   A.   I think it took about a year to complete so I
11        would say mid to late 2002.
12   Q.   Okay.  And did you see that report?
13   A.   Yes.
14   Q.   And did it include recommendations with respect
15        to behavioral assessment?
16   A.   Yes.
17   Q.   And what actions, if any, were taken by Massport
18        and the State Police as a result of their report?
19   A.   Well, the report included -- I seem to recall
20        over 100 recommendations.
21   Q.   Let's focus on the behavioral threat assessment.
22   A.   One of the recommendations was to train and
23        deploy troopers to use behavior pattern
24        recognition techniques.
```

19

```
 1   Q.   All right.  And let me ask you a couple questions
 2        about the division of responsibility for security
 3        at Logan Airport.  Are the Massachusetts State
 4        Police the only ones who provide security at the
 5        airport?
 6   A.   In terms of law enforcement, they are the only
 7        ones.
 8   Q.   All right.  And --
 9   A.   On the state level.  I mean, we have Federal law
10        enforcement there.  Air marshals, customs and
11        immigration enforcement, but for the Commonwealth
12        they are the principal agency for law
13        enforcement.
14   Q.   And what are the sort of general security
15        responsibilities of the state troopers assigned
16        to Troop F?
17   A.   It includes ensuring that the airport operates in
18        a safe and orderly manner, preventing thefts of
19        baggage, preventing acts of violence, securing of
20        the airfield and other secure areas, monitoring
21        the perimeter of the airport from intrusion,
22        responding to calls from the TSA for prohibited
23        items and other disturbances occurring at
24        checkpoints.
```

21

1      in the screening of passengers?

2   A.   No.

3   Q.   Okay.  That's the responsibility of TSA?

4   A.   The physical screening of passengers is the TSA's

5        responsibility.

6   Q.   And in limiting it now to the terminals

7        themselves and not to the other areas of the

8        airport --

9   A.   Okay.

10  Q.   -- where are the state troopers assigned?

11  A.   Throughout the airport.  On the airfield --

12  Q.   Just in the terminals themselves now.

13  A.   They're assigned in the terminals.

14  Q.   All right.  And is that on both sides of the

15       screening area?

16  A.   Yes.  On the secure side and they're on the

17       public side.

18  Q.   All right.  Now, after receiving the report and

19       recommendations from Mr. Ron with respect to

20       behavioral screening, what measures were taken

21       collectively by Massport and the State Police?

22  A.   Again, you're talking in terms of behavior

23       pattern?

24  Q.   Right.  Just in terms of behavior pattern.

22

 1  A.   I asked them to put together a training course

 2       specifically in the techniques that they

 3       advocated for the State Police and they put

 4       together a training course.  And it was delivered

 5       in October of 2002 to about a dozen troopers.

 6  Q.   When you say "they," are you referring to Mr.

 7       Ron?

 8  A.   Mr. Ron and his company.  I believe it was New

 9       Age Aviation Security.

10  Q.   Okay.  And were there training materials prepared

11       for that?

12  A.   Yes.

13  Q.   And did you participate in that training?

14  A.   I served in an advisory capacity because they

15       were not citizens of this country and the

16       techniques that they were going to train us on

17       evolved at Ben Gurion Airport in Israel.  And I

18       was advising them on some of the limitations that

19       would apply in using those techniques in this

20       country.

21  Q.   All right.  And did you ultimately determine that

22       some of those were not appropriate to the United

23       States?

24  A.   Yes.

24

| | | |
|---|---|---|
| 1 | Q. | It was not mandatory? |
| 2 | A. | It was not mandatory. |
| 3 | Q. | Would it be fair to describe it as experimental |
| 4 | | or a pilot project? |
| 5 | A. | Yes. |
| 6 | Q. | And at some point was a decision made to expand |
| 7 | | the program? |
| 8 | A. | Yes. |
| 9 | Q. | Who made that decision? |
| 10 | A. | I made it in conjunction with Major Robbins and |
| 11 | | Tom Canton. |
| 12 | Q. | Okay.  And was there any formal record made of |
| 13 | | that decision? |
| 14 | A. | I don't believe so. |
| 15 | Q. | So there was a meeting between you and Major |
| 16 | | Robbins and Mr. Canton? |
| 17 | A. | I would not even classify it as a meeting because |
| 18 | | I'm not sure there was a meeting.  I think it was |
| 19 | | in the course of conversations so I don't recall |
| 20 | | a formal meeting to discuss it.  It just in the |
| 21 | | course of working and talking these subjects came |
| 22 | | up.  I just don't have a recollection of a |
| 23 | | specific meeting. |
| 24 | Q. | And would it be fair to say, though, that there |

25

```
 1        was agreement between Massport and the
 2        Massachusetts State Police that an expanded
 3        version of the program should go forward?
 4   A.   Yes.
 5   Q.   And who was responsible for implementing that
 6        decision?
 7   A.   From the State Police, Major Robbins, and from
 8        Massport, Tom Canton.
 9   Q.   And what steps were taken to follow up on that?
10   A.   Well, I initially set out to devise a training
11        program.  And the reason being is that I had
12        reservations about some of the techniques that
13        were used in Israel and I felt that there would
14        be a danger, that they would not be lawful in
15        this country.
16             I also had reservations about the
17        behavioral aspect because I felt that in the
18        training we received from the New Age Aviation
19        Security firm, it wasn't specific enough in terms
20        of what behaviors we should be looking for and I
21        was interested in having scientific validation so
22        we could be on firm ground that we were looking
23        for the right things so I set out kind -- I kind
24        of set out from scratch and looked at this
```

28

1    was kind of a metaresearch paper on previous

2    studies.  And it included dozens and dozens of

3    deception studies.  A textbook by Knapp,

4    K N A P P, on nonverbal behaviors.  Those are a

5    couple that come to mind.

6    Q.  Was there anyone else you consulted in connection

7        with scientific validation, the method?

8    A.  I believe there were.  The names are not coming

9        to me at the moment.

10   Q.  How long did this process take?

11   A.  It's still going on.  I mean, it started in the

12       end of 2001 and I'm still doing it today.

13   Q.  All right.  And at some point did you produce

14       training materials?

15   A.  Yes.

16   Q.  And what is PASS, P A S S?

17   A.  That stands for Passenger Assessment Screening

18       System.

19   Q.  And is that part of the training materials that

20       you developed?

21   A.  Yes.

22              MR. REINSTEIN:  All right.  Mark this.

23              (PASS manual marked Exhibit No. 2.)

24   Q.  All right.  Let me show you what's been marked as

KACZYNSKI REPORTING

29

1     Exhibit 2.  It once had a cover in an earlier

2     version we were provided, but is that a copy of

3     the -- tell me what that is.

4  A.  This would be a student manual for the Passenger

5     Assessment Screening System.

6  Q.  Is that based on a PowerPoint?

7  A.  Yeah.  This is based on PowerPoint slides.

8  Q.  Okay.  And when was this first developed?

9  A.  Probably in the middle of 2002.

10  Q.  And is this the materials that were used for

11     training the state troopers?

12  A.  Yes.

13  Q.  We've been provided with something else that is

14     dated October, 2004 which has your name on it

15     called the "Behavior Assessment Screening System

16     Lesson Plan."  Is that essentially the same

17     thing?

18  A.  It's the same program.

19  Q.  And this is based on the same materials that you

20     developed?

21  A.  Yes.

22         MR. REINSTEIN:  All right.  And mark

23     that.

24         MS. O'NEIL:  You're not going to mark

KACZYNSKI REPORTING

32

1  Q.  You had no further conversations with the

2      superintendent about it?

3  A.  Superintendent or the major?

4  Q.  The major.  Excuse me.

5  A.  I don't recall any conversations.

6  Q.  Okay.  Now, when did you begin training troopers

7      at Troop F in the behavior pattern recognition?

8  A.  I believe in the spring of 2003 we started the

9      training program.

10 Q.  All right.  That was intended to be for all the

11     troopers assigned to Troop F?

12 A.  Yes.

13 Q.  All right.  How was that done?

14 A.  There were lists posted with various times

15     available for the training and people signed up

16     for training.

17 Q.  Was everyone required to receive the training?

18 A.  Yes.

19              MR. REINSTEIN:  Let's have this marked.

20              (3/10/03 document and attachments

21     marked Exhibit No. 4.)

22 Q.  Let me show you what's been marked as Exhibit 4.

23     It's a collection of separate documents.  If you

24     could look through it for a minute.

33

```
 1   A.   Okay.

 2   Q.   All right.  Can you describe what those are?

 3   A.   Sign-in sheets for the PASS training program.

 4   Q.   And those indicate that each of the troopers

 5        identified there took the training?

 6   A.   Yes.

 7   Q.   And there's also a roster there of all the

 8        troopers assigned to Troop F?

 9             Sorry.  Three pages back from the end.

10   A.   Yes.  I see that.

11   Q.   As far as you know, was that a full roster of the

12        troopers assigned to Troop F at that time?

13   A.   It appears to be a full roster.

14   Q.   And --

15   A.   I'm just wondering if it has all the command

16        staff on it.  That's all.  It looks like the

17        whole -- it does look like the whole troop.

18   Q.   All right.  Now, were other officers, State

19        Police troopers, assigned to Troop F from time to

20        time to supplement the officers there?

21   A.   It depends how you define "assign."  I mean, in

22        the sense of being -- assigned to Troop F would

23        mean you were on their payroll, which was a big

24        step so that didn't happen frequently.  I mean,
```

34

1      that was kind of a permanent assignment.  There

2      are frequently troopers that work shifts there

3      doing traffic as a detail, which is a separate

4      assignment but you're not assigned there.

5  Q.  They were assigned but not assigned?

6  A.  Exactly.  But that word takes on a little more

7      significance because if you're a state trooper

8      assigned to Logan Airport, your check says

9      "Massport" on it and people don't go back and

10     forth that easily or that quickly because it's a

11     big step but there are a lot of people that

12     aren't assigned there working there.

13 Q.  Let me ask you.  Are the troopers who are

14     assigned in the sense you described to Logan

15     Airport actually paid by Massport?

16 A.  Yes.

17 Q.  And are considered to be employed by Massport?

18 A.  No.  There is a special statute that kind of puts

19     the troopers on loan to the Port Authority so for

20     all intents and purposes you work there but

21     legally you're still an employee of the State

22     Police.

23 Q.  And the responsibility for supervision is joint

24     or belongs to --

35

1  A.  The operational control is strictly the State

2      Police.  And that's a matter of statute.

3  Q.  Now, going back to these trainings, did you

4      conduct those trainings?

5  A.  Yes.

6  Q.  All right.  And you used the materials that we've

7      identified in the earlier exhibit?

8  A.  Yes.  Yes.

9  Q.  And that's a presentation that was developed by

10     you --

11 A.  Yes.

12 Q.  -- based on the study and background that you

13     described earlier?

14 A.  Yes.

15 Q.  There is in these materials discussion of

16     something called "elevated suspicion"?

17 A.  Correct.

18 Q.  Would you describe that, please?

19 A.  What I learned and what we learned after 9/11 is

20     that the 9/11 hijackers gave off signs that they

21     had hostile intent before those attacks and that

22     people actually detected them and felt that they

23     were doing something but they just couldn't

24     articulate what it was they were feeling.

48

1  Q.  Okay.  Now, in general, when you provide training

2      for State Police troopers, it's intended to guide

3      their activities in the enforcement of the law;

4      is that correct?

5  A.  Yes.

6  Q.  And that would be true of the PASS system as

7      well?

8  A.  Yes.

9  Q.  And this was not something that was optional for

10     the officers who were trained in this method?

11 A.  The training was not optional.  It was mandatory.

12 Q.  Right.  But if they're going to use it, if the

13     officers were going to go and adopt the system,

14     they were expected to use it in the manner that

15     it was given to them?

16 A.  Yes.

17 Q.  And it was not open to them to use some other

18     system?

19 A.  If it's within the subject matter of this

20     program, they should be doing it according to the

21     way they were trained.

22 Q.  Okay.  And you anticipated in providing this

23     training that the officers should use it?

24 A.  Yes.

49

1    Q.   And that's what they were instructed?

2    A.   They were encouraged to use it.

3    Q.   They were encouraged to use it?

4    A.   Yes.

5    Q.   They didn't have to?

6    A.   It's a supplement to their skills as a police

7         officer to identify potential high-risk people,

8         potential criminals, and it was offered as a tool

9         but they weren't told that they had to use these

10        particular techniques.  It's training we think is

11        effective and useful and we encourage them to use

12        these techniques.

13   Q.   I would like to talk to you about the context in

14        which this training was provided.  This was

15        obviously post-9/11?

16   A.   Yes.

17   Q.   And is it fair to say that the component of the

18        training was a discussion of terrorism and that

19        there was substantial dangers to the

20        transportation that it posed?

21   A.   Yes.

22   Q.   And there was significant discussion of that at

23        the training?

24   A.   Yes.

50

1    Q.    And I want to simply make sure that I understand

2          that this was conveyed to be very important.

3    A.    Yes.

4    Q.    And all of the troopers were led to believe that

5          in the course of the training?

6    A.    Yes.

7    Q.    So to suggest it was optional under the

8          circumstances is probably an understatement?

9    A.    I don't think it was framed in terms like, This

10         is an option for you.

11                    Here is the training.  We think it's a

12         good idea.  We encourage you to do this.

13                    So I think that's a more accurate

14         statement of how it was framed.

15   Q.    But you encouraged them, and this was a

16         significant component of the antiterrorist

17         interdiction?

18   A.    Yes.

19                    MR. REINSTEIN:  Why don't we do this?

20         It's 11 o'clock.  Let's take like a five-minute

21         break.

22                    (Recess.)

23   Q.    Sergeant, you mentioned in the training one of

24         the options was to -- in the case of elevated

56

1      picture him at this point in time.  I mean, I

2      know the name and I know he's on the job.  I just

3      -- I don't think I've ever worked with him on

4      anything or had any serious interactions.

5  Q.  This is one last question.  This training has

6      been provided in at least some form to other

7      employees at Logan, hasn't it?

8  A.  There's a derivative program called Logan Watch

9      for civilian airport employees.

10  Q.  Okay.  And is it fair to say that the training

11      that you provided to the State Police

12      contemplates that it's going to be used in all

13      areas of the airport?

14  A.  Yes.

15  Q.  It's not just at the checkpoints?

16  A.  Airport-wide is the intent.

17  Q.  Airport-wide.  Okay.  I have no further

18      questions.

19         MR. TRIMMIER:  I have no questions.

20         MS. CARAVAGGIO:  I just have a couple.

21

22    EXAMINATION BY MS. CARAVAGGIO:

23  Q.  Sir, I represent Troopers Thompson and Croxton.

24      I just have a few questions for you.

SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY



## Voluntary Encounters

If the voluntary encounter transforms into an investigatory stop, Miranda warnings are not required so long as the use of restraint is proportional to the seriousness of the situation and the person is not placed in full custody associated with arrest.



## PASS General Guidelines and Procedures



## Methods of Contact

Principal method is for officers on foot to approach passengers on foot

Officers in a cruiser may alight from the cruiser to perform PASS activity

Officers may have contact with persons in parked or stopped vehicles provided the approach used does not constitute a seizure



## Methods of Contact

PASS activity should not be initiated by pulling over vehicles in motion

However, once a vehicle is lawfully stopped, occupants may questioned provided the activity does not detain the occupants longer than necessary to complete the purpose of the stop or the occupants consent to being questioned despite completion of the purpose of the stop

SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









CONFIDENTIAL
MPSSI 00067

SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY







CONFIDENTIAL
MPSSI 00071

26

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-12513-RBC

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
KING DOWNING,                           *
        Plaintiff,                      *
                                        *
v.                                      *
                                        *
MASSACHUSETTS PORT AUTHORITY,           *
THE MASSACHUSETTS DEPARTMENT            *
OF STATE POLICE, STATE POLICE           *
TROOPER THOMPSON, STATE                 *
POLICE SERGEANT CROXTON,                *
THOMAS G. ROBBINS, and PETER            *
J. DIDOMENICA,                          *
        Defendants.                     *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

              DEPOSITION OF WILLIAM A. THOMPSON,
JR., taken pursuant to notice under to the applicable
provisions of the Federal Rules of Civil Procedure,
before Michelle Kaczynski, a Registered Professional
Reporter and Notary Public in and for the Commonwealth
of Massachusetts, at the offices of Lurie & Krupp, LLP,
One McKinley Square, Boston, Massachusetts, on
Thursday, June 22, 2006, at 10:05 a.m.

**KACZYNSKI REPORTING**
**72 CHANDLER STREET, SUITE 3**
**BOSTON, MASSACHUSETTS   02116**
**(617) 426-6060**

```
 1                    P R O C E E D I N G S

 2                         -  -  -  -  -

 3              WILLIAM A. THOMPSON, JR.,

 4         having been satisfactorily identified and

 5              duly sworn by the Notary Public,

 6           was examined and testified as follows:

 7              MR. KRUPP:  We have agreed for purposes

 8    of this deposition that all objections except as to

 9    form will be reserved until the trial of trial, motions

10    to strike will be reserved, and the witness will have

11    thirty days to read and sign, but it's not necessary to

12    do that before a notary.  Also -- any other regular

13    stipulations?

14              MR. TRIMMIER:  No.

15              MR. KITTREDGE:  No.

16              MR. KRUPP:  Okay.  We've also agreed

17    pursuant to a letter addressed to Laura Hoey, H O E Y,

18    myself and John Reinstein from Sarah Talber at TSA that

19    an attorney from TSA can be present here at the

20    deposition although TSA is not a party to the action.

21    TSA as I understand it is here to try to help the

22    witness safeguard what TSA considers to be sensitive

23    security information and may from time to time

24    interpose an objection.  We don't know how this
```

```
 1        procedure is going to work and are reserving our rights

 2        and opportunity to go back to the court if it proves to

 3        be unworkable.  Any other preliminaries?  Okay.

 4        EXAMINATION BY MR. KRUPP:

 5             Q.   Would you please state your name for the

 6        record?

 7             A.   Trooper William A. Thompson, Jr.

 8             Q.   And how old are you?

 9             A.   Forty-six.

10             Q.   How long have you been a -- you're a Mass.

11        state trooper?

12             A.   Yes.

13             Q.   How long have you been a state trooper?

14             A.   Twenty years.

15             Q.   Can you just tell us a little bit about your

16        educational background?

17             A.   Bachelor's degree in criminal justice.

18             Q.   From where?

19             A.   From Curry College.

20             Q.   Any other educational programs, formal

21        educational programs after Curry College?

22             A.   No.

23             Q.   And was, the highest degree you got was a

24        B.S.?
```

KACZYNSKI REPORTING

1          Q.    Did you ever receive any training in the

2    Behavior Assessment and Screening System, which acronym

3    is BASS, B A S S?

4          A.    I believe that's one and the same.

5          Q.    Okay, and --

6          A.    I don't recall any training in that at that

7    time.

8                MR. KRUPP:  All right.  Let's mark this

9    as the first exhibit.

10               (Marked Exhibit 1; PASS Training

11               Document, 3/10/03).

12         Q.    Exhibit 1 is a multi-page document, the first

13   page of which at the top says 3/10/03, PASS training,

14   and I'd just ask you to turn to the fourth page of that

15   document; yes, you have that in front of you, which has

16   a date, 3/13/03, do you see that?

17         A.    Yes.

18         Q.    Do you recognize your handwriting on that

19   page?

20         A.    Yes, I do.

21         Q.    Is that your handwriting where it says Tpr.

22   William Thompson?

23         A.    Yes, it is.

24         Q.    And the number sign 1992, is that something

1    that you wrote?

2        A.    Yes.

3        Q.    Is this a sign-in sheet for a training that

4    you attended?

5        A.    Yes, it is.

6        Q.    Do you know what the abbreviation at the top

7    right, ATU, means?

8        A.    Anti-terrorist unit.

9        Q.    All right, and PASS, that's the Passenger

10    Assessment Screening System training, is that right?

11        A.    That's correct.

12        Q.    Is it fair to say that in March of 2003, you

13    were still part of the anti-terrorism unit?

14        A.    If the date indicates March 2003, yes, I

15    guess I was, yes.

16        Q.    Okay.  Under the term instructors, do you see

17    two names?

18        A.    Yes.

19        Q.    Do you recognize those names?

20        A.    Yes.

21        Q.    Do you know who those people are?

22        A.    Instructors in the -- they're troopers.

23        Q.    Okay, and one is Sergeant Peter Didomenica?

24        A.    Yes.

1          Q.    And the other is Trooper Al DiSalvo?

2          A.    Yes.

3          Q.    Are those the two individuals that you recall

4     teaching you a training session on the Passenger

5     Assessment Screening System?

6          A.    They did teach, yes, they did teach that

7     program.

8          Q.    Okay, and have you had more than one training

9     on the Passenger Assessment Screening System?

10         A.    I don't remember.

11         Q.    Do you remember hearing the term Behavior

12    Assessment Screening System; that is to say, BASS?

13         A.    Yes.

14         Q.    And it's your understanding that BASS is the

15    same as PASS?

16         A.    Yes.

17         Q.    How was the training that you attended on

18    March 13, 2003, how was it run?

19         A.    I don't understand the question.

20         Q.    How did it operate, was it done by, with

21    handouts, was it done by overhead projection, was it an

22    all-day training, did it last only ten minutes, how did

23    it run?

24         A.    There were handouts, there were projections.

```
 1            Q.    Do you remember how long it took?

 2            A.    No, I don't.

 3            Q.    Do you remember what the substance of the

 4      training was?

 5            A.    No, I don't.

 6            Q.    Do you remember if, do you remember learning

 7      that Sergeant Peter Didomenica was one of the people

 8      who had come up with the training system?

 9            A.    Excuse me?

10            Q.    Did you remember learning that Peter

11      Didomenica had come up with the training system?

12            A.    No.

13            Q.    Do you know who came up with the training

14      system?

15            A.    No, I don't.

16                  MR. KRUPP:    Okay.    We can mark that as

17      the next exhibit.

18                        (Marked Exhibit 2; PowerPoint

19                        Presentation, PASS).

20            Q.    You have in front of you what's been marked

21      as Exhibit 2, and let me ask you to take a look at that

22      document.    If you'll look beyond the first page that

23      you have in front of you, it appears like this is a

24      PowerPoint presentation or a series of screens from
```

EXHIBIT
THOMPSON
#1
6/7/06
PENGAD 800-631-6989

3/10/03    PASS TRAINING

Buckley, Christopher    #0671 ✓
McGhee, Todd    #1496 ✓
Conrad, Donald    #0801 ✓
Moore, Robert J.    #1571 ✓
David, Philip K.    #0864 ✓
GALVIN, JAMES M.    #1055 ✓
Benson Gabriel S.    #1619 ✓
AHEARN, ROBERT J    #0528 ✓

3/11/03    PASS TRAINING

Tpr. Michael R. Halstead    #2866

Tpr Thomas R. Fritz    # 1044

Inv. Roger Cottonwood #0700

Tpr. Henry Chan

WALTER J. BUTLER  688

Lt Tom Coffey   0772

ATU.                    3-12-03

Timothy Nheun          # 1164
Robert Gallant         # 2524 ✓
ALBERT P. MANZI        1434 ✓
John M. Ciammarco      #1023 ✓
Edward F. Owens        #1749 ✓
Kathleen M. Sweeney    #2791 ✓
Steve Hines            #

Thurs. 3/13/03        ATU
                    P.A.S.S. Training

Tpr. James Doucette      # 0923 ✓
Tpr. Kevin Mullen        # 1592 ✓
Sgt. Gerald J. Fimiani   # 0989 ✓
Tpr. James Mackin        # 1406 ✓
Tpr. William Thompson    # 1992 ✓
Sgt. Dana Paglet         # 1688 ✓

Instructors:
  Sgt. Peter DiDomenica
  Tpr. Al DiSalvo

# PASS ATU Training
## Fri. 3-14-03

| | | | |
|---|---|---|---|
| ~~Tpr~~ | ~~Joe Silva~~ | ~~#297~~ | |
| Tpr | CHARLES DANCE | 863 | ✓ |
| Tpr | Gordon Alexander | 538 | ✓ |
| Tpr | Scott MCormack | #2895 | ✓ |
| Tpr | Jeffrey Saunders | #2924 | ✓ |
| Tpr | David Lemig | #1351 | ✓ |
| TPR | JOSEPH BAKER | #2297 | ✓ |
| Tpr | Priscilla Ackerman | 0520 | ✓ |
| Tpr | Lisa Cesso | 2714 | ✓ |
| Sgt | William J Baker Jr | #0566 | ✓ |
| TPR | JOSEPH L. SILVA | #1895 | ✓ |
| TPR | BALDWIN LEON | #1354 | ✓ |
| | Paul O'Connor | | ( Boston Police Lt. ) |

Instructor: Sgt. Peter DiDomenica

MASSACHUSETTS STATE POLICE

TROOP F

# LOGAN INTERNATIONAL AIRPORT

### FACSIMILE TRANSMITTAL SHEET

TO: _Mike Conti_

FROM: LT. THOMAS ELIAS
MASSACHUSETTS STATE POLICE

FAX NUMBER: _978-475-5420_

DATE: _5/14/03_

COMPANY:

NO. OF PAGES INCLUDING COVER: _(6)_

PHONE NUMBER:

SENDER'S PHONE NUMBER:
(617) 568-7322

RE: _PASS TRAINING_

☐ URGENT    ☑ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

_Additional Members who Attended. 40hr. Training._

_Lt. Elias_
_Tpr. DiSalvo_
_Tpr. Savage_
_Sgt. Duffy_
_Sgt. McPhail_
_Tpr. Bannister_

### Notice of Confidentiality

This document contains information from the Massachusetts State Police, which may be confidential and/or privilege. The information is intended for use by the individual or entity named on this transmittal sheet. If you are not the intended recipient, be aware that disclosure, copying or distribution, or use of the contents is prohibited. If you have received this facsimile in error, please notify us by telephone immediately.

## TERMINAL D • LOGAN INTERNATIONAL AIRPORT •
### EAST BOSTON,  MA 02128
### PHONE: (617) 567-2233 • FAX: (617) 561-1720

RASS Training Troop F
(Wed. August 20, 2003)

| | Name | ID# |
|---|---|---|
| (1) | HOWARD CROXTON | 0844 |
| (2) | PAUL Coppani | 2611 |
| (3) | David A Crowther | 2613 |
| (4) | MIKE RUBINO | 1834 |
| (5) | Donald J. Ventura | 2024 |
| (6) | Walter J Butler | 688 |
| (7) | William Inci | 503 |
| (8) | | |

Instructors: Duffy, DiDomenica, Savage
                Pat O'Conn — #0897

PASS Training
August 27, 2003

Name                                    ID #

Justin Joyce                            1261
MICHAEL GABRIEL                         1047
Priscilla pAckermain                    0520
Chester Bishop                          0262
John P Ross                             1828
Stephen G LYNCH                         1393
GARY M. HODGDON                         1191
BALDWIN LEÓN                            1354


Instructors :  Sgt. DiDomenica    Pid Jam #089
               Sgt. Duffy
               Tpr. Di Salvo

P.A.S.S. Training
Wednesday Sept. 3, 2003

| Name | I D# |
|------|------|
| (1) WANZA ADELL | 0526 |
| (2) JOSEPH L. BREEN | 0652 |
| (3) Kenneth J. Carroll | 2837 |
| (4) Philip K. DAVID | 0864 |
| (5) Edward L. WHELAN | 2056 |
| (6) Frank L. Muolo | 1595 |



Instructors:   Lt.   Elias
               Sgt.  Duffy
               Sgt.  DiDomenica
                          #0887

TOTAL P.04

4/10/03     POSS TRAINING

Sgt Richard F. Connelly
Tpr. Lionel L. Davis
TPR. ROBERT SULLIVAN
TPR. John F. Perry
TPR PAUL GAFFNEY
Tpr. Maureen Wesinger Lewis
Tpr Rafael L Vasquez
Tpr Thomas Gallagher
Tpr James Walsh

P.A.S.S. Training
9 - 17 - 03

| Name | ID# |
|---|---|
| CASTADORO, E. | 0727 |
| HOGABOOM, K | 1192 |
| ROTTERS, S | 1830 |
| Chaisson | 0736 |
| Cila | 0760 |
| LEARY, WF | 1343 |
| Flynn, John P. | 1016 |
| Cesso, Anthony | 2913 |
| GALGAZZi, Rich | 1057 |
| Schepis, Gary M. | 1861 |
| O'Leary, David | 1666 |

Instructors:   Sgt. DiDomenica
               Sgt. Duffy
               Tpr. Savage

#0897

KEELER D.P        #1271
KELLEHER K.C      #1276
Ø FURFARL KP      #1046
MacDonald A       #1396
Enos, Randall s   #0965
FITZPATRICK, L.J. #1006
BOEHME D          #0623

PASS TRAINING

9-24-03

P.A.S.S. Training
October 1, 2003

| Name | I D |
|------|-----|
| Berry D Jordan | 1257 |
| PETER J. MONTAGANO | 1566 |
| Joseph Stanford | 1934 |
| Frederich Yee | 2291 |
| NEIL R CALNAN | 0702 |

pind. dm   #089

Instructors : Sgt. Duffy, Sgt. DiDomenica
Tpr. Savage

PASS Training
Wed. Oct. 8, 2003

Name                          ID

Tpr. John Farnam              0977
Tpr. Shawn D'Amato            2510
Tpr. A.C. Mitchell            1557
Tpr. John Downey              0826
Tpr. Mark West                2051

Instructor: Sgt. DiDomenica   0897
            Sgt. A. Domeni

# P.A.S.S Training
## Wed. Oct. 22, 2003

| Name | ID# |
|---|---|
| Ernest E. Butner | 0691 |
| Craig McGary | # 2229 |
| Richard Stubley | # 0490 |
| Joseph J. Boiko | # 0625 |
| Timothy YANCHUN | # 2089 |
| DAVID Flodge | # 1008 |
| TIMOTHY GILLESPIE | # 1084 |
| EDWARD Connolly | # 0286 |
| WALTER HACKETT | # 0144 |
| Gabriel S. Berror | # 0618 |

Instructors: Sgt. DiDomenica
Tpr. Savage

| Last Name | First | Last Name | First | Last Name | First | Last Name | First |
|---|---|---|---|---|---|---|---|
| Ackerman | Priscilla | Croxton | Howard | Jordan | Barry | Rottenberg | Susan |
| Adell | Wanza | Damato | Shawn | Joyce | Justin | Rubino | Michael |
| Ahearn | Robert | Dance | Charles | Keeler | Dennis | Saccone | Vincent |
| Alexander | Gordon | David | Phillip | Kelleher | Kenneth | Saunders | Jeffery |
| Anderson | Edwin | Davis | Lionel | Krasco | Peter | Savage | James |
| Ayuso | Carmel | Didomenica | Peter | Leary | William | Schepis | Gary |
| Baker | William | Dill | Maryann | Lemar | David | Silva | Joseph |
| Baker | Joseph | Disalvo | Alfred | Leon | Baldwin | Skerry | Michael |
| Bannister | Robert | Doucette | James | Lynch | Stephen | Spillane | James |
| Bernson | Gabriel | Downey | John | Mac Donald | Arthur | Stanford | Joseph |
| Bille | Anthony | Duffy | Brian | Machado | Joseph | Staples | John |
| Bishop | Chester | Elias | Thomas | Mackin | James | Studley | Richard |
| Boehme | Richard | Enos | Randall | Manzi | Albert | Sullivan | Robert |
| Boike | Joseph | Farnam | John | Mc Gary | Craig | Sullivan | Daniel |
| Boswell | Ronald | Fimiani | Gerald | Mc Ghee | Todd | Thompson | David |
| Brien | Joseph | Fitzpatrick | Lawrence | Mc Phail | Charles | Thompson | William |
| Buckley | Christopher | Fladger | David | Mccormack | Scott | Toomey | James |
| Butler | Walter | Fletcher | Paul | Mitchell | Albert | Vasquez | Rafael |
| Butner, III | Ernest | Flynn | John | Montagano | Peter | Ventura | Donald |
| Calderwood | Roger | Freeman | William | Moore | Robert | Vinci | William |
| Calnan | Neil | Fritz | Thomas | Mullen | Kevin | W- Lewis | Maureen |
| Carroll | Roger | Furfari | Kenneth | Mulloney | Robert | Walsh | James |
| Carroll Jr. | Kenneth | Gabriel | Michael | Muolo | Francis | West | Mark |
| Castadoro | Edward | Gaffney | Paul | Murray | Timothy | Whelan | Edward |
| Cawley | Richard | Galeazzi | Richard | Neff | Thomas | Yanchun | Timothy |
| Cesso | Anthony | Gallagher | Thomas | Newell | Barry | Yee | Frederick |
| Cesso | Lisa | Gallant | Robert | O' Leary | David | Yianacopolus | Glen |
| Chaisson | David | Galvin | James | Owens | David | | |
| Chan | Chi | Giammarco | John | Padovani | Lawrence | | |
| Cila | Vincent | Gillespie | John | Pagley | Roger | | |
| Coffey | Thomas | Gillespie | Timothy | Paré | Dana | | |
| Connelly | Richard | Griffin | Daniel | Perry | Scott | | |
| Connolly | Edward | Hackett | Walter | Poor | John | | |
| Conrad | Donald | Halstead | Michael | Powers | Kevin | | |
| Copponi | Paul | Harris | Timothy | Quin | Edward | | |
| Cronin | Jerome | Hines | Steven | Robbins | Thomas | | |
| Crowley | Joseph | Hodgdon | Gary | Robichaud | Thomas | | |
| Crowther | David | Hogaboom | Kevin | Ross | Martin | | |
| | | | | | John | | |

RASS Training   Troop F
(Wed. August 20, 2003)

| Name | ID# |
|------|-----|
| (1) HOWARD CROXTON | 0844 |
| (2) PAUL COPPONI | 2611 |
| (3) David A Crowther | 2613 |
| (4) MIKE RUBINO | 1834 |
| (5) DONALD J. VENTURA | 2024 |
| (6) Walter J Butler | 688 |
| (7) WILLIAM VINCI | 503 |
| (8) | |

Instructors: Duffy, DiDomenica, Savage
Pix d'ann   #0897

Thurs. 3/13/03          ATU
                        P.A.S.S. Training

Tpr James Doucette        # 0923
TPR. KEVIN  MULLEN        # 1592
SGT. GERALD J. FIMIANI    # 0989
Tpr. James  Mackin        # 1406
Tpr. William Thompson     # 1992
SGT. DANA  PAGLEY         #1688

Instructors:
Sgt. Peter DiDomenica
Tpr. Al DiSalvo

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-12513-RBC

```
*****************************
KING DOWNING,                     *
        Plaintiff,                *
                                  *
v.                                *
                                  *
MASSACHUSETTS PORT AUTHORITY,     *
THE MASSACHUSETTS DEPARTMENT      *
OF STATE POLICE, STATE POLICE     *
TROOPER THOMPSON, STATE           *
POLICE SERGEANT CROXTON,          *
THOMAS G. ROBBINS, and PETER      *
J. DIDOMENICA,                    *
        Defendants.               *
*****************************
```

DEPOSITION OF HOWARD G. CROXTON,
taken pursuant to notice under the applicable
provisions of the Federal Rules of Civil Procedure,
before Michelle Kaczynski, a Registered Professional
Reporter and Notary Public in and for the Commonwealth
of Massachusetts, at the offices of the American Civil
Liberties Union of Massachusetts, 211 Congress Street,
Boston, Massachusetts, on Friday, June 23, 2006, at
9:09 a.m.

**KACZYNSKI REPORTING**
**72 CHANDLER STREET, SUITE 3**
**BOSTON, MASSACHUSETTS  02116**
**(617) 426-6060**

1           P R O C E E D I N G S

2                  - - - - -

3               HOWARD G. CROXTON,

4        having been satisfactorily identified and

5            duly sworn by the Notary Public,

6          was examined and testified as follows:

7                   MR. REINSTEIN:  Good morning, and for

8        the record, we have the same stipulations as yesterday?

9                   MR. KITTREDGE:  Yes.

10                  MS. HOEY:  Yes.

11                  MR. REINSTEIN:  Both with respect to the

12       conduct of the deposition, reading and signing and the

13       participation of counsel for TSA?

14                  MS. O'NEIL:  Agreed.

15                  MS. HOEY:  Agreed.

16                  MR. KITTREDGE:  Agreed.

17       EXAMINATION BY MR. REINSTEIN:

18           Q.   All right.  Would you state and spell your

19       name for the record, please?

20           A.   Howard G. Croxton, C R O X T O N.

21           Q.   And where are you employed?

22           A.   Logan Airport, State Police, F Troop.

23           Q.   And what's your rank within the state police?

24           A.   Trooper.

1    that was sent in maybe from Washington or something

2    like that or any threats and stuff like that he would

3    read it.

4        Q.   So that would have to do with specific

5    threats --

6        A.   Right --

7        Q.   -- or specific things that you should be on

8    the lookout for?

9        A.   Yes.

10       Q.   Again, give me a chance to finish, sometimes

11   I'm a little slow and you're a little quick, but we'll

12   get to the end of this.  Do you recall the date of the

13   briefing you received where you were provided with a

14   manual?

15       A.   I don't recall.

16            (Marked Exhibit 3; Document).

17       Q.   I ask you, these pages are not numbered, but

18   I'll ask you to turn to the one, two, three, four,

19   five, six, seventh page of that, it's the next page I

20   think after you -- yes, and it has the heading, PASS

21   training, Troop F, Wednesday, August 20.  Does that

22   refresh your recollection about when you might have

23   received this training?

24       A.   Yes.

```
1           Q.    Okay, and when was that, sir?

2           A.    August 20th, 2003.

3           Q.    All right, and you will, is that your

4     handwriting --

5           A.    Yes.

6           Q.    -- on the top line there?  And does that

7     indicate that you attended the training that day?

8           A.    Yes.

9           Q.    And would the same be true of the names of

10    the other troopers whose names appear there?

11          A.    Yes.

12          Q.    Okay, and if you just look through briefly

13    through several of the other pages, could you tell me

14    that, is it your understanding that that would be true

15    with respect to each of the officers who is listed on

16    those pages?

17                     MR. KITTREDGE:  Objection.

18                     MS. HOEY:  Objection.

19          Q.    If you know?

20          A.    No, I don't know.

21          Q.    But -- Strike that.

22                Now, was that the only formal training

23    you received in behavior pattern recognition?

24          A.    Yes.
```

KACZYNSKI REPORTING

```
 1              Q.    You're required to give it?

 2              A.    Required to give it, yes.

 3              Q.    And if you don't?

 4              A.    Well, if, well, it's -- well, it all depends,

 5        the nature of what the circumstance is.  I don't know

 6        what Trooper Thompson was, his circumstances was.  When

 7        I just came up, that's all I knew.

 8              Q.    Okay, so you knew that this person had not

 9        provided the information?

10              A.    Right.

11              Q.    What did you do next?

12              A.    What did I do?

13              Q.    Yes.

14              A.    I just said, sir, you know, you're supposed

15        to make yourself known to the trooper, he asked you,

16        you know, for the information, and he said, I don't

17        have to provide any information at all.

18              Q.    Mr. Downing said this?

19              A.    Yes.

20              Q.    And you later discovered that this was

21        Mr. Downing?

22              A.    Yes.

23              Q.    Okay, and when he told you he didn't have to

24        provide any information at all, what did you say to
```

1      him?

2          A.    Well, Trooper Thompson was still talking, was

3      talking to him, but he was sort of argumentative, so I

4      just let it go at that, just --

5          Q.    And it's your testimony you had no further

6      conversation with Mr. Downing?

7          A.    Yes.

8          Q.    And you never requested that Mr. Downing

9      provide his identification?

10         A.    I just told him he was supposed to provide it

11     when a trooper asked him.

12         Q.    Did you tell him what the consequences would

13     be if he did not provide it?

14         A.    No, because he was talking to, him and

15     Trooper Thompson were still talking, and at that time I

16     was recalled to Terminal E.

17         Q.    I see, so if Trooper Thompson says that he

18     didn't have any further conversation with him, he would

19     be wrong?

20                    MS. HOEY:  Objection.

21                    MR. KITTREDGE:  Objection.

22                    MS. O'NEIL:  Objection.

23         Q.    You can answer the question, sir.

24         A.    I don't know because I was not there.

KACZYNSKI REPORTING

1        Q.   As far as you know?

2        A.   I was reassigned as far as I knew, I was

3    reassigned at that time, so I don't know who had

4    conversation or what.

5        Q.   All right.  How long were you present in

6    front of Terminal B with, at the same time as Trooper

7    Thompson and Mr. Downing?

8        A.   I'd say no longer than ten minutes or less.

9        Q.   So what was going on during those ten

10   minutes?

11       A.   Pardon?

12       Q.   What was going on during that ten minutes,

13   that's a long period of time, what happened, did you,

14   were you standing next to Trooper Thompson?

15       A.   I was standing next to Trooper Thompson, but

16   at that time the other troopers had started coming up.

17       Q.   All right, and Trooper Thompson continued to

18   engage Mr. Downing in conversation?

19       A.   I think so.

20       Q.   What was he saying to them?

21       A.   I don't recollect.

22       Q.   You didn't hear the conversation or you just

23   don't remember it?

24       A.   I don't remember it.

1          Q.    Do you recall whether Mr. Downing ultimately

2     provided some identification while you were there?

3          A.    No.

4          Q.    He did not?

5          A.    No.

6          Q.    So for the entire ten minutes that you were

7     standing there, Mr. Downing continued to refuse to

8     provide his ID?

9          A.    He was talking to Trooper --

10                    MR. KITTREDGE:   Objection.   Go ahead.

11         A.    He was talking to Trooper Thompson, so --

12         Q.    Okay.   You never saw him give, turn over his

13    license or any other identification?

14         A.    No.

15         Q.    Do you recall any, and you don't -- Strike

16    that.

17                    Did you observe Trooper Thompson's

18    demeanor during this time?

19         A.    His demeanor?

20         Q.    Demeanor, his, the way he was acting.

21         A.    He was acting normal, he just asked him the

22    questions, whatever he was saying, and yes, he was

23    acting normal.

24         Q.    And did he ask any questions other than can

1                                    Volume:    I
                                     Pages:     1 to 51
2                                    Exhibits:  None

3

4                UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
5

   * * * * * * * * * * * * * * * *
6  KING DOWNING,
                          Plaintiff,
7

        vs.                          Civil Action
8                                    No. 04-12513-RBC
   MASSACHUSETTS PORT AUTHORITY,
9  THE MASSACHUSETTS DEPARTMENT OF
   STATE POLICE, STATE POLICE TROOPER
10 THOMPSON, STATE POLICE SERGEANT
   CROXTON, THOMAS G. ROBBINS,
11 AND PETER J. DIDOMENICA,
                          Defendants.
12 * * * * * * * * * * * * * * * *

13

14           DEPOSITION OF WANZA ADELL, a witness
   called on behalf of the Plaintiff, taken pursuant to
15 the applicable provisions of the Federal Rules of
   Civil Procedure before Cynthia A. Powers, Shorthand
16 Reporter and Notary Public in and for the
   Commonwealth of Massachusetts, at the law offices of
17 Lurie & Krupp, LLP, One McKinley Square, Boston,
   Massachusetts, on Wednesday, July 19, 2006,
18 commencing at 10:02 a.m.

19

20

                         * * * * *
21

22

                    KACZYNSKI REPORTING
23              72 Chandler Street, Suite 3
                Boston, Massachusetts 02116
24                   (617) 426-6060

5

1              MR. KRUPP:  The plaintiff has agreed

2      that you may be present from TSA to interpose those

3      objections.  We're reserving our rights as to the

4      nature of those objections and any instructions you

5      make to the trooper.

6                     MR. WARD:  Certainly.

7                     WANZA ADELL,

8

9           having been satisfactorily identified

10          and duly sworn by the Notary Public,

11          was examined and testified as follows:

12

13                   DIRECT EXAMINATION

14      BY MR. KRUPP:

15           Q.    Would you state your full name for the

16      record?

17           A.    Wanza Adell.

18           Q.    Would you spell your last name?

19           A.    A D E L L.

20           Q.    Are you employed?  Are you employed?

21           A.    Yes.

22           Q.    By whom?

23           A.    The Mass. State Police.

24           Q.    Have you ever been deposed before?

1   assigned to Troop F?  They may not all now be

2   assigned to Troop F.  Do you recognize that as a

3   Troop F list from the 2003 time period?

4          A.    Yes.

5          Q.    Do you know if your name in this list,

6   for example, is checked off because you had received

7   PASS training?

8          A.    I don't know what this list is

9   referring to, but I see my name on it and it is

10  checked, yes.

11         Q.    Okay, no problem.  Thank you.  Having

12  seen your name on the list, September 3, does that

13  refresh your memory that you received PASS training

14  in and around, in or around September of 2003?

15         A.    You're talking about this list right

16  here?

17         Q.    No, the other one that I showed you

18  that had your name as the first person in the sign-up

19  list.  Let me find it again for you.  It's dated

20  September 3, 2003 at the top.  Does that refresh your

21  memory that you attended the PASS training in or

22  around September of 2003?

23         A.    Yes, it does.

24         Q.    And am I correct that you don't

Volume:    I
Pages:     1 to 69
Exhibits:  None

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * *

KING DOWNING,

                        Plaintiff,


        vs.                              Civil Action
                                         No. 04-12513-RBC

MASSACHUSETTS PORT AUTHORITY,
THE MASSACHUSETTS DEPARTMENT OF
STATE POLICE, STATE POLICE TROOPER
THOMPSON, STATE POLICE SERGEANT
CROXTON, THOMAS G. ROBBINS,
AND PETER J. DIDOMENICA,
                        Defendants.

* * * * * * * * * * * * * * * *


                DEPOSITION OF ROBERT J. MOORE, JR., a
witness called on behalf of the Plaintiff, taken
pursuant to the applicable provisions of the Federal
Rules of Civil Procedure before Cynthia A. Powers,
Shorthand Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the law offices of
Lurie & Krupp, LLP, One McKinley Square, Boston,
Massachusetts, on Wednesday, July 19, 2006,
commencing at 11:50 a.m.



                    * * * * *



                KACZYNSKI REPORTING
            72 Chandler Street, Suite 3
            Boston, Massachusetts 02116
                  (617) 426-6060

4

1               P R O C E E D I N G S

2               MS. O'NEIL:  Just for the record, I'll

3     be representing Trooper Moore for the purposes of the

4     deposition.

5                    ROBERT J. MOORE, JR.,

6

7               having been satisfactorily identified

8               and duly sworn by the Notary Public,

9               was examined and testified as follows:

10

11                   DIRECT EXAMINATION

12     BY MR. KRUPP:

13          Q.     Please state your full name for the

14     record.

15          A.     Robert J. Moore.

16          Q.     And you're Mass. State Police trooper?

17          A.     Yes, I am.

18          Q.     How long have you been so employed?

19          A.     Approximately twenty-one and a half

20     years.

21               MR. KRUPP:  Before I question you,

22     let's put on the record the stipulations for the

23     deposition which are between counsel that we will

24     reserve all objections, except as to form, and

13

1    shortly after 9/11, did you receive any specialized

2    training separate and apart from the training you

3    received to be part of the anti-terrorist unit?

4              A.    I don't think so.

5              Q.    Did you receive training in the PASS

6    system, or Passenger Assessment Screening System, in

7    use at Logan Airport?

8              A.    Yes.

9              Q.    Was that part of your anti-terrorist

10   unit training as you understood it?

11             A.    Yes.

12             Q.    Do you know when you were trained in

13   the PASS system?

14             A.    I guess when I joined the

15   anti-terrorist unit.

16             Q.    Let me show you what's been marked as

17   Thompson Deposition Exhibit No. 1 and ask if you

18   recognize the first page of that Exhibit 1 as a

19   sign-in sheet bearing your name for the PASS training

20   that you attended?  Is that what that is?

21             A.    Yes.

22             Q.    Is your name listed there in your

23   handwriting?

24             A.    Yes, it is.

14

1          Q.    And when you attended the PASS

2     training, you signed in showing that you were in

3     attendance; is that right?

4          A.    Yes.

5          Q.    Do you know who conducted your

6     particular training?

7          A.    I don't recall right off.  I would

8     only be guessing.

9          Q.    Is it your belief that one of the

10    instructors was Sergeant Didomenica?

11         A.    Yes, he was, I believe, one of the

12    instructors.  There were several.

13         Q.    Do you know if you were one of the

14    very first people at the Troop F, from the Troop F

15    group that was trained in the PASS system?

16         A.    I actually didn't keep, you know, any

17    records or tabs on that.  It's just that when it

18    presented itself -- I think they might have trained

19    supervisors first and then it trickled down to the

20    rest of us, but on the team we had to take it.

21         Q.    Do you recognize the names of people

22    listed on the first page of Exhibit 1 as other Mass.

23    State Police troopers?

24         A.    Yes.