# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KING DOWNING, <br><br> Plaintiff, <br><br> v. <br><br> MASSACHUSETTS PORT AUTHORITY, THE MASSACHUSETTS DEPARTMENT OF STATE POLICE, STATE POLICE TROOPER THOMPSON, STATE POLICE SERGEANT CROXTON, THOMAS G. ROBBINS, and PETER J. DIDOMENICA, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   Civil Action No. 04-12513-RBC |

## AFFIDAVIT OF ANNMARIE A. TENN IN SUPPORT OF DEFENDANT MASSACHUSETTS PORT AUTHORITY'S REPLY BRIEF

I, Annmarie A. Tenn, state and depose as follows:

1. I am an associate at Ropes & Gray LLP, One International Place, Boston, MA 02110.

2. I represent Defendant Massachusetts Port Authority in the above-captioned matter. I make this Affidavit in support of Defendant Massachusetts Port Authority's Reply To Plaintiff's Consolidated Opposition to Defendants' Motions of Summary Judgment.

3. A true and correct copy of portions of the transcript from Sergeant Peter DiDomenica's deposition held on January 4, 2007 is attached hereto as Exhibit A.

4. A true and correct copy of portions of the Department of Homeland Security Appropriations Act of 2007, 2006 H.R. 5441; Pub. L. No. 109-295, § 525(d) (Oct. 4, 2006) is attached hereto as Exhibit B.

-2-

      5.      A true and correct copy of portions of the transcript from Defendant William Thompson's deposition held on June 22, 2006 is attached hereto as Exhibit C.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 18, 2007                                              /s/ Annmarie A. Tenn
                                                                       Annmarie A. Tenn

Sworn before me this day: June 18, 2007           /s/ Thomas T. Tuttle
                                                                                    Notary Public

**CERTIFICATE OF SERVICE**

In accordance with L.R. 5.2(b) and Section E.2 of the Electronic Case Filing Administrative Procedures of the United States District Court for the District of Massachusetts, I, Annmarie A. Tenn, hereby certify that on June 19, 2007, the within Affidavit filed through the ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing.

/s/ Annmarie A. Tenn
Annmarie A. Tenn

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12513-RBC

*******************************************
KING DOWNING,                              *
     Plaintiff,                            *
                                           *
v.                                         *
                                           *
MASSACHUSETTS PORT AUTHORITY, THE          *
MASSACHUSETTS DEPARTMENT OF STATE          *
POLICE, STATE POLICE TROOPER               *
THOMPSON, STATE POLICE SERGEANT            *
CROXTON, THOMAS G. ROBBINS, and            *
PETER J. DIDOMENICA,                       *
     Defendants.                           *
*******************************************

DEPOSITION OF PETER J. DIDOMENICA, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Susan L. Prokopik, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Lurie & Krupp, LLP, One McKinley Square, Boston, Massachusetts, on Thursday, January 4, 2007, at 9:57 a.m.

KACZYNSKI REPORTING
72 CHANDLER STREET, SUITE 3
BOSTON, MASSACHUSETTS 02116
(617) 426-6060

Page 22

1  A. I asked them to put together a training course
2  specifically in the techniques that they
3  advocated for the State Police and they put
4  together a training course. And it was delivered
5  in October of 2002 to about a dozen troopers.
6  Q. When you say "they," are you referring to Mr.
7  Ron?
8  A. Mr. Ron and his company. I believe it was New
9  Age Aviation Security.
10 Q. Okay. And were there training materials prepared
11 for that?
12 A. Yes.
13 Q. And did you participate in that training?
14 A. I served in an advisory capacity because they
15 were not citizens of this country and the
16 techniques that they were going to train us on
17 evolved at Ben Gurion Airport in Israel. And I
18 was advising them on some of the limitations that
19 would apply in using those techniques in this
20 country.
21 Q. All right. And did you ultimately determine that
22 some of those were not appropriate to the United
23 States?
24 A. Yes.

Page 23

1  Q. All right. And was there any further training
2  done by Mr. Ron or his company?
3  A. There was a follow-up training that was -- lasted
4  maybe a day just to check on people's skills in
5  conducting interviews. And that may have
6  occurred four to six months after the initial
7  training.
8  Q. And how many people, how many troopers were
9  involved in this?
10 A. Initially I think it was between ten and 12 and
11 then when they did the follow-up I think it may
12 have been about eight. Eight troopers.
13 Q. And when was that? When was the initial training
14 and when was the follow-up?
15 A. The initial training was I believe October of
16 2002. And then, like I say, four to six months
17 later I asked them to come back just to check us
18 out and see if we're doing it properly.
19 Q. And how were the troopers who participated in
20 this training selected?
21 A. There was a sign-up sheet posted and the troopers
22 were asked if they were interested in this type
23 of training. They would be welcome to take the
24 training.

Page 24

1  Q. It was not mandatory?
2  A. It was not mandatory.
3  Q. Would it be fair to describe it as experimental
4  or a pilot project?
5  A. Yes.
6  Q. And at some point was a decision made to expand
7  the program?
8  A. Yes.
9  Q. Who made that decision?
10 A. I made it in conjunction with Major Robbins and
11 Tom Canton.
12 Q. Okay. And was there any formal record made of
13 that decision?
14 A. I don't believe so.
15 Q. So there was a meeting between you and Major
16 Robbins and Mr. Canton?
17 A. I would not even classify it as a meeting because
18 I'm not sure there was a meeting. I think it was
19 in the course of conversations so I don't recall
20 a formal meeting to discuss it. It just in the
21 course of working and talking these subjects came
22 up. I just don't have a recollection of a
23 specific meeting.
24 Q. And would it be fair to say, though, that there

Page 25

1  was agreement between Massport and the
2  Massachusetts State Police that an expanded
3  version of the program should go forward?
4  A. Yes.
5  Q. And who was responsible for implementing that
6  decision?
7  A. From the State Police, Major Robbins, and from
8  Massport, Tom Canton.
9  Q. And what steps were taken to follow up on that?
10 A. Well, I initially set out to devise a training
11 program. And the reason being is that I had
12 reservations about some of the techniques that
13 were used in Israel and I felt that there would
14 be a danger, that they would not be lawful in
15 this country.
16     I also had reservations about the
17 behavioral aspect because I felt that in the
18 training we received from the New Age Aviation
19 Security firm, it wasn't specific enough in terms
20 of what behaviors we should be looking for and I
21 was interested in having scientific validation so
22 we could be on firm ground that we were looking
23 for the right things so I set out kind -- I kind
24 of set out from scratch and looked at this

Page 26

1   problem from the beginning.
2           And I said, How can you design a
3   program that will accurately and lawfully
4   identify people that could potentially be
5   terrorists?
6   Q. What did you do to ensure that that would take
7   place?
8   A. Well, using my experience as an attorney and
9   being director of legal training at the academy,
10  I drew upon that experience. As a racial
11  profiling compliance officer and subject matter
12  expert, I drew on that experience. I researched
13  scientific literature, social psychology,
14  history, security, interview and interrogation,
15  criminal procedure.
16          I basically drew on whatever I could to
17  come up with a rational, logical, objective,
18  lawful way to make that airport safer.
19  Q. You mentioned "scientific validation." Apart
20  from your reading, did you consult with anyone
21  about that?
22  A. Yes. I spoke with and consulted with Dr. Mark
23  Frank, who is a Ph.D. psychologist who had been
24  doing research on deception and human emotion

Page 27

1   through the Rutgers University, State University
2   of New Jersey I believe at Rutgers. Later on I
3   consulted with Dr. Paul Ekman, who is a
4   psychologist at the University of California at
5   Berkeley. And he's a world renowned expert on
6   human emotion and deception.
7           Other people included Dr. Jessica
8   Stern, a Harvard professor. Not so much in the
9   scientific aspect but more in the genesis of
10  terrorism and understanding terrorism. She is
11  recognized as an expert nationally on terrorism.
12  Q. Did your consultation with any of these
13  individuals involve materials that they provided
14  you?
15  A. I don't recall specific materials. I think it
16  was more a discussion of what techniques would
17  work best in the detection of a person with
18  hostile intent or detection of deception in
19  reference to existing research materials.
20  Q. And did you consult any of those research
21  materials?
22  A. Oh, yeah.
23  Q. Do you recall what any of those were?
24  A. One was a study by DePaulo. D E P A U L O. It

Page 28

1   was kind of a metaresearch paper on previous
2   studies. And it included dozens and dozens of
3   deception studies. A textbook by Knapp,
4   K N A P P, on nonverbal behaviors. Those are a
5   couple that come to mind.
6   Q. Was there anyone else you consulted in connection
7   with scientific validation, the method?
8   A. I believe there were. The names are not coming
9   to me at the moment.
10  Q. How long did this process take?
11  A. It's still going on. I mean, it started in the
12  end of 2001 and I'm still doing it today.
13  Q. All right. And at some point did you produce
14  training materials?
15  A. Yes.
16  Q. And what is PASS, P A S S?
17  A. That stands for Passenger Assessment Screening
18  System.
19  Q. And is that part of the training materials that
20  you developed?
21  A. Yes.
22      MR. REINSTEIN: All right. Mark this.
23      (PASS manual marked Exhibit No. 2.)
24  Q. All right. Let me show you what's been marked as

Page 29

1   Exhibit 2. It once had a cover in an earlier
2   version we were provided, but is that a copy of
3   the -- tell me what that is.
4   A. This would be a student manual for the Passenger
5   Assessment Screening System.
6   Q. Is that based on a PowerPoint?
7   A. Yeah. This is based on PowerPoint slides.
8   Q. Okay. And when was this first developed?
9   A. Probably in the middle of 2002.
10  Q. And is this the materials that were used for
11  training the state troopers?
12  A. Yes.
13  Q. We've been provided with something else that is
14  dated October, 2004 which has your name on it
15  called the "Behavior Assessment Screening System
16  Lesson Plan." Is that essentially the same
17  thing?
18  A. It's the same program.
19  Q. And this is based on the same materials that you
20  developed?
21  A. Yes.
22      MR. REINSTEIN: All right. And mark
23  that.
24      MS. O'NEIL: You're not going to mark

**EXHIBIT B**

Westlaw.

PL 109-295, 2006 HR 5441                                                                                                                   Page 1
PL 109-295, October 4, 2006, **120 Stat 1355**
(Cite as: 120 Stat 1355)

UNITED STATES PUBLIC LAWS
109th Congress - Second Session
Convening January 7, 2005

Copr. © 2006 Thomson/West. No Claim to Orig. U.S. Govt.Works

Additions and Deletions are not identified in this database.
Vetoed provisions within tabular material are not displayed

PL 109-295 (HR 5441)
October 4, 2006
DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2007

An Act Making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2007, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2007, for the Department of Homeland Security and for other purposes, namely:

TITLE I
DEPARTMENTAL MANAGEMENT AND OPERATIONS
Office of the Secretary and Executive Management

For necessary expenses of the Office of the Secretary of Homeland Security, as authorized by section 102 of the Homeland Security Act of 2002 (6 U.S.C. 112), and executive management of the Department of Homeland Security, as authorized by law, $94,470,000: *Provided,* That not to exceed $40,000 shall be for official reception and representation expenses: *Provided further,* That of the funds provided under this heading, $5,000,000 shall not be available for obligation until the Secretary of Homeland Security submits a comprehensive port, container, and cargo security strategic plan to the Committees on Appropriations of the Senate and the House of Representatives; the Committee on Homeland Security of the House of Representatives; the Committee on Homeland Security and Governmental Affairs of the Senate; and the Committee on Commerce, Science, and Transportation of the Senate that requires screening all inbound cargo, doubles the percentage of inbound cargo currently inspected, sets minimum standards for securing inbound cargo, and includes the fiscal year 2007 performance requirements for port, container, and cargo security as specified in the joint explanatory statement accompanying this Act: *Provided further,* That of the funds provided under this heading, $10,000,000 shall not be available for obligation until the Secretary submits the Secure Border Initiative multi-year strategic plan to the Committees on Appropriations of the Senate and the House of Representatives, the Committee on Homeland Security of the House of Representatives, the Committee on Homeland Security and Governmental Affairs of the Senate, and the Committees on the Judiciary of the Senate and the House of Representatives no later than December 1, 2006, that includes: a comprehensive *1356 mission statement, an identification of long-term goals, an explanation of how long-term goals will be achieved, schedule and resource requirements for goal achievement, an identification of annual performance goals and how they link to long-term goals, an identification of annual performance measures used to gauge effectiveness towards goal achievement by goal, and an identification of major capital assets critical to program success.

Office of the Under Secretary for Management

For necessary expenses of the Office of the Under Secretary for Management, as authorized by sections 701

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PL 109-295, 2006 HR 5441                                                                                          Page 19
PL 109-295, October 4, 2006, **120 Stat 1355**
(Cite as: 120 Stat 1355)

Construction, and *1381 Improvements" account specifically identified in the Joint Explanatory Statement (House Report 109- 241) accompanying Public Law 109-90 for the Fast Response Cutter, the service life extension program of the current 110-foot Island Class patrol boat fleet, and accelerated design and production of the Fast Response Cutter, $78,693,508 are rescinded.

(b) ADDITIONAL APPROPRIATION.--For necessary expenses of the United States Coast Guard for "Acquisition, Construction, and Improvements", there is appropriated an additional $78,693,508, to remain available until September 30, 2009, for the service life extension program of the current 110-foot Island Class patrol boat fleet and the acquisition of traditional patrol boats ("parent craft").

SEC. 522. None of the funds made available in this Act may be used by any person other than the Privacy Officer appointed under section 222 of the Homeland Security Act of 2002 (6 U.S.C. 142) to alter, direct that changes be made to, delay, or prohibit the transmission to Congress of any report prepared under paragraph (6) of such section.

SEC. 523. No funding provided by this or previous appropriation Acts shall be available to pay the salary of any employee serving as a contracting officer's technical representative (COTR), or anyone acting in a similar or like capacity, who has not received COTR training.

SEC. 524. Except as provided in section 44945 of title 49, United States Code, funds appropriated or transferred to Transportation Security Administration "Aviation Security", "Administration" and "Transportation Security Support" in fiscal years 2004, 2005, and 2006 that are recovered or deobligated shall be available only for procurement and installation of explosive detection systems for air cargo, baggage, and checkpoint screening systems, subject to notification.

SEC. 525. (a) Within 30 days after enactment of this Act, the Secretary of Homeland Security shall revise Department of Homeland Security (DHS) Management Directive (MD) 11056 to provide for the following:

(1) That when a lawful request is made to publicly release a document containing information designated as sensitive security information (SSI), the document shall be reviewed in a timely manner to determine whether any information contained in the document meets the criteria for continued SSI protection under applicable law and regulation and shall further provide that all portions that no longer require SSI designation be released, subject to applicable law, including sections 552 and 552a of title 5, United States Code;

(2) That sensitive security information that is three years old and not incorporated in a current transportation security directive, security plan, contingency plan, or information circular; or does not contain current information in one of the following SSI categories: equipment or personnel performance specifications, vulnerability assessments, security inspection or investigative information, threat information, security measures, security screening information, security training materials, identifying information of designated transportation security personnel, critical aviation or maritime infrastructure asset information, systems security information, confidential business information, or research and development information shall be subject to release upon request unless:

*1382 (A) the Secretary or his designee makes a written determination that identifies a rational reason why the information must remain SSI; or

(B) such information is otherwise exempt from disclosure under applicable law:

*Provided*, That any determination made by the Secretary under clause (a)(2)(A) shall be provided to the party making a request to release such information and to the Committees on Appropriations of the Senate and the House of Representatives as part of the annual reporting requirement pursuant to section 537 of the Department of Homeland Security Appropriations Act, 2006 (Public Law 109-90; 119 Stat. 2088); and

(3) Common and extensive examples of the individual categories of SSI information cited under 49 CFR 1520(b)(1) through (16) in order to minimize and standardize judgment by covered persons in the application of SSI marking.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(b) Not later than 120 days after the date of enactment of this Act, the Secretary of Homeland Security shall report to the Committees on Appropriations of the Senate and the House of Representatives on the progress that the Department has made in implementing the requirements of this section and of section 537 of the Department of Homeland Security Appropriations Act, 2006 (Public Law 109-90; 119 Stat. 2088).

(c) Not later than one year from the date of enactment of this Act, the Government Accountability Office shall report to the Committees on Appropriations of the Senate and the House of Representatives on DHS progress and procedures in implementing the requirements of this section.

(d) That in civil proceedings in the United States District Courts, where a party seeking access to SSI demonstrates that the party has substantial need of relevant SSI in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the information by other means, the party or party's counsel shall be designated as a covered person under 49 CFR Part 1520.7 in order to have access to the SSI at issue in the case, provided that the overseeing judge enters an order that protects the SSI from unauthorized or unnecessary disclosure and specifies the terms and conditions of access, unless upon completion of a criminal history check and terrorist assessment like that done for aviation workers on the persons seeking access to SSI, or based on the sensitivity of the information, the Transportation Security Administration or DHS demonstrates that such access to the information for the proceeding presents a risk of harm to the nation: *Provided*, That notwithstanding any other provision of law, an order granting access to SSI under this section shall be immediately appealable to the United States Courts of Appeals, which shall have plenary review over both the evidentiary finding and the sufficiency of the order specifying the terms and conditions of access to the SSI in question: *Provided further*, That notwithstanding any other provision of law, the Secretary may assess a civil penalty of up to $50,000 for each violation of 49 CFR Part 1520 by persons provided access to SSI under this provision.

<< 31 USCA § 501 NOTE >>

SEC. 526. The Department of Homeland Security Working Capital Fund, established, pursuant to section 403 of Public Law 103-356 (31 U.S.C. 501 note), shall continue operations during fiscal year 2007.

**\*1383** SEC. 527. RESCISSION. Of the unobligated balances from prior year appropriations made available for the "Counterterrorism Fund", $16,000,000 are rescinded.

SEC. 528. (a) The report required by Public Law 109-62 and Public Law 109-90 detailing the allocation and obligation of funds for "Disaster Relief" shall hereafter be submitted monthly and include: (1) status of the Disaster Relief Fund (DRF) including obligations, allocations, and amounts undistributed/unallocated; (2) allocations, obligations, and expenditures for Hurricanes Katrina, Rita, and Wilma; (3) information on national flood insurance claims; (4) information on manufactured housing data; (5) information on hotel/motel data; (6) obligations, allocations and expenditures by State for unemployment, crisis counseling, inspections, housing assistance, manufactured housing, public assistance and individual assistance; (7) mission assignment obligations by agency, including: (i) the amounts reimbursed to other agencies that are in suspense because FEMA has not yet reviewed and approved the documentation supporting the expenditure; and (ii) a disclaimer if the amounts of reported obligations and expenditures do not reflect the status of such obligations and expenditures from a government-wide perspective; (8) the amount of credit card purchases by agency and mission assignment; (9) specific reasons for all waivers granted and a description of each waiver; and (10) a list of all contracts that were awarded on a sole source or limited competition basis, including the dollar amount, the purpose of the contract and the reason for the lack of competitive award.

(b) The Secretary of Homeland Security shall at least quarterly obtain and report from agencies performing mission assignments each such agency's actual obligation and expenditure data.

(c) For any request for reimbursement from a Federal agency to the Department of Homeland Security to cover expenditures under the Stafford Act (42 U.S.C. 5121 et seq.), or any mission assignment orders issued by the Department of Homeland Security for such purposes, the Secretary of Homeland Security shall take appropriate steps to ensure that each agency is periodically reminded of Department of Homeland Security policies on--

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS

                                   Civil Action No. 04-12513-RBC



*******************************
KING DOWNING,                  *
      Plaintiff,               *
                               *
v.                             *
                               *
MASSACHUSETTS PORT AUTHORITY,  *
THE MASSACHUSETTS DEPARTMENT   *
OF STATE POLICE, STATE POLICE  *
TROOPER THOMPSON, STATE        *
POLICE SERGEANT CROXTON,       *
THOMAS G. ROBBINS, and PETER   *
J. DIDOMENICA,                 *
      Defendants.              *
*******************************
```

DEPOSITION OF WILLIAM A. THOMPSON, JR., taken pursuant to notice under to the applicable provisions of the Federal Rules of Civil Procedure, before Michelle Kaczynski, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Lurie & Krupp, LLP, One McKinley Square, Boston, Massachusetts, on Thursday, June 22, 2006, at 10:05 a.m.

KACZYNSKI REPORTING
72 CHANDLER STREET, SUITE 3
BOSTON, MASSACHUSETTS 02116
(617) 426-6060

Case 1:04-cv-12513-RBC   Document 63-4   Filed 06/19/2007   THOMPSON 6/22/06
Page 3 of 6

Page 53

1  then he raised, then -- and I asked him, why you are
2  asking me why am I standing here, and he raised his
3  voice.
4      Q. What did he say in a raised voice?
5      A. He said, I don't have to say anything to you,
6  and then it just was unusual, it was unusual to see
7  that in somebody, so I continued to ask him, like I
8  said, if I could do anything to help him out.
9      Q. How was he dressed?
10     A. He had on pants, he had on a shirt, and I can
11 remember a Barracuda jacket.
12     Q. What's a Barracuda jacket?
13     A. Summer jacket.
14     Q. Was he clean-shaven?
15     A. I believe he had a beard.
16     Q. Long or short?
17     A. Short.
18     Q. Anything on his head?
19     A. I don't recall.
20     Q. What's his race?
21     A. Black male.
22     Q. Dark-skinned, light-skinned?
23     A. Black male.
24     Q. Would you describe his, the tone of his skin,

Page 54

1  would you say he's dark-skinned black or light-skinned
2  black?
3      A. Black male, I mean, he's a black male.
4      Q. You understand -- as you're sitting here do
5  you know one way or the other whether the tone of his
6  skin is a very dark black color or lighter brown color?
7      A. I don't recall.
8      Q. Okay. What was his height?
9      A. Over six feet.
10     Q. Taller than you are?
11     A. Yes.
12     Q. Did he have any luggage?
13     A. I don't recall seeing any.
14     Q. Did he appear to be traveling with anyone or
15 alone or -- that may assume certain things, I'm sorry,
16 let me just rephrase the question. Did he appear to be
17 alone?
18     A. He appeared to be alone.
19     Q. After you said to him; excuse me, he said, I
20 don't have to say anything to you, words to that
21 effect, is that when you said -- well, what did you say
22 in response to that?
23     A. I said, I said to him that if you're not
24 flying out, if you have no business in the airport then

Page 55

1  you're going to have to leave the airport.
2      Q. And at this point he hadn't said to you one
3  way or the other whether he had business in the
4  airport, correct?
5      A. He said he didn't.
6      Q. He said --
7      A. He wouldn't give me any information.
8      Q. So did he say he didn't have information in
9  the airport, or did he not give you any information?
10     A. He said he's not going to give me any
11 information.
12     Q. Okay, so he just didn't tell you one way or
13 the other whether he had any business at the airport,
14 is that right?
15     A. I don't know if he had anything.
16     Q. You don't know because he didn't tell you,
17 right?
18     A. He said he wouldn't provide me any, so I
19 don't know what was going on with him.
20     Q. Okay, and so you told him that if he wasn't
21 flying out or he didn't have any business at the
22 airport he'd have to leave the airport, is that right?
23     A. Yes.
24     Q. And why was that?

Page 56

1      A. Why?
2      Q. Yes. Why did he have to leave the airport?
3      A. Because the way we're trained in the airport,
4  if you don't have any business there, there's no reason
5  for you to be there, you'd rather have someone not be
6  in the area.
7      Q. And at that time you didn't know whether he
8  had business at the airport one way or the other
9  because he didn't answer your question, right?
10     A. Yes.
11     Q. What was the next thing that happened, either
12 that happened or that you said or he said?
13     A. He left the airport, he left the area, he
14 exited the doors.
15     Q. On what level?
16     A. The upper level.
17     Q. Did he go out through the doors closest to
18 the pay phone where he was, had been on the phone?
19     A. Yes.
20     Q. And then what happened?
21     A. And I followed him.
22     Q. Why?
23     A. I was kind of concerned about his well-being.
24 I didn't know where he was coming from, didn't know

KACZYNSKI REPORTING - (617) 426-6060