UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) | |
| KING DOWNING, | ) | |
|            Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-12513-GAO |
| | ) | |
| MASSPORT, MASSACHUSETTS STATE | ) | |
| POLICE, ET AL, | ) | |
|            Defendants. | ) | |
| _____ | ) | |

## AFFIDAVIT OF MARY O'NEIL IN SUPPORT OF THE REPLY BRIEF OF DEFENDANTS ROBBINS, DIDOMENICA AND THE MASSACHUSETTS STATE POLICE

I, Mary O'Neil, state and depose as follows:

1.     I am an assistant attorney general located at One Ashburton Place, Boston, MA. 02108.

2.     I represent Defendants Robbins, Didomenica and the Massachusetts State Police, and I file this affidavit in support of their Reply to Plaintiff's Consolidated Opposition to their Motion for Summary Judgment.

3.     A true and correct copy of portions of Massachusetts State Trooper William Thompson's deposition are attached as Exhibit A.

4.     A true and correct copy of portions of Massachusetts State Trooper Howard Croxton's deposition are attached as Exhibit B.

5.     A true and correct copy of portions of Massachusetts State Trooper Robert Moore's deposition are attached as Exhibit C.

6.     A true and correct copy of portions of Massachusetts State Trooper Mark Kiley's deposition are attached as Exhibit D.

7.     A true and correct copy of plaintiff King Downing's deposition are attached as Exhibit E.

8.     A true and correct copy of portions of Massachusetts State Trooper Peter Didomenica's deposition are attached as Exhibit F.

8.     A true and correct copy of a portion of the BASS tool power point presentation is

attached as Exhibit G.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  June 22, 2007

<u>/s/ Mary O'Neil</u>

Sworn before me this day: June 22, 2007                <u>/s/ Laura MacMullin</u>

EXH. A

| Page 41 |
|---|
| 1    Q. And is it your testimony that although you |
| 2    were trained in it, you were not one of the people |
| 3    specifically assigned to enforce it? |
| 4    A. I don't understand the question. |
| 5    Q. Okay. You received training in the PASS |
| 6    policy, right? |
| 7    A. Yes. |
| 8    Q. And you did that in March of 2003? |
| 9    A. Yes. |
| 10    Q. Right? But is it your testimony that you |
| 11    were never directed to enforce the policy? |
| 12    A: We were directed to enforce it, yes. |
| 13    Q. And was everybody who was trained in the PASS |
| 14    policy expected to enforce the policy? |
| 15    A. Yes. |
| 16    Q. And everybody who was trained in it was |
| 17    directed to follow it, correct? |
| 18    A. Yes. |
| 19    Q. And now I want to go back to your earlier |
| 20    answer. When you were at Logan Airport, did you follow |
| 21    the policy? |
| 22    A. Yes. |
| 23    Q. Okay. Did you ever stop individuals at Logan |
| 24    Airport based on elevated suspicion as it's defined on |

| Page 43 |
|---|
| 1    been assigned to a unit specifically focused on |
| 2    apprehending or observing potential terror suspects? |
| 3    A. Yes. |
| 4    Q. Let me draw your attention to the events of |
| 5    October 16, 2003 which are at issue in this case. Do |
| 6    you remember having any interaction with an individual |
| 7    named King Downing? |
| 8    A. Yes, yes. |
| 9    Q. When was that first interaction? |
| 10    A. Are you looking for the time? |
| 11    Q. Yes, let's just start with the time. What |
| 12    time was it? |
| 13    A. In the morning hours of October. |
| 14    Q. What shift were you on? |
| 15    A. I was on a seven to three shift. |
| 16    Q. Had you just come on? |
| 17    A. No. |
| 18    Q. Had you received any alerts that morning that |
| 19    there was any particular thing going on or anticipated |
| 20    to be going on at the airport that you should be on the |
| 21    alert for? |
| 22    A. No. |
| 23    Q. How were you assigned on that day, to do |
| 24    what? |

| Page 42 |
|---|
| 1    page two of Exhibit 2? |
| 2    A. No. |
| 3    Q. Did you ever approach any people within Logan |
| 4    Airport to ask them for identification based on |
| 5    elevated suspicion as it's defined on page two? |
| 6    A. No. |
| 7    Q. Was there any particular reason for that? |
| 8    A. Because I dealt with different type of |
| 9    people, I dealt with irates, I didn't deal with the |
| 10    PASS program in general. |
| 11    Q. Okay, so generally you were handling a |
| 12    different kind of person than someone who might have |
| 13    been assigned to a unit or a sub-unit within Troop F |
| 14    that was specifically on the lookout for potential |
| 15    terror suspects? |
| 16            MR. KITTREDGE: Objection. |
| 17            MS. O'NEIL: Objection. |
| 18            MR. KITTREDGE: You can answer. |
| 19    Q. Is that fair to say? |
| 20            THE WITNESS: Hmm? |
| 21            MR. KITTREDGE: You can answer. |
| 22    A. Can you repeat that, please? |
| 23    Q. Sure. It's fair to say that you were dealing |
| 24    with different people than someone might have had they |

| Page 44 |
|---|
| 1    A. On that particular day I was assigned to, to |
| 2    sign in or to allow law enforcement officers to go |
| 3    through the checkpoint. |
| 4    Q. You're talking about the checkpoint between |
| 5    the secure and unsecure areas of the airport? |
| 6    A. Yes. |
| 7    Q. Were you in uniform? |
| 8    A. Yes. |
| 9    Q. And where was that checkpoint? |
| 10    A. US Air main. |
| 11    Q. Which terminal? |
| 12    A. Terminal B. |
| 13    Q. Is that a stationary posting, or is that a |
| 14    posting that allows you to roam in the area of Terminal |
| 15    B? |
| 16    A. Roam. |
| 17    Q. So are you, and the roaming that you do, is |
| 18    that in the secure or nonsecure area of the airport? |
| 19    A. Both. |
| 20    Q. If a law enforcement officer wishes to |
| 21    proceed between the nonsecure and secure areas, they |
| 22    have to contact you, is that right? |
| 23    A. That's correct. |
| 24    Q. They have to find you and contact you and |

## Page 93

1    question, is that right?
2        A. That's correct.
3        Q. Was it at that time that you became either
4    suspicious or concerned about his behavior?
5        A. Concerned.
6        Q. And to determine whether or not he had
7    legitimate business in the airport and who he was, you
8    thought it would be appropriate to see his license for
9    identification and any travel documents that he had?
10       A. That's correct.
11       Q. He refused to give those to you, didn't he?
12       A. That's correct.
13       Q. You indicated that part of the training as a
14   state police officer with duties at Logan, you were
15   trained in dealing with what I think you called irates,
16   is that right?
17       A. That's correct.
18       Q. Would you characterize Mr. Downing's behavior
19   subsequent to him questioning why you were standing
20   where you were as being irate?
21       A. Yes.
22       Q. And was all of that the reason why you
23   requested assistance in order to determine who he was
24   and what he was doing at the airport?

## Page 94

1        A. Yes.
2        Q. Did any part of the PASS training that you
3    had undergone before that cause you to act as you did?
4        A. No.
5        Q. Did Mr. Downing's race play any part
6    whatsoever in your request to him to provide
7    identification and travel documents?
8        A. No.
9            MR. TRIMMIER: I have no further
10   questions.
11           MR. KITTREDGE: I just have a couple to
12   clear up the record here.
13   EXAMINATION BY MR. KITTREDGE:
14       Q. When you attended basic training, that was to
15   enter the Metropolitan Police Department?
16       A. That's correct.
17       Q. And at that point in time were you provided
18   with any Massachusetts State Police information as part
19   of your basic training for the Metropolitan Police?
20       A. No.
21       Q. And at the point in time that Mr. Downing
22   called attention to himself by questioning you, was it
23   actually a phone booth, or was it just a pole with a
24   phone on it?

## Page 95

1        A. A pole with a phone on it.
2        Q. And how long had you maintained that post
3    observing the checkpoint prior to Mr. Downing calling
4    attention to himself?
5        A. Hours, I had been there the whole night and
6    the whole morning at that particular location.
7        Q. And at any point in time did you tell Mr.
8    Downing that he was under arrest?
9        A. No.
10           MR. KITTREDGE: No other questions.
11           MR. KRUPP: I have a couple more.
12   EXAMINATION BY MR. KRUPP:
13       Q. When you were standing where you were
14   standing near the phone booth or the phone pole, you
15   were within a couple of feet of Mr. Downing, is that
16   right?
17       A. That's correct.
18           MR. KRUPP: I oversold how many
19   questions I had, I only had one. Thank you.
20           (Deposition concluded at 12:11 p.m.).
21
22
23
24

## Page 96

1        I have read the foregoing transcript and the same
2    contains a true and accurate recording of my answers
3    given to the questions therein set forth.
4
5
6
7    _____
8    WILLIAM A. THOMPSON, JR.
9
10   On this ____ day of _____, 2006, before me, the
11   undersigned notary public, personally appeared
12   William A. Thompson, Jr., proved to me through
13   satisfactory evidence of identification, which were
14   _____, to be the person
15   whose name is signed on the preceding or attached
16   document, and who swore or affirmed to me that the
17   contents of the document are truthful and accurate to
18   the best of his knowledge.
19
20
21
22       _____
23       NOTARY PUBLIC
24

# EXH. B

## Page 53

1    lot of questions, you've been asked a lot of questions
2    about the behavioral recognition program and
3    training --
4        A. Right.
5        Q. Is that correct?
6        A. Yes.
7        Q. Okay. Could you, and if I understand your
8    testimony, the reason you had anything to do with
9    Mr. Downing that day was because you received or heard
10   a call for assistance by Trooper Thompson, is that
11   correct?
12       A. Yes, yes.
13       Q. Were you using the behavior recognition
14   training to assist Trooper Thompson?
15       A. No, I wasn't.
16           MS. O'NEIL: Nothing further.
17           MR. REINSTEIN: That's it.
18           MS. HOEY: I have nothing.
19           (Deposition concluded at 10:27 a.m.).
20
21
22
23
24

## Page 54

1        I have read the foregoing transcript and the same
2    contains a true and accurate recording of my answers
3    given to the questions therein set forth.
4
5
6
7    _____
8        HOWARD G. CROXTON
9
10   On this _____ day of _____, 2006, before me, the
11   undersigned notary public, personally appeared
12   Howard G. Croxton, proved to me through satisfactory
13   evidence of identification, which were
14   _____, to be the person
15   whose name is signed on the preceding or attached
16   document, and who swore or affirmed to me that the
17   contents of the document are truthful and accurate to
18   the best of his knowledge.
19
20
21   _____
22       NOTARY PUBLIC
23
24

## Page 55

1    COMMONWEALTH OF MASSACHUSETTS
2    COUNTY OF SUFFOLK
3        I, Michelle Kaczynski, a Registered Professional
     Reporter and Notary Public duly commissioned in and for
4    the Commonwealth of Massachusetts, do hereby certify
     that there came before me on the 23rd day of June, 2006
5    at 211 Congress Street, Howard G. Croxton, who was by
     me duly sworn to testify to the truth and nothing but
6    the truth of his knowledge touching and concerning the
     matters in controversy in this cause; that he was
7    thereupon examined under his oath and his examination
     reduced to typewriting under my direction; and that the
8    deposition is a true record of the testimony given by
     the witness.
9
10       I further certify that I am neither attorney or
     counsel for, nor related to or employed by, any of the
11   parties to the action in which this deposition was
     taken, and further that I am not a relative or employee
12   of any attorney or counsel employed by the parties
     hereto or financially interested in this action.
13
14       IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my notarial seal this 4th day of July,
15   2006.
16
17
18
19   _____
     MICHELLE KACZYNSKI
     NOTARY PUBLIC
     MY COMMISSION EXPIRES ON
     JUNE 28, 2007
20
21
22
23
24

EXH. C

Page 29

1    A.  It could have been on the street.
2    Q.  I'm asking what your memory was of
3  where you left your vehicle?
4    A.  I don't recall.
5    Q.  Did you activate your blue lights when
6  you approached the terminal?
7    A.  No.
8    Q.  Did you activate your blue lights in
9  getting to the terminal?
10   A.  I don't recall that.
11   Q.  You just don't know one way or the
12  other?
13   A.  Mm-hmm.
14   Q.  Is that yes?
15   A.  I don't know one way or the other.
16   Q.  Okay.  Do you know what door you used
17  to access the terminal once you parked your vehicle?
18   A.  I just used the door to gain access.
19  No, I don't recall which door it was.
20   Q.  When you went into the terminal,
21  whether it was the US Air side or the American side,
22  where did you -- what did you see?
23   A.  People.
24   Q.  Did you see Trooper Thompson?

Page 30

1    A.  Yes.
2    Q.  Did you see the person about whom
3  Trooper Thompson had requested the assistance?
4    A.  Yes.
5    Q.  Could you describe that person for me?
6    A.  A male.
7    Q.  Can you do any better than that?
8    A.  Oh, you want specifics?
9    Q.  Yeah, as specific as you can.
10   A.  I would say he was approximately -- a
11  black male, approximately six-two, possibly
12  six-three, over two hundred pounds, dressed in casual
13  clothing.
14   Q.  Luggage?
15   A.  I didn't see any luggage.
16   Q.  Did you notice anything peculiar about
17  his appearance?
18   A.  What do you mean by peculiar?
19   Q.  Well, anything that would be
20  suspicious about his appearance to you as a trained
21  state police trooper?
22   A.  Not that I recall.
23   Q.  How long were you in his presence?
24   A.  Could have been twenty, thirty

Page 31

1  minutes, if that was the duration.
2    Q.  What's your best estimate what the
3  duration was?
4    A.  Could have been anywhere from fifteen
5  to thirty minutes.
6    Q.  And was it entirely inside the airport
7  building?
8    A.  Portion of it was inside and a portion
9  of it was outside.
10   Q.  When you came to the scene, having
11  parked your vehicle, come inside the terminal, you
12  saw Trooper Thompson and the person about whom he
13  called for assistance, did you see any other state
14  police personnel in the area when you arrived?
15   A.  No, I was the first one on the scene.
16   Q.  What was the first thing that you did
17  when you arrived on the scene?
18   A.  Talked to Trooper Thompson.
19   Q.  About what?
20   A.  His request.
21   Q.  For assist --
22   A.  For assistance.
23   Q.  You said, I'm here, got your call,
24  something to that effect?

Page 32

1    A.  Something to that effect.
2    Q.  What is this all about, something to
3  that effect?
4    A.  Exactly.
5    Q.  And what did he tell you?
6    A.  I don't remember verbatim-punctuatim,
7  but something to the effect that the guy was
8  uncooperative.
9    Q.  What did you understand that to mean?
10   A.  I understood it, what was relayed to
11  me was that Trooper Thompson was walking through or
12  passing through and the gentleman instigated an
13  argument with him.
14   Q.  What did Trooper Thompson say
15  happened?
16   A.  He said he was -- as I said, he was
17  walking through and this guy called out to him.
18   Q.  What did he say that this guy said?
19  Strike that.  Let me be clearer about my question.
20  What did Trooper Thompson tell you that this guy said
21  when he called out to him?
22   A.  He said that he was listening to his
23  conversation on the, I don't know if it was on cell
24  phone or pay phone.

Page 65

| 1 | Logan Airport? |
| 2 | A. I will run their information through |
| 3 | the system. |
| 4 | Q. Okay. And do you permit them to |
| 5 | remain at the airport? |
| 6 | A. Yes. |
| 7 | Q. Do you permit them to remain in the |
| 8 | secure area of the airport? |
| 9 | A. Usually when they're on the no-fly |
| 10 | list, this is prior to them going into the secure |
| 11 | area. |
| 12 | Q. Do you permit them to be in the |
| 13 | unsecure area of the airport without a police |
| 14 | presence in the area? |
| 15 | A. Yes. |
| 16 | MR. KRUPP: I have nothing else for |
| 17 | you. Thank you very much. |
| 18 | A. One of them was a three-year-old baby, |
| 19 | child, was on the no-fly list. The name. But they |
| 20 | didn't check the date of birth. They were on the |
| 21 | no-fly list, a three-year old. I guess I wasn't |
| 22 | going to arrest them then. |
| 23 | MS. O'NEIL: I just have a couple of |
| 24 | questions, Trooper Moore. |

Page 66

| 1 | CROSS EXAMINATION |
| 2 | BY MS. O'NEIL: |
| 3 | Q. Trooper, did you ever use the PASS or |
| 4 | BASS program or any behavior recognition program with |
| 5 | Mr. Downing? |
| 6 | A. No, I did not. |
| 7 | Q. And you mentioned earlier that he had |
| 8 | on a casual clothes. Do you have any specific memory |
| 9 | of anything he was wearing that day? |
| 10 | A. Yes, a jacket. It said Members Only. |
| 11 | MS. O'NEIL: Nothing further. |
| 12 | MS. HOEY: I have no questions. |
| 13 | MS. CARAVAGGIO: I have no questions. |
| 14 | REDIRECT EXAMINATION |
| 15 | BY MR. KRUPP: |
| 16 | Q. What color was the Members Only |
| 17 | jacket? |
| 18 | A. It was either tan or burgundy, I |
| 19 | believe, tan or olive, or some other like that. |
| 20 | Q. Tan or olive or burgundy? |
| 21 | A. It was one of those two. |
| 22 | Q. Those are three. |
| 23 | A. I'm talking about the same shade or |
| 24 | hue. It could be a greater or lesser degree. One |

Page 67

| 1 | might say olive, one might say tan, one might say |
| 2 | brown. |
| 3 | Q. Was it in good condition? |
| 4 | A. I guess it was. For the dated time |
| 5 | that that jacket went out of style, I guess it was |
| 6 | pretty good. |
| 7 | MR. KRUPP: Thank you. |
| 8 | (Whereupon, the deposition was |
| 9 | concluded at 1:19 p.m.) |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 68

| 1 | I have read the foregoing transcript and the |
| 2 | same contains a true and accurate recording of my |
| 3 | answers given to the questions therein set forth. |
| 4 | |
| 5 | |
| 6 | |
| 7 | _____ |
| 7 | ROBERT J. MOORE, JR. |
| 8 | |
| 9 | On this_____day of_____, 2006, before me, |
| 10 | the undersigned notary public, personally appeared |
| | Robert J. Moore, Jr., proved to me through |
| | satisfactory evidence of identification, which were |
| | _____, to be the person whose |
| | name is signed on the preceding or attached document, |
| | and who swore or affirmed to me that the contents of |
| | the document are truthful and accurate to the best of |
| | his knowledge. |
| | |
| | |
| | _____ |
| | NOTARY PUBLIC |
| 24 | |

EXH. D

Page 17

1  arrive at that area?
2      A. I did not see any -- you know what, I
3  don't know. There might have been -- one might have
4  shown up as I was showing up. I just know there was
5  four troopers down there other than myself.
6      Q. When you responded to the area, what
7  was your understanding as to what the incident was
8  that you were responding to?
9      A. There was no understanding. That's
10  why I approached Trooper Thompson, to see what was
11  going on.
12      Q. Did you approach with your gun drawn?
13      A. No.
14      Q. Was there any kind of a code used to
15  alert you to any particular kind of an incident?
16      A. No.
17      Q. And the first thing that you did when
18  you got to the area was to approach Trooper Thompson;
19  is that right?
20      A. Yes.
21      Q. Is it fair to say that you were the
22  person of highest rank among the troopers present at
23  the scene?
24      A. Yes.

Page 18

1      Q. Did you have any supervisory
2  responsibility for the troopers on the scene, being
3  of higher rank?
4      A. The only responsibility is just chain
5  of command in the state police. If an incident
6  transpired there, they would have called a patrol
7  supervisor stationed to F Troop. On scene right
8  there I was of highest rank, but they would have
9  called somebody from the airport that was assigned
10  there.
11      Q. And that's because you were just on a
12  detail there?
13      A. Yes, I'm not assigned there, that's
14  correct.
15      Q. So when you responded to the scene, it
16  was your view that you were responding to give
17  assistance but not to take control of the situation,
18  if you will?
19      A. Yes.
20      Q. What did Trooper Thompson tell you
21  when you arrived at the scene?
22      A. That he had seen this guy at a phone
23  booth earlier. The guy in so many words, these
24  aren't his words, but basically was being

Page 19

1  uncooperative. He wanted to check him on the
2  trespass list, he wanted his ID, and the gentleman
3  wouldn't provide his ID.
4      Q. Did he tell you why he wanted to check
5  him on the trespass list?
6      A. Just in my opinion I can give you,
7  because the guy --
8      Q. First of all, I want what Trooper
9  Thompson told you.
10      A. No, other than what I told you.
11      Q. Did he tell you why he wanted to check
12  his ID?
13      A. Because of his reaction of being
14  uncooperative at the pay phone and that he felt he
15  may be on the trespass list.
16      Q. Did he tell you what the basis for his
17  belief was that he might be on the trespass list?
18      A. His appearance. He looked like -- not
19  to categorize, but he looked like a homeless person.
20      Q. How was he dressed?
21      A. He was dressed in a -- the only thing
22  I remember is a Members Only jacket that I wore in
23  high school that he had on, but I had mine on in '83,
24  so --

Page 20

1      Q. Do you remember what kind of pants he
2  had on?
3      A. Nope. That's the only thing that
4  stuck out was the Members Only jacket.
5      Q. Did he have a briefcase with him?
6      A. I don't know if it was a suitcase. I
7  thought it was one of those pull suitcases, suitcase
8  on wheels.
9      Q. Okay. The kind that people use
10  commuting on an airplane?
11      A. Yeah, but I'm not sure of that.
12  That's what I thought it was.
13      Q. Did Trooper Thompson tell you why he
14  approached the individual at the pay phone?
15      A. No.
16      Q. Did he tell you how the individual had
17  been uncooperative when he was at the pay phone?
18      A. No.
19      Q. So is it fair to say that in this
20  first conversation you had with Trooper Thompson he
21  tells you he wants to check to determine if this
22  individual is on the trespass list and to check his
23  ID because he had been uncooperative on the pay
24  phone?

Page 25

1   any conversations with the tall individual who you
2   were seeking ID from during the period you were at
3   the scene?
4       A.  I don't recall.  I recall them talking
5   amongst each other.
6       Q.  But you don't remember them having any
7   direct conversations with the individual who you were
8   trying to get ID from?
9       A.  That's correct.
10      Q.  Do you know where this tall individual
11  had traveled from?
12      A.  Nope.
13      Q.  Do you know his address?
14      A.  No.
15      Q.  Do you know his name?
16      A.  No.  Only because you said earlier,
17  but it's not something -- if you tell me I'll say it
18  again, but I don't know it.
19      Q.  Okay.  After you left the scene, did
20  you remain on the traffic detail at the upper level
21  of Terminal B?
22      A.  Yes.
23      Q.  From where you were situated after you
24  left the scene, if you will, the midpoint of Terminal

Page 26

1   B, after you left there did you have a vantage point
2   of the midpoint of Terminal B so you could sort of
3   see what was happening at the location where this
4   tall individual was?
5       A.  I don't know because I don't recall
6   whether it was on the upper level or lower level.  So
7   if it was on the lower level, I did not have a
8   vantage point.
9       Q.  So you returned to the upper level or
10  you remained on the upper level?
11      A.  Yep.
12      Q.  And in any event, you have no memory
13  of any observations you made of the scene at the
14  midpoint of the terminal area where the tall
15  individual was after leaving the midpoint of the
16  terminal area?
17      A.  That's correct.
18      Q.  Did you ever see the tall individual
19  leave the area of Terminal B?
20      A.  No.
21      Q.  Do you know how long he was at the
22  airport?
23      A.  No.
24      Q.  Did you overhear any conversations

Page 27

1   between Trooper Thompson and the tall individual
2   while you were at the scene?
3       A.  No.
4       Q.  Did you discuss this particular
5   incident with any of the troopers who were there
6   after it happened?
7       A.  Yes.
8       Q.  Who did you discuss with?
9       A.  When I got this I asked Trooper
10  Thompson.  I said, I thought this was already
11  resolved.  He said no, that he had just got deposed.
12  And that was the extent of that conversation.
13      Q.  Did you discuss with him the substance
14  of his memory about what had happened?
15      A.  No.
16      Q.  Did you have discussions with anyone
17  other than Trooper Thompson after you received the
18  subpoena and other than your counsel about your
19  memories of events of that day?
20      A.  No.
21      Q.  Did you receive any training whether
22  in connection with your work as, on detail or
23  otherwise in the Passenger Assessment and Screening
24  System in place at the Troop F?

Page 28

1       A.  Yes.
2       Q.  When did you receive that training?
3       A.  I don't know.  It was after the
4   airport orders.  I was assigned to the gang unit.  My
5   commanding officer thought it would be a good idea
6   for us to get the training.  I don't know the date.
7       Q.  Was it before or after this particular
8   incident, which was in October of 2003?
9       A.  I think it was afterward.  I don't
10  know.  I'm sure it's documented somewhere, but I
11  didn't look.
12      Q.  Do you remember who you received the
13  training from?
14      A.  It might have been sergeant, is it
15  DeMarco?  I don't know how to pronounce his last
16  name.
17      Q.  Didomenica?
18      A.  Yes.
19      Q.  Where was the training?
20      A.  It was on Logan Airport's property.  I
21  don't know what building it was at.
22      Q.  And this was training that you
23  received in connection with your work in Brockton?
24      A.  Well, the gang unit was a statewide

EXH. E

1          A.    Part of it.

2          Q.    What's the rest of it?

3          A.    I was told that if I didn't show my

4     identification that I was going to be put on a

5     watch list, some words to that effect, and I

6     asked what the watch list was.  They said that if

7     I got placed on the watch list and I ever came

8     back to the airport and I wasn't able to account

9     for why I was there, I would be arrested.

10         Q.    Did they say watch list, or did they say

11    trespass list?

12         A.    They might have used the word trespass

13    list.

14         Q.    Was there any other conversation?

15         A.    Might have had another round of saying

16    that I wasn't going to show the ticket, but I

17    think at that point the same issues that came up

18    before about time, needing to get away from

19    there, not being sure whether I might be subject

20    to arrest again, that I showed them the travel

21    tickets.

22         Q.    And what happened after you -- who did

23    you produce the travel tickets to?

24         A.    I gave them -- I just handed them to the

1       terrorist in any way?

2           A.    No.

3           Q.    Did he mention at any point that you were

4       being behaviorally profiled?

5           A.    No.

6           Q.    How about any of the other troopers, did

7       they bring up any behavioral profiling?

8           A.    No.

9           Q.    Did any of the other troopers mention

10      anything to you about terrorism?

11          A.    The conversations about a watch list made

12      me feel like --

13          Q.    I think you corrected that to say

14      trespass list.

15          A.    Well, the conversation about that list,

16      nobody ever said that there was a connection.

17          Q.    You said you wondered that there was a

18      connection.  The word "trespass" was used, right?

19          A.    Right.

20          Q.    And they asked for your ticket, correct?

21          A.    Right.

22          Q.    And did any of the troopers say to you

23      what's your business here, we want to see if you

24      have legitimate business here at Logan?

1      A.   Well, when I questioned them as to why I

2   had to show my ticket, the explanation that if I

3   didn't show it that I would be put on this list

4   and that if I showed up again and I didn't have

5   any reason to be there -- actually, it wasn't

6   didn't have any reason to be there, whatever the

7   statement was that was made to me, led me to

8   respond that I could be here to pick somebody up,

9   so what would a ticket have to do with it.

10      Q.   But nobody said anything beyond a

11   trespass list?  I think that's what you testified

12   to.

13      A.   When you say "said anything beyond", I

14   just gave you an explanation of other things that

15   were said.

16      Q.   I'm sorry.  The list that was identified,

17   the list that you were fearful of, and correct me

18   if fearful is not the right word, but the list

19   that you were concerned about being put on was a

20   trespass list; is that right?

21      A.   That's what they said.

22      Q.   And I'm hearing in your voice that you

23   didn't believe it?

24      A.   All I'm telling you is that I can't

EXH. F

DIDOMENICA-1/4/07

Page 18

1  assessment and report on threat mitigation for
2  the airport. So I would have to say in the late
3  2001 I probably first met him.
4  Q. Okay. Now, do you know if he did produce a
5  report on threat mitigation?
6  A. Yes.
7  Q. All right. And without telling me the contents
8  of any of that, do you recall approximately when
9  that was done?
10  A. I think it took about a year to complete so I
11  would say mid to late 2002.
12  Q. Okay. And did you see that report?
13  A. Yes.
14  Q. And did it include recommendations with respect
15  to behavioral assessment?
16  A. Yes.
17  Q. And what actions, if any, were taken by Massport
18  and the State Police as a result of their report?
19  A. Well, the report included -- I seem to recall
20  over 100 recommendations.
21  Q. Let's focus on the behavioral threat assessment.
22  A. One of the recommendations was to train and
23  deploy troopers to use behavior pattern
24  recognition techniques.

Page 19

1  Q. All right. And let me ask you a couple questions
2  about the division of responsibility for security
3  at Logan Airport. Are the Massachusetts State
4  Police the only ones who provide security at the
5  airport?
6  A. In terms of law enforcement, they are the only
7  ones.
8  Q. All right. And --
9  A. On the state level. I mean, we have Federal law
10  enforcement there. Air marshals, customs and
11  immigration enforcement, but for the Commonwealth
12  they are the principal agency for law
13  enforcement.
14  Q. And what are the sort of general security
15  responsibilities of the state troopers assigned
16  to Troop F?
17  A. It includes ensuring that the airport operates in
18  a safe and orderly manner, preventing thefts of
19  baggage, preventing acts of violence, securing of
20  the airfield and other secure areas, monitoring
21  the perimeter of the airport from intrusion,
22  responding to calls from the TSA for prohibited
23  items and other disturbances occurring at
24  checkpoints.

Page 20

1  Responding to aircraft with disruptive
2  passengers. Assisting the Federal agencies.
3  Frequently prisoners are taken at the airport and
4  we will house those prisoners for the Federal
5  authorities initially. Those are probably the
6  principal responsibilities.
7  Q. How are the responsibilities divided for security
8  divided between TSA on the one hand and
9  Massachusetts State Police on the other?
10  A. Well, it is a matter of statute. Federal law.
11  There is specific responsibilities that TSA has
12  which include the screening of all passengers on
13  commercial flights. And as part of that security
14  responsibility, they have the authority to
15  designate law enforcement functions to state and
16  local authorities, which they've done, so we in
17  effect serve as the law enforcement branch of TSA
18  when it comes to criminal matters of the airport
19  but the underlying authority is -- on the Federal
20  law is the TSA for what happens at that
21  checkpoint.
22  Q. All right. With respect to the deployment of the
23  state troopers assigned to Troop F at Logan
24  Airport, do some of the state troopers take part

Page 21

1  in the screening of passengers?
2  A. No.
3  Q. Okay. That's the responsibility of TSA?
4  A. The physical screening of passengers is the TSA's
5  responsibility.
6  Q. And in limiting it now to the terminals
7  themselves and not to the other areas of the
8  airport --
9  A. Okay.
10  Q. -- where are the state troopers assigned?
11  A. Throughout the airport. On the airfield --
12  Q. Just in the terminals themselves now.
13  A. They're assigned in the terminals.
14  Q. All right. And is that on both sides of the
15  screening area?
16  A. Yes. On the secure side and they're on the
17  public side.
18  Q. All right. Now, after receiving the report and
19  recommendations from Mr. Ron with respect to
20  behavioral screening, what measures were taken
21  collectively by Massport and the State Police?
22  A. Again, you're talking in terms of behavior
23  pattern?
24  Q. Right. Just in terms of behavior pattern.

DIDOMENICA-1/4/07

---

**Page 22**

1  A. I asked them to put together a training course
2     specifically in the techniques that they
3     advocated for the State Police and they put
4     together a training course. And it was delivered
5     in October of 2002 to about a dozen troopers.
6  Q. When you say "they," are you referring to Mr.
7     Ron?
8  A. Mr. Ron and his company. I believe it was New
9     Age Aviation Security.
10 Q. Okay. And were there training materials prepared
11    for that?
12 A. Yes.
13 Q. And did you participate in that training?
14 A. I served in an advisory capacity because they
15    were not citizens of this country and the
16    techniques that they were going to train us on
17    evolved at Ben Gurion Airport in Israel. And I
18    was advising them on some of the limitations that
19    would apply in using those techniques in this
20    country.
21 Q. All right. And did you ultimately determine that
22    some of those were not appropriate to the United
23    States?
24 A. Yes.

---

**Page 23**

1  Q. All right. And was there any further training
2     done by Mr. Ron or his company?
3  A. There was a follow-up training that was -- lasted
4     maybe a day just to check on people's skills in
5     conducting interviews. And that may have
6     occurred four to six months after the initial
7     training.
8  Q. And how many people, how many troopers were
9     involved in this?
10 A. Initially I think it was between ten and 12 and
11    then when they did the follow-up I think it may
12    have been about eight. Eight troopers.
13 Q. And when was that? When was the initial training
14    and when was the follow-up?
15 A. The initial training was I believe October of
16    2002. And then, like I say, four to six months
17    later I asked them to come back just to check us
18    out and see if we're doing it properly.
19 Q. And how were the troopers who participated in
20    this training selected?
21 A. There was a sign-up sheet posted and the troopers
22    were asked if they were interested in this type
23    of training. They would be welcome to take the
24    training.

---

**Page 24**

1  Q. It was not mandatory?
2  A. It was not mandatory.
3  Q. Would it be fair to describe it as experimental
4     or a pilot project?
5  A. Yes.
6  Q. And at some point was a decision made to expand
7     the program?
8  A. Yes.
9  Q. Who made that decision?
10 A. I made it in conjunction with Major Robbins and
11    Tom Canton.
12 Q. Okay. And was there any formal record made of
13    that decision?
14 A. I don't believe so.
15 Q. So there was a meeting between you and Major
16    Robbins and Mr. Canton?
17 A. I would not even classify it as a meeting because
18    I'm not sure there was a meeting. I think it was
19    in the course of conversations so I don't recall
20    a formal meeting to discuss it. It just in the
21    course of working and talking these subjects came
22    up. I just don't have a recollection of a
23    specific meeting.
24 Q. And would it be fair to say, though, that there

---

**Page 25**

1     was agreement between Massport and the
2     Massachusetts State Police that an expanded
3     version of the program should go forward?
4  A. Yes.
5  Q. And who was responsible for implementing that
6     decision?
7  A. From the State Police, Major Robbins, and from
8     Massport, Tom Canton.
9  Q. And what steps were taken to follow up on that?
10 A. Well, I initially set out to devise a training
11    program. And the reason being is that I had
12    reservations about some of the techniques that
13    were used in Israel and I felt that there would
14    be a danger, that they would not be lawful in
15    this country.
16       I also had reservations about the
17    behavioral aspect because I felt that in the
18    training we received from the New Age Aviation
19    Security firm, it wasn't specific enough in terms
20    of what behaviors we should be looking for and I
21    was interested in having scientific validation so
22    we could be on firm ground that we were looking
23    for the right things so I set out kind -- I kind
24    of set out from scratch and looked at this

DIDOMENICA-1/4/07

| Page 30 |
| --- |

1　that?
2　　　　MR. REINSTEIN: No.
3　　　　(Special order draft marked Exhibit No.
4　　　3.)
5　Q. I'm going to show you what's marked as Exhibit 3.
6　　Can you tell me what that is?
7　A. It's a draft of a special order establishing a
8　　behavior pattern recognition program for the
9　　State Police.
10　Q. And it's marked as a draft. What does that
11　　indicate, that it's a draft? Is there a
12　　subsequent version of this as far as you know?
13　A. No. I mean, I know it's a draft because I
14　　drafted it. And it was never implemented.
15　　There's no date. There's no special order number
16　　on it. It's stamped "draft."
17　Q. You said you drafted it?
18　A. Yes.
19　Q. And what did you do with it after you drafted it?
20　A. I provided it to Major Robbins as a draft for
21　　having a specific written policy for a state-wide
22　　program.
23　Q. And what was the purpose of having the state-wide
24　　program?

| Page 31 |
| --- |

1　A. Well, we felt what we were doing at the airport
2　　was very successful and I wanted to get this type
3　　of threat mitigation strategy out job-wide
4　　because there was a lot of other critical
5　　infrastructure that we're responsible for. And I
6　　thought it would be an effective program but to
7　　do it on a state-wide basis, I felt it would
8　　require a written policy.
9　Q. Okay. And did you receive a response from
10　　Colonel Robbins?
11　A. I don't recall a specific response. I submitted
12　　it and it seems to just have faded away and not
13　　have been acted on in terms of enactment so I
14　　don't remember a specific moment in time where
15　　there was a decision made that we're not going to
16　　do this.
17　Q. Was this ever distributed as far as you know?
18　A. As far as I know, it went to Major Robbins at
19　　Troop F and possibly some other command staff
20　　people at Troop F but that's as far as I think it
21　　got.
22　Q. Were you ever told anything about the reasons why
23　　it was not received?
24　A. No. I was not.

| Page 32 |
| --- |

1　Q. You had no further conversations with the
2　　superintendent about it?
3　A. Superintendent or the major?
4　Q. The major. Excuse me.
5　A. I don't recall any conversations.
6　Q. Okay. Now, when did you begin training troopers
7　　at Troop F in the behavior pattern recognition?
8　A. I believe in the spring of 2003 we started the
9　　training program.
10　Q. All right. That was intended to be for all the
11　　troopers assigned to Troop F?
12　A. Yes.
13　Q. All right. How was that done?
14　A. There were lists posted with various times
15　　available for the training and people signed up
16　　for training.
17　Q. Was everyone required to receive the training?
18　A. Yes.
19　　　　MR. REINSTEIN: Let's have this marked.
20　　　　(3/10/03 document and attachments
21　　marked Exhibit No. 4.)
22　Q. Let me show you what's been marked as Exhibit 4.
23　　It's a collection of separate documents. If you
24　　could look through it for a minute.

| Page 33 |
| --- |

1　A. Okay.
2　Q. All right. Can you describe what those are?
3　A. Sign-in sheets for the PASS training program.
4　Q. And those indicate that each of the troopers
5　　identified there took the training?
6　A. Yes.
7　Q. And there's also a roster there of all the
8　　troopers assigned to Troop F?
9　　　　Sorry. Three pages back from the end.
10　A. Yes. I see that.
11　Q. As far as you know, was that a full roster of the
12　　troopers assigned to Troop F at that time?
13　A. It appears to be a full roster.
14　Q. And --
15　A. I'm just wondering if it has all the command
16　　staff on it. That's all. It looks like the
17　　whole -- it does look like the whole troop.
18　Q. All right. Now, were other officers, State
19　　Police troopers, assigned to Troop F from time to
20　　time to supplement the officers there?
21　A. It depends how you define "assign." I mean, in
22　　the sense of being -- assigned to Troop F would
23　　mean you were on their payroll, which was a big
24　　step so that didn't happen frequently. I mean,

Page 38

```
 1    it contemplates that these interactions could
 2    evolve into a detention.
 3  Q. Is it fair to say that the training contemplates
 4    that officers will approach members of the public
 5    and question them?
 6  A. Yes.
 7  Q. And would part of that questioning -- strike
 8    that. Could part of that questioning involve
 9    requesting identification and travel documents?
10  A. Yes.
11  Q. And in the scheme of elevated suspicion, what is
12    the -- well, let me go back.
13        Now, under this behavioral pattern
14    recognition system, officers at some point would
15    make a decision to approach individuals --
16  A. Correct.
17  Q. -- to question them?
18        And would it be fair to say that they
19    were allowed to consider nationality?
20  A. No.
21  Q. They couldn't consider nationality under these
22    circumstances?
23  A. No.
24  Q. Would they be able to consider the destination of
```

Page 39

```
 1    the traveler?
 2    MR. WARD: I'm going to object. You
 3    can't elicit the specific criteria they use in
 4    order to make a determination that someone has
 5    arisen to an elevated threat. I think if we go
 6    down a laundry list, you will soon discover
 7    exactly what they're looking for. I think if we
 8    continue on this trend of talking about specific
 9    elements that you would look to, I think we're
10    going to be revealing sensitive security
11    information.
12        THE WITNESS: I think I can answer his
13    question without doing that if you give me one
14    shot at it.
15    MR. WARD: Okay.
16  A. The decision to approach a person is in no way
17    based on any subjective or objective beliefs
18    about a person's nationality, race, ethnicity or
19    religious beliefs.
20  Q. And -- well, you used the word "based on." The
21    question is not whether it's based on. It's
22    whether it can be considered.
23  A. It cannot be considered.
24  Q. Now, there's discussion in here which suggests
```

Page 40

```
 1    that these should be voluntary encounters.
 2  A. Yes.
 3  Q. How was it ordinarily made clear or how is it
 4    supposed to be made clear that these are
 5    voluntary encounters?
 6  A. Well, as part of their training they're
 7    instructed what the standard is for a voluntary
 8    encounter and they're told that absent reasonable
 9    suspicion that these interviews have to be in the
10    context of a voluntary encounter.
11  Q. Right. That's what the officers are trained to
12    do?
13  A. Right.
14  Q. But does that training include providing any
15    information to the subject of the encounter?
16  A. When you say "subject," are you talking --
17  Q. The person who is approached.
18  A. Can you just rephrase that question?
19  Q. Sure. An officer comes up to me and wants to ask
20    me some questions. Is he required to tell me
21    that I'm not required to answer them?
22  A. In the training they're told that persons do not
23    have to answer questions nor provide
24    identification except in the limited context of
```

Page 41

```
 1    wanting to get on the plane and enter a screening
 2    checkpoint. So yes, they are instructed that
 3    people have a right not to respond to their
 4    questions.
 5  Q. The officers are but do they convey that
 6    information to the person they're speaking to?
 7  A. I don't know in specific cases if they do or not.
 8  Q. You don't train them to do that?
 9  A. We don't train them to tell them that they have
10    the right not to ask -- answer the questions.
11  Q. Now, I'm going to ask you to look at what's been
12    marked as Exhibit 2. If you go to page ten.
13  A. Okay.
14  Q. In the lower right-hand corner, there's a --
15    which I guess we'd call a slide which says
16    "Methods of contact."
17  A. Yes.
18  Q. "Officers may request to examine travel
19    documents. However, a person is generally -- not
20    generally required to produce these."
21  A. You want to continue on with what it says?
22  Q. All right. "A person is not required to answer
23    questions or otherwise cooperate. Refusal to
24    cooperate or produce documents may be a factor of
```

EXH. G

SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









SENSITIVE SECURITY INFORMATION
FOR LAW ENFORCEMENT USE ONLY









CONFIDENTIAL
MPSSI 00051