UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KING DOWNING,<br>　　　　Plaintiff,<br><br>　　v.<br><br>MASSACHUSETTS PORT AUTHORITY; THE<br>MASSACHUSETTS DEPARTMENT OF STATE<br>POLICE, STATE POLICE TROOPER<br>THOMPSON, STATE POLICE SERGEANT<br>CROXTON, THOMAS G. ROBBINS, and<br>PETER J. DIDOMENICA,<br>　　　　Defendants. | Civil Action No. 04-12513-RBC |

PLAINTIFF'S PRETRIAL MEMORANDUM

Pursuant to the Court's Order for Pre-Trial Conference and for Trial ("Pre-Trial Order") (Docket #68), plaintiff King Downing submits this pretrial memorandum. The following sections are numbered to correspond to the numbering on page 3 of the Pre-Trial Order.[1]

    1.    Summary of Plaintiff's Evidence

In 2002, the Massachusetts Port Authority ("Massport") and the Massachusetts State Police jointly decided to train all Massachusetts State Police officers assigned to Logan Airport in a program to identify potential terrorists known as the Behavior Assessment Screening System ("BASS") program. This program, which was separate and distinct from the screening and search of passengers boarding aircraft at Logan Airport, was based on a notion termed "elevated suspicion," which was "[m]ore than a hunch but less than [the] reasonable suspicion required [under Terry] to detain a person for criminal investigation." Under the BASS program, a law

---

[1]     A section numbered "3" is intentionally omitted.

enforcement officer was directed to question persons anywhere on property controlled by Massport if the person raised an "elevated suspicion" or presented even "unresolved elevated suspicion."[2] Although these directed questionings were supposed to be "voluntary," and were not based on "reasonable suspicion," under the BASS program "[r]efus[ing] to answer questions or provide identification or travel documents" in response to such questioning constituted prima facie evidence of "elevated suspicion." And, according to BASS, anyone who presented "elevated suspicion" should be barred from or escorted away from "critical infrastructure," including the Logan Airport terminal.

Although the BASS program materials acknowledge that "[r]acial profiling practices are contrary to the fundamental values of our nation and serve to disenfranchise whole segments of our population," they do not expressly prohibit the use of race or ethnicity in forming "elevated suspicion." Indeed, the program materials which have been produced to the plaintiff in redacted form strongly suggest that race and/or ethnicity and/or national origin may be considered in assessing "elevated suspicion." One slide entitled "Racial Profiling," for example, states "In forming ES [elevated suspicion] or reasonable suspicion that a person is high-risk, officers <u>may consider</u> [REDACTED]". (Emphasis added). Another slide, also under the heading "Racial Profiling," states "A person's [REDACTED] should not be the <u>sole</u> or <u>principal</u> reason in forming ES [elevated suspicion] or reasonable suspicion." (Emphasis added).

Beginning in the spring of 2003, Massport and the Massachusetts State Police required that all Massachusetts State Police officers be trained in the BASS program. Tpr. Thompson was trained in the BASS program on March 13, 2003. Most of the other officers who responded on

---

[2] A person who presents unresolved elevated suspicion, that is, a person about whom law enforcement has not even been able to determine if they present "elevated suspicion" is deemed under BASS to be a "High Risk Passenger."

October 16, 2003 in connection with the stop of Mr. Downing had been trained in the BASS program between March 2003 and September 2003.

On October 16, 2003, Mr. Downing, who is African-American, arrived at Logan on an Alaska Airlines overnight flight from the west coast.  He was dressed like any other passenger, and had with him a brief case and a carry-on, which had been strapped to a two-wheeled, portable luggage carrier.  He was wearing casual slacks, a button-down striped shirt, and a jacket.

After deplaning in Boston, Mr. Downing left the gate area and stopped to make a phone call from a public telephone on the upper level of the terminal near the airport exit.  Within a minute of Mr. Downing getting on the phone, Tpr. Thompson, who was wearing a Massachusetts State Police uniform, approached where Mr. Downing was on the telephone, and stood only about five feet away, close enough to overhear anything Mr. Downing might say on the telephone.  Tpr. Thompson had no reason to be in the particular position he was -- only a few feet away from Mr. Downing -- other than to observe Mr. Downing, listen to anything Mr. Downing might say on the telephone, or speak with Mr. Downing.

Within a minute, Tpr. Thompson initiated conversation with Mr. Downing, while Mr. Downing was still on the telephone, by asking "Is there a problem?" in an aggressive and confrontational tone and in an manner designed to assert his authority.  When Mr. Downing asked why Tpr. Thompson was standing so close to him, Tpr. Thompson demanded to see Mr. Downing's identification.  Mr. Downing did not raise his voice, become upset or irate, or act in an irritable, condescending, combative or confrontational way.  But Mr. Downing respectfully declined to produce any identification, fully believing that he was well within his rights to do so. At this point, Mr. Downing was in the non-secure area of the airport, and had done nothing to

3

Case 1:04-cv-12513-RBC   Document 74   Filed 11/21/2007   Page 4 of 9

give Tpr. Thompson any belief that he had committed, was committing, or was about to commit a crime, nor did Mr. Downing believe that there was any other lawful basis for Tpr. Thompson to demand Mr. Downing's identification.

Given Tpr. Thompson's proximity, his show of authority and his demand to see Mr. Downing's identification, Mr. Downing reasonably believed that he had been stopped by Tpr. Thompson, and that he was not free to go without responding to Tpr. Thompson's demands. After some discussion, Tpr. Thompson told Mr. Downing that if he did not produce identification, he would have to leave the airport terminal. Although suspicious that Tpr. Thompson had singled him out based on considerations of race, Mr. Downing agreed and left the terminal.

Outside the terminal, Mr. Downing attempted to hail a taxi. Tpr. Thompson, however, followed Mr. Downing outside and again demanded that Mr. Downing show him some identification. Tpr. Thompson told Mr. Downing that if he did not produce identification he would be "going downtown" and that Mr. Downing was under arrest, although Tpr. Thompson refused to tell Mr. Downing why he was under arrest. Tpr. Thompson also radioed for additional police backup. Until backup came, Tpr. Thompson stayed with Mr. Downing who was not free to leave.

Five or more minutes after Tpr. Thompson called for backup, four Massachusetts State Police uniformed officers, together with at least one police cruiser, responded to the area. The officers took up positions near Mr. Downing so that he could not leave. They continued to demand that Mr. Downing turn over identification.

At this point, afraid that he was going to be handcuffed and taken to a police lockup, Mr. Downing gave one of the officers his driver's license. The police ran Mr. Downing's license,

4

gave it back to him, but then demanded to also see Mr. Downing's travel documents. Mr. Downing protested having to produce his travel documents. The police made it clear to Mr. Downing that he was not free to go unless he produced his travel documents and, additionally, if he did not produce the travel documents his name would be placed on Logan Airport's "watch list" or "trespass list" and he would be subject to arrest if he returned to the airport without a ticket. Again, fearing the threatened consequences, Mr. Downing handed over his travel document.

    2.    <u>Stipulated Facts Agreed-to by All Parties (suitable to be read to the jury)</u>

On October 16, 2003, Mr. King Downing, who is African-American, arrived at Logan Airport on an Alaska Airlines overnight flight from the west coast. After deplaning in Boston early in the morning, Mr. Downing left the gate area and stopped to make a phone call to retrieve voicemail from a public telephone on the non-secure upper level of the terminal near the airport exit. Shortly after getting on the phone, Mr. Downing had contact with Massachusetts State Police Trooper Thompson inside the airport terminal, and then outside the terminal. Trooper Thompson asked Mr. Downing to produce identification, which he declined to do. Outside the terminal, Tpr. Thompson ultimately called for additional police, and four other uniformed troopers responded. Mr. Downing ultimately left the airport after he had provided the troopers with his identification and a boarding pass showing that he had recently arrived at Logan.

Mr. Downing contends that Tpr. Thompson stopped him based upon a program known as the Behavioral Assessment Screening System ("BASS"). At various points, this program was also known as the Passenger Assessment and Screening System ("PASS"). PASS and BASS were the same and are referred to here as BASS. The program uses a series of factors to identify

5

potential threats to airport security and was customized for use by the State Police by State Police Sergeant Peter DiDomenica.

This case will involve questions of what happened on that morning between Mr. Downing and the police, and whether what happened was the result of BASS.

    4.    <u>Factual Issues in Dispute</u>

The following factual issues are in dispute:

    a.    The nature of the conduct by Mr. Downing on the date in question, and the response by Tpr. Thompson and the other police officers who responded to Tpr. Thompson's call.

    b.    Whether Mr. Downing was stopped within the meaning of <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), when Tpr. Thompson approached Mr. Downing inside the airport terminal and demanded to see his identification.

    c.    Whether Mr. Downing was stopped within the meaning of <u>Terry</u>, when Tpr. Thompson approached Mr. Downing outside the airport terminal, told him he would be "going downtown" if he did not produce his identification, told Mr. Downing that he was under arrest, called for and received backup police support from four more uniformed Massachusetts State Police officers, and also demanded to see Mr. Downing's travel documents.

    d.    Whether race or ethnicity was a factor in the stop and investigation of Mr. Downing.

    e.    Whether the BASS program authorized or encouraged the consideration of race or ethnicity by Massachusetts State Police troopers.

    f.    Whether Tpr. Thompson and other State Police troopers were acting in accordance with BASS in the investigation and stop of Mr. Downing.

5.  <u>Issues of Law</u>[3]

a.  Whether the stop of Mr. Downing amounted to a <u>Terry</u> stop without reasonable suspicion and therefore violated Mr. Downing's rights under the Fourth Amendment.

b.  Whether race or ethnicity may be considered in the stop or investigation of individuals at Logan Airport.

c.  Whether any of the individual defendants are entitled to qualified immunity.

6.  <u>Requested Amendments to the Pleadings</u>

Plaintiff wishes to dismiss the charges against Trooper Croxton. It is the plaintiff's understanding that all defendants assent to the dismissal of Tpr. Croxton from the case.

7.  <u>Additional Matters to Aid in Disposition</u>

Most of the defendants have filed motions for reconsideration of the Court's decision denying summary judgment. Plaintiff will file a consolidated opposition to those motions before the final pretrial conference.

The parties wish to present the unredacted version of certain portions of the BASS training materials and policy. We anticipate that TSA will object.

The considerable pre-trial publicity this case has received and the nature of the anticipated evidence at trial, including the plaintiff's employment by the American Civil Liberties Union, his work related to racial profiling, the general issue of airline security and anti-terrorism measures, and the considerable number of police witnesses, will require careful screening of potential jurors for bias. Plaintiff therefore requests that the court conduct individual voir dire, including the submission of a questionnaire to the venire.

---

[3] To a large extent, these issues have been briefed in the parties' summary judgment papers. These legal issues will be further addressed in the plaintiff's proposed jury instructions.

8. <u>Plaintiff's Witnesses</u>

Plaintiff will call the following fact witnesses:

    King Downing, plaintiff

    Peter DeDominica, a defendant

    Thomas J. Kinton, Jr., CEO and Executive Director of defendant Massport

9. <u>Plaintiff's Proposed Exhibits</u>

    a.    King Downing's jacket (to be determined)

    b.    PASS Training sign-up sheets

    c.    BASS/Pass training materials

    d.    Rafi Ron press release

    e.    State Police draft policy

10. <u>Trial Counsel</u>

Names, addresses and telephone numbers of trial counsel follow.

    KING DOWNING
    By his attorneys,

    / S /  Peter B. Krupp

Dated:  November 21, 2007    Peter B. Krupp
      BBO #548112
    Lurie & Krupp, LLP
    One McKinley Square
    Boston, MA  02109
    Tel:  (617) 367-1970

    John Reinstein
      BBO # 416120
    American Civil Liberties Union of Massachusetts
    211 Congress Street, 3rd Floor
    Boston, MA  02110
    Tel:  (617) 482-3170

CERTIFICATE OF SERVICE

      I, Peter B. Krupp, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on November 21, 2007.

      / S / Peter B. Krupp

      Peter B. Krupp