**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KING DOWNING, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MASSACHUSETTS PORT AUTHORITY, THE ) | Civil Action No. 04-12513-RBC |
| MASSACHUSETTS DEPARTMENT OF STATE ) | |
| POLICE, STATE POLICE TROOPER ) | |
| THOMPSON, STATE POLICE SERGEANT ) | |
| CROXTON, THOMAS G. ROBBINS, and ) | |
| PETER J. DIDOMENICA, ) | |
| ) | |
| Defendants. ) | |
| ) | |

<u>**DEFENDANT MASSACHUSETTS PORT AUTHORITY'S**</u>
<u>**PRE-TRIAL MEMORANDUM**</u>

Defendant Massachusetts Port Authority ("Massport") files this Pre-Trial Memorandum in accordance with the Court's Pre-Trial Order ("Order") and L.R. 16.5.

**I.     RULE 16.5(d) CONFERENCE**

Pursuant to the Court's Order and as required by L.R. 16.5(d), counsel for the parties conferred on November 14, 2007 at the office of Plaintiff's counsel in advance of the pre-trial hearing.  As a result of the meeting, counsel agreed to submit a short stipulation of facts to be read to the jury at the outset of the case.  Those agreed-upon stipulated facts appear below, at Section III.  Counsel also agreed, however, that the short stipulation should not prohibit or preclude live testimony concerning the agreed-upon facts contained in the stipulation.

In discussing how to narrow the issues to be tried, Plaintiff's counsel noted that it would be seeking to amend the Complaint in order to dismiss Trooper Croxton as a defendant.  Counsel also discussed proposed exhibits and witnesses, agreeing that no expert witnesses would be

called to testify.  Finally, counsel agreed that each party would file its own pre-trial

memorandum, enumerating the issues to be tried and the relevant facts.  Accordingly, Massport's

Pre-Trial Memorandum follows:

## II.    CONCISE SUMMARY OF THE EVIDENCE WHICH WILL BE OFFERED BY DEFENDANTS

### Massport

Massport provides this concise summary of the evidence it intends to provide at trial:

The Behavioral Assessment Screening System ("the B.A.S.S. program") is a threat-mitigation

technique that grew out of the events of September 11, 2001 and was modeled after a program

employed at Ben Gurion Airport in Israel.  As its name suggests, the B.A.S.S. program is a

behavioral assessment program that seeks to identify high-risk passengers based upon their

behavior in order to prevent another terrorist attack like 9/11.  The B.A.S.S. program was

customized for use at Logan Airport by State Police Sergeant Peter DiDomenica, an attorney,

who took steps to ensure that it comported with Constitutional requirements.  The training

materials for the B.A.S.S. program expressly state that "[r]acial profiling practices are contrary

to the fundamental values of our nation and serve to disenfranchise whole segments of the

population."  Race cannot be the basis for a stop initiated by the B.A.S.S. program.

In the past four years, since the B.A.S.S. program was implemented at Logan airport, the

only person to challenge its use is Plaintiff King Downing, the National Coordinator of the

ACLU's Campaign Against Racial Profiling.  After the initiation of this lawsuit, the ACLU

issued a press release concerning the case.

### Other Defendants

Massport understands that the other Defendants will present evidence concerning the

interaction between Plaintiff Downing and Trooper Thompson on October 16, 2003.

Specifically, the other Defendants will present evidence demonstrating that Downing initiated a confrontation with Trooper Thomson inside the unsecured area of the airport. When Trooper Thompson asked Downing to provide his identification or explain what he was doing in the airport, Downing continued to be confrontational and aggressive, all the while refusing to provide any information to Trooper Thompson. The Trooper then told Downing that if he would not provide any information, he would need to leave the airport, which Downing attempted to do. Despite the fact that Downing had been to Logan many times, he exited the airport on the upper level of the terminal, where cabs do not pick-up fares.

Given the way in which Downing was acting, Trooper Thompson followed him outside of the terminal. Trooper Thompson subsequently called for assistance. He approached Downing on the sidewalk directly outside of the terminal and again asked Downing for identification, which Downing continued to refuse to provide. Plaintiff Downing eventually provided his license and boarding pass, when requested to do so by Sergeant Kiley, one of the troopers who responded to the request for assistance.

## III.    FACTS ESTABLISHED BY STIPULATION

The parties have agreed to the following brief stipulation of facts to be read to the jury at the outset of trial:

> On October 16, 2003, Mr. King Downing, who is African-American, arrived at Logan Airport on an Alaska Airlines overnight flight from the west coast. After deplaning in Boston early in the morning, Mr. Downing left the gate area and stopped to make a phone call to retrieve voicemail from a public telephone on the non-secure upper level of the terminal near the airport exit. Shortly after getting on the phone, Mr. Downing had contact with Massachusetts State Police Trooper Thompson inside the airport terminal, and then outside the terminal. Trooper Thompson asked Mr. Downing to produce identification, which he declined to do. Outside the terminal, Tpr. Thompson ultimately called for additional police, and four other uniformed troopers responded. Mr. Downing ultimately left the airport after he had provided the troopers with his identification and a boarding pass showing that he had recently arrived at Logan.

Downing contends that Tpr. Thompson stopped him based upon a program known as the Behavioral Assessment Screening System ("BASS"). At various points, this program was also known as the Passenger Assessment and Screening System ("PASS"). PASS and BASS were the same and are referred to here as BASS. The program uses a series of factors to identify potential threats to airport security and was customized for use by the State Police by State Police Sergeant Peter DiDomenica.

This case will involve questions of what happened on that morning between Mr. Downing and the police, and whether what happened was the result of BASS.

The parties have agreed, however, that this short stipulation should not preclude any live, in-person testimony concerning the agreed-upon facts during trial. Given the brevity of the stipulated facts, any live testimony concerning the stipulated facts will not be unduly repetitive nor impermissibly time consuming.

## IV.    FACTUAL ISSUES IN DISPUTE

### General Factual Issues In Dispute

The following general factual issues are in dispute:

- Whether the B.A.S.S. program was the basis for the encounter between Plaintiff Downing and Trooper Thompson?

- Assuming there is a finding that the B.A.S.S. program techniques were the basis for the encounter between Plaintiff Downing and Trooper Thompson, whether the B.A.S.S. program condones, promotes, and encourages racial profiling?

- Irrespective of whether B.A.S.S. techniques were employed by Trooper Thompson, whether racial profiling was the basis of the encounter?

- Assuming there is a finding that the B.A.S.S. techniques were not the basis of the interaction between Trooper Thompson and Plaintiff Downing, whether the interaction between Plaintiff Downing and Trooper Thompson was based upon a lack of reasonable articulable suspicion?

Massport believes that the answer to each of the above questions is "no."

**Specific Facts In Dispute**

Given Plaintiff's responses to Massport's Statement of Undisputed Facts in connection with its Motion for Summary Judgment, Massport believes that virtually all of the following specific facts should be considered *undisputed* for the purposes of trial. Plaintiff's counsel, however, disagrees. Accordingly, the following specific facts identified below – which relate to the general factual issues above – are also in dispute.

- King Downing is a lawyer who, on October 16, 2003 and currently, serves as the National Coordinator of the ACLU's Campaign Against Racial Profiling.

- In this role, King Downing is charged with raising awareness about the existence of racial profiling, promoting local, state and federal legislative and administrative reforms designed to curtail racial profiling by the police, and developing and maintaining a clearinghouse of materials on both the public and internal websites of the ACLU.

- On the morning of October 16, 2003, Downing arrived at Logan on a red-eye flight from the West Coast.

- Downing had flown to Boston to attend a meeting related to a racial-profiling working group that was scheduled to begin at 10:00a.m. in Roxbury.

- After deplaning, Downing used a public payphone located outside of the secure area of Terminal B to retrieve his voicemail.

- Trooper Thompson was on duty in Terminal B at the time Downing arrived at Logan.

- Generally, State Police officers assigned to Logan are responsible for ensuring that the airport operates in a safe and orderly manner, preventing thefts of bags, preventing acts of violence and trespass, securing the airfield and other secure areas, monitoring the perimeter of the airport from intrusion, and responding to calls from the Transportation Safety Administration concerning prohibited items and disturbances occurring at checkpoints.

- While Downing was on the payphone, Trooper Thompson stood approximately five feet away from him, observing the security checkpoint.

- While Downing was on the phone, and before any words were exchanged between them, he turned to look at Trooper Thompson.

- Downing said to Trooper Thompson that he wanted to know why Trooper Thompson was standing so close to him while he was on the phone.

- Trooper Thompson then asked Downing for identification and information concerning why he was in the airport.

- Downing refused to provide any information to Trooper Thompson, asking "Why do I have to show you ID?" and saying, "I'm not showing you my ID."

- Trooper Thompson considered Downing to be condescending and confrontational.

- During the exchange, Trooper Thompson told Downing that if he was not going to provide information, he would have to leave the airport.

- Downing then attempted to leave the airport. Specifically, he hung up the telephone, walked out of the airport, and proceeded to attempt to hail a cab from the upper level of the airport where cabs do not take fares.

- A second encounter occurred between Downing and Trooper Thompson on the sidewalk outside of the terminal on the upper level, where Downing had gone to hail a cab.

- Trooper Thompson followed Downing outside of the airport and radioed for assistance.

- In response to Trooper Thompson's call, four officers, including Trooper Croxton, Trooper Moore, Trooper Adell, and Sergeant Kiley, arrived.

- Sergeant Kiley asked Downing to produce his license, and Downing produced it.

- Trooper Thompson called in the license so that it could be checked against the trespass list.

- After Trooper Thompson ran the license, he returned it to Downing.

- Downing was then asked to produce his airline ticket for inspection.

- Downing first refused to produce his travel documents saying, "You asked me to show identification. I've shown identification. Now you're asking for my tickets. I'm not going to show you my tickets."

- Downing subsequently produced his boarding pass and itinerary.

- Once checked, his travel documents were returned to him.

- Downing then left the area, proceeded to the lower level of the airport, and took a cab from Logan to his meeting in Roxbury, where he arrived for his meeting on time.

- The B.A.S.S. program grew out of a post-9/11 study of security issues by Rafi Ron, an Israeli security consultant.

- The B.A.S.S. program is designed to identify high-risk passengers and to prevent another terrorist attack like 9/11.

- The B.A.S.S. program materials state that "[r]acial profiling practices are contrary to the fundamental values of our nation and serve to disenfranchise whole segments of the population."

- Downing does not know if the B.A.S.S. program played any role in his interaction with police.

- Downing does not know if the B.A.S.S. program promotes, condones, or encourages racial profiling.

- Downing does not know if race generally played any role in his encounter with police.

- Downing was never physically restrained during his interaction with police.

- Downing was never touched by any of the officers.

- Downing was never handcuffed.

- Downing was never placed in a police cruiser.

- Downing was never asked to relocate to a more private or different area of the airport.

In addition to the specific facts listed above, there are other disputed facts, both contextual and subsidiary, that Massport and other Defendants might adduce at trial.

## V.     ISSUES OF LAW, INCLUDING EVIDENTIARY QUESTIONS, TOGETHER WITH SUPPORTING AUTHORITY

At the time of this filing, two Motions *In Limine* filed by Massport are pending before the Court. *See* Section VII, *infra* (discussing additional matters for the Court's consideration). The questions of law presented by those Motions are as follows:

- Whether two redacted power point slides entitled "Racial Profiling" that are contained in the B.A.S.S. training materials are admissible? Massport contends that the slides should be excluded from evidence pursuant to Fed. R. Evid. 403. In the alternative, Massport seeks to introduce the unredacted version of the slides. Massport also requests that the jury be given a limiting instruction regarding all redacted materials that might be introduced at trial.

- Whether evidence concerning Plaintiff's quantification of his alleged damages is admissible? Massport contends that any such evidence should be excluded since, to date, Plaintiff has provided no evidence of his calculation of alleged damages and, in fact, has stated that his damages cannot be calculated.

Massport believes that the other primary issue of law in this case is whether Plaintiff Downing was "seized" under the Fourth Amendment. The Supreme Court has long-held that "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *See Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968). The relevant inquiry is whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion) (stating that no seizure occurred when DEA agents approached respondent in public concourse of airport, requested identification and airline ticket, and put a few questions to her). Indeed, "[a]sking questions is an essential part of police investigations. In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment. Interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *See, e.g.*, *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humbolt County*, 542 U.S. 177, 185 (2004) (holding that officer who arrested suspect for violation of Nevada's stop-and-identify statute did not contravene Fourth Amendment as officer's request for identification was related to the stop) (brackets and quotations omitted). That someone eventually responds to an officer does not convert the encounter into a seizure. *See INS v. Delgado*, 466 U.S. 210, 216 (1984) ("[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.").

## VI.    REQUESTED AMENDMENT TO THE PLEADINGS

Massport does not contemplate any amendments to its pleadings.

## VII.    ADDITIONAL MATTERS TO AID IN THE DISPOSITION OF THIS ACTION

At of the time of this filing, three motions filed by Massport remain pending on the Court's docket:

1.    Motion For Reconsideration Or, In The Alternative, For Clarification, filed Nov. 13, 2007, D. Mass. docket # 69;

2.    Motion *In Limine* To Exclude Certain Redacted Materials And, In The Alternative, For Leave To Introduce The Unredacted Version Of Those Materials And For A Limiting Instruction, filed Nov. 21, 2007, D. Mass. docket # 76; and

3.    Motion *In Limine* To Exclude Testimony Concerning The Quantification Of Damages, filed Nov. 21, 2007, D. Mass. docket # 78.

There are other motion, pending and to be filed, by other Defendants that will be described in their Pre-Trial Memoranda.  Massport also understands that Plaintiff Downing intends to file a motion requesting individual *voir dire* of potential jurors.

## VIII.   WITNESSES TO BE CALLED

Massport does not intend to call any witnesses.  Instead, Massport plans to conduct direct and cross-examinations of various witnesses called by other parties.

To Massport's knowledge, Plaintiff intends to call the following witnesses:

1.    Plaintiff King Downing (fact witness); and

2.    State Police Sergeant Peter DiDomenica (fact witness).

Earlier today, Plaintiff filed his pre-trial memorandum, which states that he also intends to call Thomas J. Kinton, Jr., CEO of Defendant Massport, as a fact witness during trial.  Plaintiff failed to disclose during the Rule 16.5(d) conference between counsel held on November 14, 2007 that he intended to call Mr. Kinton to testify at trial.  Plaintiff's pre-trial memorandum is the first

notice Massport and other Defendants have received concerning Plaintiff's intention to call Mr.

Kinton. Given Plaintiff's late notice, as well as the fact that Mr. Kinton will be traveling and out

of the country beginning next week, Massport intends to object to Plaintiff's untimely efforts to

add Mr. Kinton as a potential witness in this case.

To Massport's knowledge, other Defendants intend to call the following witnesses:

1.    State Police Trooper William A. Thompson (fact witness);

2.    State Police Trooper Howard G. Croxton (fact witness);

3.    State Police Trooper Wanza Adell (fact witness);

4.    State Police Trooper Robert J. Moore, Jr. (fact witness);

5.    State Police Sergeant Mark W. Kiley (fact witness); and

6.    Thomas G. Robbins (fact witness).

## IX.    PROPOSED EXHIBITS

The exhibits that Massport intends to introduce at trial are attached hereto as Exhibit A.

Some of the exhibits, however, are subject to the various *Motions In Limine* filed by Defendants.

(*See, e.g.*, MPSSI 00435-69). During the Rule 16.5(d) conference held on November 14, 2007,

counsel identified for each other the exhibits that they intended to introduce, except for rebuttal

or impeachment exhibits, with the exception of the "Rafi Ron" press release, which Plaintiff

subsequently included on its proposed exhibit list the following day.

## X.    CONTACT INFORMATION FOR TRIAL COUNSEL

Roscoe Trimmier, Jr. and Annmarie A. Tenn, both of Ropes & Gray LLP, will serve as

trial counsel for Massport. Their contact information is as follows:

Roscoe Trimmier, Jr.  (BBO #502506)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110
T:  (617) 951-7000
F:  (617) 951-7050
roscoe.trimmier@ropesgray.com

Annmarie A. Tenn (BBO #658789)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110
T:  (617) 951-7000
F:  (617) 951-7050
annmarie.tenn@ropesgray.com[1]

Date:   November 21, 2007          Respectfully submitted,

MASSACHUSETTS PORT AUTHORITY

By its attorneys,

/s/ Annmarie A. Tenn
Roscoe Trimmier, Jr.  (BBO #502506)
Annmarie A. Tenn (BBO #658789)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110
(617) 951-7000
roscoe.trimmier@ropesgray.com
annmarie.tenn@ropesgray.com

---

[1] L.R. 16.5(d) identifies other possible topics for consideration in the pre-trial memorandum, none of which are relevant here.

**CERTIFICATE OF SERVICE**

In accordance with L.R. 5.2(b) and Section E.2 of the Electronic Case Filing Administrative Procedures of the United States District Court for the District of Massachusetts, I, Annmarie A. Tenn, hereby certify that on November 21, 2007, the within Pre-Trial Memorandum filed through the ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing.

/s/ Annmarie A. Tenn
Annmarie A. Tenn

**EXHIBIT A**

**PART 1**

*Folder*

EXHIBIT
# 1
9-18-06  *LW3*

# ACLUF
AMERICAN CIVIL LIBERTIES UNION FOUNDATION

March 8, 2001

www.aclu.org

National Headquarters 125 Broad Street, New York, N.Y. 10004-2400

(212) 549-2500

## Job Opportunity
## Coordinator
## ACLU Campaign Against Racial Profiling

The American Civil Liberties Union, a national not-for-profit public interest organization, is seeking a coordinator for its nationwide Campaign Against Racial Profiling (CARP).   The Coordinator will work under the joint supervision of the ACLU's Public Education and the Legislative Directors.

**Job Description:**

The ACLU launched CARP in 1999 with the dual purpose of (a) raising public awareness about the nature and prevalence of racial profiling by law enforcement agencies; and (b) promoting local, state and federal legislative and administrative reforms designed to curtail racial profiling by the police.  The CARP Coordinator is responsible for coordinating the Campaign's activities by:

(1) providing leadership to ACLU state affiliates and their coalition partners by developing strategies for legislative and administrative reform, organizing public support,  and delivering regular, ongoing technical assistance, information and advice;

(2) advancing reforms at the federal level in conjunction with the ACLU's national Legislative Office lobbyists and field organizers;

(3) building coalitions and working in coalition with other organizations at both the national and local levels regarding public awareness and law enforcement reform;

(4) serving as a principal ACLU spokesperson on the issue of racial profiling.

(5) supervising the creation of printed and web-based materials for distribution to the public;

(6) developing and maintaining  a clearinghouse of materials on both the public and internal websites of the ACLU.

All of these responsibilities will be carried out in close coordination with the ACLU's public education, lobbying, field and litigation programs.

**Qualifications:**

A college degree and seven to ten years of relevant experience, including working with state legislative, referenda and/or political campaigns.  Excellent analytical, writing and communications skills, both written and verbal.  Proven knowledge of criminal justice policy and/or police practices and police reform issues.  A demonstrated interested in civil liberties.

**Salary and Benefits:**

Salary commensurate with experience, within the parameters of the ACLU scale.  Excellent health and welfare benefits.

**APPLICATION PROCEDURE:**

By no later than April 9, 2001, interested persons should submit a letter of interest which includes desired salary range, a resume, and names and phone numbers of three references, and a writing sample to ACLU - Public Education Department, Attn:  LS-CARP, 125 Broad Street - 18th Fl., New York, NY 10004.

**The ACLU is an equal opportunity/affirmative action employer and encourages women, people of color, persons with disabilities, and lesbians and gay men to apply**

Nadine Strossen *President*    Ira Glasser *Executive Director*    Kenneth B. Clark *Chair, National Advisory Council*    Richard Zacks *Treasurer*

**~ary - Printable By Category**

Print this page | Close window | Help

## Itinerary
KING DOWNING
Reservation code: FODGGA

**Travel Arranger Priority Comments:**
A PHOTO ID IS REQUIRED FOR ALL DOMESTIC FLIGHTS

### FLIGHTS

**Tue, Oct 14; CONTINENTAL AIRLINES, CO 1581**

| | |
|---|---|
| From: NEWARK, NJ (EWR) | Departs: 8:00am |
| Departure Terminal: TERMINAL C | |
| To: SEATTLE TACOMA, WA (SEA) | Arrives: 10:56am |
| Class: Economy | Seat: 19F |
| Status: Confirmed | Confirmation: UETYLQ |
| Meal: Breakfast | Smoking: No |
| Aircraft: BOEING 737-700 JET | Mileage: 2406 |
| Flight Time: 5 hours and 56 minutes | |

Verify flight times prior to departure

**Wed, Oct 15-Thu, Oct 16: ALASKA AIRLINES, AS 0010**

| | |
|---|---|
| From: SEATTLE TACOMA, WA (SEA) | Departs: 10:51pm |
| To: BOSTON, MA (BOS) | Arrives: 7:05am |
| Class: Economy | Seat: Check-In Required |
| Status: Confirmed | Confirmation: FODGPK |
| Meal: Snack or Brunch , Snack or Brunch | Smoking: No |
| Aircraft: BOEING 737-700 JET | Mileage: 2489 |
| Flight Time: 5 hours and 14 minutes | |

Verify flight times prior to departure

**Thu, Oct 16: ALASKA AIRLINES, AS 0015**

| | |
|---|---|
| From: BOSTON, MA (BOS) | Departs: 6:00pm |
| To: SEATTLE TACOMA, WA (SEA) | Arrives: 9:12pm |
| Class: Economy | Seat: 08A |
| Status: Confirmed | Confirmation: FODGPK |
| Meal: Dinner | Smoking: No |
| Aircraft: BOEING 737-700 JET | Mileage: 2489 |
| Flight Time: 6 hours and 12 minutes | |

Verify flight times prior to departure

### OTHER

**Tue, Oct 14:**

City: NEWARK, NJ (EWR)
Status: Confirmed
Information: **TICKET HAS BEEN ISSUED ELECTRONICALLY. PLEASE PRESENT PHOTO ID
ELECTRONIC TICKET IS 005 7463384582-**



# BOARDING PASS                                    **CHECK ID**

| Seat | Flight | From | To | Boards | Gate | Date |
|------|--------|------|-----|--------|------|------|
| 23B | 10 | M SEATTLE TACOMA | BOSTON | 1021P | D6 | OCT15 |

TSA-SEA

EXHIBIT
#3
9-18-06    LOB

DOWNING/KING

Save Time with 24-Hour Web Check-In at alaskaair.com!        430/SEA    SSSS



# BOARDING PASS                                    **CHECK ID**

| Seat | Flight | From | To | Boards | Gate | Date |
|------|--------|------|-----|--------|------|------|
| 14B | 10 | M SEATTLE TACOMA | BOSTON | 1021P | D6 | OCT15 |

*S*

DOWNING/KING

alaskaair.com -- Earn Bonus Miles and Travel Free Faster!        4WU/SEA    SSSS

## What To Do If You're Stopped By The Police

Think carefully about your words, movement, body language, and emotions.

**Don't get into an argument** with the police.

Remember, **anything you say or do can be used** against you.

**Keep your hands** where the police can see them.

**Don't run. Don't touch** any police officer.

**Don't resist** even if you believe you are innocent.

**Don't complain** on the scene or tell the police they're wrong, or that you're going to file a complaint.

**Do not make any statements** regarding the incident.

**Ask for a lawyer** immediately upon your arrest.

Remember officers' **badge & patrol car numbers.**

**Write down everything** you remember ASAP.

Try to find **witnesses** & their names & phone numbers.

If you are injured, **take photographs of the injuries** as soon as possible, but make sure you **seek medical attention** first.

If you feel your rights have been violated, **file a written complaint** with police department's internal affairs division or civilian complaint board, or call the ACLU hotline, **1-877-6-PROFILE.**

**KEEP THIS CARD HANDY!**
**IF YOU HAVE A POLICE ENCOUNTER, YOU CAN PROTECT YOURSELF.**



www.aclu.org

**4.** Sometimes you can be released without bail, or have bail lowered. Have your lawyer ask the judge about this possibility. You must be taken before the judge on the next court day after arrest.

**5.** Do not make any decisions in your case until you have talked with a lawyer.

**IN YOUR HOME**

**1.** If the police knock and ask to enter your home, you don't have to admit them unless they have a warrant signed by a judge.

**2.** However, in some emergency situations (like when a person is screaming for help inside, or when the police are chasing someone) officers are allowed to enter and search your home without a warrant.

**3.** If you are arrested, the police can search you and the area close by. If you are in a building, "close by" usually means just the room you are in.

We all recognize the need for effective law enforcement, but we should also understand our own rights and responsibilities – especially in our relationships with the police. Everyone, including minors, has the right to courteous and respectful police treatment. If your rights are violated, don't try to deal with the situation at the scene. You can talk to a lawyer afterwards, or file a complaint with the Internal Affairs or Civilian Complaint Board.

**Produced by the American Civil Liberties Union.**
**ARREST THE RACISM.** Tell us about your race- or ethnic-based traffic or pedestrian stop. **Call 1-877-6-PROFILE or go to aclu.org/profiling**

**1.** What you say to the police is always important. What you say can be used against you, and it can give the police an excuse to arrest you, especially if you bad-mouth a police officer.

**IF YOU'RE STOPPED IN YOUR CAR**

**1.** Upon request, show them your driver's license, registration, and proof of insurance. In certain cases, your car can be searched without a warrant as long as the police have probable cause. To protect yourself later, you should make it clear that you do not consent to a search. It is not lawful for police to arrest you simply for refusing to consent to a search.

**2.** If you're given a ticket, you should sign it; otherwise you can be arrested. You can always fight the case in court later.

**3.** If you're suspected of drunk driving (DWI) and refuse to take a blood, urine or breath test, your driver's license may be suspended.

**4.** Do not interfere with, or obstruct the police – you can be arrested for it.

**IF YOU'RE STOPPED FOR QUESTIONING**

**1.** It's not a crime to refuse to answer questions, but refusing to answer might make the police suspicious about you. If you are asked to identify yourself, see paragraph 2 above. You don't have to answer questions like "Where are you going," "where have you been," "what are you doing," if you don't want to answer.

**2.** Police may ask for your name if you have been properly detained, and you can be arrested in some states for refusing to give it. If you reasonably fear that your name is incriminating, you can claim the right to remain silent, which may be a defense in case you are arrested anyway.

**3.** You don't have to consent to any search of yourself, your car or your house. If you DO consent to a search, it can affect your rights later in court. If the police say they have a search warrant, **ASK TO SEE IT.**

**4.** Ask if you are under arrest. If you are, you have a right to know why.

**Don't bad-mouth the police officer or run away, even if you believe what is happening is unreasonable. That could lead to your arrest.**

**IF YOU'RE ARRESTED OR TAKEN TO A POLICE STATION**

**1.** You have the right to remain silent and to talk to a lawyer before you talk to the police. Tell the police nothing except your name and address. Don't give any explanations, excuses or stories. You can make your defense later, in court, based on what you and your lawyer decide is best.

**2.** Ask to see a lawyer immediately. If you can't pay for a lawyer, you have a right to a free one, and should ask the police how the lawyer can be contacted.

**Don't say anything without a lawyer.**

**3.** Within a reasonable time after your arrest, or booking, you have the right to make a local phone call: to a lawyer, bail bondsman, a relative or any other person. The police may not listen in to the call to the lawyer.

## What To Do If You're Stopped By The Police

Think carefully about your words, movement, body language, and emotions.

**Don't get into an argument** with the police.

Remember, **anything you say or do can be used** against you.

**Keep your hands** where the police can see them.

**Don't run. Don't touch** any police officer.

**Don't resist** even if you believe you are innocent.

**Don't complain** on the scene or tell the police they're wrong, or that you're going to file a complaint.

**Do not make any statements** regarding the incident.

**Ask for a lawyer** immediately upon your arrest.

Remember officers' **badge & patrol car numbers.**

**Write down everything** you remember ASAP.

Try to find **witnesses** & their names & phone numbers.

If you are injured, **take photographs of the injuries** as soon as possible, but make sure you **seek medical attention** first.

If you feel your rights have been violated, **file a written complaint** with police department's internal affairs division or civilian complaint board, or call the ACLU hotline, **1-877-6-PROFILE.**

**KEEP THIS CARD HANDY!**
**IF YOU HAVE A POLICE ENCOUNTER, YOU CAN PROTECT YOURSELF.**

www.aclu.org

**4.** Sometimes you can be released without bail, or have bail lowered. Have your lawyer ask the judge about this possibility. You must be taken before the judge on the next court day after arrest.

**5.** Do not make any decisions in your case until you have talked with a lawyer.

**IN YOUR HOME**

**1.** If the police knock and ask to enter your home, you don't have to admit them unless they have a warrant signed by a judge.

**2.** However, in some emergency situations (like when a person is screaming for help inside, or when the police are chasing someone) officers are allowed to enter and search your home without a warrant.

**3.** If you are arrested, the police can search you and the area close by. If you are in a building, "close by" usually means just the room you are in.

We all recognize the need for effective law enforcement, but we should also understand our own rights and responsibilities – especially in our relationships with the police. Everyone, including minors, has the right to courteous and respectful police treatment. If your rights are violated, don't try to deal with the situation at the scene. You can talk to a lawyer afterwards, or file a complaint with the Internal Affairs or Civilian Complaint Board.

**Produced by the American Civil Liberties Union.**
**ARREST THE RACISM.** Tell us about your race- or ethnic-based traffic or pedestrian stop. **Call 1-877-6-PROFILE or go to aclu.org/profiling**

**1.** What you say to the police is always important. What you say can be used against you, and it can give the police an excuse to arrest you, especially if you bad-mouth a police officer.

**IF YOU'RE STOPPED IN YOUR CAR**

**1.** Upon request, show them your driver's license, registration, and proof of insurance. In certain cases, your car can be searched without a warrant as long as the police have probable cause. To protect yourself later, you should make it clear that you do not consent to a search. It is not lawful for police to arrest you simply for refusing to consent to a search.

**2.** If you're given a ticket, you should sign it; otherwise you can be arrested. You can always fight the case in court later.

**3.** If you're suspected of drunk driving (DWI) and refuse to take a blood, urine or breath test, your driver's license may be suspended.

**4.** Do not interfere with, or obstruct the police – you can be arrested for it.

**IF YOU'RE STOPPED FOR QUESTIONING**

**1.** It's not a crime to refuse to answer questions, but refusing to answer might make the police suspicious about you. If you are asked to identify yourself, see paragraph 2 above. You don't have to answer questions like "Where are you going," "where have you been," "what are you doing," if you don't want to answer.



# ACLU of Massachusetts Challenges Use of Behavioral Profiling at Logan Airport

### Profiling Program May Soon Be Adopted by Airports Nationwide

**CONTACTS:**                                   November 10, 2004
John Reinstein, Legal Director, ACLU of Massachusetts, tel: 617-482-3170, x 324
Peter Krupp, Lurie & Krupp, LLP tel: (617) 367-1970
Paul Silva, ACLU Nat'l, 212-549-2689

**BOSTON** – The American Civil Liberties Union of Massachusetts today filed a lawsuit challenging the constitutionality of a so-called "behavioral assessment" program adopted by the Massachusetts Port Authority and the Massachusetts state police to stop and detain people for questioning at Logan Airport.

"This program is another unfortunate example of the extent to which we are being asked to surrender basic freedoms in the name of security," said John Reinstein, Legal Director of the ACLU of Massachusetts. "This allows the police to stop anyone, any time, for any reason."

The lawsuit was filed on behalf of King Downing, the National Coordinator of the ACLU's Campaign Against Racial Profiling, who was approached by law enforcement officials after arriving at Logan Airport on October 16, 2003 to attend a meeting on racial profiling in Boston. Upon arriving at the airport, Downing, an African-American who wears a short beard, left the gate area and was making a phone call in the public terminal when he was stopped by a state police trooper who demanded that he produce some identification. When Downing declined to do so without knowing the basis for the request, he was first told that he would have to leave the airport. However, when he attempted to leave the terminal building, Downing was stopped again, surrounded by four troopers and told that he was being placed under arrest for failing to produce identification. When Downing finally agreed to produce his driver's license, the troopers then demanded to see his airline ticket. Downing was told by the police that he could be barred from the airport if he did not cooperate. After the police inspected Downing's

identification and travel documents, he was allowed to leave.  No charges were
ever filed against him.

"This is a dangerous extension of police power," said Downing. "I was stopped and
held for no legal reason by armed State Police troopers. I  was told I could not
leave unless I proved who I was and why I was at the airport, and that if I did not
cooperate, I would be arrested or banned from the airport. This is racial profiling,
and not the action of a government that stands for freedom and the rights of all its
people."

Behavioral profiling has been used as the basis for stopping passengers since 2002
when Massport announced that State Police troopers at Logan Airport were being
trained by an outside security consultant.  The procedures were subsequently
incorporated into the state police "Behavior Assessment Screening System" used at
Logan and other locations. It was recently reported that B.A.S.S. is being used as a
model by the Transportation Security Administration, which will soon launch a
similar program nationwide, entitled SPOT ("Screening of Passengers by
Observation Techniques").

Current law permits the police to stop and question someone when they have a
reasonable suspicion that the person is committing, had committed, or was about to
commit a crime.  In contrast, the "behavioral profiling" program instructs officers
to detain anyone who they believe is exhibiting "unusual" or "anxious" behavior.
What constitutes "unusual" or "anxious" behavior presumably is left to individual
officer discretion.

"This case illustrates the danger of giving law enforcement officers unfettered
discretion to detain people," said ACLU Cooperating Attorney Peter Knapp.  "It is
a clear case of unconstitutional racial profiling. Mr. Downing did nothing
suspicious – unless you consider having dark skin and a beard evidence of
suspicious behavior."

The case was filed in Suffolk Superior Court.

[Photograph of King Downing can be emailed upon request]

-30-

From: Dave Mackey

703-744-1310

# Logan security policy draws suit from ACLU

### By Jack Encarnacao
GLOBE CORRESPONDENT

The American Civil Liberties Union sued the Massachusetts Port Authority and the Massachusetts State Police yesterday over a new security policy at Logan International Airport in which police question and detain passengers based on unusual or suspicious behavior.

The "behavioral assessment screening" program, the first at any US airport when it started in November 2002, was one of the security changes at Logan after the Sept. 11, 2001, terrorist attacks. The two planes that hit the World Trade Center were hijacked after taking off from Logan.

But the ACLU suit says the policy is unconstitutional and "effectively condones and encourages racial and ethnic profiling." The lawsuit, filed in Suffolk Superior Court, asks for an injunction to put the policy on hold, plus unspecified monetary damages.

MassPort, which manages Logan, defended the program, which goes a step beyond prior criteria that allowed police to stop and question people when they have a reasonable suspicion that the suspect has committed or is about to commit a crime.

"Logan's Behavior Pattern Recognition program is specifically designed to ensure the protection of everyone's constitutional and civil rights," said a MassPort statement. "Racial profiling is not an effective law enforcement tool and plays no role in behavior pattern recognition."

The ACLU lawsuit stems from an October 2003 incident in which King Downing, national coordinator of the civil liberties group's "Campaign Against Racial Profiling," was leaving Logan for a meeting on the topic. State Police troopers stopped him near a public phone booth inside the airport, said John Reinstein, legal director of the regional ACLU office.

Downing "was on his way out the door; he wasn't getting on a plane, he was getting off a plane," Reinstein said. "As far as we're concerned, that's no different from somebody walking down the street. The question is whether the police can walk up to anybody, not on any reasonable basis but sort of on hunch, and require them to account for where they're going and where they've been."

State Police issued a statement saying they were investigating the allegations of the lawsuit and also said the ACLU has been uncooperative with requests to interview Downing. "The Massachusetts State Police are committed to protecting the constitutional and civil rights of all citizens," the statement said.

Reinstein said the ACLU did not provide Downing to police be-

cause they were not filing a complaint against State Police, but were only seeking information about security policies. Reinstein also said Downing was not trying to test the security policy.

According to the ACLU lawsuit, Downing, who is black and wears a short beard, initially refused to show identification to police unless they told him why they were asking to see his documentation. Downing was then told by an officer that he had been behaving suspiciously. Fearing arrest, Downing eventually showed authorities his driver's license and travel documents and was allowed to leave, the lawsuit says.

"This is a dangerous extension of police power," Downing said in a statement yesterday. "I was stopped and held for no legal reason by armed State Police troopers. . . . This is racial profiling and not the action of a government that stands for freedom and the rights of all its people."

Frederick Schauer, a professor at Harvard University's Kennedy School of Government and author of the book "Profiles, Probabilities, and Stereotypes," said the lawsuit could help clarify a US Supreme Court decision in a Nevada case last spring, which indicated that authorities are free to ask for identification from anyone they determine is suspicious.

**EXHIBIT A**

**PART 2**

LAW ENFORCEMENT SENSITIVE
OFFICIAL USE ONLY



# MASSACHUSETTS STATE POLICE TROOP F

P.A.S.S. Training

*Passenger Assessment and Screening System*



CONFIDENTIAL
MPSSI 00435

LETTER FROM BOSTON

Sally B. Donnelly/Logan Airport

# A Chastened Airport Watches for Suspects

Stunned by 9/11, Boston's Logan tries profiling, but in a quiet way



AT THE READY Armed state troopers provide security on a Logan concourse

**M**ASSACHUSETTS STATE trooper Todd McGhee moved through Terminal B at Boston's Logan International Airport last week and locked his gaze on a scruffy young man with no suitcase leaning against a window. As the powerfully built 6-ft. 3-in. officer approached, wearing his Sig Sauer handgun and a peaked hat, the man began to move in the other direction. "Are you flying today, sir?" said McGhee. It took him less than a minute of questioning to confirm that this was just a kid waiting to pick up a family friend.

Logan, from which half the 9/11 hijackers staged their attack, may now be the most secure airport in the nation, and it wants to be a model of what other airports may become. It was the first major airport to screen all bags for explosives last January with full-scale bomb-detection machines. It formed the nation's first airport-based Anti-Terrorism Unit of troopers who prowl the concourses toting submachine guns. It has set up a perimeter stretching 250 ft. into Boston Harbor that puts the airport off limits to boaters. And state troopers conduct random vehicle searches along its access roads. Later this month Logan will become the only U.S. airport to install shatterproof film on all terminal windows.

The most significant step the airport has taken, though, is its aggressive profiling program: cops and other trained airport workers try to determine the intent of certain passengers—rather than just the content of their carry-ons. These hundreds of professional watchdogs have been trained over the past six months to recognize suspicious behavior by discreetly observing body language and movement and by listening to people talk. The Transportation Security Administration (TSA) proposed a system last week that relies almost entirely on computers to do the profiling by gathering a passenger's commercial and personal data and travel history. Logan's experts, however, say face-to-face contact with suspicious people "is crucial," in the words of Major Tom Robbins, head of Logan's state troopers and director of aviation security.

Logan authorities are quick to stress that the profiling is based not on race but on people's actions, such as lingering a little too long near a security door. But young to middle-age men draw more interest than grandmothers. And if a passport shows travel to certain Middle Eastern countries, the passenger holding it will trigger a more intensive interview.

The reason Logan decided to reinvent its security is not just that it had to live down its role as a jumping-off point for the 9/11 hijackers. It was also the place where the shoe bomber, Richard Reid, landed on Dec. 22. Aviation director Thomas Kinton, a 27-year veteran at Logan, remembers the phone call he got alerting him to the explosives that were found in Reid's shoes: "We knew from that moment on that we weren't waiting for anyone to make Logan secure." Within hours, Kinton and Major Robbins ordered the screeners—who were still airline contractors—to start checking passengers' shoes.

Today Logan's state-of-the-art security system is barely detectable to the average traveler, even in a week like the last one. The airport was on edge after the Department of Homeland Security warned that al-Qaeda was planning hijackings this summer. Discreet security cameras monitor those entering the airport. And airport workers, some of them armed, have been trained to watch people unobtrusively. The most important work takes place in what is called the dirty, or unsecured, area before the metal detectors. "That's where the risk is, and that's where we try to identify a threat," says trooper Robert Bannister.

All this security comes at a price. Logan has spent nearly $250 million on improvements, $117 million of which will be covered by the TSA. The airlines, of course, fear that the airport will eventually pass along the costs, which could mean higher ticket prices or fewer flight choices. But those concerns don't intrude on McGhee, who volunteered for duty at Logan. "I'm looking for everybody from Tim McVeigh to Osama bin Laden," says McGhee, "and anyone in between who wants to do us harm." ∎

**❝I'm looking for everybody from Tim McVeigh to Osama bin Laden and anyone in between who wants to do us harm.❞** —MASSACHUSETTS STATE TROOPER TODD MCGHEE

CONFIDENTIAL
MPSSI 00436

PASSENGER TICKET AND BAGGAGE CHECK
SUBJECT TO CONDITIONS OF CONTRACT
NOT TRANSFERABLE

NORTHWEST AIRLINES

AMERICAN EXPRESS

NAME /PATRICK

BOSTON

ORMSTRAAM

NONREFUNDABLE REFUND BY ISS AGT ONLY YLD NV/KL

FP AX3783

L ZRH W2089.25J/CF61T NUC2089.25END ROE1.00XT5.90NL

4.80CJ12.90RNI.10VV3.00XFBOS3·

XT 27.70

FARE USD 2089.00

TAX/FEE/CHARGE US 13.40

TAX/FEE/CHARGE XY 2.50

TOTAL USD 2132.60

STOCK CONTROL NO. TX 889    CK    CPN

308611168796    1 012 7334536167 2

DEP

1726000001    0690966    7334536167    SITI

FLIGHT COUPON 1    2    NORTH BRUNSWI    NJ US

X/ AMSTERDAM

101542 /FCBOS NW AMS K NORTHWEST AIRLINE

CHECK-IN REQUIRED

BOARDING PASS

1726000001    0690966    A82

/PATRICK

FROM BOSTON

TO AMSTERDAM

NORTHWEST AIRLINE

CHECK-IN REQUIRED

1 012 7334536167 2

AA3172417J

CONFIDENTIAL
MPSSI 00437

```
                    ETKT PASSENGER ITINERARY                    PAGE 01 OF 02
▲Delta              NOT TRANSFERABLE
    /CHRISTINE                     DL2363080181   DATE/PLACE OF ISSUE 30JAN03 BOSRES
DAV/DATE  FLIGHT STATUS  CARRIER/VENDOR      CITY          TIME  SEAT  CLASS  MEAL      REMARK
FRI 07MAR03 5352    OK   DELTA AIR LINES INC  LV BOSTON     645P   2C   COACH  BEVERAGE
          OPERATED BY COMAIR                  AR WAS-R REAGAN NAT 823P
          A DELTA CONNECTION CARRIER
FRI 07MAR03 5012    OK   DELTA AIR LINES INC  LV WAS-R REAGAN NAT 500P  3B  COACH  BEVERAGE
          OPERATED BY COMAIR                  AR ORLANDO    1108P
          A DELTA CONNECTION CARRIER
THU 13MAR03 1546    OK   DELTA AIR LINES INC  LV ORLANDO    635A  29C  COACH  BEVERAGE
                                             AR NYC-KENNEDY  903A

THU 13MAR03 6175    OK   DELTA AIR LINES INC  LV NYC-KENNEDY 1130A  3A  COACH  BEVERAGE
          OPERATED BY ATLANTIC COAST AIRLINES AR BOSTON    1230P
          A DELTA CONNECTION CARRIER
CONTINUED . . .
```

              DUPLICATE        0 0062163916161 4              DUPLICATE

```
                    ETKT PASSENGER RECEIPT                     PAGE 02 OF 02
▲Delta              NOT TRANSFERABLE         THIS TICKET SHALL EXPIRE ONE YEAR FROM DATE OF ISSUE
    /CHRISTINE                     DL2363080181   DATE/PLACE OF ISSUE 30JAN03 BOSRES
                                             CONF NBR RTH93Z    ISS AGT IB DL/CX
ENDORSEMENTS NON REF/CHANGE FEE/PENALTY
```

```
FARE CALCULATION BOS DL X/WAS DL ORL 95.81UA14TN DL X/NYC DL BOS 79.07UA7LOS USD174.88EH ZP BOSBCAMCOJFK
        XT US13.12 ZP12.00 AY10.00 XF13.50 BOS3OCA4.5MCO3JFK3
```

```
USD   174.88                FORM OF PAYMENT CAXXXXXXXXXXXXX6197/435820
XT     48.62
```

```
  USD223.50
```
              DUPLICATE        0 0062163916161 4              DUPLICATE

```
                    BOARDING CARD              BOARDING CARD
▲Delta              ELECTRONIC TICKET        ******* ET *******
    /CHRISTINE      1 006 2163916161 0          /CHRISTINE
                       RTH93Z
DL2363080181                         SEAT    DL2363080181              SEAT
UA14TN                               2C                                2C
FLIGHT  DATE  CLASS  ORIGIN    DEPARTS       FLIGHT    DATE
DL5352 07MAR  U    BOSTON     645P          DL5352   07MAR
OPERATED BY       COACH  DESTINATION         ORIGIN
COMAIR                WAS-R REAGAN NA        BOSTON
                                             DESTINATION
DEPARTURE GATE B02  **SUBJECT TO CHANGE**    WAS-R REAGAN NA
                                             OPERATED BY COMAIR
                                             A DELTA CONNECTION CARRIER
                                    BAGS                              BAGS
                                    01                               01
                                BOS029423/HS
```

CONFIDENTIAL
MPSSI 00438

## AIRPORT PASSENGER INTERVIEW

**(1) <u>Approach Passenger and Request Travel Documents/ Review Documents</u>**
- Passport/Government Picture ID
- Ticket/Itinerary/Boarding Pass

**(2) <u>Trip Story –</u>**



**(3) <u>Baggage Control Questions</u>**

- Initial Statement
  - "I am going to ask you some important questions about your bags to make sure there is nothing in the bags that might endanger the flight"

- Control Questions
  - "Who packed your bags?"
  - "When and where were they packed?"
  - "Who owns your bags?"
  - "Are there any contents in your bags that you do not own?"
  - "Are you carrying anything in you bags for someone else"
  - "Were your bags out of your control ay anytime since you packed them?"

CONFIDENTIAL
MPSSI 00439

Verbal Symptoms of Deception



CONFIDENTIAL
MPSSI 00440



CONFIDENTIAL
MPSSI 00441

# Law Enforcement
## Guide
## to
# Terrorist Groups
## and
# Their Known Emblems



Prepared and distributed by the
Texas Department of Public Safety
Special Crimes Service
PO Box 4087
Austin, TX 78773-0421

(512) 424-2200
1-800-252-5402

Special thanks to the Wyoming DCI and the US Department of State.



**GREATER SYRIAN PARTY**

This group is located in Lebanon and Syria with supporters in North America.

Law enforcement officers should be on the watch for these emblems and/or named groups during traffic stops and other contacts with middle eastern subjects. These emblems may be found on jewelry, documents, auto stickers, and other forms of advertisement. Their display may indicate membership in these groups and/or financial/general support for the listed groups.

**(1) International Islamic Terrorist Organizations**



AL-QAIDA, AKA: Al Qaeda, "the Base," the World Islamic Front for Jihad Against Jews and Crusaders, the Islamic Army for the Liberation of the Holy Places, the Usama Bin Laden Network, the Usama Bin Laden Organization

Al-Qaeda troops used the black Islamic flag of Caliphate, which is the negative image of the white Taliban flag.

Some Islamic organizations refrain from using personalized emblems or flags and instead use the symbol of a black flag or banner with the Islamic "declaration of faith" inscribed on it. That includes several organizations that share the vision of reinstating the "Khalifa," the Islamic Kingdom. One such organization that operates here in the US is the Al-Muhajiroun, which has a presence in New York City.

* "There is no god but Allah, and Muhammad is his messenger." This phrase is also incorporated in flags of Islamic countries such as Saudi Arabia.

INT:13/08/02




**DEMOCRATIC FRONT FOR THE LIBERATION OF PALESTINE (DFLP)**

The DFLP is a Marxist-Leninist organization founded in 1969 when it split from the PFLP (see below). The DFLP conducted numerous small bombings and minor assaults on Israeli targets. Its strength is estimated at 500.



**IZZ AL-DIN AL-QASSIM BRIGADES**

The Brigades is considered the military arm of Hamas (see below).



**HAMAS (Islamic Resistance Movement)**

Hamas is a Palestinian terrorist group known for suicide bombings that target Israeli and possibly Western citizens. It receives funding from Palestinian expatriates, Iran, and private benefactors in Saudi Arabia.



**HIZBALLAH (Party of God)**

Hizballah is a Lebanese Shi'ite terrorist group known for car bombings that target Westerners and Israelis. Organizational aid comes from Iran and Islamic support groups in Europe and North America.

CONFIDENTIAL
MPSSI 00442

UNCLASSIFIED



### Improvised **Explosive** Device (IED) Safe Standoff Distance Cheat Sheet



| | Threat Description | Explosives Mass (TNT equivalent) | Building Evacuation Distance | Outdoor Evacuation Distance |
|---|---|---|---|---|
| | Pipe Bomb | 5 lbs 2.3 kg | 70 ft 21 m | 850 ft 259 m |
| | Suicide Belt | 10 lbs 4.5 kg | 90 ft 27 m | 1,080 ft 330 m |
| | Suicide Vest | 20 lbs 9 kg | 110 ft 34 m | 1,360 ft 415 m |
| | Briefcase/Suitcase Bomb | 50 lbs 23 kg | 150 ft 46 m | 1,850 ft 564 m |
| | Compact Sedan | 500 lbs 227 kg | 320 ft 98 m | 1,500 ft 457 m |
| | Sedan | 1,000 lbs 454 kg | 400 ft 122 m | 1,750 ft 534 m |
| | Passenger/Cargo Van | 4,000 lbs 1,814 kg | 640 ft 195 m | 2,750 ft 838 m |
| | Small Moving Van/ Delivery Truck | 10,000 lbs 4,536 kg | 860 ft 263 m | 3,750 ft 1,143 m |
| | Moving Van/Water Truck | 30,000 lbs 13,608 kg | 1,240 ft 375 m | 6,500 ft 1,982 m |
| | Semitrailer | 60,000 lbs 27,216 kg | 1,570 ft 475 m | 7,000 ft 2,134 m |

| | Threat Description | LPG Mass/Volume | Fireball Diameter | Safe Distance |
|---|---|---|---|---|
| | Small LPG Tank | 20 lbs/5 gal 9 kg/19 l | 40 ft 12 m | 160 ft 48 m |
| | Large LPG Tank | 100 lbs/25 gal 45 kg/95 l | 69 ft 21 m | 276 ft 84 m |
| | Commercial/Residential LPG Tank | 2,000 lbs/500 gal 907 kg/1,893 l | 184 ft 56 m | 736 ft 224 m |
| | Small LPG Truck | 8,000 lbs/2,000 gal 3,630 kg/7,570 l | 292 ft 89 m | 1,168 ft 356 m |
| | Semitanker LPG | 40,000 lbs/10,000 gal 18,144 kg/37,850 l | 499 ft 152 m | 1,996 ft 608 m |

---

[1] Based on the maximum amount of material that could reasonably fit into a container or vehicle. Variations possible.
[2] Governed by the ability of an unreinforced building to withstand severe damage or collapse.
[3] Governed by the greater of fragment throw distance or glass breakage/falling glass hazard distance. These distances can be reduced for personnel wearing ballistic protection. Note that the pipe bomb, suicide belt/vest, and briefcase/suitcase bomb are assumed to have a fragmentation characteristic that requires greater standoff distances than an equal amount of explosives in a vehicle.
[4] Assuming efficient mixing of the flammable gas with ambient air.
[5] Determined by U.S. firefighting practices wherein safe distances are approximately 4 times the flame height. Note that an LPG tank filled with high explosives would require a significantly greater standoff distance than if it were filled with LPG.

CONFIDENTIAL
MPSSI 00443

UNCLASSIFIED

Female suicide bombers have disguised their devices so as to look pregnant or have adopted ostentatious "western" clothing so as to lower their profile as an attacker.



Palestinian female suicide bombers, or members of support teams

Other groups have used female suicide bombers, which tends to aid disguise because they are "unexpected". The DKHP in Turkey utilised a female in the suicide bombing on 10 September 2001. Female suicide bombers have also been encountered as part of Islamic groups in Chechenya. In the last month three have died in two attacks. They are allegedly members of a "special platoon" of 36 female suicide bombers. The Moscow hostage-takers (Chechens linked to al Qaida) included females with suicide belts.

Groups may conceal devices on small boats, a tactic used by several groups, notably the LTTE, Al Qaida and Palestinian groups.

Bomb squads with maritime territories should familiarise themselves with the construction of small boats, and the circumstances and methods of suicide boat bombers.

Bomb squads need to consider how they would remove the clothing of dead, injured or live suicide bombers to access a suicide IED under clothing. In some cases this would be remote in others "semi remote" (ie Hook and Line") or in still others, if first responders are restraining the terrorist, then manually.



Law Enforcement Sensitive
Bomb Squad Use Only

CONFIDENTIAL
MPSSI 00445

The ingenuity of Al Qaida IED manufacturers is demonstrated by the range of devices from the "Shoe bombs" (see later), which are carefully constructed with no metal components of a size commensurate with the requirement to puncture the skin of a pressurised aircraft, to large truck bombs with fairly complex mixes of various fuels and oxidisers. In terms of disguise, the shoe bombs were perfectly disguised and passed airline security, while the hidden device that killed Commander Masood, was also successfully disguised. There continue to be concerns about Al Qaida plots to smuggle concealed devices onto aircraft. The bombing of "Mike's Place" in Tel Aviv in late April 2003, is potentially an Al Qaida inspired attack, and again the device design had disguise as a key component. The devices were hidden in a book and there are reports that the initiation mechanism was also disguised in some way.

Al Qaida have used single bombers (for example Richard Reid, The Djerba attack), two suicide attackers per bomb (The Cole attack and the 1998 embassy attacks, or multiple person attack. Thus there is no "standard number" of terrorists for an Al Qaida operation. (But we do note the similarity in team size between Riyadh and 9/11).

used can prevent such an attack. It also suggests that thought needs to be given to protection of security guards, perhaps in concrete "sangars".

Cordoba Compound. The National Guard were responsible for the security at this facility. One of the guards was manning a .50 calibre machine gun post. This shows that Al Qaida is willing to take on even heavily armed security officers. All the guards at the gate were killed with small arms fire or grenades thrown by the attackers. The initial assault on the parallel gates was from a Ford Crown Victoria sedan, which attempted (but failed) to ram through the gate of the compound. It is possible that the make and colour of this car was chosen specifically because it is similar to one used by a senior US resident in the compound. The ramming attempt failed but the force of the firepower from the occupants, meant that an alternate plan was put into action with the terrorists gaining access to the gate switches. Perhaps this tactical flexibility demonstrates extremely thorough planning. Once this gate had been secured the terrorists opened the parallel gate (knowing where the switches were) and drove a Dodge pick up truck through (the Ford blocking the initial point of effort). The terrorists had to negotiate three layers of security, showing that layered defence doesn't always work and that security guards need the classic military tactic of automatic weaponry covering security guards and gates from a greater distance. The Dodge Pick-up was detonated adjacent to "High-Rise Number One", the main US accommodation building. It is estimated that this device contained a minimum of 400kg of explosives. The remaining three terrorists then fired, maneuvered and threw grenades through the camp to the opposite side of the compound and escaped over the compound wall. Some reports suggest that an oil barrel had been conveniently left adjacent to the wall allowing them to climb over. This indicates internal preparation and reconnaissance within the compound. Double-taped AK magazines and a quantity of grenades were found during later scene investigations. The compound houses the US Vinnel Corporation, many of whom were participating in a military exercise away from the compound, hence probably reducing the number of casualties.

Al Hamra Compound. This compound was the most lightly guarded of all the targets with only an unarmed guard who was shot and wounded. Over 70% of residents are Saudis. It was assaulted by terrorists in a Toyota Camry, with the bomb in a GMC Suburban truck. After forcing their way past the unarmed guard, they drove to the centre of the compound before detonating the bomb adjacent to a building. It may be that the explosion was initiated prematurely – four terrorist bodies were found in the Toyota. The recreation centre was reportedly holding a party for a large group of Saudis and many of the casualties were believed to be at the function. Some reports

## 10.   PALESTINIAN SUICIDE BOMBER PROFILE

The Israeli security forces have developed a profile based on their observations.



The photographs below illustrate three incidences of attack failure.



Three incidences of attack failure, where the bomber was killed or injured.

Bomb Squads and their commanders should consider the PR impact of such images on US TV

The motivation of potential suicide bombers is not an area of difficulty for Palestinian terrorist organisers. According to sources we have interviewed, in many cases there are more volunteers than there are explosive devices ready for them.

The remarkable support for suicide bombers amongst the Palestinian population has also resulted in a small number of attacks from the secular, non-religious PFLP.  This is intriguing suggesting that the motivation is as much cultural within a society as it is part of a religious doctrine.

The following "definitions" within Islamic culture may help the reader:

- A martyr dying for a cause = "Shahid"
- Suicide for personal reasons   ="Intihar" and is forbidden by Islam ("haram").
- Suicide for a holy cause as in suicide bombing = "Istishhad", which is praised by Islam. Istishhad literally means martyrdom, so it can be passive or active. For example, a Hamas leader who is assassinated by Israel has gone through istishhad and is therefore a shahid.
- Suicide operations, however, are specifically called "amaliyat istishhadiyah" (plural), or martyrdom operations, as dying is inherently part of the definition.

CONFIDENTIAL
MPSSI 00450

**EXHIBIT A**

**PART 3**



3.   Another Tamil Tiger device, with explosive strapped to the chest in a thin pad and wiring and fusing in the trousers.   Not the two switches, presumably a firing switch and an arming switch (red coloured).

4.  The truck-borne suicide bomb used in Dar es Salaam in 1998.  There is some contradiction apparent in the reporting of the main explosive charge. Some sources suggest the charge was ANFO, others suggest it was ground TNT, perhaps mixed with other material.  Al Qaida had reportedly planned a "back up" initiation system for this device, which was to throw a grenade into the rear of the truck.  It would appear that it is standard for Al Qaida suicide vehicle bombs to have the firing switch on or near the dashboard in the driver's compartment.   Al Qaida may have used commercial blasting caps (detonators) but they do have proven capability of manufacturing their own primary explosives.



Large Vehicle Borne IED
Dar-es-Salam - 7 August 1998

**Device construction**
Nissan Atlas refrigerated truck part filled with a fertiliser/ fuel oil based home made explosive, retained at rear with a wall of Propane gas cylinders

**Initiation**
Suicide switch in vehicle cab linked to backup timer / firing pack laying on top of explosive

Not to scale - colours may be changed for the purpose of illustration

Law Enforcement Sensitive
Bomb Squad Use Only

CONFIDENTIAL
MPSSI 00451



One of the shoes after a render safe procedure

Consider the Render Safe Procedure needed to deal with this device. (Consider the design of the object and the sensitivity of the TATP).



One of the shoes showing the sole peeled away. Note the cellular structure of the sole



Another image of the same style shoe. The TATP initiator was placed in the large "cell" at the lower right side.

Law Enforcement Sensitive
Bomb Squad Use Only

CONFIDENTIAL
MPSSI 00452

## 14.   PALESTINIAN DEVICES

Over the past few years Palestinian terrorists have utilised a wide variety of suicide IEDs. The devices used in suicide bombings are often remarkably simple in terms of their physical construction and technology.   For example, most devices comprise of very simple circuitry to aid reliability in operation. Some utilise sophisticated plastic explosives while others have used improvised pipe bombs or artillery or mortar rounds.  In principle any terrorist bomb can be converted into a suicide device relatively easily, and carried in a holdall, backpack or some other container. Explosives used include:

> TATP
> Pipe bombs (with various fills)
> Conventional munitions
> Improvised mortars
> White phosphorus mortars
> High explosive in packets
> Plastic explosive moulded into easily concealable shapes

All can include additional shrapnel such as ball bearings, nails and nuts and bolts.

A number of **switching mechanisms** are available.   Usually electrical switches are involved, and often two switches, as in the Tamil device described earlier. Thus, two actions are required, which avoids accidental or premature initiation.  This might mean that a suspect whose hand(s) can be immobilised might be prevented from initiating the device.  Also, a suspect with both hands out of sight might indicate that he/she is about to initiate a device. Not all Palestinian devices have two switches, however. For some the arming mechanism is the insertion of a battery.  If the device is concealed on the body then switches are often accessed in pockets. Devices concealed in packages and bags present different options. Switches may be fitted to the exterior of the package or positioned inside bags and holdalls. In these circumstances removing the item from the suspect will prevent initiation, providing there is no back up initiation system.  There is unsubstantiated information that some Palestinian devices have a "back up"  mobile-phone initiated switching system. However, this must be considered rare in Palestinian devices.  Very occasionally initiation is not electrical, but by a burning fuse, lit by the bomber with a cigarette lighter.

The following images are representative, as there appears to be no standard design.  The first shows a belt device that, despite the lack of standard design, is fairly typical.  In particular the "rocker" initiation switch is popular.  In this diagram, the rocker is a single firing switch and there is no electrical arming switch present. However the terrorists have introduced an arming function into the device by the simple expedient of drilling a hole into the side of the rocker switch and inserting a pin. The switch will not close until the pin is removed.



A publicity shot of a Palestinian female terrorist. Although many "publicity shots" and propaganda images at parades appear to utilise "dummy" devices, this appears to be real. It would normally be covered with clothing.





Image of the birdcage taken by an Israeli EOD Robot

Below is another device, this time concealed in a suitcase. Other similar devices have been seen in guitar cases.

**Palestinian Suicide Suitcase**



**Device construction**
Small suitcase containing packets of TATP and plastic drums of Urea Nitrate / Fuel Oil HME, 9v Duracell battery taped to drum. Arming switch and firing switch on top of case. Spaces packed with nails, bolts etc (for shrapnel effect)

Firing switch (Toggle)

Arming switch (Slider)

ULTRALIFE

**Device Initiation**
Three initiators constructed by drilling flashbulbs and filling with TATP.
The device is armed by closing the slider switch and fired with the toggle switch.
The safe/arm and fire switch positions would be marked on the case in some fashion.

Not to scale · colours may be changed for the purpose of illustration

CONFIDENTIAL
MPSSI 00455

## 15.   IRAQI DEVICES

As stated earlier it is believed that several hundred suicide jackets have been found and recovered in Iraq. ██████████████████████████████████ ████████████  The diagram below is drawn from open source information.

Iraqi suicide garments
Variants encountered during Op Iraqi Freedom

Firing pack (common to both garments) ►
Plastic box with 9 volt battery. test / arm switches and arming indicator LED. A lanyard initiates the device by pulling a plug from its socket and closing the circuit.



◄ Leather waistcoat (vest)
Pockets sewn into lining in small of the back containing ball bearings and a total of approximately 9kg of C4 explosive sealed in clear plastic. One blasting cap attached to a detonating cord link. Wires passed through lining to firing pack in vest pocket.

Explosive belt ►
Eight canvas lined pockets sewn into tough canvas belt, each pocket containing approximately 0.5lb packet of possible Semtex. each with a blasting cap wired in series. The pockets were packed with ball bearings for maximum fragmentation effect.



Not to scale - details may be changed for the purpose of illustration

Law Enforcement Sensitive
Bomb Squad Use Only

CONFIDENTIAL
MPSSI 00456

LAW ENFORCEMENT SENSITIVE
FOR OFFICIAL USE ONLY



The Director of Central Intelligence

Interagency Intelligence Committee on Terrorism

Community Counterterrorism Board

6 January 2003

## SUICIDE/HOMICIDE ATTACKER BEHAVIORS—— ——AND SUGGESTED COUNTERMEASURES

This paper results from a request to the Community Counterterrorism Board (CCB) from the Sergeant at Arms of the US Senate for the Interagency Intelligence Committee on Terrorism (IICT) to investigate the suicide attacker phenomenon and develop aids as possible to assist US Government law enforcement and security personnel in defeating suicide attacks.

In response, CCB sponsored an unclassified IICT conference on suicide attackers in August 2002 and followed up with a classified conference in October 2002. Following those conferences, psychologists in the FBI and CIA collaborated to produce the paper. Although the paper is applicable primarily to terrorist groups that originate in the Middle East, it provides an extensive listing of potentially observable behaviors that could identify suicide attackers as well as suggesting countermeasures law enforcement and security personnel might be able to use.

The paper's primary dissemination will be via electronic means. CCB is posting it on CT-Link to make it available to US Government agencies to download. Agencies may copy the material to unclassified FOR OFFICIAL USE ONLY or LAW ENFORCEMENT SENSITIVE networks as desired. IICT member organizations are encouraged to effect the widest possible dissemination consistent with keeping the information out of the press and away from would-be suicide attackers.

LAW ENFORCEMENT SENSITIVE
FOR OFFICIAL USE ONLY

CONFIDENTIAL
MPSSI 00457

LAW ENFORCEMENT SENSITIVE
FOR OFFICIAL USE ONLY

# SUICIDE/HOMICIDE ATTACKER BEHAVIORS——
## ——AND SUGGESTED COUNTERMEASURES[1]



2

CONFIDENTIAL
MPSSI 00458

LAW ENFORCEMENT SENSITIVE
FOR OFFICIAL USE ONLY



4

LAW ENFORCEMENT SENSITIVE
FOR OFFICIAL USE ONLY

CONFIDENTIAL
MPSSI 00450

LAW ENFORCEMENT SENSITIVE
FOR OFFICIAL USE ONLY



6

LAW ENFORCEMENT SENSITIVE
FOR OFFICIAL USE ONLY

CONFIDENTIAL
MPSSI 00460

11

Attached is a copy of a training manual found in May 2000 by British investigators in Manchester, England, while searching the apartment of suspected al Qaeda member Anas al-Liby, AKA Nazih al-Raghie. The Southern District of New York included this manual as evidence in the recent African embassy bombing trials, since it clearly outlines terrorist cell-members' goals and many of their operational techniques. Although the manual is somewhat dated (for example, it does not mention the Internet, which is used extensively by current terrorists for communicating with one another), and was apparently written for another part of the world (there are references to "polytheists"--presumably Hindus--and to the use of torture during interrogations, which would refer to oppressive regimes in the Middle East), it nevertheless contains much material that is relevant to terrorist cell members' behavior in Western Europe and the United States. Of particular interest are the sections on surveillance detection and evasion, how to maintain cover in foreign lands, and how to deal with arrest and interrogation. Most important, the manual provides insight into the general mindset of radical Islamic terrorists, and should prove useful to any law enforcement officer involved in counterterrorism investigations.

CONFIDENTIAL
MPSSI 00461

UK/BM-22 TRANSLATION

Financial Security Precautions:

1.     Dividing operational funds into two parts: One part is to be invested in projects that offer financial return, and the other is to be saved and not spent except during operations.
2.     Not placing operational funds [all] in one place.
3.     Not telling the Organization members about the location of the funds.
4.     Having proper protection while carrying large amounts of money.
5.     Leaving the money with non-members and spending it as needed.


Forged Documents (Identity Cards, Records Books, Passports)

The following security precautions should be taken:

1.     Keeping the passport in a safe place so it would not be ceized by the security apparatus, and the brother it belongs to would have to negotiate its return (I'll give you your passport if you give me information)
2.     All documents of the undercover brother, such as identity cards and passport, should be falsified.
3.     When the undercover brother is traveling with a certain identity card or passport, he should know all pertinent [information] such as the name, profession, and place of residence.
4.     The brother who has special work status (commander, communication link, ...) should have more than one identity card and passport. He should learn the contents of each, the nature of the [indicated] profession, and the dialect of the residence area listed in the document.
5.     The photograph of the brother in these documents should be without a beard. It is preferable that the brother's public photograph [on these documents] be also without a beard. If he already has one [document] showing a photograph with a beard, he should replace it.
6.     When using an identity document in different names, no more than one such document should be carried at one time.

CONFIDENTIAL
MPSSI 00462

# Full Text of Hijacking Letter

(U//FOUO) On 28 September 2001, the FBI released copies of the same documents found at three different locations used by suspected terrorists in the 11 September 2001 attacks. One letter was found in Mohammad Atta's suitcase left at the airport, one in Nawaf Alhazmi's vehicle at Dulles International Airport, and one at crime scene in Stony Creek Township, PA, where a fourth commercial jet crashed. The full-text translation of the four-page, hand-written letter was provided for the *New York Times* by Capital Communications Group, a Washington, DC-based international consulting firm, and by Imad Musa, a translator for the firm.

(U//FOUO) The letter appears to be a "pep talk" specifically designed for the terrorists involved in the 11 September 2001 attacks on the WTC and Pentagon. It was designed to motivate the terrorists to follow through on their attacks by committing suicide. It was more than likely written by a religious scholar who had prior knowledge of the attacks.

(U) The following translation is *Unclassified*.

## "The Last Night"

1.      "Make an oath to die and renew your intentions. Shave excess hair from the body and wear cologne. Shower.

2.      "Make sure you know all aspects of the plan well, and expect the response, or a reaction, from the enemy.

3.      "Read al-Tabby and Anvil [traditional war chapters from the *Quran*] and reflect on their meanings and remember all of the things that God has promised for the martyrs.

4.      "Remind your soul to listen and obey [all divine orders] and remember that you will face decisive situations that might prevent you from 100 percent obedience, so tame your soul, purify it, convince it, make it understand, and incite it. God said, 'Obey God and His Messenger, and do not fight amongst yourselves or else you will fail. And be patient, for God is with patience.'

5.      "Pray during the night and be persistent in asking God to give you victory, control, and conquest, and that He may make your task easier and not expose us.

6.      "Remember God frequently, and the best way to do it is to read the Holy *Quran*, according to all scholars, as far as I know. It is enough for us that it [the *Quran*] are the words of the Creator of the Earth and the plants, the One that you will meet [on the Day of Judgment].

7.      "Purify you soul from all unclean things. Completely forget something called "this world" [or "this life"]. The time for play is over and the serious time is upon us. How much time have we wasted in our lives? Shouldn't we take advantage of these last hours to offer good deeds and obedience?

8.      "You should feel complete tranquility, because the time between you and your marriage [in heaven] is very short. Afterwards begins the happy life, where God is satisfied with you, and eternal bliss "in the company of the prophets, the companions, the martyry and the good people, who are all good company." Ask God for his mercy and be optimistic, because [the Prophet], peace be upon him, (used to prefer optimism in all his affairs).

9.      "Keep in mind that, if you fall into hardship, how will you act and how will you remain steadfast

CONFIDENTIAL
MPSSI 00463

2. They were not harmed

3. And God was satisfied with them.

"God says: 'They came back with God's blessings, they were not harmed, and God was satisfied with them, and God is everlasting.'

"All of their equipment and gates and technology will not prevent, nor harm, except by God's will. The believers do not fear such things. The only ones that fear it are the allies of Satan, who are the brothers of the devil. They have become their allies, God save us, for fear is a great form of worship, and the only one worthy of it is God. He is the only one who deserves it. He said in the verses: 'This is only the Devil scaring his allies' who are fascinated with Western civilization, and have drank the love [of the West] like they drink water [unclear] and have become afraid of their weak equipment 'so fear them not, and fear Me, if you are believers.'

"Fear is great worship. The allies of God do not offer such worship except for the one God, who controls everything. [Unclear] with total certainty that God will weaken the schemes of the non-believers. God said: 'God will weaken the schemes of the non-believers.'

"You must remember your brothers with all respect [?]. No one should notice that you are making the supplicating, 'There is no God but God,' because if you say it 1,000 times no one will be able to tell whether you are quiet or remember God. And among its miracles is what the Prophet, peace be upon him, said: [Whoever says, 'There is no God but God,' with all his heart, goes to heaven.] The Prophet, peace be upon him, solidify you put all the worlds and universes on one side of the balance, and 'No God but God' on the other, 'No God but God' will weigh more heavily." You can repeat these words confidently, and this is just one of the strengths of these words. Whoever thinks deeply about these words will find that they have no dots [in the Arabic letter] and this is just one of its greatnesses, for words that have dots in them carry less weight than those that do not. And it is enough that these are the words of monotheism, which will make you steadfast in battle [unclear] as the prophet, peace be upon him, and his companions, and those who came after them, God willing, until the Day of Judgment.

"Also, do not seem confused or show signs of nervous tension. Be happy, optimistic calm because you are heading for a deed that God loves and will accept [as a good deed]. It will be the day, God willing, you spend with the women of paradise.

[Poetry section]

"Smile in the face of hardship young man/For you are heading toward eternal paradise.

"You must remember to make supplications wherever you go, and anytime you do anything, and God is with his faithful servants, He will protect them and make their tasks easier, and give them success and control, and victory, and everything..."

## "The Third Phase"

"When you ride the (T) [probably for tiara, airplane in Arabic], before your foot steps in it, and before you enter it, you make a prayer and supplications. Remember that this is a battle for the sake of God. As the Prophet, peace be upon him, said: (An action for the sake of God is better than all of what is in this world), or as he said. When you step inside (T), and sit in your seat, begin with the known supplications that we have mentioned before. Be busy with constant remembrance of God. God said: 'Oh ye faithful, when you find the enemy be steadfast, and remember God constantly so that you may be successful.' When (T) moves, even slightly, toward (Q) [unknown reference], say the supplications of travel. Because you are traveling to Almighty God, so be attentive on this trip.

"Then [unclear] and then it takes off. This is the moment that both groups come together. So remember

CONFIDENTIAL
MPSSJ 00464

"If you see the enemy as strong, remember the groups [that had formed a coalition to fight the prophet Muhammad]. They were 10,000. Remember how God gave victory to his faithful servants. God said: "When the faithful saw the groups, they said, this is what God and the prophet promised, they said the truth. It only increased their faith.'

"And may the peace of the God be upon the prophet."

CONFIDENTIAL
MPSSI 00465

FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

- The identity of the target's spouse, where they work and whether the target visits them there.

- The identity of the target's children and whether the target goes to their school.

- Does the target have a significant other (boyfriend or girlfriend)? What is their address, and when does the target visit them?

- The identity of the physician who treats the target.

- The location of the stores where the target does their shopping.

- The location entrances and exits to the targets residence, and the surrounding streets.

- The identity of the means of surreptitiously entering into the target's residence.

- Is the target armed? How many guards does the have?

If the intended target is a facility or important building, surveillance teams may attempt to obtain the following information pertain to the exterior of the facility:

- How wide are the streets and in which direction do they run leading to the facility?

- Available transportation to the facility.

- The area, physical layout, and setting of the facility.

- Traffic signals and pedestrian areas near the facility.

- The location security personnel centers and nearby government agencies.

- The location of nearby embassies and consulates.

- The economic characteristics of the area where the place is located.

- Traffic congestion times near the facility.

- Amount and location of lighting near the facility.

Surveillance teams may also attempt to obtain the following information pertaining to the interior of the facility:

- Number of people who are inside the facility.

- Number and location of guard posts within the facility.

2

FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

CONFIDENTIAL
MPSSI 00466

FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

Surveillance operations have certain characteristics that are particular to pre-operational activity. The degree of expertise used in the execution of the operation will increase or decrease the likelihood of detection. Some of these characteristics are:

- Suspicious persons or vehicles being observed in the same location on multiple occasions.



**JFIC Comments:**

Terrorist groups often use pre-operational surveillance preceding a planned attack against a specified target in order to collect information against that target. They use a variety of surveillance methods and equipment to carry out these operations. Some surveillance operations are more sophisticated than others, and that degree of sophistication may increase or decrease the likelihood of detection. A potential target of surveillance may be surveilled numerous times over long periods. Vigilance on behalf of law enforcement officials and ordinary citizens could also increase detection of these long term operations.

According to terrorist training literature, at least 80% of information obtained about a target is available through public sources. With the proliferation of the internet, this percentage may be a bit higher. Evidence obtained from computers seized in Afghanistan have demonstrated that targets can be collected on via use of the internet. Other media such as television, magazines, and newspapers also serve as a source of information. Many of these public source collection efforts can go virtually undetected. Although a great deal of information can be obtained from public sources, it does not preclude the need to utilize covert collection methods in order to

4

FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

CONFIDENTIAL
MPSSI 00467

FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

Attachment 1: Diagram depicting an unidentified airport.



To read the map, start from left to right and top to bottom. unintelligible (u/i)

- Airport (u/i) (top)
- Body of the Airplane (u/i)
- Elevation Higher (far right)
- Departure Lounge (right to the middle)
- Woman and Men Bathrooms (under departure lounge)

6

FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

CONFIDENTIAL
MPSSI 00468

FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

3-Information Center (middle)
4-Offices
5-Women and Men Bathrooms (right)
6-Prayers Room(next to bathroom)
7-Library (left of the diagram)
8-Grocery Shop(left of the diagram)
9-Travel Agency Offices (bottom of the diagrams)
10-Security Office (bottom of the diagrams).

8

FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE

CONFIDENTIAL
MPSSI 00469