**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KING DOWNING, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MASSACHUSETTS PORT AUTHORITY, THE )<br>MASSACHUSETTS DEPARTMENT OF STATE )<br>POLICE, STATE POLICE TROOPER )<br>THOMPSON, STATE POLICE SERGEANT )<br>CROXTON, THOMAS G. ROBBINS, and )<br>PETER J. DIDOMENICA, )<br>)<br>Defendants. )<br>) | Civil Action No. 04-12513-RBC |

**DEFENDANTS COLONEL THOMAS ROBBINS, SERGEANT PETER DIDOMENICA, AND THE MASSACHUSETTS STATE POLICE'S PRE-TRIAL MEMORANDUM**

Defendant Colonel Thomas Robbins, Sergeant Peter DiDomenica, and the Massachusetts State Police file this Pre-Trial Memorandum in accordance with the Court's Pre-Trial Order ("Order") and L.R. 16.5. [1]

**I.   RULE 16.5(d) CONFERENCE**

Pursuant to the Court's Order and as required by L.R. 16.5(d), counsel for the parties conferred on November 14, 2007 at the office of Plaintiff's counsel in advance of the pre-trial hearing. As a result of the meeting, counsel agreed to submit a short stipulation of facts to be read to the jury at the outset of the case. Those agreed-upon stipulated facts appear below, at Section III. Counsel also agreed, however, that the short stipulation should not prohibit or preclude live testimony concerning the agreed-upon facts contained in the stipulation.

---

[1] Except for the named defendants, and unless otherwise noted, this Pre-trial Memorandum is identical to the one submitted by Massport.

In discussing how to narrow the issues to be tried, Plaintiff's counsel noted that it would be seeking to amend the Complaint in order to dismiss Trooper Croxton as a defendant. Counsel also discussed proposed exhibits and witnesses, agreeing that no expert witnesses would be called to testify. Finally, counsel agreed that each party would file its own pre-trial memorandum, enumerating the issues to be tried and the relevant facts. Accordingly, the Pre-Trial Memorandum follows:

II.   **CONCISE SUMMARY OF THE EVIDENCE WHICH WILL BE OFFERED BY DEFENDANTS**

**Massachusetts State Police, Colonel Robbins, and Sergeant DiDomenica [2]**

The Massachusetts State Police intends to show that King Downing's encounter with William Thompson was not based upon the Behavioral Assessment Screening System ("the BASS program"). Further, the State Police will show that the encounter was initiated by King Downing, and then escalated by him. He diverted Trooper Thompson from the performance of his duties at a security checkpoint at Logan International Airport. He then became argumentative and condescending when Trooper Thompson informed him that he was working. When he continued to be argumentative Trooper Thompson reasonably asked him for identification or to leave. King Downing was leaving anyway. But when he left, he attempted to flag a cab where cabs were prohibited from stopping. King Downing continued to walk up and down outside the terminal trying to get a cab to pick him up even though they were not permitted to do so. Downing's actions prompted Thompson to inquire again about Downing's identification and why he was at the Airport. Downing again refused to show any identification. Trooper Thompson requested assistance, and a number of other troopers arrived seriatim. The

---

[2] This section is new.

encounter resulted in little more than the Trooper's reasonable request that Downing identify himself and show why he was at the Airport.

Although there is no evidence to support a review of the BASS program, if such a review were necessary, the Massachusetts State Police states that evidence will show that the program resulted from safety concerns resulting from the 9/11 attacks that originated at Logan International Airport.  Sergeant DiDomenica, an attorney, was tasked with reviewing threat mitigation strategies in the wake of 9/11. Sergeant DiDomenica analyzed a number of studies, and interviewed a number of experts on the subject of threat mitigation strategies, all with the purpose of creating a threat mitigation strategy that was efficient and constitutional.  BASS was this strategy.  And BASS expressly denounces racial profiling.  The evidence will show that Sergeant DiDomenica and Colonel Robbins acted in good faith, as reasonable public officials.

**Massport**

Massport provides this concise summary of the evidence it intends to provide at trial: The Behavioral Assessment Screening System ("the B.A.S.S. program") is a threat-mitigation technique that grew out of the events of September 11, 2001 and was modeled after a program employed at Ben Gurion Airport in Israel.  As its name suggests, the B.A.S.S. program is a behavioral assessment program that seeks to identify high-risk passengers based upon their behavior in order to prevent another terrorist attack like 9/11.  The B.A.S.S. program was customized for use at Logan Airport by State Police Sergeant Peter DiDomenica, an attorney, who took steps to ensure that it comported with Constitutional requirements.  The training materials for the B.A.S.S. program expressly state that "[r]acial profiling practices are contrary to the fundamental values of our nation and serve to disenfranchise whole segments of the population."  Race cannot be the basis for a stop initiated by the B.A.S.S. program.

In the past four years, since the B.A.S.S. program was implemented at Logan airport, the only person to challenge its use is Plaintiff King Downing, the National Coordinator of the ACLU's Campaign Against Racial Profiling. After the initiation of this lawsuit, the ACLU issued a press release concerning the case.

### Trooper Thompson

The Massachusetts State Police, Colonel Robbins, and Sergeant DiDomenica understand that Trooper Thompson will present evidence concerning the interaction between Plaintiff Downing and himself on October 16, 2003. Specifically, Trooper Thompson will present evidence demonstrating that Downing initiated a confrontation with Trooper Thomson inside the unsecured area of the airport. When Trooper Thompson asked Downing to provide his identification or explain what he was doing in the airport, Downing continued to be confrontational and aggressive, all the while refusing to provide any information to Trooper Thompson. The Trooper then told Downing that if he would not provide any information, he would need to leave the airport, which Downing attempted to do. Despite the fact that Downing had been to Logan many times, he exited the airport on the upper level of the terminal, where cabs do not pick-up fares.

Given the way in which Downing was acting, Trooper Thompson followed him outside of the terminal. Trooper Thompson subsequently called for back-up. He approached Downing on the sidewalk directly outside of the terminal and again asked Downing for identification, which Downing continued to refuse to provide. Plaintiff Downing eventually provided his license and boarding pass, when requested to do so by Sergeant Kiley, one of the troopers who responded to the request for back-up.

### III.     FACTS ESTABLISHED BY STIPULATION

The parties have agreed to the following brief stipulation of facts to be read to the jury at the outset of trial:

On October 16, 2003, Mr. King Downing, who is an African-American, arrived at Logan Airport on an Alaska Airlines overnight flight from the west coast. After deplaning in Boston early in the morning, Mr. Downing left the gate area and stopped to make a phone call to retrieve voicemail from a public telephone on the non-secure upper level of the terminal near the airport exit. Shortly after getting on the phone, Mr. Downing had contact with Massachusetts State Police Trooper Thompson inside the airport terminal, and then outside the terminal. Trooper Thompson asked Mr. Downing to produce identification, which he declined to do. Outside the terminal, Tpr. Thompson ultimately called for additional police, and four other uniformed troopers responded. Mr. Downing ultimately left the airport after he had provided the troopers with his identification and a boarding pass showing that he had recently arrived at Logan.

Downing contends that Tpr. Thompson stopped him based upon a program known as the Behavior Assessment Screening System ("BASS"). At various points, this program was also known as the Passenger Assessment and Screening System ("PASS"). PASS and BASS were the same and are referred to here as BASS. The program uses a series of factors to identify potential threats to airport security and was customized for use by the State Police by State Police Sergeant Peter DiDomenica

This case will involve questions of what happened on that morning between Mr. Downing and the police, and whether what happened was the result of BASS.

The parties have agreed, however, that this short stipulation should not preclude any live, in-person testimony concerning the agreed-upon facts during trial.  Given the brevity of the stipulated facts, any live testimony concerning the stipulated facts will not be unduly repetitive nor impermissibly time consuming.

## IV. FACTUAL ISSUES IN DISPUTE

### General Factual Issues In Dispute

The following general factual issues are in dispute:

- Whether the B.A.S.S. program was the basis for the encounter between Plaintiff Downing and Trooper Thompson?

- Assuming there is a finding that the B.A.S.S. program techniques were the basis for the encounter between Plaintiff Downing and Trooper Thompson, whether the B.A.S.S. program condones, promotes, and encourages racial profiling?

- Irrespective of whether B.A.S.S. techniques were employed by Trooper Thompson, whether racial profiling was the basis of the encounter?

- Assuming there is a finding that the B.A.S.S. techniques were not the basis of the interaction between Trooper Thompson and Plaintiff Downing, whether the interaction between Plaintiff Downing and Trooper Thompson was based upon a lack of reasonable articulable suspicion?

The Defendants Massachusetts State Police, Colonel Robbins, and Sergeant DiDomenica believe that the answer to each of the above questions is "no."

### Specific Facts In Dispute

Given Plaintiff's responses to the Defendants' Statements of Undisputed Facts in connection with their Motions for Summary Judgment, the Massachusetts State Police, Colonel Robbins, and Sergeant DiDomenica believe that virtually all of the following specific facts should be considered *undisputed* for the purposes of trial.  Plaintiff's counsel, however,

-6-

disagrees. Accordingly, the following specific facts identified below – which relate to the general factual issues above – are also in dispute.

- King Downing is a lawyer who, on October 16, 2003 and currently, serves as the National Coordinator of the ACLU's Campaign Against Racial Profiling.

- In this role, King Downing is charged with raising awareness about the existence of racial profiling, promoting local, state and federal legislative and administrative reforms designed to curtail racial profiling by the police, and developing and maintaining a clearinghouse of materials on both the public and internal websites of the ACLU.

- On the morning of October 16, 2003, Downing arrived at Logan on a red-eye flight from the West Coast.

- Downing had flown to Boston to attend a meeting related to a racial-profiling working group that was scheduled to begin at 10:00a.m. in Roxbury.

- After deplaning, Downing used a public payphone located outside of the secure area of Terminal B to retrieve his voicemail.

- Trooper Thompson was on duty in Terminal B at the time Downing arrived at Logan.

- Generally, State Police officers assigned to Logan are responsible for ensuring that the airport operates in a safe and orderly manner, preventing thefts of bags, preventing acts of violence and trespass, securing the airfield and other secure areas, monitoring the perimeter of the airport from intrusion, and responding to calls from the Transportation Safety Administration concerning prohibited items and disturbances occurring at checkpoints.

- While Downing was on the payphone, Trooper Thompson stood approximately five feet away from him, observing the security checkpoint.

- While Downing was on the phone, and before any words were exchanged between them, he turned to look at Trooper Thompson.

- Downing said to told Trooper Thompson that he wanted to know why Trooper Thompson was standing so close to him while he was on the phone.

- Trooper Thompson then asked Downing for identification and information concerning why he was in the airport.

- Downing refused to provide any information to Trooper Thompson, asking "Why do I have to show you ID?" and saying, "I'm not showing you my ID."

- Trooper Thompson considered Downing to be condescending and confrontational.

- During the exchange, Trooper Thompson told Downing that if he was not going to provide information, he would have to leave the airport.

- Downing then attempted to leave the airport. Specifically, he hung up the telephone, walked out of the airport, and proceeded to attempt to hail a cab from the upper level of the airport where cabs do not take fares.

- A second encounter occurred between Downing and Trooper Thompson on the sidewalk outside of the terminal on the upper level, where Downing had gone to hail a cab.

- Trooper Thompson followed Downing outside of the airport and radioed for assistance.

- In response to Trooper Thompson's call, four officers, including Trooper Croxton, Trooper Moore, Trooper Adell, and Sergeant Kiley, arrived.

- Sergeant Kiley asked Downing to produce his license, and Downing produced it.

- Trooper Thompson called in the license so that it could be checked against the trespass list.

- After Trooper Thompson ran the license, he returned it to Downing.

- Downing was then asked to produce his airline ticket for inspection.

- Downing first refused to produce his travel documents saying, "You asked me to show identification. I've shown identification. Now you're asking for my tickets. I'm not going to show you my tickets."

- Downing subsequently produced his boarding pass and itinerary.

- Once checked, his travel documents were returned to him.

- Downing then left the area, proceeded to the lower level of the airport, and took a cab from Logan to his meeting in Roxbury, where he arrived for his meeting on time.

- The B.A.S.S. program grew out of a post-9/11 study of security issues by Rafi Ron, an Israeli security consultant.

- The B.A.S.S. program is designed to identify high-risk passengers and to prevent another terrorist attack like 9/11.

- The B.A.S.S. program materials state that "[r]acial profiling practices are contrary to the fundamental values of our nation and serve to disenfranchise whole segments of the population."

- Downing does not know if the B.A.S.S. program played any role in his interaction with police.

- Downing does not know if the B.A.S.S. program promotes, condones, or encourages racial profiling.

- Downing does not know if race generally played any role in his encounter with police.

- Downing was never physically restrained during his interaction with police.

- Downing was never touched by any of the officers.

- Downing was never handcuffed.

- Downing was never placed in a police cruiser.

- Downing was never asked to relocate to a more private or different area of the airport.

## V. ISSUES OF LAW, INCLUDING EVIDENTIARY QUESTIONS, TOGETHER WITH SUPPORTING AUTHORITY

At the time of this filing, two Motions *In Limine* filed by Massport are pending before the Court. *See* Section VII, *infra* (discussing additional matters for the Court's consideration). The questions of law presented by those Motions are as follows:

- Whether two redacted power point-type slides entitled "Racial Profiling" that are contained in the B.A.S.S. training materials are admissible? Massport contends that the slides should be excluded from evidence pursuant to Fed. R. Evid. 403. In the alternative, Massport seeks to introduce the unredacted version of the slides. Massport also requests that the jury be given a limiting instruction regarding all redacted materials that might be introduced at trial.

- Whether evidence concerning Plaintiff's quantification of his alleged damages is admissible? Massport contends that any such evidence should be excluded since, to date, Plaintiff has provided no evidence of his calculation of alleged damages and, in fact, has stated that his damages cannot be calculated.

Massport believes that the other primary issue of law in this case is whether Plaintiff Downing was "seized" under the Fourth Amendment. The Supreme Court has long-held that "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *See Terry v.*

*Ohio*, 392 U.S. 1, 20 n.16 (1968).  The relevant inquiry is whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion) (stating that no seizure occurred when DEA agents approached respondent in public concourse of airport, requested identification and airline ticket, and put a few questions to her).  Indeed, "[a]sking questions is an essential part of police investigations.  In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment.  Interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."  *See, e.g.*, *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humbolt County*, 542 U.S. 177, 185 (2004) (holding that officer who arrested suspect for violation of Nevada's stop-and-identify statute did not contravene Fourth Amendment as officer's request for identification was related to the stop) (brackets and quotations omitted).  That someone eventually responds to an officer does not convert the encounter into a seizure.  *See INS v. Delgado*, 466 U.S. 210, 216 (1984) ("[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation.  While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."). [3]

      The Massachusetts State Police, as well as Colonel Robbins and Sergeant DiDomenica also contend that whether, absent a finding that the BASS program was used, the Court has the jurisdiction to issue a declaratory judgment under G.L. c. 231A.

      A further issue of law is whether the individual defendants are entitled to qualified immunity.

---

[3] The remainder of section V is new.

In addition to Massport's Motions in Limine regarding the quantification of damages and the exclusion of redacted materials, and Trooper Thompson's Motion in Limine to exclude evidence of the BASS program, which the Massachusetts State Police, Col. Robbins, and Sergeant DiDomenica join, the latter have filed three Motions in Limine of their own:

The first Motion in Limine joins Defendant Thompson's Motion in Limine to exclude all BASS evidence. Moreover, pursuant to Fed. Rules Ev. 403, this Motion seeks to particularly exclude any evidence regarding "elevated suspicion."

The second Motion in Limine seeks to exclude any line of inquiry, including the deposition testimony of Sergeant DiDomenica, that seeks to elicit an opinion from Sergeant DiDomenica regarding the constitutionality of the encounter that occurred between the witnesses in the case.

The third Motion in Limine seeks to exclude the State Police Draft Order.

Further, the Massachusetts State Police, Colonel Robbins, and Sergeant DiDomenica have filed a motion to bifurcate the trial so that the issue of whether the BASS program was even used can be answered.

Finally, the Massachusetts State Police, Colonel Robbins, and Sergeant DiDomenica have also filed a Motion for a View of that part of the Airport where the encounter took place.

## VI.   REQUESTED AMENDMENT TO THE PLEADINGS

The Massachusetts State Police, Col. Robbins, and Sergeant DiDomenica do not contemplate any amendments to their pleadings.

## VII.  ADDITIONAL MATTERS TO AID IN THE DISPOSITION OF THIS ACTION[4]

---

[4] This section is new.

At of the time of this filing, the following motions filed by the Massachusetts State Police, Col. Robbins, and Sergeant DiDomenica remain pending on the Court's docket:

1. Robbins's Motion For Reconsideration filed Nov. 13, 2007;

2. Motion *In Limine* To Exclude Testimony concerning the BASS program, and, more particularly, to Exclude Slides and Testimony regarding "Elevated Suspicion." Filed Nov. 21, 2007;

3. Motion *In Limine* To Exclude Testimony Concerning Sergeant DiDomenica's opinion of the constitutionality of actions by other witnesses, filed Nov. 21, 2007;

4. Motion in Limine to Exclude Evidence concerning the Massachusetts State Police Draft Order filed Nov. 21, 2007;

5. Motion to Take a View, filed Nov. 21, 2007;

6. Motion to bifurcate trial. Filed Nov. 21, 2007.

There are other motion, pending and to be filed, by other defendants that will be described in their Pre-Trial Memorandum. The Massachusetts State Police, Col. Robbins, and Sergeant DiDomenica, also understand that Plaintiff Downing intends to file a motion requesting individual *voir dire* of potential jurors.

## VIII. WITNESSES TO BE CALLED

Plaintiff intends to call the following witnesses:

1. Plaintiff King Downing (fact witness);

2. State Police Sergeant Peter DiDomenica (fact witness); and

3. In Plaintiff's Pre-Trial Memorandum filed November 21, 2007

    he indicated he intended to call Thomas Vinton of Massport.

The Defendants Massachusetts State Police, Col. Robbins and Sgt. DiDomenica will likely call the following witnesses:

1. State Police Trooper William A. Thompson (fact witness);

    2.    State Police Trooper Howard G. Croxton (fact witness);

    3.    State Police Trooper Wanza Adell (fact witness);

    4.    State Police Trooper Robert J. Moore, Jr. (fact witness);

    5.    State Police Sergeant Mark W. Kiley (fact witness); and

    6.    Thomas G. Robbins (potential fact witness).

    7.    Sergeant Peter DiDomenica (fact witness).

## IX. PROPOSED EXHIBITS

The exhibits that the Massachusetts State Police, Col. Robbins, and Sergeant DiDomenica intend to introduce at trial are:

    1.    Job posing for plaintiff's position;

    2.    Plaintiff's Boarding Pass;

    3.    Plaintiff's training materials regarding what you should do when stopped by the police;

    4.    ACLU press release regarding lawsuit;

    5.    BASS redacted training manual (to be determined);

    6.    BASS redacted powerpoint slides (to be determined)

    7.    Photographs of the Airport (to be determined).

During the Rule 16.5(d) conference held on November 14, 2007, counsel identified for each other the exhibits that they intended to introduce, except for rebuttal or impeachment exhibits, with the exception of the "Rafi Ron" press release, which Plaintiff subsequently included on its proposed exhibit list the following day.

X.     CONTACT INFORMATION FOR TRIAL COUNSEL

Assistant Attorneys General Mary O'Neil and Lisa Fauth will represent the Massachusetts State Police, Colonel Robbins, and Sergeant DiDomenica. Their contact information is as follows:

>    Mary O'Neil  (BBO #379430)
>    Office of Attorney General Martha Coakley
>    One Ashburton Place Rm. 1803
>    Boston, Massachusetts 02103
>    T:  (617) 727-2200 x 2636
>    F:  (617) 727-3076
>    mary.e.o'neil@state.ma.us
>
>    Lisa Fauth (BBO #659505)
>    Office of Attorney General Martha Coakley
>    One Ashburton Place Rm. 1803
>    Boston, Massachusetts 02103
>    T:  (617) 727-2200 x2817
>    F:  (617) 727-3076
>    lisa.fauth@state.ma.us[5]

Date:   November 21, 2007

Respectfully submitted,

MASSACHUSETTS STATE POLICE, COL. ROBBINS, AND SERGEANT DIDOMENICA

By their attorneys,

/s/ Mary O'Neil
Mary O'Neil (BBO#379430)
Lisa Fauth (BBO #659505)
Attorney General Martha Coakley
One Ashburton Place
Boston, Massachusetts 02103
(617) 727-2200
mary.e.o'neil@state.ma.us
lisa.fauth@state.ma.us

---

[5] L.R. 16.5(d) identifies other possible topics for consideration in the pre-trial memorandum, none of which are relevant here.

-15-

Case 1:04-cv-12513-RBC    Document 82    Filed 11/21/2007    Page 15 of 16

**CERTIFICATE OF SERVICE**

In accordance with L.R. 5.2(b) and Section E.2 of the Electronic Case Filing Administrative Procedures of the United States District Court for the District of Massachusetts, I, Mary O'Neil, hereby certify that on November 21, 2007, the within Pre-Trial Memorandum filed through the ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing.

/s/ Mary O'Neil
Mary O'Neil